### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:

| | |
|---|---|
| **EMERALD GRANDE, LLC** | **Case No. 1:17-bk-00021** |
| **Debtor.** | **Chapter 11** |

———————————————

| | |
|---|---|
| **EMERALD GRANDE, LLC** | **A.P. No.: 1:20-ap-00028** |
| **Plaintiff** | |

v.

**KM HOTELS, LLC,**

**And**

**SAFE HARBOR TITLE COMPANY, LLC,**

**Defendants**

### FIRST AMENDED COMPLAINT

COMES NOW Emerald Grande, LLC ("**Plaintiff**"), in its capacity as debtor and debtor-in-possession in the above-captioned bankruptcy case, by and through counsel, and files this *First Amended Complaint* (the "**Complaint**") against KM Hotels, LLC ("**KM**") and Safe Harbor Title Company, LLC ("**Safe Harbor**"; and, collectively with KM, the "**Defendants**"), stating as follows:

### NATURE OF THE ACTION

1.      This is an adversary proceeding seeking:

(a)      no less than $3,600,000.00 in damages against KM for its breach of that certain *Purchase and Sale Agreement*, dated as of August 9, 2019, by and between Plaintiff and KM (as amended, the "**PSA**");

(b)      in the alternative to damages, a decree of specific performance, compelling KM to close the transactions contemplated by the PSA; and

(c)      no less than $500,000.00 in damages against Safe Harbor, the escrow agent under the PSA, for its unlawful release of escrowed funds to KM in breach of that certain *Earnest Money Escrow Agreement*, dated as of August 9, 2019 (the "**Escrow Agreement**").

2.      True and correct copies of the PSA and Escrow Agreement are attached hereto and incorporated herein by reference as **Exhibit A** and **Exhibit B**, respectively.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* (Misc. No. 5:13-mc-00012) entered by the United States District Court for the Northern District of West Virginia.

4.      This adversary proceeding is commenced pursuant to FED. R. BANKR. P. 7001(1) and (7).

5.      Venue is proper in this district and Court under 28 U.S.C. § 1409(a).

6.      This adversary proceeding arises in and relates to Plaintiff's above-captioned bankruptcy case (No. 1:17-bk-00021) (the "**EG Bankruptcy Case**") currently pending in this Court.

7.      Plaintiff consents to entry of a final order or judgment by the Court.

## PARTIES

8.      Plaintiff is a limited liability company formed under the laws of the State of Georgia and is the debtor and debtor-in-possession in the EG Bankruptcy Case.

9.      KM is a limited liability company formed under the laws of the State of Virginia.

10.      Safe Harbor is a limited liability company formed under the laws of the State of Virginia.

- 2 -

## <u>FACTUAL ALLEGATIONS</u>

**I.      THE PROPERTIES.**

11.     In or about 1988, Covington Place Associates, LLC ("**Covington Place**") constructed a shopping mall (hereinafter referred to as the "**Crossings Mall**") proximate to Exit 9 on Interstate 79 near Elkview, West Virginia, on a parcel of land adjacent to Little Sandy Creek, Elk District, Kanawha County, West Virginia.

12.     Covington Place later conveyed the Crossings Mall to Interstate Properties, LLC ("**Interstate**") by deed dated December 30, 1993 and recorded with the County Clerk of Kanawha County, West Virginia (the "**Clerk**") in Deed Book 2331, Page 294.

13.     Thereafter, Interstate conveyed to Plaza Management, LLC ("**Plaza**") a parcel of real property immediately adjacent to the Crossings Mall (hereinafter referred to as the "**Hotel Parcel**") by deed dated September 10, 1999 and recorded with the Clerk in Deed Book 2480, Page 541 (the "**Plaza Deed**").

14.     A true and correct copy of the Plaza Deed is attached hereto and incorporated herein by reference as **<u>Exhibit C</u>**.

15.     The Plaza Deed granted to Plaza a perpetual, mutual, and reciprocal easement through the Crossings Mall parcel for access to, utility installation on, and maintenance for the Hotel Parcel, providing as follows (the "**Hotel Easement**"):

> to the Grantee a perpetual, mutual and reciprocal cross easement and right of way over, across and through the access roads, ways and lanes and the parking areas of the other, for all vehicles and pedestrians as well as for installation and maintenance of utility facilities to the property of the other party.

*See* Exhibit C.

16.     Under the Plaza Deed, the Hotel Parcel is the dominant tenement with respect to the Hotel Easement and the Crossings Mall parcel is the servient tenement.

17.     After recordation of the Plaza Deed, Plaza constructed a hotel (the "**Hotel**") on the Hotel Parcel.  The Hotel opened in or around October 2000 as a Holiday Inn Express.

