# PURCHASE AND SALE AGREEMENT

By and Between

## EMERALD GRANDE, LLC, as Seller

and

## KM HOTELS, LLC, as Purchaser

Dated as of August 9, 2019

for the

Property:

## La Quinta Hotel – Elkview, WV

EXHIBIT A

# TABLE OF CONTENTS

**Page**

ARTICLE I   DEFINITIONS ...................................................................................... 1

  1.1   Definitions ............................................................................................ 1

ARTICLE II   THE TRANSFERRED PROPERTY AND ASSUMED LIABILITIES .......... 8

  2.1   Description of the Transferred Property ............................................ 8

  2.2   Excluded Property ............................................................................... 11

  2.3   Assumed Liabilities ........................................................................... 11

ARTICLE III   PURCHASE PRICE ............................................................................ 11

  3.1   Purchase Price. ................................................................................... 11

  3.2   Earnest Money. ................................................................................... 12

  3.3   Payment of Purchase Price ................................................................ 13

ARTICLE IV   DUE DILIGENCE ............................................................................. 13

  4.1   Due Diligence. .................................................................................... 13

ARTICLE V   TITLE TO THE PROPERTY ................................................................ 15

  5.1   Title Commitment .............................................................................. 15

  5.2   Exceptions to Title. ............................................................................ 15

  5.3   Conveyance of the Property ............................................................... 16

  5.4   Bankruptcy Matters............................................................................ 16

ARTICLE VI   CONDITION OF THE PROPERTY .................................................... 17

  6.1   PROPERTY SOLD "AS IS" ............................................................... 17

  6.2   Limitation On Representations and Warranties. ................................ 18

  6.3   Reliance On Due Diligence ................................................................ 19

  6.4   RELEASE OF SELLER FOR VIOLATIONS OF CERTAIN APPLICABLE LAWS ........................................................................ 19

  6.5   Survival .............................................................................................. 20

ARTICLE VII   REPRESENTATIONS AND WARRANTIES....................................... 20

  7.1   Seller's Representations and Warranties ........................................... 20

  7.2   Purchaser's Representations and Warranties ..................................... 23

ARTICLE VIII   COVENANTS ................................................................................. 25

  8.1   Confidentiality. .................................................................................. 25

  8.2   Conduct of the Business...................................................................... 26

-i-

**EXHIBIT A**

**TABLE OF CONTENTS**

(continued)

**Page**

| | | | |
|---|---|---|---|
| 8.3 | Licenses and Permits | | 26 |
| 8.4 | Employees | | 26 |
| 8.5 | Bookings | | 26 |
| 8.6 | Tax Contests and Clearance | | 27 |
| 8.7 | Notices and Filings | | 27 |
| 8.8 | Access to Information | | 27 |
| 8.9 | Privacy Laws | | 28 |
| 8.10 | Further Assurances | | 28 |
| ARTICLE IX | CLOSING CONDITIONS | | 28 |
| 9.1 | Purchaser Closing Conditions | | 28 |
| 9.2 | Seller Closing Conditions | | 29 |
| ARTICLE X | CLOSING | | 30 |
| 10.1 | Closing Date | | 30 |
| 10.2 | Closing Deliveries | | 30 |
| 10.3 | Possession | | 31 |
| ARTICLE XI | PRORATIONS AND EXPENSES | | 32 |
| 11.1 | Closing Statement | | 32 |
| 11.2 | Prorations | | 32 |
| 11.3 | Accounts Receivable | | 34 |
| 11.4 | Transaction Costs | | 34 |
| ARTICLE XII | TRANSITION PROCEDURES | | 35 |
| 12.1 | Baggage | | 35 |
| 12.2 | IT Systems | | 35 |
| 12.3 | Notice to Guests and Employees | | 36 |
| ARTICLE XIII | DEFAULT AND REMEDIES | | 36 |
| 13.1 | Seller's Default | | 36 |
| 13.2 | Seller's Right to Cure | | 36 |
| 13.3 | Purchaser's Default | | 36 |
| 13.4 | Purchaser's Right to Cure | | 37 |
| 13.5 | LIQUIDATED DAMAGES | | 37 |

EXHIBIT A

# TABLE OF CONTENTS

(continued)

**Page**

ARTICLE XIV   CASUALTY AND CONDEMNATION ........................................................ 37

    14.1   Casualty.................................................................................................... 37

    14.2   Condemnation ......................................................................................... 38

ARTICLE XV   SURVIVAL, INDEMNIFICATION AND RELEASE .................................. 38

    15.1   Survival .................................................................................................... 39

    15.2   Indemnification by Seller ....................................................................... 39

    15.3   Indemnification by Purchaser ................................................................ 39

    15.4   Limitations on Indemnification Obligations. ........................................ 39

    15.5   Indemnification Procedure. ..................................................................... 41

    15.6   Exclusive Remedy for Indemnification Loss ........................................ 42

ARTICLE XVI   MISCELLANEOUS PROVISIONS ........................................................... 42

    16.1   Notices. .................................................................................................... 42

    16.2   Time Periods ........................................................................................... 43

    16.3   Assignment ............................................................................................. 44

    16.4   Successors and Assigns .......................................................................... 44

    16.5   Third Party Beneficiaries ....................................................................... 44

    16.6   GOVERNING LAW ............................................................................... 44

    16.7   Rules of Construction ............................................................................. 44

    16.8   Severability ............................................................................................. 45

    16.9   JURISDICTION AND VENUE .............................................................. 45

    16.10   WAIVER OF TRIAL BY JURY ........................................................... 45

    16.11   Prevailing Party...................................................................................... 45

    16.12   Incorporation of Recitals, Exhibits and Schedules ............................. 46

    16.13   Updates of Schedules ............................................................................ 46

    16.14   Entire Agreement .................................................................................. 46

    16.15   Amendments, Waivers and Termination of Agreement ...................... 46

    16.16   Not an Offer ........................................................................................... 46

    16.17   Execution of Agreement ....................................................................... 47

    16.18   Franchise ................................................................................................ 47

**EXHIBIT A**

## <u>LIST OF EXHIBITS</u>

Exhibit A        Form of Seller Closing Certificate

Exhibit B        Form of Deed

Exhibit C        Form of Bill of Sale

Exhibit D        Form of Contractor Notification Letter

Exhibit E        Form of Purchaser Closing Certificate

Exhibit F        Form of Bankruptcy Court Approval Order

Exhibit G        Form of Earnest Money Escrow Agreement

EXHIBIT A

## LIST OF SCHEDULES

Schedule 2.1.1          Legal Description of the Land

Schedule 2.1.6          Equipment Leases

Schedule 2.1.7          Assigned Operating Agreements

Schedule 2.1.9          Intellectual Property

Schedule 2.3            Assumed Liabilities

Schedule 4.1.1          Seller's Due Diligence Materials

Schedule 5.2.1          Permitted Exceptions

Schedule 7.1.3          Consents and Approvals; No Conflicts

Schedule 7.1.5          Litigation

Schedule 7.1.6          Employees

Schedule 7.1.7          Taxes

Schedule 7.1.8          Contracts

Schedule 8.3            Licenses and Permits

Schedule 8.5            Bookings

Schedule 8.6            Tax Contests and Clearance

EXHIBIT A

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "Agreement") is made and entered into as of this 9th day of August, 2019, by and between Emerald Grande, LLC, a Georgia limited liability company ("Seller"), and KM Hotels, LLC, a Virginia limited liability company, or its assigns ("Purchaser"). Seller and Purchaser are sometimes referred to herein individually as a "Party", and collectively as the "Parties".

**WHEREAS**,

A.     Seller is the owner of the La Quinta Hotel – Elkview (the "Hotel").

B.     Seller desires to sell the Hotel to Purchaser, and Purchaser desires to purchase the Hotel from Seller, on the terms set forth in this Agreement and subject to entry of the Approval Order (as hereinafter defined) by the United States Bankruptcy Court for the Northern District of West Virginia (the "Bankruptcy Court").

**NOW**, **THEREFORE**, in consideration of the mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1     Definitions**. The following terms when used in this Agreement shall have the meanings set forth in this Section 1.1.

"Accounts Receivable" means all amounts which Seller is entitled to receive from the Business which are due and payable but not paid as of the Closing, including, without limitation, any sums due under any lease of space, charges for the use or occupancy of any guest, conference or banquet rooms or other facilities at the Hotel, any restaurant, bar or banquet services, or any other goods or services provided by or on behalf of Seller at the Hotel but expressly excluding all (i) credit card charges, checks and other instruments which Seller has submitted for payment as of the Closing, and (ii) items of income otherwise prorated pursuant to Section 11.2 or 11.3.1.

"Accrued PTO" means, with respect to any Employee, the salary and wages which such Employee is entitled to receive for any personal time off for vacation days accrued but unused by such Employee as of the time in question, together with all employment taxes with respect thereto, including, without limitation, any withholding and employer contributions required under Applicable Law, but expressly excluding sick days and personal days.

"Accrued Vacation Pay" means, with respect to any Employee, the salary and wages which such Employee is entitled to receive for any vacation days and sick days accrued but unused by such Employee as of the time in question, together with all employment taxes with respect thereto, including, without limitation, any withholding and employer contributions required under Applicable Law, but expressly excluding personal days.

**EXHIBIT A**

"Affiliate" means, with respect to the Person in question, any other Person that, directly or indirectly, (i) owns or controls fifty percent (50%) or more of the outstanding voting and/or equity interests of such Person, or (ii) controls, is controlled by or is under common control with, the Person in question. For the purposes of this definition, the term "control" and its derivations means having the power, directly or indirectly, to direct the management, policies or general conduct of business of the Person in question, whether by the ownership of voting securities, contract or otherwise.

"Agreement" has the meaning set forth in the introductory paragraph.

"Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other Applicable Law addressing or in any way relating to terrorist acts and acts of war.

"Applicable Law" means (i) all statutes, laws, common law, rules, regulations, ordinances, codes or other legal requirements of any Governmental Authority, stock exchange, and similar quasi-governmental authority, and (ii) any judgment, injunction, order or other similar requirement of any court or other adjudicatory authority, in effect at the time in question and in each case to the extent the Person or property in question is subject to the same.

"Approval Order" has the meaning set forth in Section 5.4.

"Assigned Operating Agreements" has the meaning set forth in Section 2.1.7.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Bookings" has the meaning set forth in Section 2.1.13.

"Books and Records" has the meaning set forth in Section 2.1.10.

"Broker" means CBRE.

"Business" means the lodging business and all activities related and incidental thereto conducted at the Hotel, including, without limitation, (i) the licensing of any transient guest, conference or banquet rooms or other facilities at the Hotel, (ii) the maintenance and repair of the Real Property and tangible Personal Property, (iii) the employment of the Employees, and (iv) the payment of Taxes.

"Business Day" means any day other than a Saturday, Sunday or federal legal holiday in the United States.

"Claim Notice" has the meaning set forth in Section 15.4.1.

"Closing" has the meaning set forth in Section 10.1.

"Closing Date" has the meaning set forth in Section 10.1.

"Closing Statement" has the meaning set forth in Section 11.1.

EXHIBIT A

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Compensation" means, with respect to any Employee, all salary and wages which such Employee is entitled to receive at the time in question, together with all employment taxes with respect thereto, including, without limitation, any withholding and employer contributions required under Applicable Law, but expressly excluding all other compensation accrued or payable to such Employee, including, without limitation, any (i) bonus or incentive compensation; (ii) Accrued PTO, Accrued Vacation Pay, sick days and personal days; and (iii) health, welfare and other benefits provided to such Employee under any Seller Employee Plans, and employer contributions to, and amounts paid or accrued under, any Seller Employee Plans for the benefit of such Employee.

"Confidential Information" has the meaning set forth in Section 8.1.1.

"Contractor Notification Letters" has the meaning set forth in Section 10.2.1(i).

"Contracts" means, collectively, the Equipment Leases and the Assigned Operating Agreements.

"Cut-Off Time" has the meaning set forth in Section 11.2.

"Deed" has the meaning set forth in Section 10.2.1(b).

"Deposit" has the meaning set forth in Section 3.2.1.

"Diligence Period" means the period commencing on the Effective Date and ending on the 45th day after the Effective Date.

"Earnest Money Escrow Agreement" has the meaning set forth in Section 3.2.1.

"Effective Date" shall be the date of last execution by a party to this Agreement.

"Employees" means, at the time in question, all persons employed full time or part time at the Hotel by Seller.

"Environmental Claims" means all claims for reimbursement, remediation, abatement, removal, clean up, contribution, personal injury, property damage or damage to natural resources made by any Governmental Authority or other Person arising from or in connection with the (i) presence or actual or potential spill, leak, emission, discharge or release of any Hazardous Substances over, on, in, under or from the Transferred Property, or (ii) violation of any Environmental Laws with respect to the Transferred Property.

"Environmental Laws" means any Applicable Laws which regulate the manufacture, generation, formulation, processing, use, treatment, handling, storage, disposal, distribution or transportation, or an actual or potential spill, leak, emission, discharge or release of any Hazardous Substances, pollution, contamination or radiation into any water, soil, sediment, air or other environmental media, including, without limitation, (i) the Comprehensive Environmental Response, Compensation and Liability Act, (ii) the Resource Conservation and Recovery Act, (iii)

3

**EXHIBIT A**

the Federal Water Pollution Control Act, (iv) the Toxic Substances Control Act, (v) the Clean Water Act, (vi) the Clean Air Act, and (vii) the Hazardous Materials Transportation Act, and similar state and local laws, as amended as of the time in question.

"Environmental Liabilities" means all liabilities and obligations under any Environmental Laws arising from or in connection with the Transferred Property, including, without limitation, any obligations to manage, control, contain, remove, remedy, respond to, clean up or abate any actual or potential spill, leak, emission, discharge or release of any Hazardous Substances, pollution, contamination or radiation into any water, soil, sediment, air or other environmental media.

"Equipment Leases" has the meaning set forth in Section 2.1.6.

"Escrow Agent" means Safe Harbor Title Company, LLC.

"Excluded Property" has the meaning set forth in Section 2.2.

"FF&E" has the meaning set forth in Section 2.1.3.

"Governmental Authority" means any federal, state or local government or other political subdivision, agency or office thereof, including, without limitation, any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person or property in question.

"Guest Ledger" means all charges accrued to the open accounts of any guests or customers at the Hotel as of the Cut-Off Time for the use or occupancy of any guest, conference or banquet rooms or other facilities at the Hotel, any restaurant, bar or banquet services, or any other goods or services provided by or on behalf of Seller at the Hotel.

"Hazardous Substances" means any hazardous or toxic substances, materials or waste, whether in solid, semisolid, liquid or gaseous form, including, without limitation, asbestos, petroleum or petroleum by products and polychlorinated biphenyls as regulated by Environmental Laws.

"Hotel" has the meaning set forth in the recitals.

"Hotel Guest Data and Information" means all guest or customer profiles, contact information (e.g., addresses, phone numbers, facsimile numbers and email addresses), histories, preferences and any other guest or customer information in any database of the Hotel, in each such case for historical (as opposed to current) guests and customers as of the Closing Date.

"Improvements" has the meaning set forth in Section 2.1.2.

"Indemnification Claim" has the meaning set forth in Section 15.5.1.

"Indemnification Deductible" has the meaning set forth in Section 15.4.2.

4

**EXHIBIT A**

"Indemnification Loss" means, with respect to any Indemnitee, any actual (and not contingent) liability, damage, loss, cost or expense, including, without limitation, reasonable attorneys' fees and expenses and court costs, incurred by such Indemnitee as a result of the act, omission or occurrence in question.

"Indemnitee" has the meaning set forth in Section 15.5.1.

"Indemnitor" has the meaning set forth in Section 15.5.1.

"Inspections" has the meaning set forth in Section 4.1.2.

"Inspectors" has the meaning set forth in Section 4.1.2(d).

"Intellectual Property" has the meaning set forth in Section 2.1.9.

"Inventoried Baggage" has the meaning set forth in Section 12.1.

"IT Systems" has the meaning set forth in Section 2.1.5.