18.     Plaza subsequently conveyed the Hotel Parcel to Emerald Coast Hospitality, LLC ("**Emerald Coast**") by deed dated January 12, 2008 and recorded with the Clerk in Deed Book 2715, Page 156.

19.     Ultimately, Plaintiff acquired title to the Hotel Parcel and the improvements thereon (*viz.*, the Hotel) from Emerald Coast by deed dated October 1, 2008 and recorded with the Clerk in Deed Book 2730, Page 152 (the "**EG Deed**").

20.     A true and correct copy of the EG Deed is attached hereto and incorporated herein by reference as **Exhibit D**.

21.     Through different owners and under different franchises, the Hotel has been operated continuously since at least October 2000.

22.     Plaintiff has operated the Hotel as a La Quinta Inn & Suites from 2013 until present.

II.     **ENCROACHMENTS ON CROSSINGS MALL PARCEL.**

23.     In 2013, the owners of Interstate formed Tara Retail Group, LLC ("**Tara**") as a "special purpose entity" to undertake a refinancing of the debt on the Crossings Mall with UBS Real Estate Securities, Inc. ("**UBS**").

24.     Interstate thereafter conveyed the Crossings Mall to Tara by deed dated September 10, 2013 and recorded with the Clerk in Deed Book 2861, Page 401 (the "**Tara Deed**").

25.     A true and correct copy of the Tara Deed is attached hereto and incorporated herein by reference as **Exhibit E**.

26.     Contemporaneously with the execution of the Tara Deed, UBS commissioned a survey of the Crossings Mall, dated September 10, 2013 (the "**Tara Survey**").

27.     A true and correct copy of the Tara Survey is attached hereto and incorporated herein by reference as **Exhibit F**.

28.     The Tara Survey showed numerous encroachment issues (the "**Encroachments**") between the Hotel Parcel and the Crossings Mall, including the following:

(a)     A portion of the Hotel structure and a portion of the retaining wall separating the Hotel from the adjoining property of 84 Lumber encroach upon the Crossings Mall parcel;

(b)     The air conditioning units and electrical pad and equipment servicing the Hotel, a garbage enclosure utilized by the Hotel, and mulch beds and landscaping for the Hotel each encroach upon the Crossings Mall parcel;

(c)     Certain parking spaces utilized by the Hotel are located within the Crossings Mall parcel; and

(d)      Hotel employees and invitees access the Hotel Parcel by the road within the Crossings Mall parcel.

29.     Notwithstanding the Encroachments shown on the Tara Survey, UBS agreed to close the debt refinancing transactions, as evidenced by that certain *Promissory Note* dated September 17, 2013 (the "**Note**") and that certain *Loan Agreement* dated September 17, 2013 (the "**Loan Agreement**"; and**,** collectively with the Note, the "**Loan Documents**").

30.     Tara's obligations under the Loan Documents were secured by, among other things, that certain *Deed of Trust and Security Agreement*, dated as of September 17, 2013, and recorded with the Clerk on October 1, 2013 in Deed Book 3989, Page 928 (the "**Tara Trust Deed**").

31.     The Loan Agreement provides the following with respect to the boundaries of the Crossings Mall parcel: "No easements or other encumbrances affecting the Property encroach upon any of the Improvements so as to affect the value, marketability, use or operation of the Property except those which are insured against by the Title Insurance Policy, each of which, whether or not insured against by the Title Insurance Policy, is shown on the Survey." (Loan Agreement at § 3.1.21.)

32.     The Loan Agreement, therefore, confirms that UBS had knowledge of the Encroachments shown by the Tara Survey because the Encroachments are specifically referenced therein.

33.     In December of 2013, UBS transferred and assigned the Loan Documents and Tara Trust Deed to U.S. Bank, National Association, as Trustee, for the benefit of the holders of COMM 2013-CCRE12 Mortgage Trust Commercial Mortgage Pass-Through Certificates ("**US Bank**") pursuant to that certain *Assignment of Deed of Trust and Security Agreement*, dated as of December 10, 2013, and recorded with the Clerk on May 1, 2014 in Deed Book 244, Page 109 (the "**Assignment**").   COMM 2013 CCRE-12 Crossings Mall Road, LLC ("**COMM 2013**") is the current holder of the Note pursuant to an allonge executed by US Bank.

34.     The Tara Survey and Section 3.1.21 of the Loan Agreement establish that COMM 2013 had or should have had knowledge of the Encroachments at the time of the Assignment. COMM 2013, therefore, took its security interest in and to the Crossings Mall parcel subject to the Encroachments.

35.     Likewise, the Plaza Deed (containing the Hotel Easement) was of record for over a decade prior to the Assignment.  As a result, COMM 2013 took its security interest in and to the Crossings Mall parcel subject to the existing Hotel Easement.