"Knowledge" means (i) with respect to Purchaser, the actual knowledge of Mayur Patel, without any duty of inquiry or investigation, and expressly excluding the knowledge of any other shareholder, partner, member, trustee, beneficiary, director, officer, manager, employee, agent or representative of Seller or any of its Affiliates, and (ii) with respect to Seller, (A) the actual knowledge of William Abruzzino, without any duty of inquiry or investigation, and expressly excluding the knowledge of any other shareholder, partner, member, trustee, beneficiary, director, officer, manager, employee, agent or representative of Purchaser or any of its Affiliates, (B) any matter disclosed in any exhibits or schedules to this Agreement, (C) any matter disclosed in any Seller Due Diligence Materials received by or made available to Purchaser prior to Closing or any other documents or materials provided by Seller to Purchaser prior to Closing, and (D) any matter disclosed by the Inspections or in the Purchaser Due Diligence Reports received by or made available to Purchaser prior to Closing.  For the purposes of this definition, the term "actual knowledge" means, with respect to any person, the conscious awareness of such person at the time in question, and expressly excludes any constructive or implied knowledge of such person.

"Land" has the meaning set forth in Section 2.1.1.

"Liabilities" means any liability, obligation, damage, loss, diminution in value, cost or expense of any kind or nature whatsoever, whether accrued or unaccrued, actual or contingent, known or unknown, foreseen or unforeseen.

"Licenses and Permits" has the meaning set forth in Section 2.1.8.

"Notice" has the meaning set forth in Section 16.1.1.

"Operating Agreements" means all maintenance, repair, improvement, service and supply contracts, booking and reservation agreements, credit card service agreements, and all other agreements for goods or services which are held by Seller in connection with the Business, other

**EXHIBIT A**

than the Equipment Leases, and Licenses and Permits, together with all deposits made or held by Seller thereunder and are shown on Schedule 2.1.7.

"Ordinary Course of Business" means the ordinary course of business consistent with Seller's past custom and practice for the Business, taking into account the facts and circumstances in existence from time to time.

"Party" and "Parties" has the meaning set forth in the introductory paragraph.

"Permitted Exceptions" has the meaning set forth in Section 5.2.1.

"Person" means any natural person, corporation, general or limited partnership, limited liability company, association, joint venture, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a representative capacity.

"Personal Property" means the Transferred Property other than the Real Property.

"Plans and Specifications" has the meaning set forth in Section 2.1.11.

"Prohibited Person" has the meaning set forth in Section 7.1.12.

"Property Tax Appeals Matters" has the meaning set forth in Section 8.6.1.

"Prorations" has the meaning set forth in Section 11.2.

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchaser" has the meaning set forth in the introductory paragraph.

"Purchaser Closing Condition Failure" has the meaning set forth in Section 13.2.

"Purchaser Closing Conditions" has the meaning set forth in Section 9.1.1.

"Purchaser Closing Deliveries" has the meaning set forth in Section 10.2.2.

"Purchaser Default" has the meaning set forth in Section 13.3.

"Purchaser Documents" has the meaning set forth in Section 7.2.2.

"Purchaser Due Diligence Reports" means all studies, reports and assessments prepared by any Person for or on behalf of Purchaser (other than any internal studies, reports and assessments prepared by any of Purchaser's employees, attorneys or accountants) in connection with the Inspections.

"Purchaser Indemnitees" means Purchaser and Purchaser's manager and each of their respective Affiliates, and each of their respective shareholders, members, partners, trustees, beneficiaries, directors, officers and employees, and the successors, permitted assigns, legal representatives, heirs and devisees of each of the foregoing.

**EXHIBIT A**

"Real Property" has the meaning set forth in Section 2.1.2.

"Scheduled Closing Date" has the meaning set forth in Section 10.1.

"Secured Lender" means Carter Bank & Trust, who holds a first priority secured lien on the Transferred Property pursuant to: (i) that certain *Promissory Note* dated as of October 17, 2014, by and between the Debtor and the Secured Lender, pursuant to which the Secured Lender loaned to the Debtor a principal balance of $10,850,000; (ii) that certain *Deed of Trust* dated as of October 17, 2014 on the real property and improvements commonly known as the La Quinta Hotel – Elkview and located in Kanawha County at The Crossings Shopping Center, Elkview, West Virginia 25071 (the "Elkview Hotel"); (iii) that certain *Deed of Trust* dated as of October 17, 2014 on the real property and improvements commonly known as the La Quinta Hotel – Summersville (the "Summersville Hotel") and located in Nicholas County at 106 Merchants Walk, Summersville, West Virginia 26651; (iv) that certain *Assignment of Leases and Rents* dated as of October 17, 2014 for the Elkview Hotel by and between the Debtor and the Secured Lender; (v) that certain *Assignment of Leases and Rents* dated as of October 17, 2014 for the Summersville Hotel by and between the Debtor and Secured Lender; and (vi) that certain *Security Agreement* dated as of October 17, 2014 by and between the Debtor and the Secured Lender.

"Seller" has the meaning set forth in the introductory paragraph.

"Seller Closing Conditions" has the meaning set forth in Section 9.2.

"Seller Closing Deliveries" has the meaning set forth in Section 10.2.1.

"Seller Cure Period" has the meaning set forth in Section 13.2.

"Seller Default" has the meaning set forth in Section 13.1.

"Seller Documents" has the meaning set forth in Section 7.1.2.

"Seller Due Diligence Materials" has the meaning set forth in Section 4.1.1(a).

"Seller Employee Plans" means all plans and programs maintained by or on behalf of Seller for the health, welfare or benefit of any Employees and/or their respective spouses, dependents or other qualified beneficiaries, including, without limitation, the Retirement Plan.

"Seller Indemnitees" means Seller, Secured Lender, and each of their respective, shareholders, members, partners, trustees, beneficiaries, directors, officers and employees, and the successors, permitted assigns, legal representatives, heirs and devisees of each of the foregoing.

"Seller's Possession" means in the physical possession or control of (A) any officer or employee of Seller who has responsibility for the Business or the Transferred Property or (B) any Person still engaged by Seller from whom Seller has a right to obtain the item in question at no cost or expense to Seller other than any *de minimis* cost of expense or any cost of expense which Purchaser agrees in writing to reimburse; provided, however, that any reference in this Agreement to Seller's Possession of any documents or materials expressly excludes the possession of any such

EXHIBIT A

documents or materials that (i) are legally privileged or constitute attorney work product, (ii) are subject to a confidentiality agreement or to Applicable Law prohibiting their disclosure by Seller.

"Supplies" has the meaning set forth in Section 2.1.4.

"Survival Period" has the meaning set forth in Section 15.1.1.

"Taxes" means any federal, state, local or foreign, real property, personal property, sales, use, room, occupancy, ad valorem, employment or similar taxes, assessments, levies, charges or fees imposed by any Governmental Authority on Seller with respect to the Transferred Property or the Business, including, without limitation, any interest, penalty or fine with respect thereto, but expressly excluding any (i) federal, state, local or foreign income, capital gain, gross receipts, capital stock, franchise, profits, estate, gift or generation skipping tax, or (ii) transfer, documentary stamp, recording or similar tax, levy, charge or fee incurred with respect to the transaction described in this Agreement.

"Third-Party Claim" means, (i) with respect to any Seller Indemnitee, any claim, demand, lawsuit, arbitration or other legal or administrative action or proceeding against such Seller Indemnitee by any Person which is not Purchaser or an Affiliate of Purchaser, and (ii) with respect to any Purchaser Indemnitee, any claim, demand, lawsuit, arbitration or other legal or administrative action or proceeding against such Purchaser Indemnitee by any Person which is not Seller or an Affiliate of Seller.

"Title Commitment" has the meaning set forth in Section 5.1.

"Title Company" means Safe Harbor Title Company, LLC.

"Title Exceptions" has the meaning set forth in Section 5.2.1.

"Trade Payables" has the meaning set forth in Section 11.2.7.

"Transferred Property" has the meaning set forth in Section 2.1.

"Update" has the meaning set forth in Section 16.13.

"WARN Act" means the Worker's Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, et seq., as well as the rules and regulations thereto, set forth in 20 CFR 639, et seq., and any similar state and local laws, as amended from time to time, and any regulations, rules and guidance issued pursuant thereto.

"Warranties" has the meaning set forth in Section 2.1.12.

## ARTICLE II
## THE TRANSFERRED PROPERTY AND ASSUMED LIABILITIES

2.1 **Description of the Transferred Property**. Subject to the terms set forth in this Agreement, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and

EXHIBIT A

Purchaser shall purchase and accept from Seller, the property and assets set forth in this Section 2.1, but expressly excluding the Excluded Property (collectively, the "Transferred Property"):

2.1.1   Land.  The land described in Schedule 2.1.1, together with all appurtenant easements and any other rights and interests, including air or development rights (if any), appurtenant thereto (the "Land");

2.1.2   Improvements.  All buildings, structures and other improvements located on or affixed to the Land and all fixtures on the Land which constitute real property under Applicable Law (the "Improvements"; the Land and the Improvements are referred to collectively herein as the "Real Property");

2.1.3   FF&E.  All fixtures (other than those which constitute Improvements), furniture, furnishings, equipment, machinery, tools, vehicles, appliances, art work and other items of tangible personal property which are located at the Hotel, or ordered for future use at the Hotel as of the Closing, other than the Supplies, IT Systems, Books and Records and Plans and Specifications (the "FF&E");

2.1.4   Supplies.   All linens and towels, uniforms, engineering, maintenance, cleaning and housekeeping supplies, matches and ashtrays, soap and other toiletries, stationery, menus, directories and other printed materials, and all other similar supplies and materials, which are located at the Hotel or ordered or stored for future use at the Hotel as of the Closing (the "Supplies");

2.1.5   IT Systems.  All right, title and interest, if any, of Seller in and to computer hardware, telecommunications and information technology systems located at the Hotel, and all computer software used at the Hotel (subject to the terms of any applicable license agreement(s), which such license agreement(s) shall be transferred to Purchaser at Closing, to the extent the same are transferable or the Parties obtain any consent necessary to effectuate such a transfer), including all user names and passwords applicable to the foregoing (the "IT Systems");

2.1.6   Equipment Leases.  All right, title and interest, if any, of Seller in and to leases and purchase money security agreements for any equipment, machinery, vehicles, furniture or other personal property located at the Hotel which are held by Seller and used primarily in the Business, and which the Purchaser has expressly agreed to assume and are listed on Schedule 2.1.6, together with all deposits made by Seller thereunder, to the extent the same and such deposits are transferable or the Parties obtain any consent necessary to effectuate such a transfer (the "Equipment Leases");

2.1.7   Assigned Operating Agreements. All Operating Agreements which the Purchaser has expressly agreed to assume and are listed on Schedule 2.1.7, to the extent the same and the deposits held thereunder are transferable or the Parties obtain any consent necessary to effectuate such a transfer, except the Excluded Agreements (the "Assigned Operating Agreements");

2.1.8   Licenses and Permits.  All right, title and interest, if any, of Seller in and to licenses, permits, consents, authorizations, approvals, registrations and certificates issued by any Governmental Authority which are held by Seller with respect to the Hotel, including, without

9

**EXHIBIT A**

limitation, the construction, use or occupancy of the Hotel or the Business, together with any deposits made by Seller thereunder, to the extent the same and such deposits are transferable under Applicable Law or the Parties obtain any consent necessary to effectuate such a transfer, which are itemized in Schedule 8.3 (the "Licenses and Permits");

2.1.9   Intellectual Property.  All right, title and interest, if any, of Seller in and to trademarks, trade names, service marks and other intellectual property rights set forth in Schedule 2.1.9 (the "Intellectual Property");

2.1.10   Books and Records.  All right, title and interest, if any, of Seller in and to original books and records located at the Hotel or stored off-site, which relate exclusively to the Hotel or the Business (including, without limitation, plans, specifications, warranties, operating manuals and tenant files), but expressly excluding (a) all Hotel Guest Data and Information, and (b) all documents and other materials which (i) are legally privileged or constitute attorney work product, (ii) are subject to an Applicable Law or a confidentiality agreement prohibiting their disclosure, or (iii) constitute confidential internal assessments, reports, studies, memoranda, notes or other correspondence prepared by or on behalf of any officer or employee, including, without limitation, all (A) internal financial analyses, appraisals, tax returns, financial statements, (B) corporate or other entity governance records, (C) Employee personnel files, (D) any work papers, memoranda, analysis, correspondence and similar documents and materials prepared in connection with the transaction described in this Agreement (the "Books and Records").

2.1.11   Plans and Specifications.  All right, title and interest, if any, of Seller in and to, and all physical embodiments of (in any format or medium), all plans and specifications, blue prints, architectural plans, engineering diagrams and similar items located at the Hotel or in Seller's Possession which relate exclusively to the Hotel, to the extent the same are transferable or the Parties obtain any consent necessary to effectuate such a transfer (the "Plans and Specifications");

2.1.12   Warranties.  All right, title and interest, if any, of Seller in and to warranties and guaranties held by Seller with respect to any Improvements or Personal Property, to the extent the same are transferable or the Parties obtain any consent necessary to effectuate such a transfer (the "Warranties");

2.1.13   Bookings.  All right, title and interest, if any, of Seller in and to advance bookings and reservations for transient guest, conference and banquet rooms or other facilities at the Hotel as of the Closing made in the Ordinary Course of Business, together with all deposits held by Seller with respect thereto (the "Bookings");

2.1.14   Miscellaneous Hotel Assets, Including Guest Data and Certain Other Information.  All right, title and interest, if any, of Seller in and to telephone and facsimile numbers, email addresses, user names, passwords, social media accounts and other account information used exclusively at or on behalf of the Hotel, all keys and lock and safe combinations and codes at the Hotel, and all guest data and accounts receivable data maintained by the Hotel.

EXHIBIT A

**2.2**    **Excluded Property**.  Notwithstanding anything to the contrary in Section 2.1, the property, assets, rights and interests set forth in this Section 2.2 (the "Excluded Property") shall not be transferred, assigned or conveyed to Purchaser, and shall be excluded from the Property:

**2.2.1**    Cash.  Except for deposits expressly included in Section 2.1, and subject to the provisions of Article XI, all cash on hand or on deposit in any house bank, operating account or other account or reserve maintained in connection with the Business, together with any and all credit card charges, checks and other instruments which Seller has submitted for payment as of the Closing;

**2.2.2**    Accounts Receivable.  Seller shall receive a credit at Closing for accounts receivable charged to the Guest Ledger pursuant to Section 11.3.1.

**2.2.3**    Third-Party Property.  Any fixtures, personal property or intellectual property owned by (i) the lessor under any Equipment Leases, (ii) the supplier, vendor, licensor or other party under any Operating Agreements or Licenses and Permits, (iii) any Employees, or (iv) any guests or customers of the Hotel;

**2.3**    **Assumed Liabilities**.  At Closing, Purchaser shall assume (i) all Liabilities with respect to the condition of the Transferred Property (regardless of whether such condition existed prior to the Closing Date), including, without limitation, the design, construction, engineering, maintenance and repair or environmental condition of the Real Property, which arise and accrue on or after the Closing Date, and (ii) except as otherwise expressly provided herein, all Liabilities with respect to the Transferred Property, the Hotel or the Business which the Purchaser expressly agrees to assume at the Closing, and which agreed upon Liabilities are itemized on Schedule 2.3, arising and accruing from and after the Closing Date (and prior to the Closing Date to the extent Purchaser has received a credit for such Liabilities under Section 11.2) (the "Assumed Liabilities").  The rights and obligations of the Parties under this Section 2.3 shall survive the Closing.

**ARTICLE III**
**PURCHASE PRICE**

**3.1**    **Purchase Price**.

**3.1.1**    The purchase price for the Transferred Property is Three Million Six Hundred Thousand Dollars ($3,600,000.00), (the "Purchase Price"), which shall be adjusted at Closing for the Prorations pursuant to Section 11.2, the Accounts Receivable pursuant to Section 11.3, and as otherwise expressly provided in this Agreement.

**3.1.2**    No later than 20 days prior to Closing, or within a reasonable time thereafter as agreed by Seller and Purchaser, Purchaser shall prepare and deliver to Seller a proposed allocation of the Purchase Price among the Transferred Property which shall be prepared in a manner consistent with Section 1060 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") (the "Proposed Allocation Schedule").  After receipt of the Proposed Allocation Schedule from Purchaser, Seller shall have 10 days to review the Proposed Allocation Schedule.  The Proposed Allocation Schedule will be considered final and binding on the Parties unless Seller communicates to Purchaser objections to the Proposed Allocation Schedule (an "Allocation

11

**EXHIBIT A**

Dispute Notice"). Seller and Purchaser shall, within 5 days (or such longer period as Seller and Purchaser may agree in writing) following delivery of an Allocation Dispute Notice (the "Allocation Resolution Period"), attempt in good faith to resolve their differences and prepare a final allocation schedule that is acceptable to both Seller and Purchaser. If Seller and Purchaser are unable to completely resolve any such differences within such 5-day period, the unresolved issues (the "Allocation Dispute") shall be resolved by a mutually acceptable accounting firm.