- 6 -

### III.   DESTRUCTION OF THE CULVERT BRIDGE.

36.     As set forth above, the Hotel and the Crossings Mall are immediately adjacent to one another; however, only the Crossings Mall has direct access to Kanawha County Route 45 via the culvert bridge located in the right of way maintained by the West Virginia Division of Highways and/or the West Virginia Division of Natural Resources (the "**Culvert Bridge**").

37.     A simplified illustration follows:



38.     Because the Hotel Parcel does not have direct access to the Culvert Bridge, ingress and egress requires travel through and across the Crossings Mall property.  The Hotel Easement set forth in the Plaza Deed permits this travel across the Crossings Mall property, thereby giving the Hotel Parcel access to the Culvert Bridge.

39.     The Culvert Bridge is the only viable commercial access point to the Hotel and the Crossings Mall.

40.     On or about June 23, 2016, floodwaters from thunderstorms in southern West Virginia destroyed the Culvert Bridge.

41.     The destruction of the Culvert Bridge and ensuing lack of public access forced the Hotel and the Crossings Mall to close.

42.     As a result of the closures of the Hotel and Crossings Mall:

(a)     Plaintiff filed a voluntary chapter 11 petition in this Court on January 11, 2017, initiating the EG Bankruptcy Case; and

(b)     Tara filed a voluntary chapter 11 petition in this Court on January 24, 2017, initiating Case No. 1:17-bk-00057 (the "**Tara Bankruptcy Case**," or "**TBC**").

43.     Commercial access to the Hotel and the Crossings Mall remained unavailable until Tara rebuilt the Culvert Bridge at the end of July 2017. *See* (Docs. 98, 200; TBC). Due to the restoration of the Culvert Bridge, both the Hotel and the Crossings Mall have been commercially accessible since approximately August 2017.

## IV.     PSA – NEGOTIATION & TERMS.

44.     Subsequent to the reconstruction of the Culvert Bridge, Plaintiff determined that a sale of the Hotel was in the best interests of Plaintiff's creditors and stakeholders in the EG Bankruptcy Case.

45.     Plaintiff therefore engaged a real estate brokerage firm to market the Hotel, after which Plaintiff received a number of offers for the purchase of the Hotel. KM was one of the offerors.

46.     After reviewing the offers, Plaintiff concluded that KM's offer to purchase the Hotel was the highest and best offer. Plaintiff elected to move forward with KM's offer, declining all others.

- 8 -

47.     On or about August 9, 2019, Plaintiff and KM entered into the PSA.  This Court subsequently approved and authorized the PSA by Order entered September 11, 2019 (Doc. 712) (the "**Sale Order**").

48.     Broadly, the PSA provided for KM's purchase of the Hotel in exchange for a payment of $3,600,000.00, subject to certain adjustments at closing (as defined in the PSA, the "**Purchase Price**").   The PSA further contained, among other things, an earnest money requirement and certain closing conditions.  Both are at issue in this adversary proceeding.

**A.     Earnest Money Deposit.**

49.     Within three (3) business days after full execution of the PSA, KM was obligated to deposit $500,000.00 of earnest money (the "**Deposit**") with Safe Harbor, the escrow agent under Section 3.2.1 of the PSA and the Escrow Agreement.

50.     KM delivered the Deposit to Safe Harbor after execution of the PSA.  Safe Harbor accepted and held the Deposit.

51.     Section 3.2.1 of the PSA provided for the application of the Deposit to the Purchase Price at closing and specified that the Deposit was nonrefundable to KM, unless, in relevant part: "(i) the Title Commitment contains a defect, lien, or encumbrance other than the Permitted Exceptions [. . .]; [or] (ii) any survey obtained by [KM] reveals material issues affecting the marketability of the [Hotel] . . . ."  (PSA at § 3.2.1.)

52.     Even upon the occurrence of one of the foregoing exceptions, however, the PSA permitted the release of the Deposit to KM only if either: (i) Plaintiff provided written notice to Safe Harbor directing the disbursement of the Deposit to KM; or (ii) KM delivered to Safe Harbor a written request for the return of the Deposit "subject to the terms of the Earnest Money Escrow Agreement."  (PSA at § 3.2.4.)

- 9 -

53.     Under the Escrow Agreement, any release of the Deposit required "written instructions *jointly executed* by the parties to th[e] [Escrow] Agreement."  (Escrow Agreement at ¶ 1.a) (emphasis added).

### B.     Conditions to Close.

54.     Separately from the Deposit, KM also had an obligation to close the sale transaction contemplated in the PSA; however, KM's closing obligations were subject to the satisfaction or waiver of certain conditions specified in the PSA.