**3.2**    **Earnest Money**.

3.2.1    Deposit of Earnest Money. Within three (3) Business Days of the Effective Date, the Purchaser shall deposit the amount of Five Hundred Thousand Dollars ($500,000.00) (the "Deposit") with Escrow Agent which is held in escrow as earnest money pursuant to that certain Earnest Money Escrow Agreement dated as of the Effective Date, among Seller, Purchaser and Escrow Agent (the "Earnest Money Escrow Agreement"), a copy of which is attached hereto as Exhibit G. The Deposit shall be fully applied to the Purchase Price at the Closing, and shall be non-refundable to Purchaser, except as follows (unless waived by Purchaser): (i) the Title Commitment contains a defect, lien, or encumbrance other than the Permitted Exceptions that is not promptly cured by Seller; (ii) any survey obtained by Purchaser reveals material issues affecting the marketability of the Transferred Property that cannot be insured against, at standard rates, or promptly corrected by Seller; (iii) a Phase I environmental report for the Hotel reveals environmental contaminants or other conditions that materially affect the suitability or marketability of the Hotel; (iv) a property condition report for the Hotel obtained by Purchaser reveals conditions that materially affect the suitability or marketability of the Hotel, or (v) a Seller Default.

3.2.2    Investment of Earnest Money. The Deposit shall be invested in accordance with the Earnest Money Escrow Agreement upon Purchaser's delivery of the Deposit.

3.2.3    Disbursement of Earnest Money to Seller. At Closing, Purchaser shall cause Escrow Agent to disburse the Deposit to Seller, and Purchaser shall receive a credit against the Purchase Price in the amount of the Deposit disbursed to Seller. If this Agreement is terminated for any reason and Purchaser is not entitled to a refund of the Deposit, then Purchaser shall provide written notice to Escrow Agent with concurrent copy to Seller (or Seller can send written notice to Escrow Agent with concurrent copy to Purchaser, subject to the terms of the Earnest Money Escrow Agreement) directing Escrow Agent to disburse the Deposit to Seller no later than two (2) Business Days after such termination. This Section 3.2.3 shall survive the termination of this Agreement.

3.2.4    Refund of Earnest Money to Purchaser. If this Agreement is terminated and Purchaser is entitled to a refund of the Deposit as provided for in Section 3.2.1, then Seller shall provide written notice to Escrow Agent with concurrent copy to Purchaser (or Purchaser can send written notice to Escrow Agent with concurrent copy to Seller, subject to the terms of the Earnest Money Escrow Agreement) directing Escrow Agent to disburse the Deposit to Purchaser. This Section 3.2.4 shall survive the termination of this Agreement.

**EXHIBIT A**

**3.3** **Payment of Purchase Price**.

3.3.1 <u>Payment at Closing</u>. At Closing, Purchaser shall pay, or cause to be paid, to Seller an amount equal to the Purchase Price (as adjusted pursuant to Section 3.1), less the Deposit disbursed to Seller; provided, however, that Seller acknowledges and agrees that at Closing, Purchaser or Escrow Agent shall pay directly to the Secured Lender, on behalf of Seller, a portion of the Purchase Price equal to $2,700,000 (the "<u>Secured Lender Lien Release Amount</u>"), unless a different amount is expressly agreed to by Secured Lender following receipt of the Closing Statement, and that upon receipt of such payment, the Secured Lender will release its liens on the Transferred Property. Purchaser shall cause the wire transfer of funds to be received by Seller no later than 1:00 p.m. (Eastern Time) on the Closing Date.

3.3.2 <u>Method of Payment</u>. All amounts to be paid by Purchaser to Seller pursuant to this Agreement shall be paid by wire transfer of immediately available U.S. federal funds.

**ARTICLE IV**
**DUE DILIGENCE**

**4.1** **Due Diligence**.

4.1.1 <u>Seller's Due Diligence Materials</u>.

(a) Seller shall provide to Purchaser within five (5) days of the Effective Date, or make available to Purchaser at the Hotel for review and copying by Purchaser, those due diligence materials in Seller's Possession relating to the Transferred Property requested by Purchaser, including without limitation, financial statements, bank statements, and general ledgers, and P&L statements for the prior three years, and Purchaser agrees to acknowledge in writing, upon Seller's request, the receipt of any due diligence documents or materials delivered to Purchaser. All documents and materials provided by Seller to Purchaser pursuant to this Agreement (including, without limitation, any and all documents and materials set forth on the CBRE website), together with any copies or reproductions of such documents or materials, or any summaries, abstracts, compilations or other analyses made by or for Purchaser based on the information in such documents or materials, are referred to collectively herein as the "<u>Seller Due Diligence Materials</u>" and are set forth on <u>Schedule 4.1.1</u>.

(b) If this Agreement is terminated pursuant to the terms of this Agreement, Purchaser shall promptly (i) return all original Seller Due Diligence Materials provided to Purchaser, and destroy all other Seller Due Diligence Materials, (ii) use commercially reasonable efforts to cause all Persons to whom Purchaser has provided any Seller Due Diligence Materials to return any original Seller Due Diligence Materials to Purchaser, and destroy all other copies of Seller Due Diligence Materials, provided that Purchaser shall be responsible for, and shall defend indemnify and hold harmless the Seller Indemnitees in accordance with Article XV from any Indemnification Loss incurred by any Seller Indemnitee arising from or in connection with, any Person's failure to return or destroy any such Seller Due Diligence Materials, and (iii) certify to Seller that all original Seller Due Diligence Materials have been returned to Seller and all other Seller Due Diligence Materials have been destroyed. This Section 4.1.1(b) shall survive the termination of this Agreement.

**EXHIBIT A**

(c)    Exhibits and Schedules.  Seller shall provide, within 5 Business Days of the Effective Date, the Schedules and Exhibits to this Agreement, and the Diligence Period shall commence on the date that such Schedules and Exhibits are provided to the Purchaser. Purchaser shall have 3 Business Days after receipt of all Schedules and Exhibits to elect, in its sole discretion, to terminate this Agreement if such Schedules and Exhibits are not acceptable and the Parties are unable to agree on mutually acceptable Schedules and Exhibits, in which case the Deposit shall be refunded to Purchaser and the Parties shall have no further rights or obligations under this Agreement.  From time to time prior to the Closing, Seller shall have the right (but not the obligation) to supplement or amend the Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof and shall promptly notify Purchaser of any such supplement or amendment.

4.1.2    Access.

(a)    Seller shall permit Purchaser, subject to the remainder of this Section 4.1.2, to have access from time to time during the Diligence Period to the Transferred Property for the purpose of inspections and measuring of the Transferred Property (collectively, "Inspections"), and, in the case of any such entry, Purchaser shall: (i) in all events give at least twenty-four (24) hours telephonic or email advance notice to Seller so that Seller may, at its option, have a representative designated by Seller present during each visit to the Transferred Property and (ii) not unreasonably interfere with the use or operation of the Transferred Property.  Any such access shall be limited to normal business hours and Purchaser shall cooperate with any request by Seller in connection with the timing of any such access.  Notwithstanding the foregoing, no invasive, intrusive or destructive testing or soil investigations shall be performed.  Purchaser specifically acknowledges and agrees not to utilize any such access for, or to otherwise engage in, any marketing of all or any part of the Transferred Property prior to the Closing.  In the event Purchaser discovers a preexisting condition at the Transferred Property, Purchaser hereby covenants that it shall not disclose such condition to any person unless Purchaser is required to disclose the discovery of such existing environmental conditions to a Governmental Authority pursuant to Applicable Law (and Purchaser shall immediately notify Seller of such pending disclosure and provide Seller an opportunity to minimize such disclosure to the extent permitted under Applicable Law.  Prior to Purchaser's entry on the Transferred Property, Purchaser shall furnish (or caused to be furnished) to Seller an insurance certificate reasonably acceptable to Seller evidencing the fact that Purchaser, as the named insured, has in full force and effect a commercial general liability insurance policy with a company having a BEST rating of A: IX in an amount of at least One Million Dollars per occurrence ($1,000,000) naming Seller, Seller's lender as additional insureds.  Purchaser agrees to maintain such coverage for so long as this Agreement remains in effect.  Purchaser's maintenance of such insurance policies shall not release or limit Purchaser's indemnification obligations under Section 4.1.2.

(b)    Access to the Transferred Property shall be solely for the benefit of Purchaser and those acting on behalf of Purchaser, actually or prospectively, for the purposes stated in Section 4.1.2(a) of this Agreement and shall not give rise to a contingency or condition to the performance of Purchaser's obligations hereunder.  The results of any such inspection (whether evidencing latent or patent defects in the Transferred Property, and/or the existence or nonexistence of hazardous materials), and any information or matter discovered by Purchaser including, without limitation, other occupants of the Transferred Property, economic projections

14

**EXHIBIT A**

or market studies concerning the Transferred Property, any development rights, taxes, bonds, covenants, conditions and restrictions affecting the Transferred Property, air quality, the utilities serving the Transferred Property, any zoning, environmental or building laws, rules or regulations affecting the Transferred Property, the use or occupancy of the Transferred Property or any part thereof, the suitability of the Transferred Property as the subject of a cooperative or condominium conversion, or otherwise disclosing a condition which is undesirable or in violation of any law or governmental rule, regulation, ordinance or order shall not be grounds for any modification of the respective obligations of Seller and Purchaser hereunder or for any amendment or modification of this Agreement.

(c)     All: (i) confidential or otherwise non-public information and materials provided by or on behalf of Seller to Purchaser and/or its representatives, agents or employees; and (ii) Purchaser Due Diligence Reports shall be treated as Confidential Information by Purchaser, and Purchaser shall cause all of its employees, agents, representatives and contractors to maintain the confidentiality of all such information.

(d)     Purchaser shall indemnify, defend and hold harmless Seller Indemnitees from and against all Indemnification Loss resulting from, relating to or arising out of any access to the Transferred Property pursuant to this Section 4.1.2 or breach of this Section 4.1.2 after the Effective Date and prior to the Closing, whether occasioned by the acts or omissions of Purchaser or those of its employees, agents, vendors, representatives or contractors (collectively, "Inspectors") and not caused by the gross negligence or willful misconduct of Seller Indemnitees. Seller may, at Purchaser's reasonable out-of-pocket cost and expense, repair any physical damage to the Transferred Property caused any Inspections for which Purchaser is responsible under this Section 4.1.2.

(e)     Purchaser's obligations under this Section 4.1.2 shall survive the Closing or the termination of this Agreement.

## ARTICLE V
## TITLE TO THE PROPERTY

**5.1     Title Commitment**. Purchaser shall promptly obtain a commitment for an ALTA owner's title insurance policy from the Title Company for the Real Property ("Title Commitment").

**5.2     Exceptions to Title**.

5.2.1     Permitted Exceptions.  All liens, encumbrances or other exceptions to title to which the Purchaser does not object within the Diligence Period (the "Title Exceptions"), including, without limitation, those set forth on Schedule 5.2.1 attached hereto and (i) the rights and interests of customers and guests at the Hotel to occupy rooms on a transient license basis, (ii) all liens and encumbrances caused or created by any Purchaser Indemnitee, and (iii) any existing mortgages that Purchaser has agreed to assume at Closing, shall constitute "permitted exceptions" to title to the Real Property (the "Permitted Exceptions").  Notwithstanding anything in this Agreement to the contrary, Seller shall cure any title defects created by, through or under

15

EXHIBIT A

Seller, any title defect that is not a Permitted Exception and any encumbrance that can be cured by payment of a liquidated amount (the "Required Cure Items").

       5.2.2   Access to Property.  The Parties acknowledge that the Real Property does not have deeded access to a public right of way as of the date of this Agreement.  Seller covenants and agrees that it will obtain an access easement providing for deeded ingress/egress between a public right of way and the Real Property, in form acceptable to Purchaser and sufficient to allow the Title Company to issue an ALTA access endorsement in standard form insuring Purchaser's access to the Real Property (the "Access Easement").   Purchaser's obligation to close the transactions described in this Agreement is subject to satisfaction of the preceding covenant.

    **5.3**    **Conveyance of the Property**.  At Closing, Seller shall convey its fee simple interest in and to the Real Property to Purchaser, subject only to all Permitted Exceptions.

    **5.4**    **Bankruptcy Matters**.

       5.4.1   This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller, in consultation with Secured Lender, of higher or better competing bids, of any sale, transfer, or disposition of the Transferred Property.  Subject to payment of the Expense Reimbursement below, this Agreement may be terminated and the purchase and sale of the Transferred Property and the other transactions contemplated by this Agreement may be abandoned at any time prior to the Closing by the Seller by written notice to Purchaser if Seller accepts a Qualified Competing Offer as the Successful Overbidder (each as defined in the Sale Motion) from a Person other than Purchaser.

       5.4.2   Seller and Purchaser acknowledge that this Agreement and the consummation of the transactions contemplated hereby are subject to Bankruptcy Court approval, and the expiration of any appeal periods of the Approval Order, if any.  Seller will use reasonable efforts to consummate the transactions contemplated hereby by seeking entry of the Approval Order. Within five (5) Business Days of the Effective Date, Seller shall file with the Bankruptcy Court a motion (the "Sale Motion") in form and substance reasonably satisfactory to Purchaser and Secured Lender seeking entry of an order substantially in the form of Exhibit F, as amended, modified or supplemented with the prior written consent of Purchaser and Secured Lender (which consent will not be unreasonably withheld, conditioned or delayed), (i) authorizing and approving the sale of the Transferred Property on the terms and conditions set forth herein, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, free and clear of all liens and encumbrances except Permitted Exceptions, subject to higher and better Qualified Bids submitted by Qualified Bidders (each as defined in the sale motion and accompany bidding procedures), (ii) granting the Purchaser certain bidding protections, including the reimbursement of actual out-of-pocket expenses not to exceed $25,000 (the "Expense Reimbursement") in the event that Seller accepts a Qualified Competing Offer as the Successful Overbidder (as defined in the sale motion and accompany bidding procedures) from a Person other than Purchaser for the sale of the Transferred Property and the Seller and Successful Overbidder consummate the competing transaction; and (iii) finding that Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and not a successor to Seller, with one or more appropriate motions and the entry of appropriate orders of the Bankruptcy Court (all such motions and orders being in form

**EXHIBIT A**

and substance reasonably satisfactory to Seller, Purchaser, Secured Lender and Title Company, the "Approval Order").

        5.4.3   If the Approval Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or re-argument shall be filed with respect to the Approval Order or other such order), and this Agreement has not otherwise been terminated pursuant to the terms of this Agreement, Seller shall use its reasonable best efforts to diligently defend such appeal, petition or motion and shall use its reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion.

        5.4.4   Except to the extent filings must be made on an emergency basis in the reasonable judgment of Seller, and to the extent reasonably practicable, Seller shall provide Purchaser and Secured Lender with a draft of any motions, orders or other pleadings that Seller proposes to file with the Bankruptcy Court relating to the transaction contemplated by this Agreement or the Business, including the motion to approve the Approval Order, no later than three (3) Business Days prior to the filing thereof with the Bankruptcy Court, and all such motions, orders or other pleadings must be in a form mutually acceptable to Purchaser, Seller and Secured Lender.

        5.4.5   Seller shall consult with Purchaser and Secured Lender regarding pleadings that it intends to file with the Bankruptcy Court in connection with the transactions contemplated by this Agreement, or which might reasonably affect the Bankruptcy Court's approval of the transactions herein described and the Approval Order. Seller shall promptly provide Purchaser and Secured Lender and their respective counsel with copies of all notices, filings and orders of the Bankruptcy Court that Seller has in its possession (or receives) pertaining to the transactions described herein and the Approval Order, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Purchaser, Secured Lender and its respective counsel. Seller shall not seek any modification to the Approval Order by the Bankruptcy Court or any other Governmental Authority of competent jurisdiction to which a decision relating to the Seller's Bankruptcy case has been appealed, in each case, without the prior written consent of Purchaser and Secured Lender.