55.     Among other things, these closing conditions included: (i) Plaintiff's procurement of an "access easement providing for deeded ingress/egress between a public right of way and the [Hotel], in a form acceptable to [KM] and sufficient to and sufficient to allow the Title Company to issue an ALTA access endorsement in standard form insuring [KM's] access to the [Hotel]," despite the fact that the Plaza Deed already provided deeded ingress/egress between the public right of way and the Hotel, *viz.* the Hotel Easement (¶ 15, *supra*); and (ii) Plaintiff's conveyance of title "free and clear of all liens and other encumbrances other than Permitted Exceptions." (PSA at §§ 5.2.2, 9.1.1(d).)

56.     With respect to "liens, encumbrances or other exceptions to title," the PSA permitted KM to lodge title objections with Plaintiff during the Diligence Period (as defined therein).  After receipt of such title objections, Plaintiff had the opportunity to cure.  *See* (PSA at § 5.2.1).

## V.     DILIGENCE PERIOD & OBJECTIONS.

57.     Following execution of the PSA and entry of the Sale Order, KM began its diligence efforts with respect to the Hotel.  In connection therewith, KM delivered to Plaintiff a letter, dated September 20, 2019 (the "**KM Letter**"), setting forth "Specific Objections" related to title (each,

a "**Title Objection**"; collectively, the "**Title Objections**").  A true and correct copy of the KM Letter is attached hereto and incorporated herein by reference as **Exhibit G**.

58.     In the KM Letter, KM represented that the Title Objections were based upon certain requirements and exceptions enumerated in the *ALTA Commitment for Title Insurance* (Commitment No. NCS-975064-CAST) (the "**Title Commitment**") issued by First American Title Insurance Company ("**First American**").

59.     These Title Objections included, among other things, (i) an objection and reservation of rights to conduct a property survey and (ii) an objection to the purported lack of deeded access to the Hotel Parcel (the "**Access Objection**").  (KM Letter at ¶¶ 2.b., i.)

60.     In connection with the Title Objections, KM commissioned a survey of the Hotel Parcel in or around September of 2019 (as later updated, the "**KM Survey**").  A true and correct copy of the KM Survey is attached hereto and incorporated by reference herein as **Exhibit H**.

61.     The KM Survey identified the same set of Encroachments between the Hotel and the Crossings Mall as are shown in the Tara Survey, (¶ 28, *supra*), including the following:

(a)     A portion of the Hotel structure and a portion of the retaining wall separating the Hotel from the adjoining property of 84 Lumber encroach upon the Crossings Mall parcel;

(b)     The air conditioning units and electrical pad and equipment servicing the Hotel, a garbage enclosure utilized by the Hotel, and mulch beds and landscaping for the Hotel each encroach on the Crossings Mall parcel;

(c)     Certain parking spaces utilized by the Hotel are located within the Crossings Mall parcel; and

- 11 -

(d)      Hotel employees and invitees access the Hotel Parcel by the road within the Crossings Mall parcel.

62.     Even so, KM interposed an additional Title Objection related to the Encroachments (the "**Encroachment Objection**") as a result of the KM Survey.

63.     Following receipt of KM's Title Objections, Plaintiff responded with a series of emails in September, October, and November of 2019, transmitting various documents and information, that addressed and cured many of the Title Objections.  Plaintiff additionally engaged with KM through a number of conversations, during which Plaintiff further addressed and narrowed the outstanding Title Objections.

64.     Ultimately, KM agreed that all but two of its Title Objections were resolved: the Access Objection and the Encroachment Objection.

## VI.    ATTEMPTED RESOLUTION OF THE REMAINING TITLE OBJECTIONS.

65.     In response to KM's assertion that its Access Objection and Encroachment Objection were unresolved, Plaintiff stated its position as follows:

(a)      *Encroachments*. Each one of the Encroachments was in existence openly and continuously since October 2000, when the Hotel first began operations.  Further, the Tara Survey identified the Encroachments in 2013.  Consequently, the Encroachments are prescriptive in nature under applicable law because COMM 2013 was at least on inquiry notice of their existence prior to the execution and recording of the Loan Documents.

(b)      *Access*.  Contrary to the parties' assumption at the time the PSA was executed, the Plaza Deed does in fact provide an ingress/egress easement – the Hotel Easement – to and for the benefit of the Hotel Parcel.   Thus, Plaintiff and KM were proceeding under a mutual mistake when including language in Section 5.2.2 of the PSA that "[t]he Parties acknowledge that

- 12 -

the [Hotel] does not have deeded access to a public right of way as of the date of this Agreement."

Additionally, Hotel employees and invitees traveled through the Crossings Mall parcel to access

the Hotel Parcel since at least 2000, which is also shown on the Tara Survey.