        5.4.6   If the final, unappealable Approval Order has not been obtained within the time period required by Section 9.1.1, Purchaser may, but is not required, to declare such failure to deliver a Seller Default.

## ARTICLE VI
## CONDITION OF THE PROPERTY

    **6.1**   **PROPERTY SOLD "AS IS"**.   PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, (A) THE PURCHASE OF THE TRANSFERRED PROPERTY SHALL BE ON AN "AS IS", "WHERE IS", "WITH ALL FAULTS" BASIS, SUBJECT TO WEAR AND TEAR FROM THE EFFECTIVE DATE UNTIL CLOSING, AND (B) SELLER HAS NO OBLIGATION TO

**EXHIBIT A**

REPAIR ANY DAMAGE TO OR DEFECT IN THE TRANSFERRED PROPERTY, REPLACE ANY OF THE TRANSFERRED PROPERTY OR OTHERWISE REMEDY ANY MATTER AFFECTING THE CONDITION OF THE TRANSFERRED PROPERTY

### 6.2    Limitation On Representations and Warranties.

6.2.1    Purchaser agrees that, except as expressly set forth herein, Seller shall not be liable for any latent or patent defects in the Transferred Property, and shall not be bound in any manner whatsoever by any guarantees, promises, projections or other information pertaining to the Transferred Property made, furnished or claimed to have been made or furnished by any Seller Indemnitee, whether verbally or in writing.  Purchaser acknowledges that neither Seller nor any of the employees, agents or attorneys of Seller has made any verbal or written representations or warranties whatsoever to Purchaser, whether express or implied, except as expressly set forth in this Agreement and, in particular, that no such representations and warranties have been made with respect to the physical or environmental condition or operation or occupancy of the Real Property, the layout or footage of the Real Property, the actual or projected revenue and expenses of the Transferred Property, zoning, environmental, union, labor, employment and other laws, regulations and rules applicable to the Transferred Property, or the compliance of the Transferred Property therewith, the quantity, quality or condition of the articles of Personal Property and mixtures included in the transactions contemplated hereby, the existence or non-existence of any certificate of occupancy relating to the Real Property, the use or occupancy of the Transferred Property or any part thereof or any other matter or thing affecting or relating to the Transferred Property or the transactions contemplated hereby, except as specifically set forth in this Agreement.  Purchaser has not relied and is not relying upon any representations or warranties, other than the representations and warranties expressly set forth in this Agreement, or upon any statements made in any informational materials with respect to the Transferred Property provided to Purchaser by Seller or any other person or entity, including the Broker or Secured Lender or any shareholder, member, manager, employee, agent, attorney or other person representing or purporting to represent Seller or the Broker.  Without limitation of the foregoing, subject to the provisions of Article VIII, Purchaser specifically acknowledges and agrees that it has assumed the risk of changes in the condition of the Transferred Property between the Effective Date and the Closing Date and no adverse change in such condition shall grant Purchaser any right to terminate this Agreement or to obtain any damages against Seller.  IN ADDITION TO, AND WITHOUT LIMITATION OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE MERCHANTABILITY, TITLE, MARKETABILITY, FITNESS, OR SUITABILITY FOR A PARTICULAR PURPOSE OF THE TRANSFERRED PROPERTY OR ANY COMPONENT THEREOF, AND THE TRANSFERRED PROPERTY AND EACH COMPONENT THEREOF ARE SOLD IN AN "AS IS", "WHERE IS" CONDITION, WITH ALL FAULTS.  BY EXECUTING THIS AGREEMENT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, PURCHASER AFFIRMS AND AGREES THAT (A) PURCHASER HAS NOT RELIED ON SELLER'S SKILL OR JUDGMENT TO SELECT OR FURNISH THE TRANSFERRED PROPERTY OR ANY COMPONENT THEREOF FOR ANY PARTICULAR PURPOSE, (B) SELLER MAKES NO WARRANTY THAT THE TRANSFERRED PROPERTY OR ANY COMPONENT THEREOF ARE FIT FOR ANY PARTICULAR PURPOSE, AND (C) THERE ARE NO REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, WITH RESPECT TO THE TRANSFERRED PROPERTY OR

EXHIBIT A

ANY COMPONENT THEREOF. PURCHASER HAS BEEN GIVEN THE OPPORTUNITY TO INSPECT THE TRANSFERRED PROPERTY AND EACH COMPONENT THEREOF AND HAS DETERMINED TO PURCHASE THE TRANSFERRED PROPERTY AND EACH COMPONENT THEREOF BASED ON SUCH INSPECTION.

6.2.2    Without limiting the generality of the provisions of Section 6.2.1, Purchaser specifically acknowledges and agrees as follows:

(a)    neither Seller nor any other party acting (or purporting to act) on behalf of Seller has made any representation or warranty of any kind of nature concerning any environmental condition existing at the Property; and

(b)    Purchaser shall take title to the Real Property subject to any and all environmental conditions thereat, whether known or unknown, disclosed or undisclosed.

**6.3**    **Reliance On Due Diligence**. PURCHASER ACKNOWLEDGES AND AGREES THAT:

(A)    PURCHASER WILL BE RELYING ONLY ON ITS DUE DILIGENCE INSPECTIONS OF THE PROPERTY, ITS REVIEW OF THE SELLER DUE DILIGENCE MATERIALS AND THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY SELLER IN THIS AGREEMENT IN PURCHASING THE TRANSFERRED PROPERTY; AND

(B)    PURCHASER WILL NOT BE RELYING ON ANY STATEMENT MADE OR INFORMATION PROVIDED TO PURCHASER BY SELLER (EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY SELLER IN THIS AGREEMENT), SELLER'S LENDERS, OR ANY OF THEIR AFFILIATES, OR ANY OF THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, PARTNERS, TRUSTEES, BENEFICIARIES, DIRECTORS, MANAGERS, OFFICERS, EMPLOYEES, ATTORNEYS, ACCOUNTANTS, CONTRACTORS, CONSULTANTS, AGENTS OR REPRESENTATIVES, OR ANY PERSON PURPORTING TO REPRESENT ANY OF THE FOREGOING.

**6.4**    **RELEASE OF SELLER FOR VIOLATIONS OF CERTAIN APPLICABLE LAWS**. NOTWITHSTANDING ANY INDEMNIFICATION OBLIGATION OF SELLER UNDER THIS AGREEMENT, EFFECTIVE AS OF THE CLOSING, PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) DOES HEREBY FOREVER RELEASE AND DISCHARGE THE SELLER INDEMNITEES FROM ANY AND ALL (A) VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT OF 1990, (B) ANY AND ALL NOTES OR NOTICES OF VIOLATIONS OF ANY LEGAL REQUIREMENT IN OR ISSUED BY ANY GOVERNMENTAL AUTHORITY (BUT NOT ANY LIEN, PENALTY OR FINE IMPOSED IN CONNECTION WITH ANY OF THE FOREGOING AS PROVIDED IN SECTION 5), AND/OR ANY CONDITION OR STATE OF REPAIR OR DISREPAIR AND/OR OTHER MATTER OR THING, WHETHER OR NOT NOTED, WHICH, IF NOTED, WOULD RESULT IN A VIOLATION BEING PLACED ON THE TRANSFERRED PROPERTY; PROVIDED, HOWEVER, THAT SUCH RELEASE AND DISCHARGE SHALL NOT APPLY TO ANY INDEMNIFICATION OBLIGATION OF SELLER RESULTING FROM A BREACH OF

19

**EXHIBIT A**

SELLER'S REPRESENTATIONS OR WARRANTIES SET FORTH IN SECTION 7.1. EXCEPT AS OTHERWISE PROVIDED HEREIN, SELLER SHALL HAVE NO DUTY TO REMOVE OR COMPLY WITH OR REPAIR OR DISREPAIR ANY (X) CONDITION, MATTER OR THING, WHETHER OR NOT NOTED, WHICH IF NOTED, WOULD RESULT IN A VIOLATION BEING PLACED ON THE TRANSFERRED PROPERTY OR (Y) OF THE AFOREMENTIONED VIOLATIONS OR OTHER CONDITIONS, AND PURCHASER SHALL ACCEPT THE TRANSFERRED PROPERTY SUBJECT TO ALL SUCH VIOLATIONS, THE EXISTENCE OF ANY CONDITIONS AT THE TRANSFERRED PROPERTY WHICH WOULD GIVE RISE TO SUCH VIOLATIONS, IF ANY, AND ANY CLAIMS OF ANY GOVERNMENTAL AUTHORITY ARISING FROM THE EXISTENCE OF SUCH VIOLATIONS IN EACH CASE WITHOUT ABATEMENT OF OR CREDIT AGAINST THE PURCHASE PRICE.

     **6.5**    <u>**Survival**</u>.  This Article VI shall survive the Closing.

**ARTICLE VII**
**REPRESENTATIONS AND WARRANTIES**

     **7.1**    <u>**Seller's Representations and Warranties**</u>.  To induce Purchaser to enter into this Agreement and to consummate the transaction described in this Agreement, Seller hereby makes the express representations and warranties in this Section 7.1 as of the date hereof and as of the Closing Date, except to the extent that (x) any such representation or warranty is made as of a specific date and/or (y) the failure of any representation or warranty contained in Sections 7.1.4, 7.1.5. (to the extent such failure does not have and is not reasonably likely to have a material adverse effect on the Transferred Property or Seller's ability to consummate the transaction described in this Agreement), 7.1.7(ii), 7.1.7(iii), or 7.1.9 to be true at Closing shall not result from a breach of covenant by Seller hereunder.

        7.1.1   <u>Organization and Power</u>.  Seller is duly incorporated or formed (as the case may be), validly existing, in good standing in the jurisdiction of its incorporation or formation, is qualified to do business in the jurisdiction in which the Transferred Property is located, and has all requisite power and authority to own the Transferred Property and to consummate the sale contemplated hereby.

        7.1.2   <u>Authority and Binding Obligation</u>.  Subject to Section 5.4, (i) Seller has full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Seller, pursuant to this Agreement (the "<u>Seller Documents</u>"), and to perform all obligations of Seller, under each of the Seller Documents, (ii) the execution and delivery by the signer on behalf of Seller of the Seller Documents, and the performance by Seller of its obligations under each of the Seller Documents, has been duly and validly authorized by all necessary action by Seller, and (iii) each of the Seller Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Seller, enforceable against Seller, in accordance with its terms.  The person executing this Agreement on behalf of Seller has the authority and power to bind Seller.

        7.1.3   <u>Consents and Approvals; No Conflicts</u>.  Subject to the Approval Order, the approval of the appropriate Governmental Authorities in connection with the transfer of the

20

**EXHIBIT A**

Licenses and Permits, if any, which will be obtained prior to Closing to permit operation of the Hotel after Closing, and the recordation of any Seller Documents as appropriate, and except as disclosed in <u>Schedule 7.1.3</u>, (i) no filing with, and no permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution or delivery by Seller of any of the Seller Documents, or the performance by Seller of any of its obligations under any of the Seller Documents or the consummation by Seller of the transaction described in this Agreement, except to the extent the failure to obtain such permit, authorization, consent or approval would not have a material adverse effect on Seller's ability to consummate the transaction described in this Agreement, and (ii) neither the execution and delivery by Seller of any of the Seller Documents, nor the performance by Seller of any of its obligations under any of the Seller Documents, nor the consummation by Seller of the transaction described in this Agreement, will: (A) violate any provision of Seller's organizational or governing documents; (B) violate any Applicable Law to which Seller or the Transferred Property is subject; (C) result in a violation or breach of, or constitute a default under any of the Contracts, except to the extent such violation, breach or default would not have a material adverse effect on Seller's ability to consummate the transaction described in this Agreement; or (D) result in the creation or imposition of any lien or encumbrance on the Transferred Property or any portion thereof.

7.1.4   <u>Condemnation</u>.  Seller has not received any written notice and has no actual Knowledge of any pending condemnation proceeding or other proceeding in eminent domain.

7.1.5   <u>Litigation</u>.  Except as set forth in <u>Schedule 7.1.5</u>, Seller has not been served with, and does not otherwise have Knowledge of, any court filing in or otherwise received written notice of any litigation with respect to the Transferred Property or the Business in which Seller is named a party which has not been resolved, settled or dismissed.

7.1.6   <u>Employees</u>.  Seller is not a party to any collective bargaining agreement with any labor union with respect to the Employees.  Seller is not a party to any written employment agreement with any of the Employees, other than Seller's standard offer letters for at-will employment.  <u>Schedule 7.1.6</u> sets forth a correct and complete list of the positions of each Employee at the Hotel and the number of Employees at the Hotel as of the Effective Date.  There are no individuals working at the Hotel that are employees of Seller or of Seller's property manager other than the Employees.  Purchaser may elect to conduct individual interviews with the Employees prior to Closing, <u>provided</u>, <u>however</u>, that such interviews shall not unduly interfere with the operation of the Business prior to the Closing, and choose to retain and employ post-Closing one or more of the Employees.

7.1.7   <u>Taxes</u>.  Except as disclosed in <u>Schedule 7.1.7</u>, (i) all Taxes which are due and payable will be paid in full at Closing; provided, however, that if any Taxes are payable in installments, such representation and warranty shall apply only to such installments which are due and payable at Closing, (ii) Seller has no Knowledge of an audit of any Taxes which has not been resolved or completed, and (iii) Seller is not currently contesting any Taxes.  The provisions of this Section 7.1.7 will survive the Closing for three (3) years.

7.1.8   <u>Contracts</u>.  <u>Schedule 7.1.8</u> sets forth a correct and complete list of all of the equipment leases, and supply, maintenance, repair, management or other similar agreements to which Seller is a party or is bound (specifically noting those that Seller will terminate at or prior

21

to Closing and those terminable by Purchaser at Closing without any termination fee upon not more than thirty (30) days' notice) relating to and necessary for the operation of the Hotel or the Transferred Property, and Seller has made available to Purchaser a true and complete copy thereof. None of the Contracts have been amended or modified, except as set forth on Schedule 7.1.8. Except as set forth on Schedule 7.1.8, Seller has not given or received any written notice of any breach or default under any of the Contracts which has not been cured.  Seller does not represent or warrant that: (i) any particular Contract will be in force or effect as of the Closing; or (ii) the parties to the Contracts will not be in default under their respective Contracts as of the Closing Date.  The termination or expiration of any Contract shall not affect the obligations of Purchaser under this Agreement.

7.1.9   Finders and Investment Brokers.  Except for the Broker, Seller has not dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of Seller in connection with the transaction described by this Agreement in a manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction described in this Agreement.

7.1.10   Foreign Person.  Seller is a "United States person" (as defined in Section 7701(a)(30)(B) or (C) of the Code) for the purposes of the provisions of Section 1445(a) of the Code.

7.1.11   Bankruptcy.  Seller is presently in bankruptcy in the Northern District of West Virginia.

7.1.12   Anti-Terrorism.  Neither Seller nor any of Seller's Affiliates is or will be (i) conducting any business or engaging in any transaction or dealing with any Person appearing on the U.S. Treasury Department's OFAC list of prohibited countries, territories, "specifically designated nationals" or "blocked person" (each, a "Prohibited Person"), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (ii) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (iii) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (iv) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (v) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (A) any U.S. anti-money laundering law, (B) the Foreign Corrupt Practices Act, (C) the U.S. mail and wire fraud statutes, (D) the Travel Act, (E) any similar or successor statutes or (F) any regulations promulgated under the foregoing statutes.

7.1.13   Personal Property.  Seller has good title to all material Personal Property reasonably necessary to operate the Hotel the day after Closing in generally the same manner as currently operated, except for the leases and purchase money security agreements for any equipment, machinery, vehicles, furniture or other personal property located at the Real Property

EXHIBIT A

or making up a part of the Transferred Property which, in any case, are held by the lessor thereunder and used in the business operated at the Real Property.

7.1.14  Employment Matters.  During the six (6) year period immediately preceding the Effective Date, Seller did not violate in any material respect, any applicable employment laws with respect to Employees, including but not limited to, employment discrimination and retaliation, occupational safety and health, disability, wage and hour, and withholding and payment of taxes, except where such violation was cured or remedied.