66.     Plaintiff therefore posited that, to the extent KM was concerned that Tara or

COMM 2013 could extinguish the Plaintiff's rights vis-à-vis the Encroachments, Plaintiff held a

superior interest in and to the Encroachments via prescription under applicable law.  Plaintiff

further suggested that, given the parties' mutual mistake at the time of executing the PSA, the

Hotel Easement set forth in the Plaza Deed provided the requisite deeded ingress/egress to the

Hotel Parcel.

67.     Notwithstanding the Hotel Easement and prescriptive nature of the Encroachments,

however, Plaintiff agreed to request that Tara formally grant easements recognizing the

Encroachments and confirming the Hotel Easement as a further accommodation to KM.

68.     Accordingly, Plaintiff and Tara together determined to seek this Court's approval

of a formal recognition of Plaintiff's existing (i) right of access to and across the Crossings Mall

parcel via the Hotel Easement and (ii) use of the Encroachments situated on the Crossings Mall

property.

69.     On October 29, 2019, Tara filed a motion in the Tara Bankruptcy Case (Doc. 1272;

TBC) (as orally amended during a prehearing conference, "**Tara's Motion**"), seeking approval of,

among other things: (i) Tara's grant of an easement to Plaintiff for continued use, maintenance,

and replacement (as applicable) of the Encroachments; (ii) Tara's grant to Plaintiff of a

confirmatory easement formally memorializing Plaintiff's continuing right to use the parking

spaces situated on Crossings Mall property, all as shown on the Tara Survey; and (iii) Tara's grant

to Plaintiff of a confirmatory access easement, from County Route 45 across the Culvert Bridge and through the access road to the Hotel, consistent with the Hotel Easement in the Plaza Deed.

70.     On November 8, 2019, COMM 2013 filed an objection to Tara's Motion (Doc. 1285; TBC) (the "**COMM 2013 Objection**").  COMM 2013 objected on multiple grounds, including the reason that Tara's Motion requested a grant of the proposed easements free and clear of COMM 2013's security interest in and to the Crossings Mall property.

71.     This Court held a hearing on Tara's Motion and the COMM 2013 Objection on November 20, 2019.

72.     During the hearing, Tara introduced into evidence, among other things, the Tara Survey.  As set forth above, the Tara Survey was commissioned in conjunction with the Loan Documents executed by COMM 2013's predecessor in interest, UBS, in 2013.  *See* (Doc. 1295, Hearing Exhibit 1; TBC).

73.     After receiving evidence introduced by Tara, proffers of the parties, and arguments by counsel, this Court stated that it was "mystified as to why we are here."  (Recording of Hearing at 17:40.)  Beginning at the 19-minute mark of the recording, this Court observed that the Hotel's various uses of the Crossings Mall property were in existence and known at the time of the Tara Trust Deed and Assignment.  At 32:50 of the recording, this Court stated that it appears "there is an issue of a prescriptive easement."

74.     On December 18, 2019, this Court entered an order granting Tara's Motion and overruling the COMM 2013 Objection (Doc. 1299; TBC) (the "**Easement Order**").

75.     In the Easement Order, this Court made the following observations:

> The court is also satisfied that no adequate protection or compensation is due [COMM] 2013 based upon [Tara's] proposed easements. As the court notes above, adequate protection is only

- 14 -

necessary to protect against diminished collateral value from a proposed use of estate property under § 363(b) of the Bankruptcy Code. **Even without addressing legal issues of prescriptive easements and the like,** the court finds that [Tara's] proposed use of the easements does not diminish [COMM] 2013's collateral interest. In that regard, **the court finds as persuasive the fact that [Plaintiff's] purported interest in [Tara's] property preexisted that of [COMM] 2013. For instance, [Plaintiff] and its employees and invitees used the subject property for years without interference before [COMM] 2013 financed [Tara's] purchase of its property; and they have continued to use the property since then without [COMM] 2013 asserting any right in the property used by [Plaintiff]. The court finds that open and apparent use important because [COMM] 2013 was, or reasonably should have been, aware of [Plaintiff's] use of [Tara's] property at the time it took its security interest thereupon.** The court, therefore, cannot reasonably finds that [COMM] 2013's security interest in [Tara's] property is hampered by the proposed easements based upon the historical use of the property. As such, no adequate protection is necessary to permit [Tara] to use the subject property in furtherance of its settlement with [Plaintiff].

(Easement Order at 6-7) (emphasis added).

76.    COMM 2013 did not seek an appeal from or move to alter, amend, modify or vacate the Easement Order.

77.    Consistent with the Easement Order, Tara granted to Plaintiff that certain *Confirmatory Easement and Right of Way* (the "**Confirmatory Easement**") and that certain *Easement and Right of Way* (the "**Encroachment Easement**" and collectively with the Confirmatory Easement, the "**2020 Easements**") on February 3, 2020.