7.1.15  Ownership.  Seller is the fee simple owner of the Transferred Property.

7.1.16  Environmental.  Seller is not aware of any past or present release of Hazardous Substances at, on, under, migrating to from, or surrounding the Transferred Property, and has not received any warning notices, notice of violations, administrative complaints, judicial complaints requests for information, or other formal or informal notices from any environmental or governmental agency or from any third party alleging that conditions at, on, under, migrating to or from, or surrounding the Transferred Property are in violation of any Environmental Laws, or that Seller is liable for any costs associated with any remediation relating to the existence of such materials at, on, under or migrating from the Transferred Property.  Seller represents and warrants to Purchaser that no (i) underground tanks, vessels or containers or associated piping used currently or in the past for the management of Hazardous Substances, (ii) dumps, landfills or other units for the treatment or disposal of Hazardous Substances, (iii) PCBs, or (iv) asbestos-containing materials, in each case, are present at, on or under the Transferred Property, nor to Seller's knowledge have such features ever been present at, on or under the Transferred Property.

7.1.17  Notwithstanding the foregoing, if Purchaser has Knowledge of a breach of any representation or warranty made by Seller in this Agreement prior to Closing, and Purchaser nevertheless proceeds to close the transaction described in this Agreement, such representation or warranty by Seller shall be deemed to be qualified or modified to reflect Purchaser's Knowledge of such breach.  Additionally, to the extent that there have been delivered or made available to Purchaser or its representative Seller Due Diligence Materials, and such Seller Due Diligence Materials contain provisions inconsistent with or different from the representations and warranties made herein, then such representations and warranties shall be deemed modified to conform them to the provisions of such documents and materials.

**7.2**    **Purchaser's Representations and Warranties**.  To induce Seller to enter into this Agreement and to consummate the transaction described in this Agreement, Purchaser hereby makes the representations and warranties in this Section 7.2, upon which Purchaser acknowledges and agrees that Seller is entitled to rely.

7.2.1  Organization and Power.  Purchaser is duly incorporated or formed (as the case may be), validly existing and in good standing in the jurisdiction of its formation, and has all requisite power and authority to own, lease and operate its properties and to carry on its business as currently being conducted.

7.2.2  Authority and Binding Obligation.  (i) Purchaser has full power and authority to execute and deliver this Agreement and all other documents to be executed and

EXHIBIT A

delivered by Purchaser pursuant to this Agreement (the "Purchaser Documents"), and to perform all obligations of Purchaser arising under each of the Purchaser Documents, (ii) the execution and delivery by the signer on behalf of Purchaser of each of the Purchaser Documents, and the performance by Purchaser of its obligations under each of the Purchaser Documents, has been duly and validly authorized by all necessary action by Purchaser, and (iii) each of the Purchaser Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms. The person executing this Agreement on behalf of Purchaser has the authority and power to bind Purchaser.

7.2.3   Consents and Approvals; No Conflicts. (i) No filing with, and no permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution or delivery by Purchaser of any of the Purchaser Documents, the performance by Purchaser of any of its obligations under any of the Purchaser Documents, or the consummation by Purchaser of the transaction described in this Agreement, and (ii) neither the execution and delivery by Purchaser of any of the Purchaser Documents, nor the performance by Purchaser of any of its obligations under any of the Purchaser Documents, nor the consummation by Purchaser of the transaction described in this Agreement, will: (A) violate any provision of the organizational or governing documents of Purchaser; (B) violate any Applicable Law to which Purchaser is subject; or (C) result in a violation or breach of or constitute a default under any contract, agreement or other instrument or obligation to which Purchaser is a party or by which any of Purchaser's properties are subject.

7.2.4   Finders and Investment Brokers. Except for Broker, Purchaser has not dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of Purchaser in connection with the transaction described by this Agreement in any manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction described in this Agreement.

7.2.5   No Violation of Anti-Terrorism Laws. Neither Purchaser nor any of Purchaser's Affiliates is or will be (i) conducting any business or engaging in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (ii) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (iii) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (iv) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (v) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (A) any U.S. anti-money laundering law, (B) the Foreign Corrupt Practices Act, (C) the U.S. mail and wire fraud statutes, (D) the Travel Act, (E) any similar or successor statutes or (F) any regulations promulgated under the foregoing statutes.

7.2.6   ERISA. Purchaser is not an employee benefit plan subject to ERISA, or Section 4975 of the Code, Purchaser's assets and the Purchase Price do not constitute "plan assets"

**EXHIBIT A**

within the meaning of the "plan asset regulations" (29 C.F.R. Section 2510.3-101), and Purchaser's acquisition of the Transferred Property will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

Notwithstanding the foregoing, if Seller has Knowledge prior to Closing of a breach of any representation or warranty made by Purchaser in this Agreement and Seller nevertheless elects to close the transaction described in this Agreement, such representation or warranty by Purchaser shall be deemed to be qualified or modified to reflect Seller's Knowledge of such breach.

## ARTICLE VIII
## COVENANTS

**8.1** **Confidentiality**.

8.1.1 <u>Disclosure of Confidential Information</u>. Purchaser shall keep confidential and not make any public announcement or disclose to any Person the existence or any terms of this Agreement or any information disclosed by the Inspections or in the Seller Due Diligence Materials, the Purchaser Due Diligence Reports or any other documents, materials, data or other information with respect to the Transferred Property or the Business which is not generally known to the public or otherwise in the public domain (the "<u>Confidential Information</u>"). Notwithstanding the foregoing, Purchaser shall be permitted to (i) disclose any Confidential Information to the extent required under Applicable Law, and (ii) disclose any Confidential Information to any Person on a "need to know" basis, such as its partners, members, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, engineers, surveyors, lenders, investors, managers, franchisors and such other Persons whose assistance is required to consummate the transactions described in this Agreement; provided, however, that Purchaser shall (A) advise each such Person of the confidential nature of such Confidential Information, and (B) use commercially reasonable efforts to cause each such Person to maintain the confidentiality of such Confidential Information.

8.1.2 <u>Public Announcements</u>. Subject to Section 5.4 and notwithstanding Section 8.1.1, neither Party shall have the right before Closing to make a public announcement regarding the transaction described in this Agreement; provided that any announcement made at or after Closing that includes the name(s) of Seller or Purchaser and/or any affiliates thereof shall require the written consent of Seller or Purchaser, as applicable, in its sole and absolute discretion.

8.1.3 <u>Communication with Governmental Authorities</u>. Without limiting the generality of the provisions in Section 8.1.1, Purchaser shall not, through its officers, employees, managers, contractors, consultants, agents, representatives or any other Person (including, without limitation, Purchaser's Inspectors), directly or indirectly, communicate with any Governmental Authority or any official, employee or representative thereof, involving any matter with respect to the Transferred Property or the Business, unless required by Applicable Law; provided that the foregoing shall not limit or restrict Purchaser's right to (i) search and submit requests for public records and public databases via customary searches and (ii) request customary open permit, code violation, tax and lien searches and zoning verification letters.

8.1.4 <u>Survival</u>. Purchaser's obligations under this Section 8.1 shall survive the termination of this Agreement.

**EXHIBIT A**

**8.2** **Conduct of the Business**.

8.2.1 <u>Operation in Ordinary Course of Business</u>.  From the Effective Date until the Closing or earlier termination of this Agreement, except as otherwise provided in this Agreement, Seller shall conduct the Business in the Ordinary Course of Business, including, without limitation, (i) maintaining the inventories of FF&E, and Supplies at levels maintained in the Ordinary Course of Business, (ii) performing maintenance and repairs for the Real Property and tangible Personal Property in the Ordinary Course of Business and (iii) maintaining insurance.

8.2.2 <u>Contracts</u>.  From the Effective Date until the Closing or earlier termination of this Agreement, Seller shall not (i) terminate any Contract except in the Ordinary Course of Business without obtaining Purchaser's written consent (which consent shall not be unreasonably withheld, conditioned or delayed) or (ii) enter into any new supply, maintenance, repair, management or similar agreement or contract that is not terminable by Purchaser at Closing without any termination fee upon not more than thirty (30) days' notice, or amend any existing Contract with the result that such Contract is not terminable by Purchaser following Closing without any termination fee upon not more than thirty (30) days' notice, without obtaining in each instance Purchaser's prior written consent.  If Purchaser fails to notify Seller of its failure to give any requested consent or approval within five (5) Business Days after any request therefor, accompanied by a statement of its reasons for withholding such consent or approval, Purchaser shall be deemed to have approved the matter in issue.

**8.3** **Licenses and Permits**.  Purchaser shall reasonably cooperate in obtaining the transfer of all Licenses and Permits which Purchaser agrees to assume, as set forth in <u>Schedule 8.3</u> attached hereto (to the extent transferable) or the issuance of new Licenses and Permits.  If this Agreement is terminated and Purchaser has filed an application or otherwise commenced the processing of obtaining new Licenses and Permits, Purchaser shall withdraw all such applications and cease all other activities with respect to such new Licenses and Permits. Purchaser's obligations under the immediately preceding sentence shall survive the termination of this Agreement.  For the avoidance of doubt, Purchaser acknowledges that there is not a permanent certificate of occupancy for the Transferred Property, that the temporary certificate of occupancy is for residential use rather than for transient Hotel use and it is not a condition to Closing, and there shall be no liability, if there is no temporary or permanent certificate of occupancy in effect as of Closing or if there is a certificate of occupancy in effect as of Closing, the permitted uses thereunder.

**8.4** **Employees**.

8.4.1 <u>COBRA</u>.  Neither Seller nor any of its affiliates shall have COBRA or other mandated group health plan continuation coverage obligations for any laid off Employees, including any that may be rehired by the Purchaser on or after the Closing.

8.4.2 The provisions of this Section 8.4 shall survive the Closing indefinitely.

**8.5** **Bookings**.  Purchaser shall assume all of the obligations of Seller relating to Bookings booked in the Ordinary Course of Business at market rates prior to the Closing Date, which shall relate to periods on or after the Closing Date.  Purchaser shall indemnify, defend, and

**EXHIBIT A**

hold harmless Seller for, from, and against any loss, damage, liability, or claim (including attorneys' fees in a reasonable amount and court costs) incurred by Seller stemming from Purchaser's failure to honor such Bookings. The provisions of this paragraph shall survive the Closing.

### 8.6    Tax Contests and Clearance.

8.6.1    Taxable Period Terminating Prior to Closing Date. Seller shall retain the right to commence, continue and settle any proceeding to contest any Taxes for any taxable period which terminates prior to the Closing Date, and shall be entitled to any refunds or abatements of Taxes awarded in such proceedings, including, without limitation, those property tax appeals matters as set forth in Schedule 8.6) (the "Property Tax Appeals Matters"). In the event Purchaser receives any such refunds or abatements of Taxes to which Seller is entitled under this Section 8.6.1, Purchaser shall deliver such refunds or abatements to Seller within five (5) Business Days after Purchaser's receipt thereof. This Section 8.6.1 shall survive the Closing.

8.6.2    Taxable Period Including the Closing Date. Purchaser shall have the right to commence, continue and settle any proceeding to contest any Taxes for any taxable period which includes the Closing Date, and Purchaser and Seller shall be entitled to their pro rata share (based on their respective days of ownership during such taxable period) of any refunds or abatements of Taxes awarded in such proceedings after Purchaser has been reimbursed for its reasonable expenses of such proceedings.

8.6.3    Taxable Period Commencing After Closing Date. Purchaser shall have the right to commence, continue and settle any proceedings to contest Taxes for any taxable period which commences after the Closing Date, and shall be entitled to any refunds or abatements of Taxes awarded in such proceedings. This Section 8.6.3 shall survive the Closing.

8.6.4    Cooperation. Seller and Purchaser shall use commercially reasonable efforts to cooperate with the Party contesting the Taxes (at no cost or expense to the Party not contesting the Taxes other than any *de minimis* cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) and to execute and deliver any documents and instruments reasonably requested by the Party contesting the Taxes in furtherance of the contest of such Taxes. This Section 8.6.4 shall survive the Closing.

### 8.7    Notices and Filings. Seller and Purchaser shall use commercially reasonable efforts to cooperate with each other (at no cost or expense to the Party whose cooperation is requested, other than any *de minimis* cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to provide written notice to any Person under any Contracts, Licenses and Permits, and to effect any registrations or filings with any Governmental Authority or other Person, regarding the change in ownership of the Transferred Property or the Business. This Section 8.7 shall survive the Closing.

### 8.8    Access to Information. After the Closing, Purchaser shall provide to the officers, employees, agents and representatives of any Seller Indemnitees reasonable access to (i) the Books and Records with respect to the Hotel, (ii) the Transferred Property, and (iii) the employees at the Hotel, for any purpose reasonably required by Seller, including, without limitation, to prepare any

EXHIBIT A

documents required to be filed by Seller under Applicable Law, including any filings appropriate or necessary in the Bankruptcy Case, or to investigate, evaluate and defend any claim, charge, audit, litigation or other proceeding made by any Person or insurance company; provided, however, that (A) such Seller Indemnitees shall provide reasonable prior notice to Purchaser; (B) Purchaser shall not be required to provide such access during non-business hours; (C) such access shall not unreasonably interfere with the Business; (D) Purchaser shall have the right to accompany the officer, employees, agents or representatives of such Seller Indemnitees in providing access to the Books and Records, the Transferred Property or the employees of Purchaser (or Purchaser's manager) as provided in this Section 8.8.  This Section 8.8 shall survive the Closing.  Seller at its sole cost and expense shall, prior to Closing, make any desired copies of the Books and Records or other records associated with the Hotel and their operations.

**8.9    Privacy Laws**.  To the extent Purchaser reviews, is given access to or otherwise obtains any Hotel Guest Data and Information as part of the purchase of the Transferred Property and the Business, Purchaser shall at all times comply in all material respects with all Applicable Law concerning (i) the privacy and use of such Hotel Guest Data and Information and the sharing of such information and data with third parties (including, without limitation, any restrictions with respect to Purchaser's or any third party's ability to use, transfer, store, sell, or share such information and data), and (ii) the establishment of adequate security measures to protect such Hotel Guest Data and Information.  This Section 8.9 shall survive the Closing.

**8.10    Further Assurances**.  From the Effective Date until the Closing or earlier termination of this Agreement, Seller and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transaction described in this Agreement, including, without limitation, (i) obtaining all necessary consents, approvals and authorizations required to be obtained from any Governmental Authority or other Person under this Agreement or Applicable Law, and (ii) effecting all registrations and filings required under this Agreement or Applicable Law.  After the Closing, Seller and Purchaser shall use commercially reasonable efforts (at no cost or expense to such Party, other than any *de minimis* cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to further effect the transaction contemplated in this Agreement.  The immediately preceding sentence of this Section 8.10 shall survive the Closing.

## ARTICLE IX
## CLOSING CONDITIONS

### 9.1    Purchaser Closing Conditions.

9.1.1    Satisfaction of Purchaser Closing Conditions.  Purchaser's obligations to close the transactions described in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent, unless one or more obligations are waived by Purchaser (the "Purchaser Closing Conditions"):

(a)    Seller's Deliveries.  All of the Seller Closing Deliveries shall have been delivered to Purchaser.

**EXHIBIT A**

(b)    <u>Representations and Warranties</u>.  The representations or warranties of Seller in this Agreement (as qualified by any schedules to this Agreement as updated in accordance with Section 16.13) shall be true and correct in all material respects as of the Closing (except to the extent that (x) any such representation or warranty is made as of a specific date and/or (y) the failure of any such representation or warranty pursuant to Sections 7.1.4, 7.1.5 (to the extent such failure does not have and is not reasonably likely to have a material adverse effect on the Transferred Property or Seller's ability to consummate the transaction described in this Agreement), 7.1.7(ii), 7.1.7(iii), or 7.1.9 to be true at Closing shall not result from a breach of covenant by Seller hereunder).

(c)    <u>Covenants and Obligations</u>.  The covenants and obligations of Seller in this Agreement shall have been performed in all material respects.

(d)    <u>Title</u>.  Subject to receipt by Carter Bank at Closing of the amount set forth in Section 3.3.1, title to the Transferred Property shall be free and clear of all liens and other encumbrances other than Permitted Exceptions.

(e)    The Bankruptcy Court shall have entered the Approval Order within 120 days from the Effective Date, unless a different period is agreed to by Purchaser and Seller.