78.    The forms of the 2020 Easements were shared with and approved by KM.

79.    The Confirmatory Easement was recorded with the Clerk in Deed Book 3053, Page 813 on February 6, 2020, and the Encroachment Easement was recorded with the Clerk in Deed Book 3053, Page 796 on February 6, 2020.

- 15 -

80.     True and correct copies of the Confirmatory Easement and Encroachment Easement are attached hereto and incorporated by reference herein as **Exhibit I** and **Exhibit J**, respectively.

## VII.    FAILURE TO CLOSE.

### A.    Conditional Termination.

81.     After entry of the Easement Order, KM served Plaintiff with a conditional notice of termination of the PSA by letter dated January 29, 2020 (the "**Conditional Notice**").  A true and correct copy of the Conditional Notice is attached hereto and incorporated herein by reference as **Exhibit K**.

82.     In the Conditional Notice, KM threatened to proceed with a termination of the PSA due to "title issues" unless Plaintiff:

> agree[d] to an amendment to the [PSA] (i) extending [KM's] right to terminate with full refund of the Deposit until such time as all title issues have been resolved . . . (ii) granting [KM] the right to terminate with full refund of the Deposit if [KM] cannot obtain a loan commitment due to title issues, and (iii) otherwise in form acceptable to [KM].

(Conditional Notice at 1.)

83.     The Conditional Notice did not detail the allegedly unresolved "title issues." Furthermore, the demand for a termination right if KM was unable to obtain a loan commitment contravened the terms of the PSA, which did not include a financing condition.

84.      Plaintiff responded to the Conditional Notice by letter dated February 6, 2020 (the "**First Termination Response**").  A copy of the First Termination Response is attached hereto and incorporated herein by reference as **Exhibit L**.

- 16 -

85.     As set forth in the First Termination Response, Plaintiff observed that any purported "title issues" had been resolved through the grant and recordation of the 2020 Easements, consistent with the Easement Order.  Plaintiff further responded that the Easement Order itself made clear that the 2020 Easements were not necessary for Plaintiff to deliver marketable title and otherwise satisfy the conditions to close the transactions in the PSA.

86.     Nevertheless, Plaintiff restated its willingness and commitment to consummating the PSA.  To that end, Plaintiff stated that it would consider an amendment to the PSA to provide KM a limited extension of time to close the sale transaction, beyond the then-current scheduled closing date of February 28, 2020.

87.     On or about the time of the First Termination Response, however, KM indicated its proposed lender was unable or unwilling to provide a funding commitment for KM to consummate the sale transactions under the PSA.

88.     Upon information and belief, KM used the Conditional Notice to manufacture a controversy over purported "title issues" to conceal KM's deteriorating financing prospects.

**B.      Extension of Closing.**

89.     KM nevertheless assured Plaintiff that KM remained committed to purchasing the Hotel.

90.     In reliance on the assurances from KM, and in an effort to facilitate a closing, Plaintiff agreed to extend to April 13, 2020 the scheduled closing date under the PSA.  *See First Amendment to Purchase Agreement*, dated as of February 28, 2020 (the "**Amendment**").

91.     A true and correct copy of the Amendment is attached hereto and incorporated herein by reference as **<u>Exhibit M</u>**.

- 17 -

92.     Subsequent to the Amendment, Plaintiff engaged with KM to address the purportedly remaining "title issues" referenced in the Conditional Notice.  KM represented that these "title issues" related to the 2020 Easements.

93.     According to KM, First American (its title insurer) allegedly would only provide insurance for KM's interest in the 2020 Easements by excluding the Tara Trust Deed, given its recordation prior to the 2020 Easements.  KM relayed that First American allegedly was concerned that the 2020 Easements could be extinguished if COMM 2013 foreclosed on the Tara Trust Deed.

94.     As a result, KM requested that Plaintiff obtain an agreement from COMM 2013, whereby COMM 2013 would subordinate to the 2020 Easements its security interest in and to the Crossings Mall parcel evidenced by the Tara Trust Deed.

95.     COMM 2013 refused to voluntarily subordinate the Tara Trust Deed to the 2020 Easements.

96.     Nonetheless, subordination was not required for the Encroachments and/or Plaintiff's access rights across the Crossings Mall parcel to survive any foreclosure by COMM 2013.  The Easement Order confirmed that the Hotel/Plaintiff had access to and through the Crossings Mall parcel, along with rights to the Encroachments, and that those rights to the Encroachments and access were superior to COMM 2013's security interest in the Crossings Mall.

## VIII.   PURPORTED TERMINATION & BREACH.

97.     On April 13, 2020, KM sent a letter of even date to Plaintiff and Safe Harbor, purporting to terminate the PSA for cause (the "**Termination Letter**").  A true and correct copy of the Termination Letter is attached hereto and incorporated herein by reference as **<u>Exhibit N</u>**.