(f)    The Diligence Period shall have expired.

(g)    The Exhibits to the Agreement shall be in form and substance acceptable to Purchaser.

**9.2    <u>Seller Closing Conditions</u>.**

(a)    <u>Satisfaction of Seller Closing Conditions</u>.  Seller's obligations to close the transactions contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent, unless one or more obligations are waived by Seller (the "<u>Seller Closing Conditions</u>"):

(b)    <u>Receipt of the Purchase Price</u>.  Purchaser shall have (A) paid to Seller or deposited with Escrow Agent with written direction to disburse the same to Seller, the Purchase Price (as adjusted pursuant to Section 3.1 less the Deposit), and (B) delivered written direction to Escrow Agent to disburse the Deposit to Seller.

(c)    <u>Purchaser's Deliveries</u>.  All of the Purchaser Closing Deliveries shall have been delivered to Seller.

(d)    <u>Representations and Warranties</u>.  The representations and warranties of Purchaser in this Agreement shall be true and correct in all material respects as of the Closing (or as of such other date to which such representation or warranty expressly is made).

(e)    <u>Covenants and Obligations</u>.  The covenants and obligations of Purchaser in this Agreement shall have been performed in all material respects.

**EXHIBIT A**

9.2.2  _Failure of Seller Closing Condition_.  If any of the Seller Closing Conditions is not satisfied at Closing, then Seller shall have the right to (i) terminate this Agreement by providing written notice to Purchaser, in which case the Deposit shall be disbursed to Seller in accordance with Section 3.2.3, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (ii) waive any of the Seller Closing Conditions at or prior to Closing

## ARTICLE X
## CLOSING

**10.1    Closing Date**.  The closing of the transaction described in this Agreement (the "Closing") shall take place at 10:00 a.m. Eastern Time at the offices of Kay Casto & Chaney PLLC, 1500 Chase Tower, 15th Floor, 707 Virginia Street, East, Charleston, WV 25301, or by overnight delivery and wire transfer, no later than thirty (30) days after the later to occur of (i) expiration of the Diligence Period or (ii) the Business Day after all of the conditions to the obligations of the Seller and Purchaser under Article IX (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing) have been satisfied or waived in accordance with this Agreement, or at such other time and place as agreed to in writing by the Parties (the "Scheduled Closing Date") (as such date may be postponed pursuant to Section 5.2.1 or 13.2) (the date on which the Closing actually occurs is referred to herein as the "Closing Date"); provided, that each of Purchaser and Seller may adjourn the Scheduled Closing Date as provided in Section 10.1.1 below.

10.1.1 _Extension of Closing Date_.  Each of Purchaser and Seller may adjourn the Scheduled Closing Date once, upon at least five (5) days' prior written notice to the other Party for a period of no more than fifteen (15) days; provided, however, that Seller shall have the right, but not the obligation, to postpone the Closing one or more times, but in no event for more than thirty (30) days in the aggregate from the Scheduled Closing Date; provided further, that TIME SHALL BE OF THE ESSENCE with respect to Purchaser's obligation to close the transactions contemplated herein no later than the Scheduled Closing Date, as same may be adjourned by Purchaser as provided above.

**10.2    Closing Deliveries**.

10.2.1 _Seller's Deliveries_.  At the Closing, Seller shall deliver or cause to be delivered to Purchaser all of the (i) documents set forth in this Section 10.2.1, each of which shall have been duly executed by Seller and acknowledged (if required), and (ii) other items set forth in this Section 10.2.1 (the "Seller Closing Deliveries"), as follows:

(a)     A closing certificate in the form of _Exhibit A_, together with all exhibits thereto;

(b)     A limited warranty deed (the "Deed") in the form of _Exhibit B_, conveying the Real Property to Purchaser, subject to the Permitted Exceptions;

(c)     A Bill of Sale in the form of _Exhibit C_, transferring the FF&E, Supplies, IT Systems, Intellectual Property, Books and Records, Plans and Specifications, Warranties, Bookings and Accounts Receivable to Purchaser on the terms set forth therein;

**EXHIBIT A**

(d)　　A FIRPTA affidavit in the form set forth in the regulations under Section 1445 of the Code;

(e)　　The Access Easement;

(f)　　A rent roll, list of Bookings and list of accounts receivable updated to no earlier than one day prior to the Closing Date;

(g)　　To the extent not previously delivered to Purchaser, and to the extent in Seller's possession or control, all originals (or copies if originals are not available) of the Contracts, Books and Records, the Bookings, keys and lock combinations or codes in Seller's Possession, which shall be located at the Hotel on the Closing Date and deemed to be delivered to Purchaser upon delivery of possession of the Hotel; provided, however, that Seller shall have the right to (i) redact and reformat any Books and Records which include data or other information pertaining to any other Hotel owned, managed or franchised by Seller or its Affiliates, and (ii) retain copies of any Books and Records delivered to Purchaser;

(h)　　The Closing Statement prepared pursuant to Section 11.1;

(i)　　A letter to each counterparty under the Contracts (the "Contractor Notification Letters"), in the form of Exhibit D attached hereto, notifying such contractor of Purchaser's acquisition of the Transferred Property and of the assignment of the Contracts to Purchaser; and

(j)　　The Tax Escrow Agreement;

10.2.2 _Purchaser's Deliveries_.  At the Closing, Purchaser shall deliver or cause to be delivered to Seller all of the (i) documents set forth in this Section 10.2.2, each of which shall have been duly executed by Purchaser and acknowledged (if required), and (ii) other items set forth in this Section 10.2.2 (the "Purchaser Closing Deliveries"), as follows:

(a)　　The Purchase Price (as adjusted pursuant to Section 3.1) to be paid by Purchaser, less the Deposit received by Seller;

(b)　　A letter of direction to Escrow Agent directing Escrow Agent to disburse the Deposit to Seller;

(c)　　A closing certificate in the form of Exhibit E, together with all exhibits thereto;

(d)　　A counterpart of each of the documents and instruments to be delivered by Seller under Section 10.2.1 which require execution by Purchaser;

(e)　　Such other documents and instruments as may be requested by the Title Company in order to consummate the transaction described in this Agreement.

**10.3　　Possession**.  Seller shall deliver possession of the Real Property, subject only to the Permitted Exceptions and tangible Personal Property to Purchaser upon completion of the Closing.

**EXHIBIT A**

## ARTICLE XI
## PRORATIONS AND EXPENSES

**11.1** **Closing Statement**.  At least five (5) Business Days prior to Closing, the parties shall cause the Title Company to prepare an initial draft of a closing statement, and Seller shall provide Purchaser with a then current list of bookings and accounts receivable, and an accounting of all payments to be made by or on behalf of Seller with the proceeds received from the Purchase Price.  No later than the three (3) Business Days prior to Closing, the Parties, through their respective employees, agents or representatives, jointly shall make such examinations, audits and inventories of the Hotel as may be necessary to make the adjustments and prorations to the Purchase Price as set forth in Sections 11.2 and 11.3 or any other provisions of this Agreement. Based upon such examinations, audits and inventories, the Parties jointly shall prepare prior to Closing a closing statement (the "Closing Statement"), which shall set forth their best estimate of the amounts of the items to be adjusted and prorated under this Agreement.  The Closing Statement shall be delivered to the Secured Lender at least two (2) Business Day prior to Closing for its review, comment and approval with respect to all amounts due and payable to the Secured Lender (including without limitation the Secured Lender Lien Release Amount), such approval not to be unreasonably withheld, conditioned or delayed. The Closing Statement shall be approved and executed by the Parties at Closing, and such adjustments and prorations shall be final with respect to the items set forth in the Closing Statement, except to the extent any such items shall be re-prorated after the Closing as expressly set forth in Section 11.2.  Notwithstanding the foregoing, if at any time within sixty (60) days after the Closing, any Party discovers any item which was omitted or incorrectly adjusted or prorated in the Closing Statement, such item shall be adjusted and prorated in the same manner as if their existence or such error had been known at the time of the preparation of the Closing Statement, and the Party in whose favor such original omission or error was made shall refund such difference to the other Party promptly after the original omission or error is discovered.  The preceding sentence of this Section 11.1 shall survive the Closing.

**11.2** **Prorations**.  The items of revenue and expense set forth in this Section 11.2 shall be prorated between the Parties (the "Prorations") (i) as of 11:59 p.m. local time (at the Hotel) on the day preceding the Closing Date, except with respect to cash on hand, account funds, inventory and vending machines, and (ii) 4:00 a.m. local time (at the Hotel) on the Closing Date with respect to cash on hand, account funds, inventory and vending machines (the "Cut-Off Time"), so that the Closing Date is a day of income and expense for Purchaser.

　　11.2.1 Contracts.  Any amounts prepaid, accrued or due and payable under the Contracts to be assumed by Purchaser (other than for utilities which proration is addressed separately in Section 11.2.2) shall be prorated as of the Cut-Off Time between Seller and Purchaser with Seller being credited for amounts prepaid, and Purchaser being credited for amounts accrued and unpaid.  Purchaser shall receive a credit for all deposits held by Seller under the Contracts (together with any interest thereon) which are not transferred to Purchaser, and Purchaser thereafter shall be obligated to refund or apply such deposits in accordance with the terms of such Contracts.  Seller shall receive a credit for all deposits made by Seller under the Contracts to be assumed by Purchaser (together with any interest thereon) which are transferred to Purchaser or remain on deposit for the benefit of Purchaser.

EXHIBIT A

11.2.2  Utilities.  All utility services shall be prorated as of the Cut-Off Time between Seller and Purchaser.  The Parties shall use commercially reasonable efforts to obtain readings for all utilities and fuel as of the Cut-Off Time.  If readings cannot be obtained as of the Closing Date, the cost of such utilities shall be prorated between Seller and Purchaser by estimating such cost on the basis of the most recent bill for such service; provided, however, that after the Closing, the Parties shall re-prorate the amount for such utilities and pay any deficiency in the original proration to the other Party promptly upon receipt of the actual bill for the relevant billing period, which obligation shall survive the Closing.  Seller shall receive a credit for all fuel stored at the Hotel based on Seller's cost for such fuel.  Seller shall receive a credit for all deposits transferred to Purchaser or which remain on deposit for the benefit of Purchaser with respect to such utility contracts.

11.2.3  Compensation and other Employee-Related Prorations.  Seller shall pay directly to the Employees then employed at the Hotel for the payroll period that includes the Closing Date for all Compensation due to such Employees through the Cut-Off Time on or before Seller's first payroll date on or after the Closing Date, and Purchaser shall not receive a credit for any Compensation with respect to such Employees.  This Section 11.2.3 shall survive the Closing.

11.2.4  Accrued PTO and Accrued Vacation Pay.  Seller shall provide Purchaser a credit in an amount equal to the Accrued Vacation Pay and the Accrued PTO as of the Cut-Off Time for any Employees then employed at the Hotel and which will continue to be employed at the Hotel by Purchaser after Closing, and Purchaser shall permit such Employees to take vacation, sick, and personal time off with respect thereto after the Closing in accordance with the terms of the vacation, sick, and personal time off policies in effect with respect to such Employees as of the Closing Date employed at the Hotel.  This Section 11.2.4 shall survive the Closing.

11.2.5  Bookings.  Purchaser shall receive a credit for all prepaid deposits for Bookings scheduled to occur on or after the Closing Date or otherwise spanning any period which includes the Closing Date as set forth in the schedule of Bookings delivered to Purchaser at Closing, except to the extent such deposits are transferred to Purchaser.  Purchaser shall assume all of the obligations of Seller relating to reservations booked in the Ordinary Course of Business at market rates prior to the Closing Date, which shall relate to periods on or after the Closing Date, subject to the provisions of Section 8.5.  Purchaser shall indemnify, defend, and hold harmless Seller Indemnitees for, from, and against any Indemnification Loss incurred by Seller arising from Purchaser's failure to honor such reservations.

11.2.6  Vending Machines.  Seller shall remove all monies from all vending machines, laundry machines, pay telephones and other coin operated equipment as of the Cut-Off Time and shall retain all monies collected therefrom as of the Cut-Off Time, and Purchaser shall be entitled to any monies collected therefrom after the Cut-Off Time.

11.2.7  Trade Payables.  Except to the extent an adjustment or proration is made under another subsection of this Section 11.2, (i) Seller shall pay in full prior to the Closing all amounts payable to vendors or other suppliers of goods or services for the Business (the "Trade Payables") which are due and payable as of the Closing Date for which goods or services have been delivered to the Hotel prior to Closing and (ii) Purchaser shall receive a credit for the amount of such Trade Payables (other than those payable to any Affiliate of Seller) which have accrued,

33

**EXHIBIT A**

but are not yet due and payable as of the Closing Date, and Purchaser shall pay all such Trade Payables accrued as of the Closing Date when such Trade Payables become due and payable; provided, however, Seller and Purchaser shall re-prorate the amount of credit for any Trade Payables and pay any deficiency in the original proration to the other Party promptly upon receipt of the actual bill for such goods or services. Seller shall receive a credit for all advance payments or deposits made with respect to FF&E, and Supplies ordered, but not delivered to the Hotel prior to the Closing Date, except to the extent that such items would have constituted Excluded Property had they been delivered to the Hotel prior to the Closing Date, and Purchaser shall pay the amounts which become due and payable for such FF&E, and Supplies which were ordered prior to Closing, except to the extent that such items would have constituted Excluded Property had they been delivered to the Hotel prior to the Closing Date; provided, however, promptly following the sixtieth (60th) day following the Closing Date, Seller and Purchaser shall re-prorate the amount of credit for all such advance payments or deposits based on the goods and services so ordered as were then actually received by Purchaser. This Section 11.2.7 shall survive the Closing.

11.2.8 <u>Cash</u>. Seller shall receive a credit for all cash on hand or on deposit in any house bank at the Hotel which shall remain on deposit for the benefit of Purchaser.

11.2.9 <u>Other Adjustments and Prorations</u>. All other items of income and expense as are customarily adjusted or prorated upon the sale and purchase of a Hotel property in Elkview, West Virginia similar to the Transferred Property shall be adjusted and prorated between Seller and Purchaser accordingly.

**11.3    Accounts Receivable**.

11.3.1 <u>Guest Ledger</u>. At Closing, Seller shall receive a credit in an amount equal to: (i) all amounts charged to the Guest Ledger for all room nights up to the night during which the Cut-Off Time occurs, and (ii) one half (1/2) of all amounts charged to the Guest Ledger for the room night which includes the Cut-Off Time. The Guest Ledger which shall be prorated as set forth above and Purchaser shall be entitled to retain all deposits made and amounts collected with respect to such Guest Ledger. Seller will settle all outstanding Guest ledger balance on credit cards provided by Guests and settle credit card batch to receive credit. Purchaser cannot use Seller's credit card authorization to settle cards in the future.

11.3.2 <u>Accounts Receivable (Other than Guest Ledger)</u>. All accounts receivable to the date of Closing shall belong to the Seller. Purchaser agrees to assist in the collection of said receivables by promptly remitting any such payments received by it to the Seller.

**11.4    Transaction Costs**.

11.4.1 <u>Seller's Transaction Costs</u>. In addition to the other costs and expenses to be paid by Seller set forth elsewhere in this Agreement, Seller shall pay for the following items in connection with this transaction: (i) any commission or other compensation or consideration due to Broker; (ii) one half (½) of any transfer, sales or similar tax and recording charges payable in connection with the conveyance of the Real Property; (iii) one half (½) of the fees and expenses for the Escrow Agent; and (iv) the fees and expenses of its own attorneys, accountants, intermediaries, advisors and consultants.

EXHIBIT A

11.4.2  <u>Purchaser's Transaction Costs</u>.  In addition to the other costs and expenses to be paid by Purchaser as set forth elsewhere in this Agreement, Purchaser shall pay for the following items in connection with this transaction:  (i) the fees and expenses incurred by Purchaser for Purchaser's Inspectors or otherwise in connection with the Inspections; (ii) the cost to obtain the Title Commitment; (iii) any sales or similar taxes payable in connection with the conveyance of the Personal Property; (iv) any fees or expenses payable for the assignment, transfer or conveyance of any Contracts, Licenses and Permits, IT Systems, Intellectual Property, Plans and Specifications and Warranties; (v) any mortgage tax, and expenses for any loan title insurance policies, recording charges or other amounts payable in connection with any financing obtained by Purchaser; (vi) one half (1/2) of the fees and expenses for the Escrow Agent; (vii) one half (½) of any transfer, sales or similar tax and recording charges payable in connection with the conveyance of the Real Property; and (viii) the fees and expenses of its own attorneys, accountants, intermediaries, advisors and consultants.