- 18 -

A.       **Wrongful Termination of PSA.**

98.       In the Termination Letter, KM asserted that it was terminating the PSA for two reasons: "[Plaintiff's] failure to (i) promptly cure [KM's] [Title Objections] . . . and (ii) comply with the terms and conditions of Section 5.2.2 of the [PSA] in regard to obtaining the Access Easement in form acceptable to [KM] and sufficient to allow [KM's] title insurer to issue an ALTA access endorsement . . . ."  (Termination Letter at 1.)

99.       Both statements are incorrect.

100.       Plaintiff complied with its obligations under Section 5.2.2 of the PSA by providing "deeded ingress/egress between a public right of way [*i.e.*, the Culvert Bridge] and the [Hotel Parcel]" via the Hotel Easement (contained in the Plaza Deed) and the Confirmatory Easement, both of which were approved in form by KM.

101.       Further, KM's alleged inability to obtain an ALTA access endorsement from ***First American*** did not give rise to a termination right under the PSA.  Section 5.2.2 of the PSA required KM to seek an ALTA access endorsement from "the Title Company," which was defined to mean "Safe Harbor Title Company, LLC."  (PSA at § 1.1.)

102.       KM did not state that it was unable to obtain an ALTA access endorsement from "the Title Company" – *i.e.*, Safe Harbor.  Upon information and belief, KM did not even seek an ALTA access endorsement from Safe Harbor but, instead, manufactured the alleged "title issues" due to its deteriorating financial ability to close the purchase of the Hotel.

103.       KM thus failed to satisfy a condition precedent to termination under Section 5.2.2 of the PSA.  As a result, KM was not entitled to terminate the PSA under that section.

104.       KM was not entitled to terminate the PSA due to uncured Title Objections, either.

- 19 -

105.    The Termination Letter did not specify the Title Objections that Plaintiff allegedly failed to cure.  Upon information and belief, however, the reference in the Termination Letter to uncured Title Objections related solely to First American's alleged, and unfounded, concern that the 2020 Easements could be extinguished if COMM 2013 foreclosed on the Tara Trust Deed.

106.    As set forth herein, and at all relevant times, Plaintiff has had prescriptive rights to the property and access comprising the 2020 Easements, and those prescriptive rights are superior to COMM 2013's interests, pursuant to the Easement Order and applicable law.  Moreover, the Plaza Deed (containing the Hotel Easement) was of record years prior to the Tara Trust Deed.

107.    Consequently, COMM 2013 could not (and cannot) extinguish the 2020 Easements through foreclosure on the Tara Trust Deed or otherwise.  There were, therefore, no uncured Title Objections as of the date of the Termination Letter.

108.    In sum, Plaintiff cured or caused to be cured all Title Objections prior to the date of the Termination Letter.  Plaintiff further provided the requisite deeded ingress/egress access to the Hotel Parcel prior to the date of the Termination Letter.  Plaintiff thus satisfied all obligations with respect to KM's conditions to close.

109.    Accordingly, KM's purported termination of the PSA by and through the Termination Letter resulted in a breach of the PSA.

**B.    Wrongful Deposit Refund.**

110.    In addition to purportedly terminating the PSA, the Termination Letter instructed Safe Harbor to refund the Deposit to KM.

111.    Less than 24 hours after receipt of the Termination Letter, Plaintiff responded with a letter dated April 14, 2020 to KM and Safe Harbor (the "**Dispute Notice**").  In the Dispute Notice,

Plaintiff advised KM and Safe Harbor that Plaintiff contested KM's right to terminate the PSA and/or receive a refund of the Deposit.

112.    A true and correct copy of the Dispute Notice is attached hereto and incorporated herein by reference as **Exhibit O**.

113.    Despite (i) the unilateral instruction in the Termination Notice and (ii) the Dispute Notice contesting the release of the Deposit, Safe Harbor released the Deposit to KM. Safe Harbor failed to contact Plaintiff prior to releasing the Deposit.

114.    Thereafter, KM failed and refused to close the sale transactions in the PSA.

115.    KM further failed and refused to turn over the Deposit to Plaintiff.

116.    As a result of the conduct of KM and Safe Harbor, and the breaches of the parties' respective agreements, Plaintiff has suffered and will continue to suffer harm and damages and has incurred fees and costs in this action to which it is entitled to recover.

## COUNT I

### (Breach of the PSA – Defendant KM)

117.    The allegations contained in paragraphs 1 to 116 of this Complaint are incorporated by reference herein, as if restated verbatim.

118.    Plaintiff and KM entered into a binding contract, the PSA, which was supported by offer, acceptance, and consideration.

119.    In the PSA, KM agreed to purchase the Hotel for the Purchase Price as of the closing date (later extended by the Amendment), subject only to Plaintiff's satisfaction of certain conditions to close.