11.4.3  <u>Other Transaction Costs</u>.  All other fees, costs and expenses not expressly addressed in this Section 11.4 or elsewhere in this Agreement shall be allocated between Seller and Purchaser in accordance with applicable local custom for similar transactions.

11.4.4  This Section 11.4 shall survive the Closing.

## ARTICLE XII
## TRANSITION PROCEDURES

**12.1  Baggage**.  On the Closing Date, employees, agents or representatives of the Parties jointly shall make a written inventory of all baggage, boxes and similar items checked in or left in the care of Seller at the Hotel, and Seller shall deliver to Purchaser the keys to any secured area which such baggage and other items are stored (and thereafter such baggage, boxes and other items inventoried shall be deemed the "<u>Inventoried Baggage</u>").  Purchaser shall be responsible for, and shall indemnify and hold harmless the Seller Indemnitees in accordance with Article XV from and against any Indemnification Loss incurred by any Seller Indemnitees with respect to any theft, loss or damage to any Inventoried Baggage from and after the time of such inventory.

**12.2  IT Systems**.  With respect to the IT Systems, Seller shall provide Purchaser with a contact name and a telephone number and/or email address of the applicable licensor, vendor or supplier, and Purchaser shall (i) be responsible for obtaining any consents or approvals necessary for the assignment or transfer of such IT Systems from Seller to Purchaser should Purchaser agree to assume such Systems, or a new license for such IT Systems, should Purchaser agree to utilize the same vendor (as the case may be), and (ii) pay any fees or expenses charged by the licensor, vendor or supplier of such IT Systems in respect of such assignment or transfer or new license (as the case may be); provided that, Seller, at no cost or liability to Seller, shall, upon Purchaser's request, cooperate with Purchaser in all reasonable respects in Purchaser's efforts to effectuate such assignment or transfer or procurement of a new license.  Seller shall be responsible for any termination charges or fees of any IT Systems contract that is not assumed by or transferred to Purchaser.  With respect to the Excluded IT Systems to be removed from the Hotel at Closing, Seller shall have no obligation to replace such Excluded IT Systems.  If Purchaser replaces any of the Excluded IT Systems removed by Seller, Seller, at no cost or liability to Seller, shall cooperate with Purchaser in all reasonable respects to transfer all data from such Excluded IT Systems which

35

EXHIBIT A

were removed to the replacement systems installed by Purchaser, provided, however, that Seller makes no representation, warranty or guarantee whatsoever that the data on such Excluded IT Systems removed by Seller will be transferable or compatible with the replacement systems installed by Purchaser.  This Section 12.2 shall survive the Closing.

**12.3**    **Notice to Guests and Employees**.  At Purchaser's option, Purchaser shall issue an announcement to all Employees, guests and customers at the Hotel on or after the Closing Date and all Persons who have Bookings as of the Closing Date informing such Persons of the change in ownership of the Hotel.

## ARTICLE XIII
## DEFAULT AND REMEDIES

**13.1**    **Seller's Default**.  If, on the Scheduled Closing Date, Seller fails to deliver good and marketable title to the Property, Seller fails to deliver all Seller Closing Deliveries, Seller fails to perform any of its covenants or agreements under this Agreement in any material respect, Purchaser does not receive a clean Phase I Environmental Report, or Seller fails to deliver the Approval Order within 120 days (each, a "Seller Default"), and no Purchaser Default has occurred which remains uncured, then Purchaser, as its sole and exclusive remedy, may elect to (a) terminate this Agreement, in which case the Deposit shall be refunded to Purchaser in accordance with Section 3.2.4, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination; (b) proceed to Closing without any reduction in or setoff against the Purchase Price, in which case Purchaser shall be deemed to have waived such Seller Default; or (c) obtain a court order for specific performance, together, in any such case, with Purchaser's rights under Section 16.11 hereof; provided, however, that Purchaser shall only be entitled to such specific performance remedy if: (w) Seller shall default in its obligation to consummate the Closing under this Agreement; (x) any such suit for specific performance is filed no later than thirty (30) days after the Scheduled Closing Date; (y) Purchaser is not in default under this Agreement; and (z) Purchaser certifies to Seller that it is ready, willing and able to close in accordance with the terms of this Agreement.

**13.2**    **Seller's Right to Cure**.  Notwithstanding anything to the contrary in this Agreement, Purchaser shall not have the right to exercise its remedies under Section 13.1 for a Seller Default, unless Purchaser has provided written notice to Seller specifying in reasonable detail the nature of the Seller Default, and Seller has not cured such Seller Default within fifteen (15) days after Seller's receipt of such notice (the "Seller Cure Period"), in which case the Closing shall be postponed until the date which is five (5) Business Days after the expiration of the Seller Cure Period.

**13.3**    **Purchaser's Default**.  If on the Scheduled Closing Date, Purchaser fails to perform any of its covenants or obligations under this Agreement in any material respect and no Seller Default has occurred which remains uncured (a "Purchaser Default"), then Seller, as its sole and exclusive remedy, may elect to (A) terminate this Agreement by providing written notice to Purchaser, in which case the Deposit shall be disbursed to Seller in accordance with Section 3.2.3, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (B) proceed to Closing pursuant to this Agreement, in which case Seller shall be deemed to have waived such Purchaser Default.

**EXHIBIT A**

**13.4    Purchaser's Right to Cure**.  Notwithstanding anything to the contrary in this Agreement, Seller shall not have the right to exercise its remedies under Section 13.3 for a Purchaser Default, unless Seller has provided written notice to Purchaser specifying in reasonable detail the nature of the Purchaser Default, and Purchaser has not cured such Purchaser Default within fifteen (15) days (or such longer period as is reasonably necessary to effect such cure) after receipt of such notice (the "Purchaser Cure Period"), in which case the Closing shall be postponed until the date which is five (5) Business Days after the expiration of the Purchaser Cure Period.

**13.5    LIQUIDATED DAMAGES**.  THE PARTIES ACKNOWLEDGE AND AGREE THAT IF THIS AGREEMENT IS TERMINATED PURSUANT TO SECTION 13.3 HEREOF, THE DAMAGES THAT SELLER WOULD SUSTAIN AS A RESULT OF SUCH TERMINATION WOULD BE DIFFICULT IF NOT IMPOSSIBLE TO ASCERTAIN. ACCORDINGLY, THE PARTIES AGREE THAT SELLER SHALL RETAIN THE DEPOSIT AS FULL AND COMPLETE LIQUIDATED DAMAGES (AND NOT AS A PENALTY) AS SELLER'S SOLE AND EXCLUSIVE REMEDY FOR SUCH TERMINATION; PROVIDED, HOWEVER, THAT IN ADDITION TO THE DEPOSIT, SELLER SHALL RETAIN ALL RIGHTS AND REMEDIES UNDER THIS AGREEMENT WITH RESPECT TO THOSE OBLIGATIONS OF PURCHASER WHICH EXPRESSLY SURVIVE SUCH TERMINATION.

**ARTICLE XIV**
**CASUALTY AND CONDEMNATION**

**14.1    Casualty**.  If, at any time after the Effective Date and prior to Closing or earlier termination of this Agreement, the Transferred Property or any portion thereof is damaged or destroyed by fire or any other casualty (a "Casualty"), Seller shall give written notice of such Casualty to Purchaser promptly after the occurrence of such Casualty.

14.1.1 Material Casualty.  If the amount of the repair or restoration of the Transferred Property required by a Casualty equals or exceeds Five Hundred Thousand and 00/100 Dollars ($500,000.00) (a "Material Casualty") (as determined by an independent licensed engineer or contractor reasonably selected by Seller) and such Material Casualty was not caused by Purchaser or Purchaser's Inspectors, or their respective employees or agents, then Purchaser shall have the right to elect, by providing written notice to Seller within ten (10) Business Days after Purchaser's receipt of Seller's written notice of such Material Casualty and the engineer's or contractor's written determination, to (a) terminate this Agreement, in which case the Deposit shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (b) proceed to Closing, without terminating this Agreement, in which case Seller shall transfer and assign and pay over, as applicable, to Purchaser, without representation, warranty, covenant or recourse, all of Seller's right, title and interest in and to all proceeds from all casualty insurance policies maintained by Seller with respect to the Transferred Property or the Business, except, for the avoidance of doubt, those proceeds and costs of restoration from such Casualty incurred by Seller for the period prior to the Closing and those proceeds allocable to lost profits for the time period prior to the Closing. If Purchaser fails to provide written notice of its election to Seller within such time period, then Purchaser shall be deemed to have elected to proceed to Closing pursuant to clause (b) of the preceding sentence.  If the Closing is scheduled to occur within Purchaser's ten (10) Business Day

37

EXHIBIT A

election period, the Closing Date shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) Business Day election period.

        14.1.2 <u>Non Material Casualty</u>.  In the event of any (i) Casualty which is not a Material Casualty, or (ii) Material Casualty which is caused by Purchaser or Purchaser's Inspectors, or their respective employees or agents, then Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Seller shall transfer and assign and pay over, as applicable, to Purchaser, without representation, warranty, covenant or recourse, all of Seller's right, title and interest in and to all proceeds from all casualty insurance policies maintained by Seller with respect to the Transferred Property or the Business, except, for the avoidance of doubt, those proceeds and costs of restoration from such Casualty incurred by Seller for the period prior to the Closing and those proceeds allocable to any lost profits for the time period prior to the Closing.

    **14.2**    <u>**Condemnation**</u>.  If, at any time after the Effective Date and prior to Closing or the earlier termination of this Agreement, any Governmental Authority issues a notice of condemnation or commences any condemnation proceeding or other proceeding in eminent domain with respect to all or any portion of the Real Property (a "<u>Condemnation</u>"), Seller shall give written notice of such Condemnation to Purchaser promptly after Seller receives notice of such Condemnation.

        14.2.1 <u>Material Condemnation</u>.  If the Condemnation would result in the permanent loss of more than five percent (5%) of the fair market value of the Land or Improvements as reasonably determined by Seller (a "<u>Material Condemnation</u>"), then Purchaser shall have the right to elect, by providing written notice to Seller within ten (10) Business Days after Purchaser's receipt of Seller's written notice of such Material Condemnation, to (A) terminate this Agreement, in which case the Deposit shall be refunded to Purchaser in accordance with Section 3.2.4, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (B) proceed to Closing, without terminating this Agreement, in which case Seller shall pay over and assign, as applicable, to Purchaser, without representation, warranty, covenant or recourse, all of Seller's right, title and interest in all proceeds and awards from such Material Condemnation.  If Purchaser fails to provide written notice of its election to Seller within such time period, then Purchaser shall be deemed to have elected to proceed to Closing pursuant to clause (B) of the preceding sentence.  If the Closing is scheduled to occur within Purchaser's ten (10) Business Day election period, the Closing shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) Business Day election period.

        14.2.2 <u>Non-Material Condemnation</u>.  In the event of any Condemnation other than a Material Condemnation, Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Seller shall, without representation, warranty, covenant or recourse, pay over and assign, as applicable, to Purchaser all of Seller's right, title and interest in all proceeds and awards from such Condemnation.

**ARTICLE XV**
**SURVIVAL, INDEMNIFICATION AND RELEASE**

**EXHIBIT A**

**15.1     Survival**.  Except as expressly set forth in this Section 15.1, all representations, warranties, covenants, liabilities and obligations set forth herein shall be deemed (i) if the Closing occurs, to merge in the Deed and not survive the Closing, or (ii) if this Agreement is terminated, not to survive such termination.

15.1.1 Survival of Representations and Warranties.  If this Agreement is terminated, the representations and warranties shall not survive such termination.  If the Closing occurs, the representations and warranties set forth herein shall survive the Closing for a period commencing on the Closing Date and expiring at 5:00 p.m. (Eastern Time) on the date which is two hundred seventy (270) days after the Closing Date (the period any representation or warranty survives termination or the Closing as set forth in this Section 15.1.1 is referred to herein as the "Survival Period").

15.1.2 Survival of Covenants and Obligations.  If this Agreement is terminated, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the termination of this Agreement shall survive such termination.  If the Closing occurs, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the Closing shall survive the Closing.

15.1.3 Survival of Indemnification.  This Article XV and all other rights and obligations of defense and indemnification as expressly set forth in this Agreement shall survive the Closing or termination of this Agreement.

**15.2     Indemnification by Seller**.  Subject to the limitations set forth in Article VI, Sections 8.4, 15.1, 15.4, 15.5, 15.6, and any other express provision in this Agreement, Seller shall indemnify and hold harmless the Purchaser Indemnitees from and against any Indemnification Loss incurred by any Purchaser Indemnitee to the extent resulting from (i) the breach of any express representations or warranties of Seller in this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be) and (ii) the breach by Seller of any of its covenants or obligations under this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be).

**15.3     Indemnification by Purchaser**.  Subject to the limitations set forth in Sections 15.1, 15.4, 15.5, 15.6 and any other express provision in this Agreement, Purchaser shall indemnify and hold harmless the Seller Indemnitees from and against any Indemnification Loss incurred by any Seller Indemnitee to the extent resulting from (i) the breach of any express representations or warranties of Purchaser in this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), (ii) the breach by Purchaser of any of its covenants or obligations under this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), and (iii) any Assumed Liabilities.

**15.4     Limitations on Indemnification Obligations**.

15.4.1 Failure to Provide Notice within Survival Period.  Notwithstanding anything else to the contrary in this Agreement, an Indemnitee which is seeking defense or indemnification for a breach of any representations or warranties shall be entitled to indemnification for such breach only if the Indemnitee has given written notice to the Indemnitor

39

EXHIBIT A

in accordance with Section 15.5.1 promptly after Indemnitee learns of such breach and, in all events, prior to the Closing if discovered prior to the Closing, or prior to the last day of the Survival Period if discovered after the Closing, in any such case, by Indemnitee delivering to Indemnitor written notice (a "Claim Notice") setting forth:  (a) a description in reasonable detail of the claimed breach or breaches, as applicable; (b) a detailed listing of the Section(s) of this Agreement, and if applicable, Exhibit to this Agreement, under which such claimed breach or breaches is asserted; (c) Indemnitee's good-faith calculation of the damages suffered by Indemnitee by reason of such claimed breach or breaches; and (d) all documents and written material upon which Indemnitee asserts such claimed breach is or breaches are based.  TIME SHALL BE OF THE ESSENCE in respect of Indemnitee's obligation to deliver to Indemnitor a Claim Notice in the manner and within the timeframe herein provided.

### 15.4.2  Indemnification Deductible and Cap.

(a)    Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to provide indemnification to the Purchaser Indemnitees pursuant to clause (i) of Section 15.2 to the extent that the aggregate amount of all Indemnification Losses incurred by the Purchaser Indemnitees for which Purchaser otherwise would be entitled to indemnification under clause (i) of Section 15.2 (A) does not exceed Fifty Thousand and 00/100 Dollars ($50,000.00) (the "Indemnification Deductible"), or if such Indemnification Losses exceed the Indemnification Deductible, Purchaser shall not be entitled to defense or indemnification for any amount up to the Indemnification Deductible, or (B) exceeds One Million and 00/100 Dollars ($1,000,000.00).

(b)    Notwithstanding anything to the contrary in this Agreement, Purchaser shall not be required to provide indemnification to the Seller Indemnitees pursuant to clause (i) of Section 15.3 to the extent that the aggregate amount of all Indemnification Losses incurred by the Seller Indemnitees for which Seller otherwise would be entitled to indemnification under clause (i) of Section 15.3 (A) does not exceed the Indemnification Deductible, or if such Indemnification Losses exceed the Indemnification Deductible, Seller shall not be entitled to defense or indemnification for any amount up to the Indemnification Deductible, or (B) exceeds One Million and 00/100 Dollars ($1,000,000.00).

### 15.4.3  Failure to Provide Timely Notice of Indemnification Claim.
Notwithstanding anything to the contrary in this Agreement, an Indemnitee shall not be entitled to defense or indemnification to the extent the Indemnitee's failure to promptly notify the Indemnitor in accordance with Section 15.5.1, (i) prejudices the Indemnitor's ability to defend against any Third-Party Claim on which such Indemnification Claim is based, or (ii) increases the amount of Indemnification Loss incurred in respect of such indemnification obligation of the Indemnitor.