120.    Plaintiff satisfied all conditions to close under the PSA and was ready, willing, and able to close the sale transaction as of the scheduled closing date.

- 21 -

121.    KM breached the PSA by failing and refusing to close the sale transactions under the PSA.

122.    Plaintiff has been harmed by the breach(es) of KM under the PSA in an amount to be determined at trial, but in no circumstances less than $3,600,000.00.

## COUNT II

### (Breach of the Escrow Agreement – Defendant Safe Harbor)

123.    The allegations contained in paragraphs 1 to 122 of this Complaint are incorporated by reference herein, as if restated verbatim.

124.    Plaintiff, KM, and Safe Harbor entered into a binding contract, the Escrow Agreement, as evidenced by Safe Harbor's and KM's partial performance thereunder.

125.    In the Escrow Agreement, Safe Harbor agreed to "pa[y] and deliver[] [the Deposit] in accordance with the written instructions jointly executed by the parties" to the Escrow Agreement.  (*Id.* at ¶ 1.a).)

126.    Safe Harbor breached the Escrow Agreement by releasing the Deposit to KM upon receipt of the Termination Letter, which was executed <u>only</u> by KM and subsequently contested by Plaintiff.

127.    Plaintiff has been harmed by Safe Harbor's breach of the Escrow Agreement in an amount to be determined at trial, but in no event less than the Deposit ($500,000.00).

## COUNT III

### (Specific Performance – Defendant KM; Alternative Count)

128.    The allegations contained in paragraphs 1 to 127 of this Complaint are incorporated by reference herein, as if restated verbatim.

129.    The PSA is a valid and enforceable agreement.

130.    KM breached the PSA.

131.    Pursuant to Section 13.3 of the PSA, Plaintiff is entitled to "proceed to Closing" in the event of breach of the PSA.  (*Id.*)

132.    A legal remedy is inadequate for Plaintiff because the devasting economic impacts of the COVID-19 pandemic on the hospitality industry have crippled any prospects of selling the Hotel to a third party at this time.

133.    Failure to close the transactions contemplated by the PSA will result in irreparable harm to Plaintiff and its estate.

134.    Closing of the sale transactions contemplated by the PSA is necessary to enable Plaintiff to fulfil its fiduciary duties as a debtor and debtor-in-possession in the EG Bankruptcy Case.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Upon Count I (Breach of the PSA – Defendant KM), a money judgment against KM in the principal amount of $3,600,000.00 as of April 13, 2020, plus interest and legal fees and expenses accruing thereafter;

B.    Upon Count II (Breach of the Escrow Agreement – Defendant Safe Harbor), a money judgment against Safe Harbor in the principal amount of $500,000.00 as of April 13, 2020, plus interest and legal fees and expenses accruing thereafter;

C.    Upon Count III (Specific Performance – Defendant KM; Alternative Count), a decree compelling KM to close the sale transactions under the PSA and otherwise fully perform thereunder;

D.    An award of reasonable attorneys' fees and costs incurred in bringing this adversary proceeding and all actions related thereto, pursuant to Section 16.11 of the PSA; and

- 23 -

E.      Such other and further relief against Defendants as is equitable and just.

**EMERALD GRANDE, LLC,**

**By Counsel:**

/s/ Steven L. Thomas
Steven L. Thomas (WVSB # 3738)
Victoria L. Wilson (WVSB # 10607)
Kay Casto & Chaney PLLC
P.O. Box 2031
Charleston, West Virginia 25327
Tel:  (304) 345-8900
Fax:  (304) 345-8909
sthomas@kaycasto.com;
vwilson@kaycasto.com
    *Counsel to Tara Retail Group, LLC*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:

**EMERALD GRANDE, LLC**                                      **Case No. 1:17-bk-00021**

                    **Debtor.**                              **Chapter 11**

_____

**EMERALD GRANDE, LLC**                                      **A.P. No.: 1:20-ap-00028**

                    **Plaintiff**

**v.**

**KM HOTELS, LLC,**

**And**

**SAFE HARBOR TITLE COMPANY, LLC,**

                    **Defendants**

### CERTIFICATE OF SERVICE

    I do hereby certify that on **August 17, 2020**, I filed the ***First Amended Complaint*** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following participants:

        Stephen L. Thompson, Esquire
        Barth & Thompson
        202 Berkeley Street
        Charleston, West Virginia  25302
        *Counsel for Safe Harbor Title Company, LLC*

        Carrie Goodwin Fenwick, Esquire
        Robert S. Pruett, Esquire
        Goodwin & Goodwin, LLP
        300 Summers Street, Suite 1500
        Post Office Box 2107
        Charleston, West Virginia  25301
        *Counsel for KM Hotels, LLC*

                    /s/  Steven L. Thomas

- 25 -