### 15.4.4  Effect of Taxes, Insurance or Other Reimbursement.  Notwithstanding anything to the contrary in this Agreement, the amount of any Indemnification Loss for which indemnification is provided to an Indemnitee under this Article XV shall be net of any tax benefits realized or insurance proceeds received by such Indemnitee in connection with the Indemnification Claim, or any other third party reimbursement.  If such tax benefits, insurance proceeds or reimbursement are realized or obtained by the Indemnitee after the Indemnitor has paid any amount in respect of an Indemnification Loss to the Indemnitee, the Indemnitee shall reimburse the amount

40

EXHIBIT A

realized or collected by the Indemnitee up to the amount received from the Indemnitor for such Indemnification Loss.

15.4.5 <u>Negligence or Willful Misconduct of Indemnitee</u>.    Notwithstanding anything to the contrary in this Agreement, (i) a Purchaser Indemnitee shall not be entitled to defense or indemnification to the extent the applicable Indemnification Loss results from the negligence or willful misconduct of, or breach of this Agreement by, any Purchaser Indemnitee, and (ii) a Seller Indemnitee shall not be entitled to defense or indemnification to the extent the applicable Indemnification Loss results from the negligence or willful misconduct of, or breach of this Agreement by, any Seller Indemnitee.

15.4.6 <u>WAIVER OF CERTAIN DAMAGES</u>.    NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR UNDER APPLICABLE LAW, SELLER (FOR ITSELF AND ALL SELLER INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE AND DISCLAIM ALL RIGHTS TO CLAIM OR SEEK ANY CONSEQUENTIAL, PUNITIVE, EXEMPLARY, STATUTORY OR TREBLE DAMAGES AND ACKNOWLEDGE AND AGREE THAT THE RIGHTS AND REMEDIES IN THIS AGREEMENT WILL BE ADEQUATE IN ALL CIRCUMSTANCES FOR ANY CLAIMS THE PARTIES (OR ANY INDEMNITEE) MIGHT HAVE WITH RESPECT THERETO.

**15.5    <u>Indemnification Procedure</u>**.

15.5.1 <u>Notice of Indemnification Claim</u>.    If any of the Seller Indemnitees or Purchaser Indemnitees (as the case may be) (each, an "<u>Indemnitee</u>") is entitled to defense or indemnification under Sections 4.1.1, 4.1.2, 8.8, 12.1, 15.2 or 15.3 or any other express provision in this Agreement (each, an "<u>Indemnification Claim</u>"), the Party required to provide defense or indemnification to such Indemnitee (the "<u>Indemnitor</u>") shall not be obligated to defend, indemnify and hold harmless such Indemnitee unless and until such Indemnitee provides written notice to such Indemnitor promptly after such Indemnitee has actual Knowledge of any facts or circumstances on which such Indemnification Claim is based or a Third-Party Claim is made on which such Indemnification Claim is based, describing in reasonable detail such facts and circumstances or Third-Party Claim with respect to such Indemnification Claim.

15.5.2 <u>Resolution of Indemnification Claim Not Involving Third-Party Claim</u>.    If the Indemnification Claim does not involve a Third-Party Claim and is disputed by the Indemnitor, the dispute shall be resolved by litigation or other means of alternative dispute resolution as the Parties may agree in writing.

15.5.3 <u>Resolution of Indemnification Claim Involving Third-Party Claim</u>.    If the Indemnification Claim involves a Third-Party Claim, the Indemnitor shall have the right (but not the obligation) to assume the defense of such Third-Party Claim, at its cost and expense, and shall use good faith efforts consistent with prudent business judgment to defend such Third-Party Claim, provided that (i) the counsel for the Indemnitor who shall conduct the defense of the Third-Party Claim shall be reasonably satisfactory to the Indemnitee (unless selected by Indemnitor's insurance company), (ii) the Indemnitee, at its cost and expense, may participate in, but shall not control, the defense of such Third-Party Claim, and (iii) the Indemnitor shall not enter into any

41

**EXHIBIT A**

settlement or other agreement which requires any performance by the Indemnitee, other than the payment of money which shall be paid by the Indemnitor.  The Indemnitee shall not enter into any settlement or other agreement with respect to the Indemnification Claim, without the Indemnitor's prior written consent, which consent may be withheld in Indemnitor's sole discretion.  If the Indemnitor elects, within a reasonably prompt period of time, not to assume the defense of such Third-Party Claim, the Indemnitee shall have the right to retain the defense of such Third-Party Claim and shall use good faith efforts consistent with prudent business judgment to defend such Third-Party Claim in an effective and cost efficient manner.

**15.6**   **Exclusive Remedy for Indemnification Loss**.  Except for claims based on fraud and without prejudice to the Parties' rights under this Agreement with respect to a Seller Default, Purchaser Default, Seller Closing Condition or Purchaser Closing Condition, as applicable, the indemnification provisions in this Article XV shall be the sole and exclusive remedy of any Indemnitee with respect to any claim for Indemnification Loss arising from or in connection with this Agreement.

### ARTICLE XVI
### MISCELLANEOUS PROVISIONS

**16.1**   **Notices**.

16.1.1 <u>Method of Delivery</u>.   All notices, requests, demands and other communications required to be provided by any Party under this Agreement (each, a "<u>Notice</u>") shall be in writing and delivered, at the sending Party's cost and expense, by (i) personal delivery, (ii) overnight internationally recognized courier service (e.g., Federal Express or UPS), or (iii) e-mail PDF transmission, with a verification copy sent on the same day by any of the methods set forth in clauses (i) or (ii), to the recipient Party at the following addresses:

> If to Seller:
>
> Emerald Grande, LLC
> Attn: William Abruzzino
> P.O. Box 190
> Bonita Springs, FL 34133-0190
> E-mail:
>
> With a copy to
>
> Kay Casto & Chaney, PLLC
> Attn: Steven L. Thomas
> P.O. Box 2013
> Charleston, WV 25327-2013
> E-mail: sthomas@kaycasto.com

**EXHIBIT A**

<u>If to Purchaser:</u>


KM Hotels, LLC
Attn:  Mayur Patel
6627 W. Broad Street, Suite 300
Richmond, Virginia 23230
E-Mail:  mayur.patel@kmhotels.com

With copy to:

Spotts Fain PC
Attn:  S. Spencer Katona
411 E. Franklin Street, Suite 600
Richmond, Virginia 23219
E-Mail:  skatona@spottsfain.com

<u>If to Secured Lender:</u>

Troutman Sanders, LLP
Attn: Matthew R. Brooks
600 Peachtree St., NE, Ste. 3000
Atlanta, GA 30308
Email: matthew.brooks@troutman.com


16.1.2  <u>Receipt of Notices</u>.  All Notices sent by a Party (or its counsel pursuant to Section 16.1.4) under this Agreement shall be deemed to have been received by the Party to whom such Notice is sent upon (i) delivery to the address of the recipient Party, by any of the methods set forth above provided that such delivery is made prior to 5:00 p.m. (local time for the recipient Party) on a Business Day, otherwise the following Business Day, or (ii) the attempted delivery of such Notice if (A) such recipient Party refuses delivery of such Notice, or (B) such recipient Party is no longer at such address or email address, and such recipient Party failed to provide the sending Party with its current address pursuant to Section 16.1.3.

16.1.3  <u>Change of Address</u>.  The Parties and their respective counsel shall have the right to change their respective addresses for the purposes of this Section 16.1 by providing a Notice of such change in address as required under this Section 16.1.

16.1.4  <u>Delivery by Party's Counsel</u>.  The Parties agree that the attorney for such Party shall have the authority to deliver Notices on such Party's behalf to the other Party hereto.

**16.2    Time Periods**.  Notwithstanding anything to the contrary in this Agreement, if the time period for the performance of any covenant or obligation, satisfaction of any condition or delivery of any Notice or item required under this Agreement shall expire on a day other than a Business Day, such time period shall be extended automatically to the next Business Day.

**EXHIBIT A**

**16.3** __Assignment__.  Purchaser shall not, directly or indirectly, by operation of law or otherwise, assign or delegate this Agreement or any interest therein or any rights or obligations hereunder to any Person, without the prior written consent of Seller, which consent may be withheld in Seller's sole discretion.  A transfer of any direct or indirect interests in Purchaser shall be deemed to constitute an assignment hereunder.  Notwithstanding the foregoing, Purchaser shall have the right to designate any Affiliate as its nominee to receive title to the Transferred Property, or assign all of its right, title and interest in this Agreement to any Affiliate of Purchaser by providing written notice to Seller no later than five (5) Business Days prior to the Closing; provided, however, that (a) such Affiliate remains an Affiliate of Purchaser, and (b) such designation or assignment shall not be effective until Purchaser has provided Seller with a fully executed copy of such designation or assignment and assumption instrument, which shall (i) provide that Purchaser and its designee or assignee agree to pay any additional transfer tax as a result of such designation or assignment, and (ii) include a representation and warranty in favor of Seller that all representations and warranties made by Purchaser in this Agreement are true and correct with respect to such designee or assignee as of the date of such designation or assignment, and will be true and correct as of the Closing.

**16.4** __Successors and Assigns__.  This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and permitted assigns.

**16.5** __Third Party Beneficiaries__.  This Agreement shall not confer any rights or remedies on any Person other than (i) the Parties and their respective successors and permitted assigns, and (ii) any Indemnitee to the extent such Indemnitee is expressly provided any right of defense or indemnification in this Agreement.

**16.6** __GOVERNING LAW__.  THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF WEST VIRGINIA, WITHOUT GIVING EFFECT TO ANY PRINCIPLES REGARDING CONFLICT OF LAWS.

**16.7** __Rules of Construction__.  The following rules shall apply to the construction and interpretation of this Agreement:

16.7.1  Singular words shall connote the plural as well as the singular, and plural words shall connote the singular as well as the plural, and the masculine shall include the feminine and the neuter, as the context may require.

16.7.2  All references in this Agreement to particular articles, sections, subsections or clauses (whether in upper or lower case) are references to articles, sections, subsections or clauses of this Agreement.  All references in this Agreement to particular exhibits or schedules (whether in upper or lower case) are references to the exhibits and schedules attached to this Agreement, unless otherwise expressly stated or clearly apparent from the context of such reference.

16.7.3  The headings in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

16.7.4 Each Party and its counsel have reviewed and revised (or requested revisions of) this Agreement and have participated in the preparation of this Agreement, and

44

**EXHIBIT A**

therefore any rules of construction requiring that ambiguities are to be resolved against the Party which drafted the Agreement or any exhibits hereto shall not be applicable in the construction and interpretation of this Agreement or any exhibits hereto.

16.7.5 The terms "hereby," "hereof," "hereto," "herein," "hereunder" and any similar terms shall refer to this Agreement, and not solely to the provision in which such term is used.

16.7.6 The terms "include," "including" and similar terms shall be construed as if followed by the phrase "without limitation."

16.7.7 The term "sole discretion" with respect to any determination to be made a Party under this Agreement shall mean the sole and absolute discretion of such Party, without regard to any standard of reasonableness or other standard by which the determination of such Party might be challenged.

**16.8** <u>**Severability**</u>.  If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected term or provision at any other time or in any other jurisdiction.

**16.9** <u>**JURISDICTION AND VENUE**</u>.  ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT SHALL BE CONDUCTED IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AND SELLER (FOR ITSELF AND ALL SELLER INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) HEREBY SUBMIT TO JURISDICTION AND CONSENT TO VENUE IN SUCH COURTS, AND WAIVE ANY DEFENSE BASED ON FORUM NON CONVENIENS.

**16.10** <u>**WAIVER OF TRIAL BY JURY**</u>.  EACH PARTY HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT, THE DOCUMENTS DELIVERED BY PURCHASER OR SELLER AT THE CLOSING, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ANY ACTIONS OF EITHER PARTY ARISING OUT OF OR RELATED IN ANY MANNER TO THIS AGREEMENT OR THE TRANSFERRED PROPERTY (INCLUDING WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND ANY CLAIMS OR DEFENSES ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER IS A MATERIAL INDUCEMENT FOR SELLER TO ENTER INTO AND ACCEPT THIS AGREEMENT AND THE DOCUMENTS DELIVERED BY PURCHASER AT THE CLOSING AND SHALL SURVIVE THE CLOSING OR TERMINATION OF THIS AGREEMENT.

**16.11** <u>**Prevailing Party**</u>.  If any litigation or other court action, arbitration or similar adjudicatory proceeding is commenced by any Party to enforce its rights under this Agreement

EXHIBIT A

against any other Party, all fees, costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, incurred by the prevailing Party in such litigation, action, arbitration or proceeding shall be reimbursed by the losing Party; provided, that if a Party to such litigation, action, arbitration or proceeding prevails in part, and loses in part, the court, arbitrator or other adjudicator presiding over such litigation, action, arbitration or proceeding shall award a reimbursement of the fees, costs and expenses incurred by such Party on an equitable basis.

**16.12** **Incorporation of Recitals, Exhibits and Schedules**.  The recitals to this Agreement, and all exhibits and schedules (as amended, modified and supplemented from time to time pursuant to Section 16.14) referred to in this Agreement are incorporated herein by such reference and made a part of this Agreement.  Any matter disclosed in any schedule to this Agreement shall be deemed to be incorporated in all other schedules to this Agreement.

**16.13** **Updates of Schedules**.  Notwithstanding anything to the contrary in this Agreement, Seller shall have the right to amend and supplement any schedule, or provide a new schedule, to this Agreement from time to time without Purchaser's consent to the extent that (i) such schedule needs to be amended, supplemented, or provided to maintain the truth or accuracy of the applicable representation or warranty or the information disclosed therein,  (ii) Seller did not have Knowledge as of the Effective Date of the matter being disclosed in such amendment, supplement, or new schedule, and (iii) such Schedule amendment does not impose any greater burden, liability or obligation upon Purchaser.  If Seller makes any such amendment or supplement to the schedules, or provides such a new schedule, (an "Update"), then (A) such Update shall constitute a Purchaser Closing Condition Failure if, and only if, the corresponding representation or warranty to which such Update relates would be untrue or incorrect in the absence of such Update and such breach of representation or warranty results in a failure of the Purchaser Closing Conditions to be satisfied pursuant to Section 9.1.1(b) as of Closing, and (B) if Purchaser proceeds to Closing notwithstanding such Update, the corresponding representation or warranty to which such Update relates shall be deemed qualified by such Update for the purposes of limiting the defense and indemnification obligations of Seller under this Agreement.

**16.14** **Entire Agreement**.  This Agreement set forth the entire understanding and agreement of the Parties hereto, and shall supersede any other agreements and understandings (written or oral) between the Parties on or prior to the Effective Date with respect to the transaction described in this Agreement.

**16.15** **Amendments, Waivers and Termination of Agreement**.  Except as set forth in Section 16.13, no amendment or modification to any terms or provisions of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by each of the Parties.

**16.16** **Not an Offer**.  The delivery by Seller of this Agreement executed by Seller shall not constitute an offer to sell the Transferred Property, and Seller shall have no obligation to sell the Transferred Property to Purchaser, unless and until all Parties have executed and delivered this Agreement to all other Parties.

EXHIBIT A

**16.17**  **Execution of Agreement**.  A Party may deliver executed signature pages to this Agreement by facsimile or electronic transmission to any other Party, which facsimile or electronic copy shall be deemed to be an original executed signature page.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

**16.18**  **Franchise**.  Purchaser will make its own arrangements with a franchisor for the Hotel, at its sole cost and expense.  Seller will take all steps necessary to reject the current franchise agreements for the Hotel.

[Remainder of page intentionally left blank;
Signatures on following pages]

EXHIBIT A

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed and delivered in its name by a duly authorized officer or representative.

**SELLER**:


By: _____

Name: Williiam Abruzzino

Title: Managing Member


**PURCHASER**:



By: _____

Name: _____

Title: _____

01366060.DOCX

**EXHIBIT A**

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed and delivered in its name by a duly authorized officer or representative.

**SELLER**:

By:_____

Name:_____

Title:_____

**PURCHASER**:  KM Hotels, LLC

By:_____

Name: Mayur Patel

Title: Managing Member

EXHIBIT A