## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHER DISTRICT OF WEST VIRGINIA

In re:

**EMERALD GRANDE, LLC**                                    Case No. 1:17-bk-00021

           **Debtor.**                                    **Chapter 11**

_____

**EMERALD GRANDE, LLC**                                    Adv. Proc. No. 1:20-ap-00028

           **Plaintiff**

**v.**

**KM HOTELS, LLC,**

**And**

**SAFE HARBOR TITLE COMPANY, LLC,**

           **Defendants**

### EMERALD GRANDE, LLC'S MOTION FOR
### SUMMARY JUDGMENT AGAINST KM HOTELS, LLC
### AND SAFE HARBOR TITLE COMPANY, LLC

Emerald Grande Tara Retail Group, LLC ("**EG**"), by and through counsel, moves this Court (the "**Motion**") pursuant to Rule 7056 of the Bankruptcy Rules of Procedure and Rule 56 of the Federal Rules of Civil Procedure for summary judgment as to KM Hotels, LLC ("**KM**") for breach of contract, and as to Safe Harbor Title Company, LLC ("**Safe Harbor**") for its unlawful release of escrowed funds to KM in breach of the escrow agreement between the parties.  In support of this Motion, EG refers this Court to the following exhibits, which are attached hereto and made a part hereof:

1.    *Purchase and Sale Agreement*, dated August 9, 2019 ("**PSA**"), as **Exhibit A**;

2.    *Earnest Money Escrow Agreement*, dated August 9, 2019 ("**Escrow Agreement**"), as **Exhibit B**;

114794271

3.      *Deed*, dated September 10, 1999 ("**Plaza Deed**")*, as **Exhibit C**;

4.      *Deed*, dated October 1, 2008 ("**EG Deed**")*, as **Exhibit D**;

5.      *Deed,* dated September 10, 2013 ("**Tara Deed**"), as **Exhibit E**;

6.      Survey of the Crossings Mall, dated September 10, 2013 ("**Tara Survey**"), as **Exhibit F**;

7.      Letter dated September 20, 2019 ("**KM Letter**"), as **Exhibit G**;

8.      Survey of the Hotel Parcel dated on or about September 2019, as later updated ("**KM Survey**"), as **Exhibit H**;

9.      *Confirmatory Easement and Right of Way,* dated February 5, 2020 ("**Confirmatory Easement**"), as **Exhibit I**;

10.     *Easement and Right of Way,* dated February 5, 2020 ("**Encroachment Easement**"), as **Exhibit J**;

11.     Letter dated January 29, 2020 ("**Conditional Notice***")*, as **Exhibit K**;

12.      Letter dated February 6, 2020 ("**First Termination Response**"), as **Exhibit L**;

13.     *First Amendment to Purchase Agreement*, dated February 28, 2020 ("**Amendment**"), as **Exhibit M**;

14.     Letter dated April 13, 2020 ("**Termination Letter**"), as **Exhibit N**;

15.     Letter dated April 14, 2020 ("**Dispute Notice**"), as **Exhibit O**;

16.     *Affidavit of Plaintiff*, as **Exhibit P**;

17.     Safe Harbor Title Company's website, as **Exhibit Q;**

18.     Email Correspondence in BATES NOS. KM_0011670-0011685, as **Exhibit R;**

19.     Email Correspondence in BATES NOS. KM_0011757-0011758, as **Exhibit S;**

20.     Email Correspondence in BATES NOS. KM_ 0007462-0007463, as **Exhibit T**;

21.     Email Correspondence in BATES NOS. KM_ 0000515-0000518, as **Exhibit U**;

22.     Email Correspondence in BATES NOS. KM_0000519-0000526, as **Exhibit V**;

114794271

*23.*    Email Correspondence in BATES NOS. KM_0000589-0000590, as **Exhibit W**;

*24.*    Email Correspondence in BATES NOS. KM_0004596-0004598, as **Exhibit X**;

In further support of this Motion, EG refers the Court to *Emerald Grande, LLC's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment* and the *Memorandum of Law in Support of Plaintiff Emerald Grande, LLC's Motion for Summary Judgment*, each filed contemporaneously herewith.

**EMERALD GRANDE, LLC,**

**By Counsel:**

/s/ Steven L. Thomas
Steven L. Thomas (WVSB # 3738)
Robert L. Bandy (WVSB # 7419)
Kay Casto & Chaney PLLC
P.O. Box 2031
Charleston, West Virginia 25327
Tel:  (304) 345-8900
Fax:  (304) 345-8909
sthomas@kaycasto.com
rbamdu@kaycasto.com
    *Counsel to Emerald Grande, LLC*

3

114794271

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:

**EMERALD GRANDE, LLC**                                    **Case No. 1:17-bk-00021**

        **Debtor.**                                              **Chapter 11**

_____

**EMERALD GRANDE, LLC**                                    **A.P. No.: 1:20-ap-00028**

        **Plaintiff**

**v.**

**KM HOTELS, LLC,**

**And**

**SAFE HARBOR TITLE COMPANY, LLC,**

        **Defendants**

### <u>CERTIFICATE OF SERVICE</u>

    I do hereby certify that on **March 31, 2021,** I filed the *Emerald Grande, LLC's Motion for Summary Judgment Against KM Hotels, LLC and Safe Harbor Title Company, LLC* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following participants:

        Stephen L. Thompson, Esq.
        Barth & Thompson
        P.O. Box 129
        Charleston, WV 25321
         *Counsel for Safe Harbor Title Company, LLC*

        Carrie Goodwin Fenwick, Esq.
        Goodwin & Goodwin
        300 Summers St., Ste. 1500
        Charleston, WV 25301
         *Counsel for KM Hotels, LLC*

                       /s/ Steven L. Thomas
                       Steven L. Thomas (WVSB # 3738)

114794271

# PURCHASE AND SALE AGREEMENT

By and Between

**EMERALD GRANDE, LLC, as Seller**

and

**KM HOTELS, LLC, as Purchaser**

Dated as of August 9, 2019

for the

Property:

**La Quinta Hotel – Elkview, WV**

***No Trailer - Do not delete***

EXHIBIT A

## TABLE OF CONTENTS

Page

ARTICLE I        DEFINITIONS ................................................................................ 1
1.1   Definitions ............................................................................................... 1
ARTICLE II       THE TRANSFERRED PROPERTY AND ASSUMED LIABILITIES .......... 8
2.1   Description of the Transferred Property ..................................... 8
2.2   Excluded Property .............................................................................. 11
2.3   Assumed Liabilities ........................................................................... 11
ARTICLE III      PURCHASE PRICE ....................................................................... 11
3.1   Purchase Price. ................................................................................... 11
3.2   Earnest Money. ................................................................................... 12
3.3   Payment of Purchase Price .............................................................. 13
ARTICLE IV       DUE DILIGENCE ........................................................................ 13
4.1   Due Diligence. ..................................................................................... 13
ARTICLE V        TITLE TO THE PROPERTY ......................................................... 15
5.1   Title Commitment .............................................................................. 15
5.2   Exceptions to Title. ........................................................................... 15
5.3   Conveyance of the Property ............................................................ 16
5.4   Bankruptcy Matters ........................................................................... 16
ARTICLE VI       CONDITION OF THE PROPERTY ............................................... 17
6.1   PROPERTY SOLD "AS IS" .................................................................. 17
6.2   Limitation On Representations and Warranties. ........................ 18
6.3   Reliance On Due Diligence ............................................................. 19
6.4   RELEASE OF SELLER FOR VIOLATIONS OF CERTAIN
       APPLICABLE LAWS ........................................................................... 19
6.5   Survival ................................................................................................. 20
ARTICLE VII      REPRESENTATIONS AND WARRANTIES .................................... 20
7.1   Seller's Representations and Warranties .................................... 20
7.2   Purchaser's Representations and Warranties ............................ 23
ARTICLE VIII     COVENANTS ............................................................................. 25
8.1   Confidentiality. ................................................................................... 25
8.2   Conduct of the Business .................................................................. 26

-i-

EXHIBIT A

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 8.3 | Licenses and Permits | 26 |
| 8.4 | Employees | 26 |
| 8.5 | Bookings | 26 |
| 8.6 | Tax Contests and Clearance | 27 |
| 8.7 | Notices and Filings | 27 |
| 8.8 | Access to Information | 27 |
| 8.9 | Privacy Laws | 28 |
| 8.10 | Further Assurances | 28 |
| ARTICLE IX | CLOSING CONDITIONS | 28 |
| 9.1 | Purchaser Closing Conditions | 28 |
| 9.2 | Seller Closing Conditions | 29 |
| ARTICLE X | CLOSING | 30 |
| 10.1 | Closing Date | 30 |
| 10.2 | Closing Deliveries | 30 |
| 10.3 | Possession | 31 |
| ARTICLE XI | PRORATIONS AND EXPENSES | 32 |
| 11.1 | Closing Statement | 32 |
| 11.2 | Prorations | 32 |
| 11.3 | Accounts Receivable | 34 |
| 11.4 | Transaction Costs | 34 |
| ARTICLE XII | TRANSITION PROCEDURES | 35 |
| 12.1 | Baggage | 35 |
| 12.2 | IT Systems | 35 |
| 12.3 | Notice to Guests and Employees | 36 |
| ARTICLE XIII | DEFAULT AND REMEDIES | 36 |
| 13.1 | Seller's Default | 36 |
| 13.2 | Seller's Right to Cure | 36 |
| 13.3 | Purchaser's Default | 36 |
| 13.4 | Purchaser's Right to Cure | 37 |
| 13.5 | LIQUIDATED DAMAGES | 37 |

**EXHIBIT A**

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE XIV    CASUALTY AND CONDEMNATION .......................................................... 37
    14.1    Casualty ............................................................................................ 37
    14.2    Condemnation ................................................................................... 38
ARTICLE XV    SURVIVAL, INDEMNIFICATION AND RELEASE ............................... 38
    15.1    Survival ............................................................................................ 39
    15.2    Indemnification by Seller ................................................................. 39
    15.3    Indemnification by Purchaser ........................................................... 39
    15.4    Limitations on Indemnification Obligations. .................................... 39
    15.5    Indemnification Procedure. ............................................................... 41
    15.6    Exclusive Remedy for Indemnification Loss .................................... 42
ARTICLE XVI    MISCELLANEOUS PROVISIONS ...................................................... 42
    16.1    Notices. ............................................................................................. 42
    16.2    Time Periods ..................................................................................... 43
    16.3    Assignment ....................................................................................... 44
    16.4    Successors and Assigns ..................................................................... 44
    16.5    Third Party Beneficiaries .................................................................. 44
    16.6    GOVERNING LAW .......................................................................... 44
    16.7    Rules of Construction ....................................................................... 44
    16.8    Severability ....................................................................................... 45
    16.9    JURISDICTION AND VENUE ......................................................... 45
    16.10    WAIVER OF TRIAL BY JURY ....................................................... 45
    16.11    Prevailing Party ................................................................................ 45
    16.12    Incorporation of Recitals, Exhibits and Schedules ........................... 46
    16.13    Updates of Schedules ........................................................................ 46
    16.14    Entire Agreement .............................................................................. 46
    16.15    Amendments, Waivers and Termination of Agreement ..................... 46
    16.16    Not an Offer ...................................................................................... 46
    16.17    Execution of Agreement ................................................................... 47
    16.18    Franchise ........................................................................................... 47

**EXHIBIT A**

## **LIST OF EXHIBITS**

| | |
|---|---|
| Exhibit A | Form of Seller Closing Certificate |
| Exhibit B | Form of Deed |
| Exhibit C | Form of Bill of Sale |
| Exhibit D | Form of Contractor Notification Letter |
| Exhibit E | Form of Purchaser Closing Certificate |
| Exhibit F | Form of Bankruptcy Court Approval Order |
| Exhibit G | Form of Earnest Money Escrow Agreement |

**EXHIBIT A**

## LIST OF SCHEDULES

Schedule 2.1.1        Legal Description of the Land

Schedule 2.1.6        Equipment Leases

Schedule 2.1.7        Assigned Operating Agreements

Schedule 2.1.9        Intellectual Property

Schedule 2.3          Assumed Liabilities

Schedule 4.1.1        Seller's Due Diligence Materials

Schedule 5.2.1        Permitted Exceptions

Schedule 7.1.3        Consents and Approvals; No Conflicts

Schedule 7.1.5        Litigation

Schedule 7.1.6        Employees

Schedule 7.1.7        Taxes

Schedule 7.1.8        Contracts

Schedule 8.3          Licenses and Permits

Schedule 8.5          Bookings

Schedule 8.6          Tax Contests and Clearance

1

**EXHIBIT A**

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "<u>Agreement</u>") is made and entered into as of this 9th day of August, 2019, by and between Emerald Grande, LLC, a Georgia limited liability company ("<u>Seller</u>"), and KM Hotels, LLC, a Virginia limited liability company, or its assigns ("<u>Purchaser</u>").  Seller and Purchaser are sometimes referred to herein individually as a "<u>Party</u>", and collectively as the "<u>Parties</u>".

**WHEREAS,**

A.      Seller is the owner of the La Quinta Hotel – Elkview (the "<u>Hotel</u>").

B.      Seller desires to sell the Hotel to Purchaser, and Purchaser desires to purchase the Hotel from Seller, on the terms set forth in this Agreement and subject to entry of the Approval Order (as hereinafter defined) by the United States Bankruptcy Court for the Northern District of West Virginia (the "<u>Bankruptcy Court</u>").

**NOW, THEREFORE**, in consideration of the mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1      Definitions**.  The following terms when used in this Agreement shall have the meanings set forth in this Section 1.1.

"<u>Accounts Receivable</u>" means all amounts which Seller is entitled to receive from the Business which are due and payable but not paid as of the Closing, including, without limitation, any sums due under any lease of space, charges for the use or occupancy of any guest, conference or banquet rooms or other facilities at the Hotel, any restaurant, bar or banquet services, or any other goods or services provided by or on behalf of Seller at the Hotel but expressly excluding all (i) credit card charges, checks and other instruments which Seller has submitted for payment as of the Closing, and (ii) items of income otherwise prorated pursuant to Section 11.2 or 11.3.1.

"<u>Accrued PTO</u>" means, with respect to any Employee, the salary and wages which such Employee is entitled to receive for any personal time off for vacation days accrued but unused by such Employee as of the time in question, together with all employment taxes with respect thereto, including, without limitation, any withholding and employer contributions required under Applicable Law, but expressly excluding sick days and personal days.

"<u>Accrued Vacation Pay</u>" means, with respect to any Employee, the salary and wages which such Employee is entitled to receive for any vacation days and sick days accrued but unused by such Employee as of the time in question, together with all employment taxes with respect thereto, including, without limitation, any withholding and employer contributions required under Applicable Law, but expressly excluding personal days.

1

EXHIBIT A

"Affiliate" means, with respect to the Person in question, any other Person that, directly or indirectly, (i) owns or controls fifty percent (50%) or more of the outstanding voting and/or equity interests of such Person, or (ii) controls, is controlled by or is under common control with, the Person in question. For the purposes of this definition, the term "control" and its derivations means having the power, directly or indirectly, to direct the management, policies or general conduct of business of the Person in question, whether by the ownership of voting securities, contract or otherwise.

"Agreement" has the meaning set forth in the introductory paragraph.

"Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other Applicable Law addressing or in any way relating to terrorist acts and acts of war.

"Applicable Law" means (i) all statutes, laws, common law, rules, regulations, ordinances, codes or other legal requirements of any Governmental Authority, stock exchange, and similar quasi-governmental authority, and (ii) any judgment, injunction, order or other similar requirement of any court or other adjudicatory authority, in effect at the time in question and in each case to the extent the Person or property in question is subject to the same.

"Approval Order" has the meaning set forth in Section 5.4.

"Assigned Operating Agreements" has the meaning set forth in Section 2.1.7.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Bookings" has the meaning set forth in Section 2.1.13.

"Books and Records" has the meaning set forth in Section 2.1.10.

"Broker" means CBRE.

"Business" means the lodging business and all activities related and incidental thereto conducted at the Hotel, including, without limitation, (i) the licensing of any transient guest, conference or banquet rooms or other facilities at the Hotel, (ii) the maintenance and repair of the Real Property and tangible Personal Property, (iii) the employment of the Employees, and (iv) the payment of Taxes.

"Business Day" means any day other than a Saturday, Sunday or federal legal holiday in the United States.

"Claim Notice" has the meaning set forth in Section 15.4.1.

"Closing" has the meaning set forth in Section 10.1.

"Closing Date" has the meaning set forth in Section 10.1.

"Closing Statement" has the meaning set forth in Section 11.1.

2

**EXHIBIT A**

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Compensation" means, with respect to any Employee, all salary and wages which such Employee is entitled to receive at the time in question, together with all employment taxes with respect thereto, including, without limitation, any withholding and employer contributions required under Applicable Law, but expressly excluding all other compensation accrued or payable to such Employee, including, without limitation, any (i) bonus or incentive compensation; (ii) Accrued PTO, Accrued Vacation Pay, sick days and personal days; and (iii) health, welfare and other benefits provided to such Employee under any Seller Employee Plans, and employer contributions to, and amounts paid or accrued under, any Seller Employee Plans for the benefit of such Employee.

"Confidential Information" has the meaning set forth in Section 8.1.1.

"Contractor Notification Letters" has the meaning set forth in Section 10.2.1(i).

"Contracts" means, collectively, the Equipment Leases and the Assigned Operating Agreements.

"Cut-Off Time" has the meaning set forth in Section 11.2.

"Deed" has the meaning set forth in Section 10.2.1(b).

"Deposit" has the meaning set forth in Section 3.2.1.

"Diligence Period" means the period commencing on the Effective Date and ending on the 45th day after the Effective Date.

"Earnest Money Escrow Agreement" has the meaning set forth in Section 3.2.1.

"Effective Date" shall be the date of last execution by a party to this Agreement.

"Employees" means, at the time in question, all persons employed full time or part time at the Hotel by Seller.

"Environmental Claims" means all claims for reimbursement, remediation, abatement, removal, clean up, contribution, personal injury, property damage or damage to natural resources made by any Governmental Authority or other Person arising from or in connection with the (i) presence or actual or potential spill, leak, emission, discharge or release of any Hazardous Substances over, on, in, under or from the Transferred Property, or (ii) violation of any Environmental Laws with respect to the Transferred Property.

"Environmental Laws" means any Applicable Laws which regulate the manufacture, generation, formulation, processing, use, treatment, handling, storage, disposal, distribution or transportation, or an actual or potential spill, leak, emission, discharge or release of any Hazardous Substances, pollution, contamination or radiation into any water, soil, sediment, air or other environmental media, including, without limitation, (i) the Comprehensive Environmental Response, Compensation and Liability Act, (ii) the Resource Conservation and Recovery Act, (iii)

EXHIBIT A

the Federal Water Pollution Control Act, (iv) the Toxic Substances Control Act, (v) the Clean Water Act, (vi) the Clean Air Act, and (vii) the Hazardous Materials Transportation Act, and similar state and local laws, as amended as of the time in question.

"Environmental Liabilities" means all liabilities and obligations under any Environmental Laws arising from or in connection with the Transferred Property, including, without limitation, any obligations to manage, control, contain, remove, remedy, respond to, clean up or abate any actual or potential spill, leak, emission, discharge or release of any Hazardous Substances, pollution, contamination or radiation into any water, soil, sediment, air or other environmental media.

"Equipment Leases" has the meaning set forth in Section 2.1.6.

"Escrow Agent" means Safe Harbor Title Company, LLC.

"Excluded Property" has the meaning set forth in Section 2.2.

"FF&E" has the meaning set forth in Section 2.1.3.

"Governmental Authority" means any federal, state or local government or other political subdivision, agency or office thereof, including, without limitation, any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person or property in question.

"Guest Ledger" means all charges accrued to the open accounts of any guests or customers at the Hotel as of the Cut-Off Time for the use or occupancy of any guest, conference or banquet rooms or other facilities at the Hotel, any restaurant, bar or banquet services, or any other goods or services provided by or on behalf of Seller at the Hotel.

"Hazardous Substances" means any hazardous or toxic substances, materials or waste, whether in solid, semisolid, liquid or gaseous form, including, without limitation, asbestos, petroleum or petroleum by products and polychlorinated biphenyls as regulated by Environmental Laws.

"Hotel" has the meaning set forth in the recitals.

"Hotel Guest Data and Information" means all guest or customer profiles, contact information (e.g., addresses, phone numbers, facsimile numbers and email addresses), histories, preferences and any other guest or customer information in any database of the Hotel, in each such case for historical (as opposed to current) guests and customers as of the Closing Date.

"Improvements" has the meaning set forth in Section 2.1.2.

"Indemnification Claim" has the meaning set forth in Section 15.5.1.

"Indemnification Deductible" has the meaning set forth in Section 15.4.2.

4

**EXHIBIT A**

"Indemnification Loss" means, with respect to any Indemnitee, any actual (and not contingent) liability, damage, loss, cost or expense, including, without limitation, reasonable attorneys' fees and expenses and court costs, incurred by such Indemnitee as a result of the act, omission or occurrence in question.

"Indemnitee" has the meaning set forth in Section 15.5.1.

"Indemnitor" has the meaning set forth in Section 15.5.1.

"Inspections" has the meaning set forth in Section 4.1.2.

"Inspectors" has the meaning set forth in Section 4.1.2(d).

"Intellectual Property" has the meaning set forth in Section 2.1.9.

"Inventoried Baggage" has the meaning set forth in Section 12.1.

"IT Systems" has the meaning set forth in Section 2.1.5.

"Knowledge" means (i) with respect to Purchaser, the actual knowledge of Mayur Patel, without any duty of inquiry or investigation, and expressly excluding the knowledge of any other shareholder, partner, member, trustee, beneficiary, director, officer, manager, employee, agent or representative of Seller or any of its Affiliates, and (ii) with respect to Seller, (A) the actual knowledge of William Abruzzino, without any duty of inquiry or investigation, and expressly excluding the knowledge of any other shareholder, partner, member, trustee, beneficiary, director, officer, manager, employee, agent or representative of Purchaser or any of its Affiliates, (B) any matter disclosed in any exhibits or schedules to this Agreement, (C) any matter disclosed in any Seller Due Diligence Materials received by or made available to Purchaser prior to Closing or any other documents or materials provided by Seller to Purchaser prior to Closing, and (D) any matter disclosed by the Inspections or in the Purchaser Due Diligence Reports received by or made available to Purchaser prior to Closing. For the purposes of this definition, the term "actual knowledge" means, with respect to any person, the conscious awareness of such person at the time in question, and expressly excludes any constructive or implied knowledge of such person.

"Land" has the meaning set forth in Section 2.1.1.

"Liabilities" means any liability, obligation, damage, loss, diminution in value, cost or expense of any kind or nature whatsoever, whether accrued or unaccrued, actual or contingent, known or unknown, foreseen or unforeseen.

"Licenses and Permits" has the meaning set forth in Section 2.1.8.

"Notice" has the meaning set forth in Section 16.1.1.

"Operating Agreements" means all maintenance, repair, improvement, service and supply contracts, booking and reservation agreements, credit card service agreements, and all other agreements for goods or services which are held by Seller in connection with the Business, other

EXHIBIT A

than the Equipment Leases, and Licenses and Permits, together with all deposits made or held by Seller thereunder and are shown on Schedule 2.1.7.

"Ordinary Course of Business" means the ordinary course of business consistent with Seller's past custom and practice for the Business, taking into account the facts and circumstances in existence from time to time.

"Party" and "Parties" has the meaning set forth in the introductory paragraph.

"Permitted Exceptions" has the meaning set forth in Section 5.2.1.

"Person" means any natural person, corporation, general or limited partnership, limited liability company, association, joint venture, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a representative capacity.

"Personal Property" means the Transferred Property other than the Real Property.

"Plans and Specifications" has the meaning set forth in Section 2.1.11.

"Prohibited Person" has the meaning set forth in Section 7.1.12.

"Property Tax Appeals Matters" has the meaning set forth in Section 8.6.1.

"Prorations" has the meaning set forth in Section 11.2.

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchaser" has the meaning set forth in the introductory paragraph.

"Purchaser Closing Condition Failure" has the meaning set forth in Section 13.2.

"Purchaser Closing Conditions" has the meaning set forth in Section 9.1.1.

"Purchaser Closing Deliveries" has the meaning set forth in Section 10.2.2.

"Purchaser Default" has the meaning set forth in Section 13.3.

"Purchaser Documents" has the meaning set forth in Section 7.2.2.

"Purchaser Due Diligence Reports" means all studies, reports and assessments prepared by any Person for or on behalf of Purchaser (other than any internal studies, reports and assessments prepared by any of Purchaser's employees, attorneys or accountants) in connection with the Inspections.

"Purchaser Indemnitees" means Purchaser and Purchaser's manager and each of their respective Affiliates, and each of their respective shareholders, members, partners, trustees, beneficiaries, directors, officers and employees, and the successors, permitted assigns, legal representatives, heirs and devisees of each of the foregoing.

6

**EXHIBIT A**

"Real Property" has the meaning set forth in Section 2.1.2.

"Scheduled Closing Date" has the meaning set forth in Section 10.1.

"Secured Lender" means Carter Bank & Trust, who holds a first priority secured lien on the Transferred Property pursuant to: (i) that certain *Promissory Note* dated as of October 17, 2014, by and between the Debtor and the Secured Lender, pursuant to which the Secured Lender loaned to the Debtor a principal balance of $10,850,000; (ii) that certain *Deed of Trust* dated as of October 17, 2014 on the real property and improvements commonly known as the La Quinta Hotel – Elkview and located in Kanawha County at The Crossings Shopping Center, Elkview, West Virginia 25071 (the "Elkview Hotel"); (iii) that certain *Deed of Trust* dated as of October 17, 2014 on the real property and improvements commonly known as the La Quinta Hotel – Summersville (the "Summersville Hotel") and located in Nicholas County at 106 Merchants Walk, Summersville, West Virginia 26651; (iv) that certain *Assignment of Leases and Rents* dated as of October 17, 2014 for the Elkview Hotel by and between the Debtor and the Secured Lender; (v) that certain *Assignment of Leases and Rents* dated as of October 17, 2014 for the Summersville Hotel by and between the Debtor and Secured Lender; and (vi) that certain *Security Agreement* dated as of October 17, 2014 by and between the Debtor and the Secured Lender.

"Seller" has the meaning set forth in the introductory paragraph.

"Seller Closing Conditions" has the meaning set forth in Section 9.2.

"Seller Closing Deliveries" has the meaning set forth in Section 10.2.1.

"Seller Cure Period" has the meaning set forth in Section 13.2.

"Seller Default" has the meaning set forth in Section 13.1.

"Seller Documents" has the meaning set forth in Section 7.1.2.

"Seller Due Diligence Materials" has the meaning set forth in Section 4.1.1(a).

"Seller Employee Plans" means all plans and programs maintained by or on behalf of Seller for the health, welfare or benefit of any Employees and/or their respective spouses, dependents or other qualified beneficiaries, including, without limitation, the Retirement Plan.

"Seller Indemnitees" means Seller, Secured Lender, and each of their respective, shareholders, members, partners, trustees, beneficiaries, directors, officers and employees, and the successors, permitted assigns, legal representatives, heirs and devisees of each of the foregoing.

"Seller's Possession" means in the physical possession or control of (A) any officer or employee of Seller who has responsibility for the Business or the Transferred Property or (B) any Person still engaged by Seller from whom Seller has a right to obtain the item in question at no cost or expense to Seller other than any *de minimis* cost of expense or any cost of expense which Purchaser agrees in writing to reimburse; provided, however, that any reference in this Agreement to Seller's Possession of any documents or materials expressly excludes the possession of any such

7

EXHIBIT A

documents or materials that (i) are legally privileged or constitute attorney work product, (ii) are subject to a confidentiality agreement or to Applicable Law prohibiting their disclosure by Seller.

"Supplies" has the meaning set forth in Section 2.1.4.

"Survival Period" has the meaning set forth in Section 15.1.1.

"Taxes" means any federal, state, local or foreign, real property, personal property, sales, use, room, occupancy, ad valorem, employment or similar taxes, assessments, levies, charges or fees imposed by any Governmental Authority on Seller with respect to the Transferred Property or the Business, including, without limitation, any interest, penalty or fine with respect thereto, but expressly excluding any (i) federal, state, local or foreign income, capital gain, gross receipts, capital stock, franchise, profits, estate, gift or generation skipping tax, or (ii) transfer, documentary stamp, recording or similar tax, levy, charge or fee incurred with respect to the transaction described in this Agreement.

"Third-Party Claim" means, (i) with respect to any Seller Indemnitee, any claim, demand, lawsuit, arbitration or other legal or administrative action or proceeding against such Seller Indemnitee by any Person which is not Purchaser or an Affiliate of Purchaser, and (ii) with respect to any Purchaser Indemnitee, any claim, demand, lawsuit, arbitration or other legal or administrative action or proceeding against such Purchaser Indemnitee by any Person which is not Seller or an Affiliate of Seller.

"Title Commitment" has the meaning set forth in Section 5.1.

"Title Company" means Safe Harbor Title Company, LLC.

"Title Exceptions" has the meaning set forth in Section 5.2.1.

"Trade Payables" has the meaning set forth in Section 11.2.7.

"Transferred Property" has the meaning set forth in Section 2.1.

"Update" has the meaning set forth in Section 16.13.

"WARN Act" means the Worker's Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, et seq., as well as the rules and regulations thereto, set forth in 20 CFR 639, et seq., and any similar state and local laws, as amended from time to time, and any regulations, rules and guidance issued pursuant thereto.

"Warranties" has the meaning set forth in Section 2.1.12.

## ARTICLE II
## THE TRANSFERRED PROPERTY AND ASSUMED LIABILITIES

**2.1    Description of the Transferred Property**. Subject to the terms set forth in this Agreement, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and

8

**EXHIBIT A**

Purchaser shall purchase and accept from Seller, the property and assets set forth in this Section 2.1, but expressly excluding the Excluded Property (collectively, the "Transferred Property"):

2.1.1    Land.    The land described in Schedule 2.1.1, together with all appurtenant easements and any other rights and interests, including air or development rights (if any), appurtenant thereto (the "Land");

2.1.2    Improvements.    All buildings, structures and other improvements located on or affixed to the Land and all fixtures on the Land which constitute real property under Applicable Law (the "Improvements"; the Land and the Improvements are referred to collectively herein as the "Real Property");

2.1.3    FF&E.    All fixtures (other than those which constitute Improvements), furniture, furnishings, equipment, machinery, tools, vehicles, appliances, art work and other items of tangible personal property which are located at the Hotel, or ordered for future use at the Hotel as of the Closing, other than the Supplies, IT Systems, Books and Records and Plans and Specifications (the "FF&E");

2.1.4    Supplies.    All linens and towels, uniforms, engineering, maintenance, cleaning and housekeeping supplies, matches and ashtrays, soap and other toiletries, stationery, menus, directories and other printed materials, and all other similar supplies and materials, which are located at the Hotel or ordered or stored for future use at the Hotel as of the Closing (the "Supplies");

2.1.5    IT Systems.    All right, title and interest, if any, of Seller in and to computer hardware, telecommunications and information technology systems located at the Hotel, and all computer software used at the Hotel (subject to the terms of any applicable license agreement(s), which such license agreement(s) shall be transferred to Purchaser at Closing, to the extent the same are transferable or the Parties obtain any consent necessary to effectuate such a transfer), including all user names and passwords applicable to the foregoing (the "IT Systems");

2.1.6    Equipment Leases.    All right, title and interest, if any, of Seller in and to leases and purchase money security agreements for any equipment, machinery, vehicles, furniture or other personal property located at the Hotel which are held by Seller and used primarily in the Business, and which the Purchaser has expressly agreed to assume and are listed on Schedule 2.1.6, together with all deposits made by Seller thereunder, to the extent the same and such deposits are transferable or the Parties obtain any consent necessary to effectuate such a transfer (the "Equipment Leases");

2.1.7    Assigned Operating Agreements.    All Operating Agreements which the Purchaser has expressly agreed to assume and are listed on Schedule 2.1.7, to the extent the same and the deposits held thereunder are transferable or the Parties obtain any consent necessary to effectuate such a transfer, except the Excluded Agreements (the "Assigned Operating Agreements");

2.1.8    Licenses and Permits.    All right, title and interest, if any, of Seller in and to licenses, permits, consents, authorizations, approvals, registrations and certificates issued by any Governmental Authority which are held by Seller with respect to the Hotel, including, without

9

**EXHIBIT A**

limitation, the construction, use or occupancy of the Hotel or the Business, together with any deposits made by Seller thereunder, to the extent the same and such deposits are transferable under Applicable Law or the Parties obtain any consent necessary to effectuate such a transfer, which are itemized in Schedule 8.3 (the "Licenses and Permits");

2.1.9   Intellectual Property.  All right, title and interest, if any, of Seller in and to trademarks, trade names, service marks and other intellectual property rights set forth in Schedule 2.1.9 (the "Intellectual Property");

2.1.10   Books and Records.  All right, title and interest, if any, of Seller in and to original books and records located at the Hotel or stored off-site, which relate exclusively to the Hotel or the Business (including, without limitation, plans, specifications, warranties, operating manuals and tenant files), but expressly excluding (a) all Hotel Guest Data and Information, and (b) all documents and other materials which (i) are legally privileged or constitute attorney work product, (ii) are subject to an Applicable Law or a confidentiality agreement prohibiting their disclosure, or (iii) constitute confidential internal assessments, reports, studies, memoranda, notes or other correspondence prepared by or on behalf of any officer or employee, including, without limitation, all (A) internal financial analyses, appraisals, tax returns, financial statements, (B) corporate or other entity governance records, (C) Employee personnel files, (D) any work papers, memoranda, analysis, correspondence and similar documents and materials prepared in connection with the transaction described in this Agreement (the "Books and Records").

2.1.11   Plans and Specifications.  All right, title and interest, if any, of Seller in and to, and all physical embodiments of (in any format or medium), all plans and specifications, blue prints, architectural plans, engineering diagrams and similar items located at the Hotel or in Seller's Possession which relate exclusively to the Hotel, to the extent the same are transferable or the Parties obtain any consent necessary to effectuate such a transfer (the "Plans and Specifications");

2.1.12   Warranties.  All right, title and interest, if any, of Seller in and to warranties and guaranties held by Seller with respect to any Improvements or Personal Property, to the extent the same are transferable or the Parties obtain any consent necessary to effectuate such a transfer (the "Warranties");

2.1.13   Bookings.  All right, title and interest, if any, of Seller in and to advance bookings and reservations for transient guest, conference and banquet rooms or other facilities at the Hotel as of the Closing made in the Ordinary Course of Business, together with all deposits held by Seller with respect thereto (the "Bookings");

2.1.14   Miscellaneous Hotel Assets, Including Guest Data and Certain Other Information.  All right, title and interest, if any, of Seller in and to telephone and facsimile numbers, email addresses, user names, passwords, social media accounts and other account information used exclusively at or on behalf of the Hotel, all keys and lock and safe combinations and codes at the Hotel, and all guest data and accounts receivable data maintained by the Hotel.

EXHIBIT A

**2.2**    **Excluded Property**.  Notwithstanding anything to the contrary in Section 2.1, the property, assets, rights and interests set forth in this Section 2.2 (the "Excluded Property") shall not be transferred, assigned or conveyed to Purchaser, and shall be excluded from the Property:

2.2.1    *Cash*.  Except for deposits expressly included in Section 2.1, and subject to the provisions of Article XI, all cash on hand or on deposit in any house bank, operating account or other account or reserve maintained in connection with the Business, together with any and all credit card charges, checks and other instruments which Seller has submitted for payment as of the Closing;

2.2.2    Accounts Receivable.  Seller shall receive a credit at Closing for accounts receivable charged to the Guest Ledger pursuant to Section 11.3.1.

2.2.3    Third-Party Property.  Any fixtures, personal property or intellectual property owned by (i) the lessor under any Equipment Leases, (ii) the supplier, vendor, licensor or other party under any Operating Agreements or Licenses and Permits, (iii) any Employees, or (iv) any guests or customers of the Hotel;

**2.3**    **Assumed Liabilities**.  At Closing, Purchaser shall assume (i) all Liabilities with respect to the condition of the Transferred Property (regardless of whether such condition existed prior to the Closing Date), including, without limitation, the design, construction, engineering, maintenance and repair or environmental condition of the Real Property, which arise and accrue on or after the Closing Date, and (ii) except as otherwise expressly provided herein, all Liabilities with respect to the Transferred Property, the Hotel or the Business which the Purchaser expressly agrees to assume at the Closing, and which agreed upon Liabilities are itemized on Schedule 2.3, arising and accruing from and after the Closing Date (and prior to the Closing Date to the extent Purchaser has received a credit for such Liabilities under Section 11.2) (the "Assumed Liabilities").  The rights and obligations of the Parties under this Section 2.3 shall survive the Closing.

### ARTICLE III
### PURCHASE PRICE

**3.1**    **Purchase Price**.

3.1.1    The purchase price for the Transferred Property is Three Million Six Hundred Thousand Dollars ($3,600,000.00), (the "Purchase Price"), which shall be adjusted at Closing for the Prorations pursuant to Section 11.2, the Accounts Receivable pursuant to Section 11.3, and as otherwise expressly provided in this Agreement.

3.1.2    No later than 20 days prior to Closing, or within a reasonable time thereafter as agreed by Seller and Purchaser, Purchaser shall prepare and deliver to Seller a proposed allocation of the Purchase Price among the Transferred Property which shall be prepared in a manner consistent with Section 1060 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") (the "Proposed Allocation Schedule").  After receipt of the Proposed Allocation Schedule from Purchaser, Seller shall have 10 days to review the Proposed Allocation Schedule.  The Proposed Allocation Schedule will be considered final and binding on the Parties unless Seller communicates to Purchaser objections to the Proposed Allocation Schedule (an "Allocation

EXHIBIT A

Dispute Notice"). Seller and Purchaser shall, within 5 days (or such longer period as Seller and Purchaser may agree in writing) following delivery of an Allocation Dispute Notice (the "Allocation Resolution Period"), attempt in good faith to resolve their differences and prepare a final allocation schedule that is acceptable to both Seller and Purchaser. If Seller and Purchaser are unable to completely resolve any such differences within such 5-day period, the unresolved issues (the "Allocation Dispute") shall be resolved by a mutually acceptable accounting firm.

### 3.2    Earnest Money.

3.2.1    Deposit of Earnest Money. Within three (3) Business Days of the Effective Date, the Purchaser shall deposit the amount of Five Hundred Thousand Dollars ($500,000.00) (the "Deposit") with Escrow Agent which is held in escrow as earnest money pursuant to that certain Earnest Money Escrow Agreement dated as of the Effective Date, among Seller, Purchaser and Escrow Agent (the "Earnest Money Escrow Agreement"), a copy of which is attached hereto as Exhibit G. The Deposit shall be fully applied to the Purchase Price at the Closing, and shall be non-refundable to Purchaser, except as follows (unless waived by Purchaser): (i) the Title Commitment contains a defect, lien, or encumbrance other than the Permitted Exceptions that is not promptly cured by Seller; (ii) any survey obtained by Purchaser reveals material issues affecting the marketability of the Transferred Property that cannot be insured against, at standard rates, or promptly corrected by Seller; (iii) a Phase I environmental report for the Hotel reveals environmental contaminants or other conditions that materially affect the suitability or marketability of the Hotel; (iv) a property condition report for the Hotel obtained by Purchaser reveals conditions that materially affect the suitability or marketability of the Hotel, or (v) a Seller Default.

3.2.2    Investment of Earnest Money. The Deposit shall be invested in accordance with the Earnest Money Escrow Agreement upon Purchaser's delivery of the Deposit.

3.2.3    Disbursement of Earnest Money to Seller. At Closing, Purchaser shall cause Escrow Agent to disburse the Deposit to Seller, and Purchaser shall receive a credit against the Purchase Price in the amount of the Deposit disbursed to Seller. If this Agreement is terminated for any reason and Purchaser is not entitled to a refund of the Deposit, then Purchaser shall provide written notice to Escrow Agent with concurrent copy to Seller (or Seller can send written notice to Escrow Agent with concurrent copy to Purchaser, subject to the terms of the Earnest Money Escrow Agreement) directing Escrow Agent to disburse the Deposit to Seller no later than two (2) Business Days after such termination. This Section 3.2.3 shall survive the termination of this Agreement.

3.2.4    Refund of Earnest Money to Purchaser. If this Agreement is terminated and Purchaser is entitled to a refund of the Deposit as provided for in Section 3.2.1, then Seller shall provide written notice to Escrow Agent with concurrent copy to Purchaser (or Purchaser can send written notice to Escrow Agent with concurrent copy to Seller, subject to the terms of the Earnest Money Escrow Agreement) directing Escrow Agent to disburse the Deposit to Purchaser. This Section 3.2.4 shall survive the termination of this Agreement.

**EXHIBIT A**

**3.3**     **Payment of Purchase Price**.

       3.3.1    <u>Payment at Closing</u>. At Closing, Purchaser shall pay, or cause to be paid, to Seller an amount equal to the Purchase Price (as adjusted pursuant to Section 3.1), less the Deposit disbursed to Seller; provided, however, that Seller acknowledges and agrees that at Closing, Purchaser or Escrow Agent shall pay directly to the Secured Lender, on behalf of Seller, a portion of the Purchase Price equal to $2,700,000 (the "<u>Secured Lender Lien Release Amount</u>"), unless a different amount is expressly agreed to by Secured Lender following receipt of the Closing Statement, and that upon receipt of such payment, the Secured Lender will release its liens on the Transferred Property. Purchaser shall cause the wire transfer of funds to be received by Seller no later than 1:00 p.m. (Eastern Time) on the Closing Date.

       3.3.2    <u>Method of Payment</u>. All amounts to be paid by Purchaser to Seller pursuant to this Agreement shall be paid by wire transfer of immediately available U.S. federal funds.

**ARTICLE IV**
**DUE DILIGENCE**

**4.1**     <u>**Due Diligence**</u>.

       4.1.1    <u>Seller's Due Diligence Materials</u>.

       (a)        Seller shall provide to Purchaser within five (5) days of the Effective Date, or make available to Purchaser at the Hotel for review and copying by Purchaser, those due diligence materials in Seller's Possession relating to the Transferred Property requested by Purchaser, including without limitation, financial statements, bank statements, and general ledgers, and P&L statements for the prior three years, and Purchaser agrees to acknowledge in writing, upon Seller's request, the receipt of any due diligence documents or materials delivered to Purchaser. All documents and materials provided by Seller to Purchaser pursuant to this Agreement (including, without limitation, any and all documents and materials set forth on the CBRE website), together with any copies or reproductions of such documents or materials, or any summaries, abstracts, compilations or other analyses made by or for Purchaser based on the information in such documents or materials, are referred to collectively herein as the "<u>Seller Due Diligence Materials</u>" and are set forth on <u>Schedule 4.1.1</u>.

       (b)        If this Agreement is terminated pursuant to the terms of this Agreement, Purchaser shall promptly (i) return all original Seller Due Diligence Materials provided to Purchaser, and destroy all other Seller Due Diligence Materials, (ii) use commercially reasonable efforts to cause all Persons to whom Purchaser has provided any Seller Due Diligence Materials to return any original Seller Due Diligence Materials to Purchaser, and destroy all other copies of Seller Due Diligence Materials, provided that Purchaser shall be responsible for, and shall defend indemnify and hold harmless the Seller Indemnitees in accordance with Article XV from any Indemnification Loss incurred by any Seller Indemnitee arising from or in connection with, any Person's failure to return or destroy any such Seller Due Diligence Materials, and (iii) certify to Seller that all original Seller Due Diligence Materials have been returned to Seller and all other Seller Due Diligence Materials have been destroyed. This Section 4.1.1(b) shall survive the termination of this Agreement.

13

EXHIBIT A

(c)     Exhibits and Schedules.  Seller shall provide, within 5 Business Days of the Effective Date, the Schedules and Exhibits to this Agreement, and the Diligence Period shall commence on the date that such Schedules and Exhibits are provided to the Purchaser. Purchaser shall have 3 Business Days after receipt of all Schedules and Exhibits to elect, in its sole discretion, to terminate this Agreement if such Schedules and Exhibits are not acceptable and the Parties are unable to agree on mutually acceptable Schedules and Exhibits, in which case the Deposit shall be refunded to Purchaser and the Parties shall have no further rights or obligations under this Agreement.  From time to time prior to the Closing, Seller shall have the right (but not the obligation) to supplement or amend the Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof and shall promptly notify Purchaser of any such supplement or amendment.

4.1.2   Access.

(a)     Seller shall permit Purchaser, subject to the remainder of this Section 4.1.2, to have access from time to time during the Diligence Period to the Transferred Property for the purpose of inspections and measuring of the Transferred Property (collectively, "Inspections"), and, in the case of any such entry, Purchaser shall: (i) in all events give at least twenty-four (24) hours telephonic or email advance notice to Seller so that Seller may, at its option, have a representative designated by Seller present during each visit to the Transferred Property and (ii) not unreasonably interfere with the use or operation of the Transferred Property.  Any such access shall be limited to normal business hours and Purchaser shall cooperate with any request by Seller in connection with the timing of any such access.  Notwithstanding the foregoing, no invasive, intrusive or destructive testing or soil investigations shall be performed.  Purchaser specifically acknowledges and agrees not to utilize any such access for, or to otherwise engage in, any marketing of all or any part of the Transferred Property prior to the Closing.  In the event Purchaser discovers a preexisting condition at the Transferred Property, Purchaser hereby covenants that it shall not disclose such condition to any person unless Purchaser is required to disclose the discovery of such existing environmental conditions to a Governmental Authority pursuant to Applicable Law (and Purchaser shall immediately notify Seller of such pending disclosure and provide Seller an opportunity to minimize such disclosure to the extent permitted under Applicable Law).  Prior to Purchaser's entry on the Transferred Property, Purchaser shall furnish (or caused to be furnished) to Seller an insurance certificate reasonably acceptable to Seller evidencing the fact that Purchaser, as the named insured, has in full force and effect a commercial general liability insurance policy with a company having a BEST rating of A: IX in an amount of at least One Million Dollars per occurrence ($1,000,000) naming Seller, Seller's lender as additional insureds.  Purchaser agrees to maintain such coverage for so long as this Agreement remains in effect.  Purchaser's maintenance of such insurance policies shall not release or limit Purchaser's indemnification obligations under Section 4.1.2.

(b)     Access to the Transferred Property shall be solely for the benefit of Purchaser and those acting on behalf of Purchaser, actually or prospectively, for the purposes stated in Section 4.1.2(a) of this Agreement and shall not give rise to a contingency or condition to the performance of Purchaser's obligations hereunder.  The results of any such inspection (whether evidencing latent or patent defects in the Transferred Property, and/or the existence or nonexistence of hazardous materials), and any information or matter discovered by Purchaser including, without limitation, other occupants of the Transferred Property, economic projections

14

EXHIBIT A

or market studies concerning the Transferred Property, any development rights, taxes, bonds, covenants, conditions and restrictions affecting the Transferred Property, air quality, the utilities serving the Transferred Property, any zoning, environmental or building laws, rules or regulations affecting the Transferred Property, the use or occupancy of the Transferred Property or any part thereof, the suitability of the Transferred Property as the subject of a cooperative or condominium conversion, or otherwise disclosing a condition which is undesirable or in violation of any law or governmental rule, regulation, ordinance or order shall not be grounds for any modification of the respective obligations of Seller and Purchaser hereunder or for any amendment or modification of this Agreement.

(c)     All: (i) confidential or otherwise non-public information and materials provided by or on behalf of Seller to Purchaser and/or its representatives, agents or employees; and (ii) Purchaser Due Diligence Reports shall be treated as Confidential Information by Purchaser, and Purchaser shall cause all of its employees, agents, representatives and contractors to maintain the confidentiality of all such information.

(d)     Purchaser shall indemnify, defend and hold harmless Seller Indemnitees from and against all Indemnification Loss resulting from, relating to or arising out of any access to the Transferred Property pursuant to this Section 4.1.2 or breach of this Section 4.1.2 after the Effective Date and prior to the Closing, whether occasioned by the acts or omissions of Purchaser or those of its employees, agents, vendors, representatives or contractors (collectively, "Inspectors") and not caused by the gross negligence or willful misconduct of Seller Indemnitees. Seller may, at Purchaser's reasonable out-of-pocket cost and expense, repair any physical damage to the Transferred Property caused any Inspections for which Purchaser is responsible under this Section 4.1.2.

(e)     Purchaser's obligations under this Section 4.1.2 shall survive the Closing or the termination of this Agreement.

## ARTICLE V
## TITLE TO THE PROPERTY

**5.1     Title Commitment**. Purchaser shall promptly obtain a commitment for an ALTA owner's title insurance policy from the Title Company for the Real Property ("Title Commitment").

**5.2     Exceptions to Title**.

5.2.1   Permitted Exceptions.  All liens, encumbrances or other exceptions to title to which the Purchaser does not object within the Diligence Period (the "Title Exceptions"), including, without limitation, those set forth on Schedule 5.2.1 attached hereto and (i) the rights and interests of customers and guests at the Hotel to occupy rooms on a transient license basis, (ii) all liens and encumbrances caused or created by any Purchaser Indemnitee, and (iii) any existing mortgages that Purchaser has agreed to assume at Closing, shall constitute "permitted exceptions" to title to the Real Property (the "Permitted Exceptions").  Notwithstanding anything in this Agreement to the contrary, Seller shall cure any title defects created by, through or under

15

EXHIBIT A

Seller, any title defect that is not a Permitted Exception and any encumbrance that can be cured by payment of a liquidated amount (the "Required Cure Items").

5.2.2   Access to Property.  The Parties acknowledge that the Real Property does not have deeded access to a public right of way as of the date of this Agreement.  Seller covenants and agrees that it will obtain an access easement providing for deeded ingress/egress between a public right of way and the Real Property, in form acceptable to Purchaser and sufficient to allow the Title Company to issue an ALTA access endorsement in standard form insuring Purchaser's access to the Real Property (the "Access Easement").  Purchaser's obligation to close the transactions described in this Agreement is subject to satisfaction of the preceding covenant.

**5.3   Conveyance of the Property**.  At Closing, Seller shall convey its fee simple interest in and to the Real Property to Purchaser, subject only to all Permitted Exceptions.

**5.4   Bankruptcy Matters**.

5.4.1   This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller, in consultation with Secured Lender, of higher or better competing bids, of any sale, transfer, or disposition of the Transferred Property.  Subject to payment of the Expense Reimbursement below, this Agreement may be terminated and the purchase and sale of the Transferred Property and the other transactions contemplated by this Agreement may be abandoned at any time prior to the Closing by the Seller by written notice to Purchaser if Seller accepts a Qualified Competing Offer as the Successful Overbidder (each as defined in the Sale Motion) from a Person other than Purchaser.

5.4.2   Seller and Purchaser acknowledge that this Agreement and the consummation of the transactions contemplated hereby are subject to Bankruptcy Court approval, and the expiration of any appeal periods of the Approval Order, if any.  Seller will use reasonable efforts to consummate the transactions contemplated hereby by seeking entry of the Approval Order. Within five (5) Business Days of the Effective Date, Seller shall file with the Bankruptcy Court a motion (the "Sale Motion") in form and substance reasonably satisfactory to Purchaser and Secured Lender seeking entry of an order substantially in the form of Exhibit F, as amended, modified or supplemented with the prior written consent of Purchaser and Secured Lender (which consent will not be unreasonably withheld, conditioned or delayed), (i) authorizing and approving the sale of the Transferred Property on the terms and conditions set forth herein, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, free and clear of all liens and encumbrances except Permitted Exceptions, subject to higher and better Qualified Bids submitted by Qualified Bidders (each as defined in the sale motion and accompany bidding procedures), (ii) granting the Purchaser certain bidding protections, including the reimbursement of actual out-of-pocket expenses not to exceed $25,000 (the "Expense Reimbursement") in the event that Seller accepts a Qualified Competing Offer as the Successful Overbidder (as defined in the sale motion and accompany bidding procedures) from a Person other than Purchaser for the sale of the Transferred Property and the Seller and Successful Overbidder consummate the competing transaction; and (iii) finding that Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and not a successor to Seller, with one or more appropriate motions and the entry of appropriate orders of the Bankruptcy Court (all such motions and orders being in form

EXHIBIT A

and substance reasonably satisfactory to Seller, Purchaser, Secured Lender and Title Company, the "Approval Order").

5.4.3   If the Approval Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or re-argument shall be filed with respect to the Approval Order or other such order), and this Agreement has not otherwise been terminated pursuant to the terms of this Agreement, Seller shall use its reasonable best efforts to diligently defend such appeal, petition or motion and shall use its reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion.

5.4.4   Except to the extent filings must be made on an emergency basis in the reasonable judgment of Seller, and to the extent reasonably practicable, Seller shall provide Purchaser and Secured Lender with a draft of any motions, orders or other pleadings that Seller proposes to file with the Bankruptcy Court relating to the transaction contemplated by this Agreement or the Business, including the motion to approve the Approval Order, no later than three (3) Business Days prior to the filing thereof with the Bankruptcy Court, and all such motions, orders or other pleadings must be in a form mutually acceptable to Purchaser, Seller and Secured Lender.

5.4.5   Seller shall consult with Purchaser and Secured Lender regarding pleadings that it intends to file with the Bankruptcy Court in connection with the transactions contemplated by this Agreement, or which might reasonably affect the Bankruptcy Court's approval of the transactions herein described and the Approval Order. Seller shall promptly provide Purchaser and Secured Lender and their respective counsel with copies of all notices, filings and orders of the Bankruptcy Court that Seller has in its possession (or receives) pertaining to the transactions described herein and the Approval Order, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Purchaser, Secured Lender and its respective counsel. Seller shall not seek any modification to the Approval Order by the Bankruptcy Court or any other Governmental Authority of competent jurisdiction to which a decision relating to the Seller's Bankruptcy case has been appealed, in each case, without the prior written consent of Purchaser and Secured Lender.

5.4.6   If the final, unappealable Approval Order has not been obtained within the time period required by Section 9.1.1, Purchaser may, but is not required, to declare such failure to deliver a Seller Default.

## ARTICLE VI
## CONDITION OF THE PROPERTY

**6.1   PROPERTY SOLD "AS IS"**.   PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, (A) THE PURCHASE OF THE TRANSFERRED PROPERTY SHALL BE ON AN "AS IS", "WHERE IS", "WITH ALL FAULTS" BASIS, SUBJECT TO WEAR AND TEAR FROM THE EFFECTIVE DATE UNTIL CLOSING, AND (B) SELLER HAS NO OBLIGATION TO

17

EXHIBIT A

REPAIR ANY DAMAGE TO OR DEFECT IN THE TRANSFERRED PROPERTY, REPLACE ANY OF THE TRANSFERRED PROPERTY OR OTHERWISE REMEDY ANY MATTER AFFECTING THE CONDITION OF THE TRANSFERRED PROPERTY

### 6.2    Limitation On Representations and Warranties.

6.2.1    Purchaser agrees that, except as expressly set forth herein, Seller shall not be liable for any latent or patent defects in the Transferred Property, and shall not be bound in any manner whatsoever by any guarantees, promises, projections or other information pertaining to the Transferred Property made, furnished or claimed to have been made or furnished by any Seller Indemnitee, whether verbally or in writing. Purchaser acknowledges that neither Seller nor any of the employees, agents or attorneys of Seller has made any verbal or written representations or warranties whatsoever to Purchaser, whether express or implied, except as expressly set forth in this Agreement and, in particular, that no such representations and warranties have been made with respect to the physical or environmental condition or operation or occupancy of the Real Property, the layout or footage of the Real Property, the actual or projected revenue and expenses of the Transferred Property, zoning, environmental, union, labor, employment and other laws, regulations and rules applicable to the Transferred Property, or the compliance of the Transferred Property therewith, the quantity, quality or condition of the articles of Personal Property and mixtures included in the transactions contemplated hereby, the existence or non-existence of any certificate of occupancy relating to the Real Property, the use or occupancy of the Transferred Property or any part thereof or any other matter or thing affecting or relating to the Transferred Property or the transactions contemplated hereby, except as specifically set forth in this Agreement. Purchaser has not relied and is not relying upon any representations or warranties, other than the representations and warranties expressly set forth in this Agreement, or upon any statements made in any informational materials with respect to the Transferred Property provided to Purchaser by Seller or any other person or entity, including the Broker or Secured Lender or any shareholder, member, manager, employee, agent, attorney or other person representing or purporting to represent Seller or the Broker. Without limitation of the foregoing, subject to the provisions of Article VIII, Purchaser specifically acknowledges and agrees that it has assumed the risk of changes in the condition of the Transferred Property between the Effective Date and the Closing Date and no adverse change in such condition shall grant Purchaser any right to terminate this Agreement or to obtain any damages against Seller. IN ADDITION TO, AND WITHOUT LIMITATION OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE MERCHANTABILITY, TITLE, MARKETABILITY, FITNESS, OR SUITABILITY FOR A PARTICULAR PURPOSE OF THE TRANSFERRED PROPERTY OR ANY COMPONENT THEREOF, AND THE TRANSFERRED PROPERTY AND EACH COMPONENT THEREOF ARE SOLD IN AN "AS IS", "WHERE IS" CONDITION, WITH ALL FAULTS.   BY EXECUTING THIS AGREEMENT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, PURCHASER AFFIRMS AND AGREES THAT (A) PURCHASER HAS NOT RELIED ON SELLER'S SKILL OR JUDGMENT TO SELECT OR FURNISH THE TRANSFERRED PROPERTY OR ANY COMPONENT THEREOF FOR ANY PARTICULAR PURPOSE, (B) SELLER MAKES NO WARRANTY THAT THE TRANSFERRED PROPERTY OR ANY COMPONENT THEREOF ARE FIT FOR ANY PARTICULAR PURPOSE, AND (C) THERE ARE NO REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, WITH RESPECT TO THE TRANSFERRED PROPERTY OR

18

EXHIBIT A

ANY COMPONENT THEREOF. PURCHASER HAS BEEN GIVEN THE OPPORTUNITY TO INSPECT THE TRANSFERRED PROPERTY AND EACH COMPONENT THEREOF AND HAS DETERMINED TO PURCHASE THE TRANSFERRED PROPERTY AND EACH COMPONENT THEREOF BASED ON SUCH INSPECTION.

6.2.2   Without limiting the generality of the provisions of Section 6.2.1, Purchaser specifically acknowledges and agrees as follows:

(a)   neither Seller nor any other party acting (or purporting to act) on behalf of Seller has made any representation or warranty of any kind of nature concerning any environmental condition existing at the Property; and

(b)   Purchaser shall take title to the Real Property subject to any and all environmental conditions thereat, whether known or unknown, disclosed or undisclosed.

**6.3**   **Reliance On Due Diligence**. PURCHASER ACKNOWLEDGES AND AGREES THAT:

(A)   PURCHASER WILL BE RELYING ONLY ON ITS DUE DILIGENCE INSPECTIONS OF THE PROPERTY, ITS REVIEW OF THE SELLER DUE DILIGENCE MATERIALS AND THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY SELLER IN THIS AGREEMENT IN PURCHASING THE TRANSFERRED PROPERTY; AND

(B)   PURCHASER WILL NOT BE RELYING ON ANY STATEMENT MADE OR INFORMATION PROVIDED TO PURCHASER BY SELLER (EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY SELLER IN THIS AGREEMENT), SELLER'S LENDERS, OR ANY OF THEIR AFFILIATES, OR ANY OF THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, PARTNERS, TRUSTEES, BENEFICIARIES, DIRECTORS, MANAGERS, OFFICERS, EMPLOYEES, ATTORNEYS, ACCOUNTANTS, CONTRACTORS, CONSULTANTS, AGENTS OR REPRESENTATIVES, OR ANY PERSON PURPORTING TO REPRESENT ANY OF THE FOREGOING.

**6.4**   **RELEASE OF SELLER FOR VIOLATIONS OF CERTAIN APPLICABLE LAWS**. NOTWITHSTANDING ANY INDEMNIFICATION OBLIGATION OF SELLER UNDER THIS AGREEMENT, EFFECTIVE AS OF THE CLOSING, PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) DOES HEREBY FOREVER RELEASE AND DISCHARGE THE SELLER INDEMNITEES FROM ANY AND ALL (A) VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT OF 1990, (B) ANY AND ALL NOTES OR NOTICES OF VIOLATIONS OF ANY LEGAL REQUIREMENT IN OR ISSUED BY ANY GOVERNMENTAL AUTHORITY (BUT NOT ANY LIEN, PENALTY OR FINE IMPOSED IN CONNECTION WITH ANY OF THE FOREGOING AS PROVIDED IN SECTION 5), AND/OR ANY CONDITION OR STATE OF REPAIR OR DISREPAIR AND/OR OTHER MATTER OR THING, WHETHER OR NOT NOTED, WHICH, IF NOTED, WOULD RESULT IN A VIOLATION BEING PLACED ON THE TRANSFERRED PROPERTY; PROVIDED, HOWEVER, THAT SUCH RELEASE AND DISCHARGE SHALL NOT APPLY TO ANY INDEMNIFICATION OBLIGATION OF SELLER RESULTING FROM A BREACH OF

EXHIBIT A

SELLER'S REPRESENTATIONS OR WARRANTIES SET FORTH IN SECTION 7.1. EXCEPT AS OTHERWISE PROVIDED HEREIN, SELLER SHALL HAVE NO DUTY TO REMOVE OR COMPLY WITH OR REPAIR OR DISREPAIR ANY (X) CONDITION, MATTER OR THING, WHETHER OR NOT NOTED, WHICH IF NOTED, WOULD RESULT IN A VIOLATION BEING PLACED ON THE TRANSFERRED PROPERTY OR (Y) OF THE AFOREMENTIONED VIOLATIONS OR OTHER CONDITIONS, AND PURCHASER SHALL ACCEPT THE TRANSFERRED PROPERTY SUBJECT TO ALL SUCH VIOLATIONS, THE EXISTENCE OF ANY CONDITIONS AT THE TRANSFERRED PROPERTY WHICH WOULD GIVE RISE TO SUCH VIOLATIONS, IF ANY, AND ANY CLAIMS OF ANY GOVERNMENTAL AUTHORITY ARISING FROM THE EXISTENCE OF SUCH VIOLATIONS IN EACH CASE WITHOUT ABATEMENT OF OR CREDIT AGAINST THE PURCHASE PRICE.

      **6.5**    <u>Survival</u>. This Article VI shall survive the Closing.

**ARTICLE VII**
**REPRESENTATIONS AND WARRANTIES**

      **7.1**    <u>Seller's Representations and Warranties</u>. To induce Purchaser to enter into this Agreement and to consummate the transaction described in this Agreement, Seller hereby makes the express representations and warranties in this Section 7.1 as of the date hereof and as of the Closing Date, except to the extent that (x) any such representation or warranty is made as of a specific date and/or (y) the failure of any representation or warranty contained in Sections 7.1.4, 7.1.5. (to the extent such failure does not have and is not reasonably likely to have a material adverse effect on the Transferred Property or Seller's ability to consummate the transaction described in this Agreement), 7.1.7(ii), 7.1.7(iii), or 7.1.9 to be true at Closing shall not result from a breach of covenant by Seller hereunder.

      7.1.1    <u>Organization and Power</u>. Seller is duly incorporated or formed (as the case may be), validly existing, in good standing in the jurisdiction of its incorporation or formation, is qualified to do business in the jurisdiction in which the Transferred Property is located, and has all requisite power and authority to own the Transferred Property and to consummate the sale contemplated hereby.

      7.1.2    <u>Authority and Binding Obligation</u>. Subject to Section 5.4, (i) Seller has full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Seller, pursuant to this Agreement (the "<u>Seller Documents</u>"), and to perform all obligations of Seller, under each of the Seller Documents, (ii) the execution and delivery by the signer on behalf of Seller of the Seller Documents, and the performance by Seller of its obligations under each of the Seller Documents, has been duly and validly authorized by all necessary action by Seller, and (iii) each of the Seller Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Seller, enforceable against Seller, in accordance with its terms. The person executing this Agreement on behalf of Seller has the authority and power to bind Seller.

      7.1.3    <u>Consents and Approvals; No Conflicts</u>. Subject to the Approval Order, the approval of the appropriate Governmental Authorities in connection with the transfer of the

20

EXHIBIT A

Licenses and Permits, if any, which will be obtained prior to Closing to permit operation of the Hotel after Closing, and the recordation of any Seller Documents as appropriate, and except as disclosed in Schedule 7.1.3, (i) no filing with, and no permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution or delivery by Seller of any of the Seller Documents, or the performance by Seller of any of its obligations under any of the Seller Documents or the consummation by Seller of the transaction described in this Agreement, except to the extent the failure to obtain such permit, authorization, consent or approval would not have a material adverse effect on Seller's ability to consummate the transaction described in this Agreement, and (ii) neither the execution and delivery by Seller of any of the Seller Documents, nor the performance by Seller of any of its obligations under any of the Seller Documents, nor the consummation by Seller of the transaction described in this Agreement, will: (A) violate any provision of Seller's organizational or governing documents; (B) violate any Applicable Law to which Seller or the Transferred Property is subject; (C) result in a violation or breach of, or constitute a default under any of the Contracts, except to the extent such violation, breach or default would not have a material adverse effect on Seller's ability to consummate the transaction described in this Agreement; or (D) result in the creation or imposition of any lien or encumbrance on the Transferred Property or any portion thereof.

7.1.4    Condemnation. Seller has not received any written notice and has no actual Knowledge of any pending condemnation proceeding or other proceeding in eminent domain.

7.1.5    Litigation. Except as set forth in Schedule 7.1.5, Seller has not been served with, and does not otherwise have Knowledge of, any court filing in or otherwise received written notice of any litigation with respect to the Transferred Property or the Business in which Seller is named a party which has not been resolved, settled or dismissed.

7.1.6    Employees. Seller is not a party to any collective bargaining agreement with any labor union with respect to the Employees. Seller is not a party to any written employment agreement with any of the Employees, other than Seller's standard offer letters for at-will employment. Schedule 7.1.6 sets forth a correct and complete list of the positions of each Employee at the Hotel and the number of Employees at the Hotel as of the Effective Date. There are no individuals working at the Hotel that are employees of Seller or of Seller's property manager other than the Employees. Purchaser may elect to conduct individual interviews with the Employees prior to Closing, provided, however, that such interviews shall not unduly interfere with the operation of the Business prior to the Closing, and choose to retain and employ post-Closing one or more of the Employees.

7.1.7    Taxes. Except as disclosed in Schedule 7.1.7, (i) all Taxes which are due and payable will be paid in full at Closing; provided, however, that if any Taxes are payable in installments, such representation and warranty shall apply only to such installments which are due and payable at Closing, (ii) Seller has no Knowledge of an audit of any Taxes which has not been resolved or completed, and (iii) Seller is not currently contesting any Taxes. The provisions of this Section 7.1.7 will survive the Closing for three (3) years.

7.1.8    Contracts. Schedule 7.1.8 sets forth a correct and complete list of all of the equipment leases, and supply, maintenance, repair, management or other similar agreements to which Seller is a party or is bound (specifically noting those that Seller will terminate at or prior

21

EXHIBIT A

to Closing and those terminable by Purchaser at Closing without any termination fee upon not more than thirty (30) days' notice) relating to and necessary for the operation of the Hotel or the Transferred Property, and Seller has made available to Purchaser a true and complete copy thereof. None of the Contracts have been amended or modified, except as set forth on Schedule 7.1.8. Except as set forth on Schedule 7.1.8, Seller has not given or received any written notice of any breach or default under any of the Contracts which has not been cured. Seller does not represent or warrant that: (i) any particular Contract will be in force or effect as of the Closing; or (ii) the parties to the Contracts will not be in default under their respective Contracts as of the Closing Date. The termination or expiration of any Contract shall not affect the obligations of Purchaser under this Agreement.

7.1.9    Finders and Investment Brokers. Except for the Broker, Seller has not dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of Seller in connection with the transaction described by this Agreement in a manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction described in this Agreement.

7.1.10    Foreign Person. Seller is a "United States person" (as defined in Section 7701(a)(30)(B) or (C) of the Code) for the purposes of the provisions of Section 1445(a) of the Code.

7.1.11    Bankruptcy. Seller is presently in bankruptcy in the Northern District of West Virginia.

7.1.12    Anti-Terrorism. Neither Seller nor any of Seller's Affiliates is or will be (i) conducting any business or engaging in any transaction or dealing with any Person appearing on the U.S. Treasury Department's OFAC list of prohibited countries, territories, "specifically designated nationals" or "blocked person" (each, a "Prohibited Person"), including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (ii) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (iii) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (iv) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (v) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (A) any U.S. anti-money laundering law, (B) the Foreign Corrupt Practices Act, (C) the U.S. mail and wire fraud statutes, (D) the Travel Act, (E) any similar or successor statutes or (F) any regulations promulgated under the foregoing statutes.

7.1.13    Personal Property. Seller has good title to all material Personal Property reasonably necessary to operate the Hotel the day after Closing in generally the same manner as currently operated, except for the leases and purchase money security agreements for any equipment, machinery, vehicles, furniture or other personal property located at the Real Property

22

EXHIBIT A

or making up a part of the Transferred Property which, in any case, are held by the lessor thereunder and used in the business operated at the Real Property.

7.1.14 <u>Employment Matters</u>. During the six (6) year period immediately preceding the Effective Date, Seller did not violate in any material respect, any applicable employment laws with respect to Employees, including but not limited to, employment discrimination and retaliation, occupational safety and health, disability, wage and hour, and withholding and payment of taxes, except where such violation was cured or remedied.

7.1.15 <u>Ownership</u>. Seller is the fee simple owner of the Transferred Property.

7.1.16 <u>Environmental</u>. Seller is not aware of any past or present release of Hazardous Substances at, on, under, migrating to or from, or surrounding the Transferred Property, and has not received any warning notices, notice of violations, administrative complaints, judicial complaints requests for information, or other formal or informal notices from any environmental or governmental agency or from any third party alleging that conditions at, on, under, migrating to or from, or surrounding the Transferred Property are in violation of any Environmental Laws, or that Seller is liable for any costs associated with any remediation relating to the existence of such materials at, on, under or migrating from the Transferred Property. Seller represents and warrants to Purchaser that no (i) underground tanks, vessels or containers or associated piping used currently or in the past for the management of Hazardous Substances, (ii) dumps, landfills or other units for the treatment or disposal of Hazardous Substances, (iii) PCBs, or (iv) asbestos-containing materials, in each case, are present at, on or under the Transferred Property, nor to Seller's knowledge have such features ever been present at, on or under the Transferred Property.

7.1.17 Notwithstanding the foregoing, if Purchaser has Knowledge of a breach of any representation or warranty made by Seller in this Agreement prior to Closing, and Purchaser nevertheless proceeds to close the transaction described in this Agreement, such representation or warranty by Seller shall be deemed to be qualified or modified to reflect Purchaser's Knowledge of such breach. Additionally, to the extent that there have been delivered or made available to Purchaser or its representative Seller Due Diligence Materials, and such Seller Due Diligence Materials contain provisions inconsistent with or different from the representations and warranties made herein, then such representations and warranties shall be deemed modified to conform them to the provisions of such documents and materials.

**7.2    Purchaser's Representations and Warranties**. To induce Seller to enter into this Agreement and to consummate the transaction described in this Agreement, Purchaser hereby makes the representations and warranties in this Section 7.2, upon which Purchaser acknowledges and agrees that Seller is entitled to rely.

7.2.1    <u>Organization and Power</u>. Purchaser is duly incorporated or formed (as the case may be), validly existing and in good standing in the jurisdiction of its formation, and has all requisite power and authority to own, lease and operate its properties and to carry on its business as currently being conducted.

7.2.2    <u>Authority and Binding Obligation</u>. (i) Purchaser has full power and authority to execute and deliver this Agreement and all other documents to be executed and

23

EXHIBIT A

delivered by Purchaser pursuant to this Agreement (the "Purchaser Documents"), and to perform all obligations of Purchaser arising under each of the Purchaser Documents, (ii) the execution and delivery by the signer on behalf of Purchaser of each of the Purchaser Documents, and the performance by Purchaser of its obligations under each of the Purchaser Documents, has been duly and validly authorized by all necessary action by Purchaser, and (iii) each of the Purchaser Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms. The person executing this Agreement on behalf of Purchaser has the authority and power to bind Purchaser.

7.2.3   Consents and Approvals; No Conflicts.  (i) No filing with, and no permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution or delivery by Purchaser of any of the Purchaser Documents, the performance by Purchaser of any of its obligations under any of the Purchaser Documents, or the consummation by Purchaser of the transaction described in this Agreement, and (ii) neither the execution and delivery by Purchaser of any of the Purchaser Documents, nor the performance by Purchaser of any of its obligations under any of the Purchaser Documents, nor the consummation by Purchaser of the transaction described in this Agreement, will:   (A) violate any provision of the organizational or governing documents of Purchaser; (B) violate any Applicable Law to which Purchaser is subject; or (C) result in a violation or breach of or constitute a default under any contract, agreement or other instrument or obligation to which Purchaser is a party or by which any of Purchaser's properties are subject.

7.2.4   Finders and Investment Brokers.  Except for Broker, Purchaser has not dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of Purchaser in connection with the transaction described by this Agreement in any manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction described in this Agreement.

7.2.5   No Violation of Anti-Terrorism Laws.  Neither Purchaser nor any of Purchaser's Affiliates is or will be (i) conducting any business or engaging in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any such Prohibited Person; (ii) engaging in certain dealings with countries and organizations designated under Section 311 of the USA PATRIOT Act as warranting special measures due to money laundering concerns; (iii) dealing in, or otherwise engaging in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 dated September 24, 2001, relating to "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"; (iv) a foreign shell bank or any person that a financial institution would be prohibited from transacting with under the USA PATRIOT Act; or (v) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempting to violate, any of the prohibitions set forth in (A) any U.S. anti-money laundering law, (B) the Foreign Corrupt Practices Act, (C) the U.S. mail and wire fraud statutes, (D) the Travel Act, (E) any similar or successor statutes or (F) any regulations promulgated under the foregoing statutes.

7.2.6   ERISA.  Purchaser is not an employee benefit plan subject to ERISA, or Section 4975 of the Code, Purchaser's assets and the Purchase Price do not constitute "plan assets"

24

**EXHIBIT A**

within the meaning of the "plan asset regulations" (29 C.F.R. Section 2510.3-101), and Purchaser's acquisition of the Transferred Property will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

Notwithstanding the foregoing, if Seller has Knowledge prior to Closing of a breach of any representation or warranty made by Purchaser in this Agreement and Seller nevertheless elects to close the transaction described in this Agreement, such representation or warranty by Purchaser shall be deemed to be qualified or modified to reflect Seller's Knowledge of such breach.

## ARTICLE VIII
## COVENANTS

### 8.1    Confidentiality.

8.1.1    Disclosure of Confidential Information.  Purchaser shall keep confidential and not make any public announcement or disclose to any Person the existence or any terms of this Agreement or any information disclosed by the Inspections or in the Seller Due Diligence Materials, the Purchaser Due Diligence Reports or any other documents, materials, data or other information with respect to the Transferred Property or the Business which is not generally known to the public or otherwise in the public domain (the "Confidential Information").  Notwithstanding the foregoing, Purchaser shall be permitted to (i) disclose any Confidential Information to the extent required under Applicable Law, and (ii) disclose any Confidential Information to any Person on a "need to know" basis, such as its partners, members, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, engineers, surveyors, lenders, investors, managers, franchisors and such other Persons whose assistance is required to consummate the transactions described in this Agreement; provided, however, that Purchaser shall (A) advise each such Person of the confidential nature of such Confidential Information, and (B) use commercially reasonable efforts to cause each such Person to maintain the confidentiality of such Confidential Information.

8.1.2    Public Announcements.  Subject to Section 5.4 and notwithstanding Section 8.1.1, neither Party shall have the right before Closing to make a public announcement regarding the transaction described in this Agreement; provided that any announcement made at or after Closing that includes the name(s) of Seller or Purchaser and/or any affiliates thereof shall require the written consent of Seller or Purchaser, as applicable, in its sole and absolute discretion.

8.1.3    Communication with Governmental Authorities.  Without limiting the generality of the provisions in Section 8.1.1, Purchaser shall not, through its officers, employees, managers, contractors, consultants, agents, representatives or any other Person (including, without limitation, Purchaser's Inspectors), directly or indirectly, communicate with any Governmental Authority or any official, employee or representative thereof, involving any matter with respect to the Transferred Property or the Business, unless required by Applicable Law; provided that the foregoing shall not limit or restrict Purchaser's right to (i) search and submit requests for public records and public databases via customary searches and (ii) request customary open permit, code violation, tax and lien searches and zoning verification letters.

8.1.4    Survival.  Purchaser's obligations under this Section 8.1 shall survive the termination of this Agreement.

EXHIBIT A

**8.2    Conduct of the Business**.

8.2.1    Operation in Ordinary Course of Business.  From the Effective Date until the Closing or earlier termination of this Agreement, except as otherwise provided in this Agreement, Seller shall conduct the Business in the Ordinary Course of Business, including, without limitation, (i) maintaining the inventories of FF&E, and Supplies at levels maintained in the Ordinary Course of Business, (ii) performing maintenance and repairs for the Real Property and tangible Personal Property in the Ordinary Course of Business and (iii) maintaining insurance.

8.2.2    Contracts.  From the Effective Date until the Closing or earlier termination of this Agreement, Seller shall not (i) terminate any Contract except in the Ordinary Course of Business without obtaining Purchaser's written consent (which consent shall not be unreasonably withheld, conditioned or delayed) or (ii) enter into any new supply, maintenance, repair, management or similar agreement or contract that is not terminable by Purchaser at Closing without any termination fee upon not more than thirty (30) days' notice, or amend any existing Contract with the result that such Contract is not terminable by Purchaser following Closing without any termination fee upon not more than thirty (30) days' notice, without obtaining in each instance Purchaser's prior written consent.  If Purchaser fails to notify Seller of its failure to give any requested consent or approval within five (5) Business Days after any request therefor, accompanied by a statement of its reasons for withholding such consent or approval, Purchaser shall be deemed to have approved the matter in issue.

**8.3    Licenses and Permits**.  Purchaser shall reasonably cooperate in obtaining the transfer of all Licenses and Permits which Purchaser agrees to assume, as set forth in Schedule 8.3 attached hereto (to the extent transferable) or the issuance of new Licenses and Permits.  If this Agreement is terminated and Purchaser has filed an application or otherwise commenced the processing of obtaining new Licenses and Permits, Purchaser shall withdraw all such applications and cease all other activities with respect to such new Licenses and Permits.  Purchaser's obligations under the immediately preceding sentence shall survive the termination of this Agreement.  For the avoidance of doubt, Purchaser acknowledges that there is not a permanent certificate of occupancy for the Transferred Property, that the temporary certificate of occupancy is for residential use rather than for transient Hotel use and it is not a condition to Closing, and there shall be no liability, if there is no temporary or permanent certificate of occupancy in effect as of Closing or if there is a certificate of occupancy in effect as of Closing, the permitted uses thereunder.

**8.4    Employees**.

8.4.1    COBRA.  Neither Seller nor any of its affiliates shall have COBRA or other mandated group health plan continuation coverage obligations for any laid off Employees, including any that may be rehired by the Purchaser on or after the Closing.

8.4.2    The provisions of this Section 8.4 shall survive the Closing indefinitely.

**8.5    Bookings**.  Purchaser shall assume all of the obligations of Seller relating to Bookings booked in the Ordinary Course of Business at market rates prior to the Closing Date, which shall relate to periods on or after the Closing Date.  Purchaser shall indemnify, defend, and

26

EXHIBIT A

hold harmless Seller for, from, and against any loss, damage, liability, or claim (including attorneys' fees in a reasonable amount and court costs) incurred by Seller stemming from Purchaser's failure to honor such Bookings. The provisions of this paragraph shall survive the Closing.

8.6    **Tax Contests and Clearance**.

8.6.1    Taxable Period Terminating Prior to Closing Date. Seller shall retain the right to commence, continue and settle any proceeding to contest any Taxes for any taxable period which terminates prior to the Closing Date, and shall be entitled to any refunds or abatements of Taxes awarded in such proceedings, including, without limitation, those property tax appeals matters as set forth in Schedule 8.6) (the "Property Tax Appeals Matters"). In the event Purchaser receives any such refunds or abatements of Taxes to which Seller is entitled under this Section 8.6.1, Purchaser shall deliver such refunds or abatements to Seller within five (5) Business Days after Purchaser's receipt thereof. This Section 8.6.1 shall survive the Closing.

8.6.2    Taxable Period Including the Closing Date. Purchaser shall have the right to commence, continue and settle any proceeding to contest any Taxes for any taxable period which includes the Closing Date, and Purchaser and Seller shall be entitled to their pro rata share (based on their respective days of ownership during such taxable period) of any refunds or abatements of Taxes awarded in such proceedings after Purchaser has been reimbursed for its reasonable expenses of such proceedings.

8.6.3    Taxable Period Commencing After Closing Date. Purchaser shall have the right to commence, continue and settle any proceedings to contest Taxes for any taxable period which commences after the Closing Date, and shall be entitled to any refunds or abatements of Taxes awarded in such proceedings. This Section 8.6.3 shall survive the Closing.

8.6.4    Cooperation. Seller and Purchaser shall use commercially reasonable efforts to cooperate with the Party contesting the Taxes (at no cost or expense to the Party not contesting the Taxes other than any *de minimis* cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) and to execute and deliver any documents and instruments reasonably requested by the Party contesting the Taxes in furtherance of the contest of such Taxes. This Section 8.6.4 shall survive the Closing.

8.7    **Notices and Filings**. Seller and Purchaser shall use commercially reasonable efforts to cooperate with each other (at no cost or expense to the Party whose cooperation is requested, other than any *de minimis* cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to provide written notice to any Person under any Contracts, Licenses and Permits, and to effect any registrations or filings with any Governmental Authority or other Person, regarding the change in ownership of the Transferred Property or the Business. This Section 8.7 shall survive the Closing.

8.8    **Access to Information**. After the Closing, Purchaser shall provide to the officers, employees, agents and representatives of any Seller Indemnitees reasonable access to (i) the Books and Records with respect to the Hotel, (ii) the Transferred Property, and (iii) the employees at the Hotel, for any purpose reasonably required by Seller, including, without limitation, to prepare any

27

EXHIBIT A

documents required to be filed by Seller under Applicable Law, including any filings appropriate or necessary in the Bankruptcy Case, or to investigate, evaluate and defend any claim, charge, audit, litigation or other proceeding made by any Person or insurance company; provided, however, that (A) such Seller Indemnitees shall provide reasonable prior notice to Purchaser; (B) Purchaser shall not be required to provide such access during non-business hours; (C) such access shall not unreasonably interfere with the Business; (D) Purchaser shall have the right to accompany the officer, employees, agents or representatives of such Seller Indemnitees in providing access to the Books and Records, the Transferred Property or the employees of Purchaser (or Purchaser's manager) as provided in this Section 8.8. This Section 8.8 shall survive the Closing. Seller at its sole cost and expense shall, prior to Closing, make any desired copies of the Books and Records or other records associated with the Hotel and their operations.

    **8.9**    **Privacy Laws**. To the extent Purchaser reviews, is given access to or otherwise obtains any Hotel Guest Data and Information as part of the purchase of the Transferred Property and the Business, Purchaser shall at all times comply in all material respects with all Applicable Law concerning (i) the privacy and use of such Hotel Guest Data and Information and the sharing of such information and data with third parties (including, without limitation, any restrictions with respect to Purchaser's or any third party's ability to use, transfer, store, sell, or share such information and data), and (ii) the establishment of adequate security measures to protect such Hotel Guest Data and Information. This Section 8.9 shall survive the Closing.

    **8.10**   **Further Assurances**. From the Effective Date until the Closing or earlier termination of this Agreement, Seller and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transaction described in this Agreement, including, without limitation, (i) obtaining all necessary consents, approvals and authorizations required to be obtained from any Governmental Authority or other Person under this Agreement or Applicable Law, and (ii) effecting all registrations and filings required under this Agreement or Applicable Law. After the Closing, Seller and Purchaser shall use commercially reasonable efforts (at no cost or expense to such Party, other than any *de minimis* cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to further effect the transaction contemplated in this Agreement. The immediately preceding sentence of this Section 8.10 shall survive the Closing.

## ARTICLE IX
## CLOSING CONDITIONS

    **9.1**   **Purchaser Closing Conditions**.

      9.1.1   Satisfaction of Purchaser Closing Conditions. Purchaser's obligations to close the transactions described in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent, unless one or more obligations are waived by Purchaser (the "Purchaser Closing Conditions"):

        (a)   Seller's Deliveries. All of the Seller Closing Deliveries shall have been delivered to Purchaser.

**EXHIBIT A**

(b)    Representations and Warranties. The representations or warranties of Seller in this Agreement (as qualified by any schedules to this Agreement as updated in accordance with Section 16.13) shall be true and correct in all material respects as of the Closing (except to the extent that (x) any such representation or warranty is made as of a specific date and/or (y) the failure of any such representation or warranty pursuant to Sections 7.1.4, 7.1.5 (to the extent such failure does not have and is not reasonably likely to have a material adverse effect on the Transferred Property or Seller's ability to consummate the transaction described in this Agreement), 7.1.7(ii), 7.1.7(iii), or 7.1.9 to be true at Closing shall not result from a breach of covenant by Seller hereunder).

(c)    Covenants and Obligations. The covenants and obligations of Seller in this Agreement shall have been performed in all material respects.

(d)    Title. Subject to receipt by Carter Bank at Closing of the amount set forth in Section 3.3.1, title to the Transferred Property shall be free and clear of all liens and other encumbrances other than Permitted Exceptions.

(e)    The Bankruptcy Court shall have entered the Approval Order within 120 days from the Effective Date, unless a different period is agreed to by Purchaser and Seller.

(f)    The Diligence Period shall have expired.

(g)    The Exhibits to the Agreement shall be in form and substance acceptable to Purchaser.

**9.2    Seller Closing Conditions.**

(a)    Satisfaction of Seller Closing Conditions. Seller's obligations to close the transactions contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent, unless one or more obligations are waived by Seller (the "Seller Closing Conditions"):

(b)    Receipt of the Purchase Price. Purchaser shall have (A) paid to Seller or deposited with Escrow Agent with written direction to disburse the same to Seller, the Purchase Price (as adjusted pursuant to Section 3.1 less the Deposit), and (B) delivered written direction to Escrow Agent to disburse the Deposit to Seller.

(c)    Purchaser's Deliveries. All of the Purchaser Closing Deliveries shall have been delivered to Seller.

(d)    Representations and Warranties. The representations and warranties of Purchaser in this Agreement shall be true and correct in all material respects as of the Closing (or as of such other date to which such representation or warranty expressly is made).

(e)    Covenants and Obligations. The covenants and obligations of Purchaser in this Agreement shall have been performed in all material respects.

29

**EXHIBIT A**

9.2.2   Failure of Seller Closing Condition.  If any of the Seller Closing Conditions is not satisfied at Closing, then Seller shall have the right to (i) terminate this Agreement by providing written notice to Purchaser, in which case the Deposit shall be disbursed to Seller in accordance with Section 3.2.3, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (ii) waive any of the Seller Closing Conditions at or prior to Closing

### ARTICLE X
### CLOSING

**10.1    Closing Date**.  The closing of the transaction described in this Agreement (the "Closing") shall take place at 10:00 a.m. Eastern Time at the offices of Kay Casto & Chaney PLLC, 1500 Chase Tower, 15th Floor, 707 Virginia Street, East, Charleston, WV 25301, or by overnight delivery and wire transfer, no later than thirty (30) days after the later to occur of (i) expiration of the Diligence Period or (ii) the Business Day after all of the conditions to the obligations of the Seller and Purchaser under Article IX (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing) have been satisfied or waived in accordance with this Agreement, or at such other time and place as agreed to in writing by the Parties (the "Scheduled Closing Date") (as such date may be postponed pursuant to Section 5.2.1 or 13.2) (the date on which the Closing actually occurs is referred to herein as the "Closing Date"); provided, that each of Purchaser and Seller may adjourn the Scheduled Closing Date as provided in Section 10.1.1 below.

10.1.1  Extension of Closing Date.  Each of Purchaser and Seller may adjourn the Scheduled Closing Date once, upon at least five (5) days' prior written notice to the other Party for a period of no more than fifteen (15) days; provided, however, that Seller shall have the right, but not the obligation, to postpone the Closing one or more times, but in no event for more than thirty (30) days in the aggregate from the Scheduled Closing Date; provided further, that TIME SHALL BE OF THE ESSENCE with respect to Purchaser's obligation to close the transactions contemplated herein no later than the Scheduled Closing Date, as same may be adjourned by Purchaser as provided above.

**10.2    Closing Deliveries**.

10.2.1  Seller's Deliveries.  At the Closing, Seller shall deliver or cause to be delivered to Purchaser all of the (i) documents set forth in this Section 10.2.1, each of which shall have been duly executed by Seller and acknowledged (if required), and (ii) other items set forth in this Section 10.2.1 (the "Seller Closing Deliveries"), as follows:

(a)    A closing certificate in the form of Exhibit A, together with all exhibits thereto;

(b)    A limited warranty deed (the "Deed") in the form of Exhibit B, conveying the Real Property to Purchaser, subject to the Permitted Exceptions;

(c)    A Bill of Sale in the form of Exhibit C, transferring the FF&E, Supplies, IT Systems, Intellectual Property, Books and Records, Plans and Specifications, Warranties, Bookings and Accounts Receivable to Purchaser on the terms set forth therein;

**EXHIBIT A**

(d)    A FIRPTA affidavit in the form set forth in the regulations under Section 1445 of the Code;

(e)    The Access Easement;

(f)    A rent roll, list of Bookings and list of accounts receivable updated to no earlier than one day prior to the Closing Date;

(g)    To the extent not previously delivered to Purchaser, and to the extent in Seller's possession or control, all originals (or copies if originals are not available) of the Contracts, Books and Records, the Bookings, keys and lock combinations or codes in Seller's Possession, which shall be located at the Hotel on the Closing Date and deemed to be delivered to Purchaser upon delivery of possession of the Hotel; provided, however, that Seller shall have the right to (i) redact and reformat any Books and Records which include data or other information pertaining to any other Hotel owned, managed or franchised by Seller or its Affiliates, and (ii) retain copies of any Books and Records delivered to Purchaser;

(h)    The Closing Statement prepared pursuant to Section 11.1;

(i)    A letter to each counterparty under the Contracts (the "Contractor Notification Letters"), in the form of Exhibit D attached hereto, notifying such contractor of Purchaser's acquisition of the Transferred Property and of the assignment of the Contracts to Purchaser; and

(j)    The Tax Escrow Agreement;

10.2.2 Purchaser's Deliveries.  At the Closing, Purchaser shall deliver or cause to be delivered to Seller all of the (i) documents set forth in this Section 10.2.2, each of which shall have been duly executed by Purchaser and acknowledged (if required), and (ii) other items set forth in this Section 10.2.2 (the "Purchaser Closing Deliveries"), as follows:

(a)    The Purchase Price (as adjusted pursuant to Section 3.1) to be paid by Purchaser, less the Deposit received by Seller;

(b)    A letter of direction to Escrow Agent directing Escrow Agent to disburse the Deposit to Seller;

(c)    A closing certificate in the form of Exhibit E, together with all exhibits thereto;

(d)    A counterpart of each of the documents and instruments to be delivered by Seller under Section 10.2.1 which require execution by Purchaser;

(e)    Such other documents and instruments as may be requested by the Title Company in order to consummate the transaction described in this Agreement.

10.3    **Possession**.  Seller shall deliver possession of the Real Property, subject only to the Permitted Exceptions and tangible Personal Property to Purchaser upon completion of the Closing.

31

**EXHIBIT A**

**ARTICLE XI**
**PRORATIONS AND EXPENSES**

**11.1    Closing Statement**.  At least five (5) Business Days prior to Closing, the parties shall cause the Title Company to prepare an initial draft of a closing statement, and Seller shall provide Purchaser with a then current list of bookings and accounts receivable, and an accounting of all payments to be made by or on behalf of Seller with the proceeds received from the Purchase Price.  No later than the three (3) Business Days prior to Closing, the Parties, through their respective employees, agents or representatives, jointly shall make such examinations, audits and inventories of the Hotel as may be necessary to make the adjustments and prorations to the Purchase Price as set forth in Sections 11.2 and 11.3 or any other provisions of this Agreement.  Based upon such examinations, audits and inventories, the Parties jointly shall prepare prior to Closing a closing statement (the "Closing Statement"), which shall set forth their best estimate of the amounts of the items to be adjusted and prorated under this Agreement.  The Closing Statement shall be delivered to the Secured Lender at least two (2) Business Day prior to Closing for its review, comment and approval with respect to all amounts due and payable to the Secured Lender (including without limitation the Secured Lender Lien Release Amount), such approval not to be unreasonably withheld, conditioned or delayed.  The Closing Statement shall be approved and executed by the Parties at Closing, and such adjustments and prorations shall be final with respect to the items set forth in the Closing Statement, except to the extent any such items shall be re-prorated after the Closing as expressly set forth in Section 11.2.  Notwithstanding the foregoing, if at any time within sixty (60) days after the Closing, any Party discovers any item which was omitted or incorrectly adjusted or prorated in the Closing Statement, such item shall be adjusted and prorated in the same manner as if their existence or such error had been known at the time of the preparation of the Closing Statement, and the Party in whose favor such original omission or error was made shall refund such difference to the other Party promptly after the original omission or error is discovered.  The preceding sentence of this Section 11.1 shall survive the Closing.

**11.2    Prorations**.  The items of revenue and expense set forth in this Section 11.2 shall be prorated between the Parties (the "Prorations") (i) as of 11:59 p.m. local time (at the Hotel) on the day preceding the Closing Date, except with respect to cash on hand, account funds, inventory and vending machines, and (ii) 4:00 a.m. local time (at the Hotel) on the Closing Date with respect to cash on hand, account funds, inventory and vending machines (the "Cut-Off Time"), so that the Closing Date is a day of income and expense for Purchaser.

11.2.1  Contracts.  Any amounts prepaid, accrued or due and payable under the Contracts to be assumed by Purchaser (other than for utilities which proration is addressed separately in Section 11.2.2) shall be prorated as of the Cut-Off Time between Seller and Purchaser with Seller being credited for amounts prepaid, and Purchaser being credited for amounts accrued and unpaid.  Purchaser shall receive a credit for all deposits held by Seller under the Contracts (together with any interest thereon) which are not transferred to Purchaser, and Purchaser thereafter shall be obligated to refund or apply such deposits in accordance with the terms of such Contracts.  Seller shall receive a credit for all deposits made by Seller under the Contracts to be assumed by Purchaser (together with any interest thereon) which are transferred to Purchaser or remain on deposit for the benefit of Purchaser.

EXHIBIT A

11.2.2 <u>Utilities</u>. All utility services shall be prorated as of the Cut-Off Time between Seller and Purchaser. The Parties shall use commercially reasonable efforts to obtain readings for all utilities and fuel as of the Cut-Off Time. If readings cannot be obtained as of the Closing Date, the cost of such utilities shall be prorated between Seller and Purchaser by estimating such cost on the basis of the most recent bill for such service; provided, however, that after the Closing, the Parties shall re-prorate the amount for such utilities and pay any deficiency in the original proration to the other Party promptly upon receipt of the actual bill for the relevant billing period, which obligation shall survive the Closing. Seller shall receive a credit for all fuel stored at the Hotel based on Seller's cost for such fuel. Seller shall receive a credit for all deposits transferred to Purchaser or which remain on deposit for the benefit of Purchaser with respect to such utility contracts.

11.2.3 <u>Compensation and other Employee-Related Prorations</u>. Seller shall pay directly to the Employees then employed at the Hotel for the payroll period that includes the Closing Date for all Compensation due to such Employees through the Cut-Off Time on or before Seller's first payroll date on or after the Closing Date, and Purchaser shall not receive a credit for any Compensation with respect to such Employees. This Section 11.2.3 shall survive the Closing.

11.2.4 <u>Accrued PTO and Accrued Vacation Pay</u>. Seller shall provide Purchaser a credit in an amount equal to the Accrued Vacation Pay and the Accrued PTO as of the Cut-Off Time for any Employees then employed at the Hotel and which will continue to be employed at the Hotel by Purchaser after Closing, and Purchaser shall permit such Employees to take vacation, sick, and personal time off with respect thereto after the Closing in accordance with the terms of the vacation, sick, and personal time off policies in effect with respect to such Employees as of the Closing Date employed at the Hotel. This Section 11.2.4 shall survive the Closing.

11.2.5 <u>Bookings</u>. Purchaser shall receive a credit for all prepaid deposits for Bookings scheduled to occur on or after the Closing Date or otherwise spanning any period which includes the Closing Date as set forth in the schedule of Bookings delivered to Purchaser at Closing, except to the extent such deposits are transferred to Purchaser. Purchaser shall assume all of the obligations of Seller relating to reservations booked in the Ordinary Course of Business at market rates prior to the Closing Date, which shall relate to periods on or after the Closing Date, subject to the provisions of Section 8.5. Purchaser shall indemnify, defend, and hold harmless Seller Indemnitees for, from, and against any Indemnification Loss incurred by Seller arising from Purchaser's failure to honor such reservations.

11.2.6 <u>Vending Machines</u>. Seller shall remove all monies from all vending machines, laundry machines, pay telephones and other coin operated equipment as of the Cut-Off Time and shall retain all monies collected therefrom as of the Cut-Off Time, and Purchaser shall be entitled to any monies collected therefrom after the Cut-Off Time.

11.2.7 <u>Trade Payables</u>. Except to the extent an adjustment or proration is made under another subsection of this Section 11.2, (i) Seller shall pay in full prior to the Closing all amounts payable to vendors or other suppliers of goods or services for the Business (the "<u>Trade Payables</u>") which are due and payable as of the Closing Date for which goods or services have been delivered to the Hotel prior to Closing and (ii) Purchaser shall receive a credit for the amount of such Trade Payables (other than those payable to any Affiliate of Seller) which have accrued,

33

EXHIBIT A

but are not yet due and payable as of the Closing Date, and Purchaser shall pay all such Trade Payables accrued as of the Closing Date when such Trade Payables become due and payable; provided, however, Seller and Purchaser shall re-prorate the amount of credit for any Trade Payables and pay any deficiency in the original proration to the other Party promptly upon receipt of the actual bill for such goods or services. Seller shall receive a credit for all advance payments or deposits made with respect to FF&E, and Supplies ordered, but not delivered to the Hotel prior to the Closing Date, except to the extent that such items would have constituted Excluded Property had they been delivered to the Hotel prior to the Closing Date, and Purchaser shall pay the amounts which become due and payable for such FF&E, and Supplies which were ordered prior to Closing, except to the extent that such items would have constituted Excluded Property had they been delivered to the Hotel prior to the Closing Date; provided, however, promptly following the sixtieth (60th) day following the Closing Date, Seller and Purchaser shall re-prorate the amount of credit for all such advance payments or deposits based on the goods and services so ordered as were then actually received by Purchaser. This Section 11.2.7 shall survive the Closing.

11.2.8 <u>Cash</u>. Seller shall receive a credit for all cash on hand or on deposit in any house bank at the Hotel which shall remain on deposit for the benefit of Purchaser.

11.2.9 <u>Other Adjustments and Prorations</u>. All other items of income and expense as are customarily adjusted or prorated upon the sale and purchase of a Hotel property in Elkview, West Virginia similar to the Transferred Property shall be adjusted and prorated between Seller and Purchaser accordingly.

**11.3    <u>Accounts Receivable</u>.**

11.3.1 <u>Guest Ledger</u>. At Closing, Seller shall receive a credit in an amount equal to: (i) all amounts charged to the Guest Ledger for all room nights up to the night during which the Cut-Off Time occurs, and (ii) one half (1/2) of all amounts charged to the Guest Ledger for the room night which includes the Cut-Off Time. The Guest Ledger which shall be prorated as set forth above and Purchaser shall be entitled to retain all deposits made and amounts collected with respect to such Guest Ledger. Seller will settle all outstanding Guest ledger balance on credit cards provided by Guests and settle credit card batch to receive credit. Purchaser cannot use Seller's credit card authorization to settle cards in the future.

11.3.2 <u>Accounts Receivable (Other than Guest Ledger)</u>. All accounts receivable to the date of Closing shall belong to the Seller. Purchaser agrees to assist in the collection of said receivables by promptly remitting any such payments received by it to the Seller.

**11.4    <u>Transaction Costs</u>.**

11.4.1 <u>Seller's Transaction Costs</u>. In addition to the other costs and expenses to be paid by Seller set forth elsewhere in this Agreement, Seller shall pay for the following items in connection with this transaction: (i) any commission or other compensation or consideration due to Broker; (ii) one half (1/2) of any transfer, sales or similar tax and recording charges payable in connection with the conveyance of the Real Property; (iii) one half (1/2) of the fees and expenses for the Escrow Agent; and (iv) the fees and expenses of its own attorneys, accountants, intermediaries, advisors and consultants.

34

**EXHIBIT A**

11.4.2  Purchaser's Transaction Costs.  In addition to the other costs and expenses to be paid by Purchaser as set forth elsewhere in this Agreement, Purchaser shall pay for the following items in connection with this transaction:  (i) the fees and expenses incurred by Purchaser for Purchaser's Inspectors or otherwise in connection with the Inspections; (ii) the cost to obtain the Title Commitment; (iii) any sales or similar taxes payable in connection with the conveyance of the Personal Property; (iv) any fees or expenses payable for the assignment, transfer or conveyance of any Contracts, Licenses and Permits, IT Systems, Intellectual Property, Plans and Specifications and Warranties; (v) any mortgage tax, and expenses for any loan title insurance policies, recording charges or other amounts payable in connection with any financing obtained by Purchaser; (vi) one half (1/2) of the fees and expenses for the Escrow Agent; (vii) one half (½) of any transfer, sales or similar tax and recording charges payable in connection with the conveyance of the Real Property; and (viii) the fees and expenses of its own attorneys, accountants, intermediaries, advisors and consultants.

11.4.3  Other Transaction Costs.  All other fees, costs and expenses not expressly addressed in this Section 11.4 or elsewhere in this Agreement shall be allocated between Seller and Purchaser in accordance with applicable local custom for similar transactions.

11.4.4  This Section 11.4 shall survive the Closing.

## ARTICLE XII
## TRANSITION PROCEDURES

**12.1  Baggage**.  On the Closing Date, employees, agents or representatives of the Parties jointly shall make a written inventory of all baggage, boxes and similar items checked in or left in the care of Seller at the Hotel, and Seller shall deliver to Purchaser the keys to any secured area which such baggage and other items are stored (and thereafter such baggage, boxes and other items inventoried shall be deemed the "Inventoried Baggage").  Purchaser shall be responsible for, and shall indemnify and hold harmless the Seller Indemnitees in accordance with Article XV from and against any Indemnification Loss incurred by any Seller Indemnitees with respect to any theft, loss or damage to any Inventoried Baggage from and after the time of such inventory.

**12.2  IT Systems**.  With respect to the IT Systems, Seller shall provide Purchaser with a contact name and a telephone number and/or email address of the applicable licensor, vendor or supplier, and Purchaser shall (i) be responsible for obtaining any consents or approvals necessary for the assignment or transfer of such IT Systems from Seller to Purchaser should Purchaser agree to assume such Systems, or a new license for such IT Systems, should Purchaser agree to utilize the same vendor (as the case may be), and (ii) pay any fees or expenses charged by the licensor, vendor or supplier of such IT Systems in respect of such assignment or transfer or new license (as the case may be); provided that, Seller, at no cost or liability to Seller, shall, upon Purchaser's request, cooperate with Purchaser in all reasonable respects in Purchaser's efforts to effectuate such assignment or transfer or procurement of a new license.  Seller shall be responsible for any termination charges or fees of any IT Systems contract that is not assumed by or transferred to Purchaser. With respect to the Excluded IT Systems to be removed from the Hotel at Closing, Seller shall have no obligation to replace such Excluded IT Systems.  If Purchaser replaces any of the Excluded IT Systems removed by Seller, Seller, at no cost or liability to Seller, shall cooperate with Purchaser in all reasonable respects to transfer all data from such Excluded IT Systems which

35

EXHIBIT A

were removed to the replacement systems installed by Purchaser, provided, however, that Seller makes no representation, warranty or guarantee whatsoever that the data on such Excluded IT Systems removed by Seller will be transferable or compatible with the replacement systems installed by Purchaser. This Section 12.2 shall survive the Closing.

    **12.3**   <u>**Notice to Guests and Employees**</u>. At Purchaser's option, Purchaser shall issue an announcement to all Employees, guests and customers at the Hotel on or after the Closing Date and all Persons who have Bookings as of the Closing Date informing such Persons of the change in ownership of the Hotel.

**ARTICLE XIII**
**DEFAULT AND REMEDIES**

    **13.1**   <u>**Seller's Default**</u>. If, on the Scheduled Closing Date, Seller fails to deliver good and marketable title to the Property, Seller fails to deliver all Seller Closing Deliveries, Seller fails to perform any of its covenants or agreements under this Agreement in any material respect, Purchaser does not receive a clean Phase I Environmental Report, or Seller fails to deliver the Approval Order within 120 days (each, a "Seller Default"), and no Purchaser Default has occurred which remains uncured, then Purchaser, as its sole and exclusive remedy, may elect to (a) terminate this Agreement, in which case the Deposit shall be refunded to Purchaser in accordance with Section 3.2.4, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination; (b) proceed to Closing without any reduction in or setoff against the Purchase Price, in which case Purchaser shall be deemed to have waived such Seller Default; or (c) obtain a court order for specific performance, together, in any such case, with Purchaser's rights under Section 16.11 hereof; provided, however, that Purchaser shall only be entitled to such specific performance remedy if: (w) Seller shall default in its obligation to consummate the Closing under this Agreement; (x) any such suit for specific performance is filed no later than thirty (30) days after the Scheduled Closing Date; (y) Purchaser is not in default under this Agreement; and (z) Purchaser certifies to Seller that it is ready, willing and able to close in accordance with the terms of this Agreement.

    **13.2**   <u>**Seller's Right to Cure**</u>. Notwithstanding anything to the contrary in this Agreement, Purchaser shall not have the right to exercise its remedies under Section 13.1 for a Seller Default, unless Purchaser has provided written notice to Seller specifying in reasonable detail the nature of the Seller Default, and Seller has not cured such Seller Default within fifteen (15) days after Seller's receipt of such notice (the "Seller Cure Period"), in which case the Closing shall be postponed until the date which is five (5) Business Days after the expiration of the Seller Cure Period.

    **13.3**   <u>**Purchaser's Default**</u>. If on the Scheduled Closing Date, Purchaser fails to perform any of its covenants or obligations under this Agreement in any material respect and no Seller Default has occurred which remains uncured (a "Purchaser Default"), then Seller, as its sole and exclusive remedy, may elect to (A) terminate this Agreement by providing written notice to Purchaser, in which case the Deposit shall be disbursed to Seller in accordance with Section 3.2.3, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (B) proceed to Closing pursuant to this Agreement, in which case Seller shall be deemed to have waived such Purchaser Default.

36

EXHIBIT A

**13.4    Purchaser's Right to Cure**.  Notwithstanding anything to the contrary in this Agreement, Seller shall not have the right to exercise its remedies under Section 13.3 for a Purchaser Default, unless Seller has provided written notice to Purchaser specifying in reasonable detail the nature of the Purchaser Default, and Purchaser has not cured such Purchaser Default within fifteen (15) days (or such longer period as is reasonably necessary to effect such cure) after receipt of such notice (the "Purchaser Cure Period"), in which case the Closing shall be postponed until the date which is five (5) Business Days after the expiration of the Purchaser Cure Period.

**13.5    LIQUIDATED DAMAGES**.  THE PARTIES ACKNOWLEDGE AND AGREE THAT IF THIS AGREEMENT IS TERMINATED PURSUANT TO SECTION 13.3 HEREOF, THE DAMAGES THAT SELLER WOULD SUSTAIN AS A RESULT OF SUCH TERMINATION WOULD BE DIFFICULT IF NOT IMPOSSIBLE TO ASCERTAIN. ACCORDINGLY, THE PARTIES AGREE THAT SELLER SHALL RETAIN THE DEPOSIT AS FULL AND COMPLETE LIQUIDATED DAMAGES (AND NOT AS A PENALTY) AS SELLER'S SOLE AND EXCLUSIVE REMEDY FOR SUCH TERMINATION; PROVIDED, HOWEVER, THAT IN ADDITION TO THE DEPOSIT, SELLER SHALL RETAIN ALL RIGHTS AND REMEDIES UNDER THIS AGREEMENT WITH RESPECT TO THOSE OBLIGATIONS OF PURCHASER WHICH EXPRESSLY SURVIVE SUCH TERMINATION.

## ARTICLE XIV
## CASUALTY AND CONDEMNATION

**14.1    Casualty**.  If, at any time after the Effective Date and prior to Closing or earlier termination of this Agreement, the Transferred Property or any portion thereof is damaged or destroyed by fire or any other casualty (a "Casualty"), Seller shall give written notice of such Casualty to Purchaser promptly after the occurrence of such Casualty.

14.1.1 Material Casualty.  If the amount of the repair or restoration of the Transferred Property required by a Casualty equals or exceeds Five Hundred Thousand and 00/100 Dollars ($500,000.00) (a "Material Casualty") (as determined by an independent licensed engineer or contractor reasonably selected by Seller) and such Material Casualty was not caused by Purchaser or Purchaser's Inspectors, or their respective employees or agents, then Purchaser shall have the right to elect, by providing written notice to Seller within ten (10) Business Days after Purchaser's receipt of Seller's written notice of such Material Casualty and the engineer's or contractor's written determination, to (a) terminate this Agreement, in which case the Deposit shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (b) proceed to Closing, without terminating this Agreement, in which case Seller shall transfer and assign and pay over, as applicable, to Purchaser, without representation, warranty, covenant or recourse, all of Seller's right, title and interest in and to all proceeds from all casualty insurance policies maintained by Seller with respect to the Transferred Property or the Business, except, for the avoidance of doubt, those proceeds and costs of restoration from such Casualty incurred by Seller for the period prior to the Closing and those proceeds allocable to lost profits for the time period prior to the Closing. If Purchaser fails to provide written notice of its election to Seller within such time period, then Purchaser shall be deemed to have elected to proceed to Closing pursuant to clause (b) of the preceding sentence.  If the Closing is scheduled to occur within Purchaser's ten (10) Business Day

EXHIBIT A

election period, the Closing Date shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) Business Day election period.

14.1.2 <u>Non Material Casualty</u>. In the event of any (i) Casualty which is not a Material Casualty, or (ii) Material Casualty which is caused by Purchaser or Purchaser's Inspectors, or their respective employees or agents, then Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Seller shall transfer and assign and pay over, as applicable, to Purchaser, without representation, warranty, covenant or recourse, all of Seller's right, title and interest in and to all proceeds from all casualty insurance policies maintained by Seller with respect to the Transferred Property or the Business, except, for the avoidance of doubt, those proceeds and costs of restoration from such Casualty incurred by Seller for the period prior to the Closing and those proceeds allocable to any lost profits for the time period prior to the Closing.

**14.2 Condemnation**. If, at any time after the Effective Date and prior to Closing or the earlier termination of this Agreement, any Governmental Authority issues a notice of condemnation or commences any condemnation proceeding or other proceeding in eminent domain with respect to all or any portion of the Real Property (a "<u>Condemnation</u>"), Seller shall give written notice of such Condemnation to Purchaser promptly after Seller receives notice of such Condemnation.

14.2.1 <u>Material Condemnation</u>. If the Condemnation would result in the permanent loss of more than five percent (5%) of the fair market value of the Land or Improvements as reasonably determined by Seller (a "<u>Material Condemnation</u>"), then Purchaser shall have the right to elect, by providing written notice to Seller within ten (10) Business Days after Purchaser's receipt of Seller's written notice of such Material Condemnation, to (A) terminate this Agreement, in which case the Deposit shall be refunded to Purchaser in accordance with Section 3.2.4, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (B) proceed to Closing, without terminating this Agreement, in which case Seller shall pay over and assign, as applicable, to Purchaser, without representation, warranty, covenant or recourse, all of Seller's right, title and interest in all proceeds and awards from such Material Condemnation. If Purchaser fails to provide written notice of its election to Seller within such time period, then Purchaser shall be deemed to have elected to proceed to Closing pursuant to clause (B) of the preceding sentence. If the Closing is scheduled to occur within Purchaser's ten (10) Business Day election period, the Closing shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) Business Day election period.

14.2.2 <u>Non-Material Condemnation</u>. In the event of any Condemnation other than a Material Condemnation, Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Seller shall, without representation, warranty, covenant or recourse, pay over and assign, as applicable, to Purchaser all of Seller's right, title and interest in all proceeds and awards from such Condemnation.

**ARTICLE XV**
**SURVIVAL, INDEMNIFICATION AND RELEASE**

38

EXHIBIT A

**15.1    Survival.** Except as expressly set forth in this Section 15.1, all representations, warranties, covenants, liabilities and obligations set forth herein shall be deemed (i) if the Closing occurs, to merge in the Deed and not survive the Closing, or (ii) if this Agreement is terminated, not to survive such termination.

15.1.1 Survival of Representations and Warranties.  If this Agreement is terminated, the representations and warranties shall not survive such termination. If the Closing occurs, the representations and warranties set forth herein shall survive the Closing for a period commencing on the Closing Date and expiring at 5:00 p.m. (Eastern Time) on the date which is two hundred seventy (270) days after the Closing Date (the period any representation or warranty survives termination or the Closing as set forth in this Section 15.1.1 is referred to herein as the "Survival Period").

15.1.2 Survival of Covenants and Obligations.  If this Agreement is terminated, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the termination of this Agreement shall survive such termination. If the Closing occurs, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the Closing shall survive the Closing.

15.1.3 Survival of Indemnification.  This Article XV and all other rights and obligations of defense and indemnification as expressly set forth in this Agreement shall survive the Closing or termination of this Agreement.

**15.2    Indemnification by Seller.**  Subject to the limitations set forth in Article VI, Sections 8.4, 15.1, 15.4, 15.5, 15.6, and any other express provision in this Agreement, Seller shall indemnify and hold harmless the Purchaser Indemnitees from and against any Indemnification Loss incurred by any Purchaser Indemnitee to the extent resulting from (i) the breach of any express representations or warranties of Seller in this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be) and (ii) the breach by Seller of any of its covenants or obligations under this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be).

**15.3    Indemnification by Purchaser.**  Subject to the limitations set forth in Sections 15.1, 15.4, 15.5, 15.6 and any other express provision in this Agreement, Purchaser shall indemnify and hold harmless the Seller Indemnitees from and against any Indemnification Loss incurred by any Seller Indemnitee to the extent resulting from (i) the breach of any express representations or warranties of Purchaser in this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), (ii) the breach by Purchaser of any of its covenants or obligations under this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), and (iii) any Assumed Liabilities.

**15.4    Limitations on Indemnification Obligations.**

15.4.1 Failure to Provide Notice within Survival Period.  Notwithstanding anything else to the contrary in this Agreement, an Indemnitee which is seeking defense or indemnification for a breach of any representations or warranties shall be entitled to indemnification for such breach only if the Indemnitee has given written notice to the Indemnitor

39

in accordance with Section 15.5.1 promptly after Indemnitee learns of such breach and, in all events, prior to the Closing if discovered prior to the Closing, or prior to the last day of the Survival Period if discovered after the Closing, in any such case, by Indemnitee delivering to Indemnitor written notice (a "Claim Notice") setting forth: (a) a description in reasonable detail of the claimed breach or breaches, as applicable; (b) a detailed listing of the Section(s) of this Agreement, and if applicable, Exhibit to this Agreement, under which such claimed breach or breaches is asserted; (c) Indemnitee's good-faith calculation of the damages suffered by Indemnitee by reason of such claimed breach or breaches; and (d) all documents and written material upon which Indemnitee asserts such claimed breach is or breaches are based.  TIME SHALL BE OF THE ESSENCE in respect of Indemnitee's obligation to deliver to Indemnitor a Claim Notice in the manner and within the timeframe herein provided.

              15.4.2  Indemnification Deductible and Cap.

              (a)      Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to provide indemnification to the Purchaser Indemnitees pursuant to clause (i) of Section 15.2 to the extent that the aggregate amount of all Indemnification Losses incurred by the Purchaser Indemnitees for which Purchaser otherwise would be entitled to indemnification under clause (i) of Section 15.2 (A) does not exceed Fifty Thousand and 00/100 Dollars ($50,000.00) (the "Indemnification Deductible"), or if such Indemnification Losses exceed the Indemnification Deductible, Purchaser shall not be entitled to defense or indemnification for any amount up to the Indemnification Deductible, or (B) exceeds One Million and 00/100 Dollars ($1,000,000.00).

              (b)      Notwithstanding anything to the contrary in this Agreement, Purchaser shall not be required to provide indemnification to the Seller Indemnitees pursuant to clause (i) of Section 15.3 to the extent that the aggregate amount of all Indemnification Losses incurred by the Seller Indemnitees for which Seller otherwise would be entitled to indemnification under clause (i) of Section 15.3 (A) does not exceed the Indemnification Deductible, or if such Indemnification Losses exceed the Indemnification Deductible, Seller shall not be entitled to defense or indemnification for any amount up to the Indemnification Deductible, or (B) exceeds One Million and 00/100 Dollars ($1,000,000.00).

              15.4.3  Failure to Provide Timely Notice of Indemnification Claim. Notwithstanding anything to the contrary in this Agreement, an Indemnitee shall not be entitled to defense or indemnification to the extent the Indemnitee's failure to promptly notify the Indemnitor in accordance with Section 15.5.1, (i) prejudices the Indemnitor's ability to defend against any Third-Party Claim on which such Indemnification Claim is based, or (ii) increases the amount of Indemnification Loss incurred in respect of such indemnification obligation of the Indemnitor.

              15.4.4  Effect of Taxes, Insurance or Other Reimbursement.  Notwithstanding anything to the contrary in this Agreement, the amount of any Indemnification Loss for which indemnification is provided to an Indemnitee under this Article XV shall be net of any tax benefits realized or insurance proceeds received by such Indemnitee in connection with the Indemnification Claim, or any other third party reimbursement.  If such tax benefits, insurance proceeds or reimbursement are realized or obtained by the Indemnitee after the Indemnitor has paid any amount in respect of an Indemnification Loss to the Indemnitee, the Indemnitee shall reimburse the amount

EXHIBIT A

realized or collected by the Indemnitee up to the amount received from the Indemnitor for such Indemnification Loss.

15.4.5 <u>Negligence or Willful Misconduct of Indemnitee</u>.    Notwithstanding anything to the contrary in this Agreement, (i) a Purchaser Indemnitee shall not be entitled to defense or indemnification to the extent the applicable Indemnification Loss results from the negligence or willful misconduct of, or breach of this Agreement by, any Purchaser Indemnitee, and (ii) a Seller Indemnitee shall not be entitled to defense or indemnification to the extent the applicable Indemnification Loss results from the negligence or willful misconduct of, or breach of this Agreement by, any Seller Indemnitee.

15.4.6 <u>WAIVER OF CERTAIN DAMAGES</u>.    NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR UNDER APPLICABLE LAW, SELLER (FOR ITSELF AND ALL SELLER INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE AND DISCLAIM ALL RIGHTS TO CLAIM OR SEEK ANY CONSEQUENTIAL, PUNITIVE, EXEMPLARY, STATUTORY OR TREBLE DAMAGES AND ACKNOWLEDGE AND AGREE THAT THE RIGHTS AND REMEDIES IN THIS AGREEMENT WILL BE ADEQUATE IN ALL CIRCUMSTANCES FOR ANY CLAIMS THE PARTIES (OR ANY INDEMNITEE) MIGHT HAVE WITH RESPECT THERETO.

**15.5**    **Indemnification Procedure**.

15.5.1 <u>Notice of Indemnification Claim</u>.    If any of the Seller Indemnitees or Purchaser Indemnitees (as the case may be) (each, an "<u>Indemnitee</u>") is entitled to defense or indemnification under Sections 4.1.1, 4.1.2, 8.8, 12.1, 15.2 or 15.3 or any other express provision in this Agreement (each, an "<u>Indemnification Claim</u>"), the Party required to provide defense or indemnification to such Indemnitee (the "<u>Indemnitor</u>") shall not be obligated to defend, indemnify and hold harmless such Indemnitee unless and until such Indemnitee provides written notice to such Indemnitor promptly after such Indemnitee has actual Knowledge of any facts or circumstances on which such Indemnification Claim is based or a Third-Party Claim is made on which such Indemnification Claim is based, describing in reasonable detail such facts and circumstances or Third-Party Claim with respect to such Indemnification Claim.

15.5.2 <u>Resolution of Indemnification Claim Not Involving Third-Party Claim</u>.    If the Indemnification Claim does not involve a Third-Party Claim and is disputed by the Indemnitor, the dispute shall be resolved by litigation or other means of alternative dispute resolution as the Parties may agree in writing.

15.5.3 <u>Resolution of Indemnification Claim Involving Third-Party Claim</u>.    If the Indemnification Claim involves a Third-Party Claim, the Indemnitor shall have the right (but not the obligation) to assume the defense of such Third-Party Claim, at its cost and expense, and shall use good faith efforts consistent with prudent business judgment to defend such Third-Party Claim, provided that (i) the counsel for the Indemnitor who shall conduct the defense of the Third-Party Claim shall be reasonably satisfactory to the Indemnitee (unless selected by Indemnitor's insurance company), (ii) the Indemnitee, at its cost and expense, may participate in, but shall not control, the defense of such Third-Party Claim, and (iii) the Indemnitor shall not enter into any

41

EXHIBIT A

settlement or other agreement which requires any performance by the Indemnitee, other than the payment of money which shall be paid by the Indemnitor. The Indemnitee shall not enter into any settlement or other agreement with respect to the Indemnification Claim, without the Indemnitor's prior written consent, which consent may be withheld in Indemnitor's sole discretion. If the Indemnitor elects, within a reasonably prompt period of time, not to assume the defense of such Third-Party Claim, the Indemnitee shall have the right to retain the defense of such Third-Party Claim and shall use good faith efforts consistent with prudent business judgment to defend such Third-Party Claim in an effective and cost efficient manner.

    **15.6**    <u>**Exclusive Remedy for Indemnification Loss**</u>. Except for claims based on fraud and without prejudice to the Parties' rights under this Agreement with respect to a Seller Default, Purchaser Default, Seller Closing Condition or Purchaser Closing Condition, as applicable, the indemnification provisions in this Article XV shall be the sole and exclusive remedy of any Indemnitee with respect to any claim for Indemnification Loss arising from or in connection with this Agreement.

**ARTICLE XVI**
**MISCELLANEOUS PROVISIONS**

    **16.1**    <u>Notices</u>.

    16.1.1 <u>Method of Delivery</u>. All notices, requests, demands and other communications required to be provided by any Party under this Agreement (each, a "<u>Notice</u>") shall be in writing and delivered, at the sending Party's cost and expense, by (i) personal delivery, (ii) overnight internationally recognized courier service (e.g., Federal Express or UPS), or (iii) e-mail PDF transmission, with a verification copy sent on the same day by any of the methods set forth in clauses (i) or (ii), to the recipient Party at the following addresses:

        <u>If to Seller</u>:

        Emerald Grande, LLC
        Attn: William Abruzzino
        P.O. Box 190
        Bonita Springs, FL 34133-0190
        E-mail:

        With a copy to

        Kay Casto & Chaney, PLLC
        Attn: Steven L. Thomas
        P.O. Box 2013
        Charleston, WV 25327-2013
        E-mail: sthomas@kaycasto.com

42

**EXHIBIT A**

If to Purchaser:

KM Hotels, LLC
Attn:  Mayur Patel
6627 W. Broad Street, Suite 300
Richmond, Virginia 23230
E-Mail:  mayur.patel@kmhotels.com

With copy to:

Spotts Fain PC
Attn:  S. Spencer Katona
411 E. Franklin Street, Suite 600
Richmond, Virginia 23219
E-Mail:  skatona@spottsfain.com

If to Secured Lender:

Troutman Sanders, LLP
Attn: Matthew R. Brooks
600 Peachtree St., NE, Ste. 3000
Atlanta, GA 30308
Email: matthew.brooks@troutman.com

16.1.2  Receipt of Notices.  All Notices sent by a Party (or its counsel pursuant to Section 16.1.4) under this Agreement shall be deemed to have been received by the Party to whom such Notice is sent upon (i) delivery to the address of the recipient Party, by any of the methods set forth above provided that such delivery is made prior to 5:00 p.m. (local time for the recipient Party) on a Business Day, otherwise the following Business Day, or (ii) the attempted delivery of such Notice if (A) such recipient Party refuses delivery of such Notice, or (B) such recipient Party is no longer at such address or email address, and such recipient Party failed to provide the sending Party with its current address pursuant to Section 16.1.3.

16.1.3  Change of Address.  The Parties and their respective counsel shall have the right to change their respective addresses for the purposes of this Section 16.1 by providing a Notice of such change in address as required under this Section 16.1.

16.1.4  Delivery by Party's Counsel.  The Parties agree that the attorney for such Party shall have the authority to deliver Notices on such Party's behalf to the other Party hereto.

**16.2    Time Periods**.  Notwithstanding anything to the contrary in this Agreement, if the time period for the performance of any covenant or obligation, satisfaction of any condition or delivery of any Notice or item required under this Agreement shall expire on a day other than a Business Day, such time period shall be extended automatically to the next Business Day.

43

**EXHIBIT A**

**16.3    Assignment**.  Purchaser shall not, directly or indirectly, by operation of law or otherwise, assign or delegate this Agreement or any interest therein or any rights or obligations hereunder to any Person, without the prior written consent of Seller, which consent may be withheld in Seller's sole discretion.  A transfer of any direct or indirect interests in Purchaser shall be deemed to constitute an assignment hereunder.  Notwithstanding the foregoing, Purchaser shall have the right to designate any Affiliate as its nominee to receive title to the Transferred Property, or assign all of its right, title and interest in this Agreement to any Affiliate of Purchaser by providing written notice to Seller no later than five (5) Business Days prior to the Closing; provided, however, that (a) such Affiliate remains an Affiliate of Purchaser, and (b) such designation or assignment shall not be effective until Purchaser has provided Seller with a fully executed copy of such designation or assignment and assumption instrument, which shall (i) provide that Purchaser and its designee or assignee agree to pay any additional transfer tax as a result of such designation or assignment, and (ii) include a representation and warranty in favor of Seller that all representations and warranties made by Purchaser in this Agreement are true and correct with respect to such designee or assignee as of the date of such designation or assignment, and will be true and correct as of the Closing.

**16.4    Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and permitted assigns.

**16.5    Third Party Beneficiaries**.  This Agreement shall not confer any rights or remedies on any Person other than (i) the Parties and their respective successors and permitted assigns, and (ii) any Indemnitee to the extent such Indemnitee is expressly provided any right of defense or indemnification in this Agreement.

**16.6    GOVERNING LAW**.  THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF WEST VIRGINIA, WITHOUT GIVING EFFECT TO ANY PRINCIPLES REGARDING CONFLICT OF LAWS.

**16.7    Rules of Construction**.  The following rules shall apply to the construction and interpretation of this Agreement:

16.7.1  Singular words shall connote the plural as well as the singular, and plural words shall connote the singular as well as the plural, and the masculine shall include the feminine and the neuter, as the context may require.

16.7.2  All references in this Agreement to particular articles, sections, subsections or clauses (whether in upper or lower case) are references to articles, sections, subsections or clauses of this Agreement.  All references in this Agreement to particular exhibits or schedules (whether in upper or lower case) are references to the exhibits and schedules attached to this Agreement, unless otherwise expressly stated or clearly apparent from the context of such reference.

16.7.3  The headings in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

16.7.4  Each Party and its counsel have reviewed and revised (or requested revisions of) this Agreement and have participated in the preparation of this Agreement, and

44

**EXHIBIT A**

therefore any rules of construction requiring that ambiguities are to be resolved against the Party which drafted the Agreement or any exhibits hereto shall not be applicable in the construction and interpretation of this Agreement or any exhibits hereto.

16.7.5 The terms "hereby," "hereof," "hereto," "herein," "hereunder" and any similar terms shall refer to this Agreement, and not solely to the provision in which such term is used.

16.7.6 The terms "include," "including" and similar terms shall be construed as if followed by the phrase "without limitation."

16.7.7 The term "sole discretion" with respect to any determination to be made a Party under this Agreement shall mean the sole and absolute discretion of such Party, without regard to any standard of reasonableness or other standard by which the determination of such Party might be challenged.

16.8 <u>Severability</u>. If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected term or provision at any other time or in any other jurisdiction.

16.9 <u>JURISDICTION AND VENUE</u>. ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT SHALL BE CONDUCTED IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AND SELLER (FOR ITSELF AND ALL SELLER INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) HEREBY SUBMIT TO JURISDICTION AND CONSENT TO VENUE IN SUCH COURTS, AND WAIVE ANY DEFENSE BASED ON FORUM NON CONVENIENS.

16.10 <u>WAIVER OF TRIAL BY JURY</u>. EACH PARTY HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT, THE DOCUMENTS DELIVERED BY PURCHASER OR SELLER AT THE CLOSING, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ANY ACTIONS OF EITHER PARTY ARISING OUT OF OR RELATED IN ANY MANNER TO THIS AGREEMENT OR THE TRANSFERRED PROPERTY (INCLUDING WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND ANY CLAIMS OR DEFENSES ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER IS A MATERIAL INDUCEMENT FOR SELLER TO ENTER INTO AND ACCEPT THIS AGREEMENT AND THE DOCUMENTS DELIVERED BY PURCHASER AT THE CLOSING AND SHALL SURVIVE THE CLOSING OR TERMINATION OF THIS AGREEMENT.

16.11 <u>Prevailing Party</u>. If any litigation or other court action, arbitration or similar adjudicatory proceeding is commenced by any Party to enforce its rights under this Agreement

EXHIBIT A

against any other Party, all fees, costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, incurred by the prevailing Party in such litigation, action, arbitration or proceeding shall be reimbursed by the losing Party; provided, that if a Party to such litigation, action, arbitration or proceeding prevails in part, and loses in part, the court, arbitrator or other adjudicator presiding over such litigation, action, arbitration or proceeding shall award a reimbursement of the fees, costs and expenses incurred by such Party on an equitable basis.

     **16.12**  **Incorporation of Recitals, Exhibits and Schedules**.  The recitals to this Agreement, and all exhibits and schedules (as amended, modified and supplemented from time to time pursuant to Section 16.14) referred to in this Agreement are incorporated herein by such reference and made a part of this Agreement.  Any matter disclosed in any schedule to this Agreement shall be deemed to be incorporated in all other schedules to this Agreement.

     **16.13**  **Updates of Schedules**.  Notwithstanding anything to the contrary in this Agreement, Seller shall have the right to amend and supplement any schedule, or provide a new schedule, to this Agreement from time to time without Purchaser's consent to the extent that (i) such schedule needs to be amended, supplemented, or provided to maintain the truth or accuracy of the applicable representation or warranty or the information disclosed therein, (ii) Seller did not have Knowledge as of the Effective Date of the matter being disclosed in such amendment, supplement, or new schedule, and (iii) such Schedule amendment does not impose any greater burden, liability or obligation upon Purchaser.  If Seller makes any such amendment or supplement to the schedules, or provides such a new schedule, (an "Update"), then (A) such Update shall constitute a Purchaser Closing Condition Failure if, and only if, the corresponding representation or warranty to which such Update relates would be untrue or incorrect in the absence of such Update and such breach of representation or warranty results in a failure of the Purchaser Closing Conditions to be satisfied pursuant to Section 9.1.1(b) as of Closing, and (B) if Purchaser proceeds to Closing notwithstanding such Update, the corresponding representation or warranty to which such Update relates shall be deemed qualified by such Update for the purposes of limiting the defense and indemnification obligations of Seller under this Agreement.

     **16.14**  **Entire Agreement**.  This Agreement set forth the entire understanding and agreement of the Parties hereto, and shall supersede any other agreements and understandings (written or oral) between the Parties on or prior to the Effective Date with respect to the transaction described in this Agreement.

     **16.15**  **Amendments, Waivers and Termination of Agreement**.  Except as set forth in Section 16.13, no amendment or modification to any terms or provisions of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by each of the Parties.

     **16.16**  **Not an Offer**.  The delivery by Seller of this Agreement executed by Seller shall not constitute an offer to sell the Transferred Property, and Seller shall have no obligation to sell the Transferred Property to Purchaser, unless and until all Parties have executed and delivered this Agreement to all other Parties.

EXHIBIT A

**16.17  <u>Execution of Agreement</u>**.  A Party may deliver executed signature pages to this Agreement by facsimile or electronic transmission to any other Party, which facsimile or electronic copy shall be deemed to be an original executed signature page.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

**16.18  <u>Franchise</u>**.  Purchaser will make its own arrangements with a franchisor for the Hotel, at its sole cost and expense.  Seller will take all steps necessary to reject the current franchise agreements for the Hotel.

[Remainder of page intentionally left blank;
Signatures on following pages]

EXHIBIT A

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed and delivered in its name by a duly authorized officer or representative.

<u>**SELLER**</u>:

By:
Name: William Abruzzino
Title: Managing Member

<u>**PURCHASER**</u>:

By:
Name:
Title:

01366060.DOCX

**EXHIBIT A**

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed and delivered in its name by a duly authorized officer or representative.

**SELLER**:

By:_____
Name:_____
Title:_____

**PURCHASER**: K M Hotels, LLC

By:_____
Name: Mayur Patel
Title: Managing Member

EXHIBIT A

<u>EXHIBIT G</u>

**Form of Earnest Money Escrow Agreement**



ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement"), dated August 9, 2019, is made and entered into, by and among **EMERALD GRANDE, LLC**, a Georgia limited liability company ("Seller"), **KM HOTELS, LLC**, a Virginia limited liability company ("Purchaser"), and **SAFE HARBOR TITLE COMPANY, LLC**, a Virginia limited liability company (the "Escrow Agent").

Whereas the parties to this Agreement desire to have Escrow Agent act as "Escrow Agent" pursuant to, and as defined in, that certain Purchase and Sale Agreement between Seller and Purchaser dated August 9, 2019 (the "Purchase Agreement") and, in connection therewith, to hold in escrow the "Deposit" as defined in the Purchase Agreement (the Deposit, together with any other funds being held by Escrow Agent pursuant to this Agreement, are referred to herein as the "Escrow Funds").

NOW, THEREFORE, in consideration of the mutual covenants set forth in this Agreement and the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. GENERAL PROVISIONS.
It is understood and agreed by the parties to this Agreement as follows:

a) The Escrow Funds shall be paid and delivered in accordance with the written instructions jointly executed by the parties to this Agreement.
b) The Escrow Agent is not a trustee for any party for any purpose, and is merely acting as a depository and in a ministerial capacity hereunder with the limited duties herein prescribed.
c) The Escrow Agent has no responsibility in respect of any instructions, certificate or notice delivered to it, other than to carry out the obligations undertaken in this Agreement and to follow the directions in such instructions or notice provided in accordance with the terms hereof.
d) The Escrow Agent shall not be liable for any action taken or omitted by it in good faith and may rely upon, and act in accordance with, the advice of its counsel without liability on its part for any action taken or omitted in accordance with such advice.
e) The Escrow Agent may conclusively rely upon and act in accordance with any certificate, instructions, notice, letter, telegram, or other written instrument believed to be genuine and to have been signed or communicated by the proper party or parties.
f) The Escrow Agent shall not be required to defend any legal proceeding which may be instituted against it in respect of the subject matter of this Agreement unless requested to do so by the parties to this Agreement and after being indemnified to the Escrow Agent's

**EXHIBIT B**

satisfaction against the cost and expense of such defense. If any such legal proceeding is instituted against it, the Escrow Agent agrees promptly to give notice of such proceeding to the parties to this Agreement. The Escrow Agent shall not be required to institute legal proceedings of any kind.

g) The Escrow Agent may resign by giving written notice of its resignation to the parties to this Agreement. Upon resignation, the Escrow Agent's sole responsibility shall be to deliver the Escrow Funds to the successor escrow agent who shall be promptly appointed in writing by the parties to this Agreement and which successor will issue to Escrow Agent its receipt for the Escrow Funds so delivered. The Escrow Agent shall have the right to petition any court of competent jurisdiction for the appointment of a successor escrow agent.

2. INDEMNIFICATION. The parties to this agreement shall indemnify, save, defend, keep and hold harmless the Escrow Agent from any and all loss, damage, cost, charge, liability, cost of litigation, or other expense, including attorney's fees and court costs, arising out of its obligations and duties, including but not limited to (i) disputes arising or concerning amounts of money to be paid, (ii) funds available for such payments, (iii) persons to whom payments should be made or (iv) any delay in the electronic wire transfer of funds, as Escrow Agent, unless Escrow Agent's actions constitute gross negligence or willful misconduct.

3. LIABILITY. The parties to this Agreement shall be jointly and severally liable to Escrow Agent for payment of its reasonable expenses in carrying out the duties set forth herein. In no event shall the Escrow Agent be required to expend its own funds for any out of pocket costs, but may give notice of such cost, without being required to do so, to the parties to this Agreement and decline to proceed unless and until such costs have been paid or advanced.

4. NOTICES. Each notice, instruction or other certificate required or permitted by the terms hereof shall be in writing and shall be communicated by personal delivery, facsimile, registered or certified mail, return receipt requested, or overnight delivery to the parties hereto at the addresses shown below, or at such other address as any of them may designate by notice to each of the others:

If to Escrow Agent:
Safe Harbor Title Company
ATTN: Melissa M. Canavos
4900 Augusta Ave., Ste., 150
Richmond, VA 23230

If to Seller:
Emerald Grande, LLC
Attn: William Abruzzino
P.O. Box 190
Bonita Springs, FL 34133-0190

**EXHIBIT B**

With a copy to:
Kay Casto & Chaney, PLLC
Attn: Steven L. Thomas
P.O. Box 2013
Charleston, WV 25327-2013
E-mail: sthomas@kaycasto.com

If to Purchaser:
KM Hotels, LLC
Attn: Mayur Patel
6627 W. Broad Street, Suite 300
Richmond, Virginia 23230
E-Mail: mayur.patel@kmhotels.com

With a copy to:
Spotts Fain PC
Attn: S. Spencer Katona
411 E. Franklin Street, Suite 600
Richmond, Virginia 23219
E-Mail: skatona@spottsfain.com

5. MISCELLANEOUS. Paragraph headings are for convenience of reference only and shall in no way affect the interpretation of this Agreement. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Agreement as a whole and not to any particular paragraph, subparagraph, or clause contained in this Agreement. A determination that any provision of this Agreement is unenforceable shall not affect the enforceability of any other specific provision or of this Agreement generally. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns, heirs, personal representatives, executors, and administrators, as may be applicable. The laws of the Commonwealth of Virginia shall apply to and govern the provisions of this Agreement and the rights, remedies, and obligations of the parties hereto. The following rules shall apply to the construction of this Agreement: (i) singular words shall connote the plural as well as the singular, and vice versa, and the neuter shall connote the masculine and the feminine, and vice versa, as may be appropriate; and (ii) all references herein to particular paragraphs or exhibits are references to paragraphs or exhibits of this Agreement. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior proposals, negotiations, agreements, and understandings among the parties hereto relating to such subject matter. Any provision herein may be waived or modified only by an agreement in writing signed by the parties hereto.

6. COUNTERPARTS. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which when taken together shall constitute but one and the same instrument.

[*Signatures on Following Page(s)*]

**EXHIBIT B**

[*Signature Page to Escrow Agreement*]

**ESCROW AGENT**:

SAFE HARBOR TITLE COMPANY, LLC, a
Virginia limited liability company

By: _____

Name: _____

Title: _____

**SELLER**:

EMERALD GRANDE, LLC, a Georgia limited
liability company

By: _____

Name: _Robert Abruzzino_

Title: _C.O.O._

**PURCHASER**:

KM HOTELS, LLC, a Virginia limited liability
company

By: _____

Name: _Mayur Patel_

Title: _Managing Member_

EXHIBIT B

YOUNG MORGAN & CANN, PLLC
Law Offices of

SUITE ONE, SCHROATH BUILDING
229 WASHINGTON AVE

ROGER J. MORGAN
CARMINE J. CANN
JAMES V. CANN
GREGORY A. MORGAN

CLARKSBURG, WEST VIRGINIA 26301
(304) 624-5687
FAX (304) 624-4006

JAMES CANN (1970)
LLOYD H. YOUNG (1978)

September 22, 1999

Plaza Management, Inc.
Five Piedmont Center, NE
Suite 202
Atlanta, Georgia 30305

Attn:  Mr. William A. Abruzzino

Re:    Holiday Inn Lot
       Elk View, WV

Gentlemen:

Enclosed please find the original of the recorded deed from Interstate Properties, Inc. d.b.a. The Crossings of Elk View to Plaza Management, L.L.C. of the lot on which the new Holiday Inn Express is to be built.  The instrument has been recorded in the office of the County Commission of Kanawha County, West Virginia as of September 16, 1999, and is of record in Deed Book No. 2480, at page 541.

Very truly yours,

YOUNG MORGAN & CANN, PLLC

By _____
   Roger J. Morgan

RJM/ljc
Enclosures

ccw/enc: George H. Feisem, III, Esquire

EXHIBIT C

**THIS DEED**, made this the 10th day of September, 1999, by and between **INTERSTATE PROPERTIES, INC., a Georgia Corporation,** party of the first part, herein the **GRANTOR**, and **PLAZA MANAGEMENT, L.L.C.**, the party of the second part, herein the **GRANTEE**.

**WITNESSETH**: That for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration. cash in hand paid by the said party of the second part to the said party of the first part, the receipt of which is hereby acknowledged, the said GRANTOR does hereby grant and convey, with Covenants of General Warranty, unto the said GRANTEE, all of that certain lot or parcel of land, together with the improvements thereon and the appurtenances thereunto belonging, situate on the Waters of Little Sandy Creek, in Elk District, Kanawha County, West Virginia, more particularly described as follows:

**BEGINNING** at a ½ inch by 36 inch Reinforcing Rod with a yellow plastic cap stamped "SLS Inc., 462-5634" hereinafter referred to as a Rebar, set, corner to Interstate Properties, Inc. from which a ½ inch Rebar, set at a corner of Parcel 2, bears S. 62-42-20 E. at 72.03 feet; thence with said Parcel S. 62-42-20 E. 27.22 feet to a point, corner to Parcel 2; thence with a new line along Parcel 2 S. 18-49-00 W. 221.88 feet to a point; thence N. 84-18-40 W 65.49 feet to a railroad spike, set; thence N. 27-30-40 E. 25.30 feet to a ½ inch rebar, set, corner to 84 Lumber, Inc.; thence with said 84 Lumber, Inc. for the next five (5) lines; N. 66-47-40 W. 146.79 feet to a point; thence N. 76-38-30 W. 64.76 feet to a railroad spike, set; thence N. 39-16-40 E. 19.97 feet to a railroad spike, set; thence N. 23-29-40 E. 106.39 feet to a ½ inch rebar, found at a previous common corner of Moles & Arthur; thence N. 23-29-40 E. 201.26 feet to a rebar, set, corner to said 84 Lumber tract and in a line of Interstate Properties tract; thence S. 42-45-20 E. 240.78 feet to the place of beginning, containing 1.558 acres, more or less, as surveyed by Smith Land Surveying, Inc. in August, 1999, and as shown on the Revised Site Plan and Plat of As-built Survey of The Crossings of Elkview dated October 7, 1998, and last revised September 1, 1999.

and being a portion of one or more of the same tracts or parcels of land conveyed to Interstate Properties, Inc. by three separate deeds as follows: (1) approximately 0.238 acres from Covington Place Associates by a deed dated the 30th day of December, 1993, and recorded in the Office of the Clerk of the County Commission of Kanawha County, West Virginia, in Deed Book No. 2331, at page 294; (2) approximately 0.78 acres from Constance Elaine Arthur by a deed dated the 2nd day of November, 1994, and recorded in said Clerk's Office in Deed Book No. 2351, at Page 748; and (3) approximately 0.54 acres from Edsel Grant Moles et ux. by a deed dated the 2nd day of November, 1994, and recorded in said Clerk's Office in Deed Book No. 2351, at page 753.

EXHIBIT C

DEED 2480 542

To which said deeds and plats aforesaid reference is here made for all pertinent purposes.

The GRANTORtor reserves unto itself and the GRANTOR grants to the GRANTEE a perpetual, mutual and reciprocal cross easement and right of way over, across and through the access roads, ways and lanes and the parking areas of the other for all vehicles and pedestrians as well as for the installation and maintenance of utility facilities to the property of the other party.

This conveyance is made subject to all existing reservations, restrictions, exceptions, conditions, easements, rights of way or other servitudes, if any, made, retained or created in prior deeds of record in the chain of title to the property herein conveyed.

The GRANTOR declares that the foregoing conveyance is exempt from the payment of West Virginia Excise Tax on the transfer of real property since this deed is being made pursuant to a conversion of a corporation to a limited liability company.

**IN WITNESS WHEREOF**, the **GRANTOR** has caused its corporate name to be signed hereto and its corporate seal to be hereunto affixed by its proper officer theretofore duly authorized, the day and year above written.

INTERSTATE PROPERTIES, INC.
A Georgia Corporation

(CORPORATE SEAL)

By: William A. Abruzzino
Its President

STATE OF WEST VIRGINIA,

COUNTY OF HARRISON, TO-WIT:

The foregoing instrument was acknowledged before me this 10th day of September, 1999, by WILLIAM A. ABRUZZINO, President of INTERSTATE PROPERTIES, INC., a Georgia corporation, on behalf of the corporation.

My commission expires ___August 23, 2004___

Notary Public

-2-

EXHIBIT C

[Elkview]

Return to:
David Thompson, Esq.
Busch, Zurbuch & Thompson
High and Court Streets
Elkins, WV 26241

## SPECIAL WARRANTY DEED

This Deed is dated October _____, 2008 by and between **EMERALD COAST HOSPITALITY, LLC,** a Georgia limited liability company authorized to do business in West Virginia ("Grantor"), whose address is P. O. Box 6726, Miramar Beach, Florida 32550 and **EMERALD GRANDE, LLC,** a Georgia limited liability company ("Grantee"), whose address is P. O. Box 6726, Miramar Beach, Florida 32550.

WITNESSETH, that Grantor, in consideration of the sum of Ten and no/100 Dollars ($10.00) and other good and valuable consideration paid by Grantee, the receipt of which is hereby acknowledged, does by these presents GRANT and CONVEY, with covenants of special warranty, to Grantee, its successors and assigns, that certain parcel of real property located in Kanawha County, West Virginia, as more particularly described on Exhibit A attached hereto and made a part hereof (the "Property") with the appurtenances,

TO HAVE AND TO HOLD the same to and for the use of Grantee, its successors and assigns forever, and Grantor, for itself, its successors and assigns, hereby covenants and agrees that it shall and will warrant and defend the title to the Property unto Grantee and its successors and assigns forever against the lawful claims of all persons claiming by, through or under Grantor but none other, excepting general taxes and assessments for 2008 and thereafter; all exceptions, covenants, agreements, easements, rights of way, restrictions and other matters of record, and subject to any unrecorded easements and all other matters which would be disclosed by an accurate survey and inspection of the Property; and prior grants, reservations, leases of coal, oil, gas or other minerals shown by instruments of record.

DECLARATION OF CONSIDERATION OR VALUE: Grantor hereby declares that this conveyance is made without monetary consideration and is an intercompany transfer, the consideration of which is the assumption of indebtedness on said property.

```
           DEED    2730    152
Recorded In Above Book and Page
      10/02/2008 01:41:34 PM
       Vera J. McCormick
          County Clerk
       Kanawha County, WV
     Deed Tax              0.00
     Recording Fee        16.00
     TOTAL                16.00
```

EXHIBIT D

IN WITNESS WHEREOF, Grantor has executed this Deed the day and year first above written.

EMERALD COAST HOSPITALITY, LLC

By: _William A. Abruzzino_ (SEAL)
William A. Abruzzino, Managing Member

STATE OF Florida )
                            ) SS
COUNTY OF Okaloosa )

On this 1st day of October, 2008, before me appeared William A. Abruzzino, to me personally known, who after being by me duly sworn did say that he is the Managing Member of Emerald Coast Hospitality, LLC, a Georgia limited liability company, and said William A. Abruzzino acknowledged that he executed this instrument on behalf of said limited liability company and acknowledged said instrument as the free act and deed of said limited liability companies.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Notary Public State of Florida
Kathryn Louise Krueger
My Commission DD611969
Expires 10/17/2012

_Kathryn Louise Krueger_
Notary Public
My Commission Expires: 10/17/2012

EXHIBIT D

DEED 2730 154

**EXHIBIT "A"**

All of that certain lot or parcel of land, together with the improvements thereon and the appurtenances

thereunto belonging, situate on the Waters of Little Sandy Creek, in Elk District, Kanawha County,

West Virginia, more particularly described as follows:

BEGINNING at a ½ inch by 36 inch Reinforcing Rod with a yellow plastic cap stamped "SLS Inc., 462-5634" hereinafter referred to as a Rebar, set, corner to Interstate Properties, Inc. from which a ½ inch Rebar, set at a corner of Parcel 2, bears S. 62-42-20 E. at 72.03 feet; thence with said Parcel S. 62-42-20 E. 27.22 feet to a point, corner to Parcel 2; thence with a new line along Parcel 2 S. 18-49-00 W. 221.88 feet to a point; thence N. 84-18-40 W 65.49 feet to a railroad spike, set; thence N. 27-30-40 E. 25.30 feet to a ½ inch rebar, set, corner to 84 Lumber, Inc.; thence with said 84 Lumber, Inc. for the next five (5) lines; N. 66-47-40 W. 146.79 feet to a point; thence N. 76-38-30 W. 64.76 feet to a railroad spike, set; thence N. 39-16-40 E. 19.97 feet to a railroad spike, set; thence N. 23-29-40 E. 106.39 feet to a ½ inch rebar, found at a previous common corner of Moles & Arthur; thence N. 23-29-40 E. 201.26 feet to a rebar, set, corner to said 84 Lumber tract and in a line of Interstate Properties tract; thence S. 42-45-20 E. 240.78 feet to the place of beginning, containing 1.558 acres, more or less, as surveyed by Smith Land Surveying, Inc. in August, 1999, and as shown on the Revised Site Plan and Plat of As-built Survey of The Crossings of Elkview dated October 7, 1998, and last revised September 1, 1999.

and being a portion of one or more of the same tracts or parcels of land conveyed to Interstate

Properties, Inc. by three separate deeds as follows: (1) approximately 0.238 acres from Covington

Place Associates by a deed dated the 30th day of December, 1993, and recorded in the Office of the

Clerk of the County Commission of Kanawha County, West Virginia, in Deed Book No. 2331, at

page 294; (2) approximately 0.78 acres from Constance Elaine Arthur by a deed dated the 2nd day

of November, 1994, and recorded in said Clerk's Office in Deed Book No. 2351, at Page 748; and

(3) approximately 0.54 acres from Edsel Grant Moles et ux. by a deed dated the 2nd day of

November, 1994, and recorded in said Clerk's Office in Deed Book No. 2351, at page 753.

This instrument was presented to the Clerk of the County
Commission of Kanawha County, West Virginia, on
and the same is admitted to record.    OCT 0 2 2000

Teste: _____ Clerk
Kanawha County Commission

**EXHIBIT D**

```
           DEED   2861   401
   Recorded In Above Book and Page
        10/01/2013 12:32:57 PM
           Vera J. McCormick
            County Clerk
          Kanawha County, WV
        Deed Tax              0.00
        Recording Fee        18.00
        TOTAL                18.00
```

THIS DEED, made this 10th day of September, 2013, by and between

INTERSTATE PROPERTIES, LLC, a Florida limited liability company, party of the

first part, and TARA RETAIL GROUP, LLC, a Georgia limited liability company,

party of the second part.

WITNESSETH: That for and in consideration of the sum of One Dollar

($1.00) and other good and valuable consideration, cash in hand paid by the said party

of the second part to the said party of the first part, the receipt of which is hereby

acknowledged, the said INTERSTATE PROPERTIES, LLC, a Florida limited liability

company, party of the first part, does hereby grant and convey, with Covenants of

General Warranty, unto the said TARA RETAIL GROUP, LLC, a Georgia limited

liability company, party of the second part, all of the following described tract or

parcel of land, together with the improvements thereon and the appurtenances

belonging, situate, lying and being on the waters of Little Sandy Creek, Elk District,

Kanawha County, West Virginia, more particularly bounded and described as

follows:

TRACT NO. 1:

BEGINNING at a West Virginia Division of Highways Concrete
Right-of-Way  Monument, found on the northern right-of-way of West
Virginia County Route 45, being 254 feet left of Station 23+77 as shown on
plans for Federal Project I-79-1(26)7 Sheet Number 23, a corner to 84
Lumber (Lease Book 207/772); thence with the right-of-way of said Route

EXHIBIT E

EXHIBIT E

45 for the next two (2) lines S 14-14-00 W 5.00 feet to a point in the line of the original Moles survey; thence N 69-19-00 W 110.42 feet to a 3/4-inch by 36-inch reinforcing rod with a yellow plastic cap stamped "SLS Monument 462-5634", hereafter referred to as a "rebar", set, near the mouth of a tributary of Little Sandy Creek, a corner to William M. and Linda Crane (DB 1931/570); thence with Crane for the next fourteen (14) calls N 55-27-00 E 141.57 feet to a 1-inch iron pipe, found, a corner to Delmar E. and Constance E. Arthur; thence with the Arthur tracts which are a part of this survey for the next six (6) lines N 64-34-00 W 209.39 feet to a 1-inch iron pipe, found at the edge of a gas line right of way; thence N 24-41-30 W 184.52 feet to a 1-inch iron pipe, found inside of a 4-inch PVC pipe; thence N 40-21-10 E 52.71 feet to a 1-inch iron pipe, found inside of a 4-inch PVC pipe; thence N 44-06-50 E 102.31 feet to a 1-inch iron pipe, found inside of a 4-inch PVC pipe; thence N 10-34-40 E 150.13 feet to a 1-inch iron pipe, found inside of a 4-inch PVC pipe; thence S 84-26-30 E 75.41 feet to a ¼-inch iron pipe, found in a tributary of Little Sandy Creek, corner to Francis K. Moles (WB 600/488); thence leaving Arthur and up said tributary with said Moles for the next seven (7) lines N 27-24-00 W 118.90 feet to a ¼-inch iron pipe, found; thence N 36-37-20 W 102.42 feet to a 5/8-inch rebar, found; thence N 36-34-30 W 105.44 feet to a ½-inch iron pipe, found; thence  N 71-54-50 W 146.91 feet to a ½-inch iron pipe, found near the forks of the tributary; thence N 40-08-50 W 299.31 feet to a rebar, set; thence N 16-58-50 W 65.65 feet to a rebar, set; thence leaving said tributary N 48-55-00 W 427.59 feet to a rebar, set on a ridge in an original line of Newhouse, from which a 10-inch dead Locust, found on the ridge, a corner to Crane and Newhouse bears S 49-32-50 W at 455.16 feet; thence leaving Crane and with Newhouse and the original line N 49-32-50 E 205.87 feet to a 1-inch iron pipe, found on the ridge, corner to Lin Tech International; thence S 43-00-20 E at 1094.28 feet passing a corner to Lin Tech International and Interstate Properties, Inc. (DB 2191/426), at 1573.98 feet passing a corner to 84 Lumber Lease parcel, in all 1788.98 feet to a rebar set, a corner to Interstate Properties, Inc., from which a 3/4-inch rebar,

-2-

EXHIBIT E

found, corner to two (2) tracts of Interstate Properties, Inc., bears S 43-00-20 E at 240.78 feet; thence with Interstate Properties, Inc. S 23-25-10 W at 201.26 feet passing a rebar, set at the end of a 20-foot right-of-way, in all 307.65 feet to a rebar, set at the southeast side of said 20 foot right-of-way, from which a 1-inch galvanized pipe, found, a corner to said 20-foot right-of-way, bears N 59-03-00 W at 20.18 feet; thence S 39-12-10 W 19.97 feet to a point, a corner to Interstate Properties, Inc. and another 84 Lumber Lease parcel (Lease Book 233/357); thence S 76-40-10 E 64.86 feet to a 2-inch metal fence post, found in a chain link fence; thence S 66-54-50 E at 125.25 feet passing a 2-inch metal fence post, found at the corner of a chain link fence in all 146.39 feet to a point in a line of Interstate Properties, Inc. and a corner to 84 Lumber; thence S 27-34-40 W 25.81 feet to a rebar, set in right-of-way of West Virginia County Route 45; thence with said right-of-way N 84-28-20 W at 217.66 feet passing a corner to 84 Lumber Lease parcel, in all 531.40 feet to the point of beginning, containing 13.31 acres, more or less, as surveyed by Smith Land Surveying, Inc. in April of 2001.

TRACT NO. 2:

A tract or parcel of land lying and being situate on the waters of the Little Sandy Creek, and along County Routes 45 and 43, in Elk District, Kanawha County, West Virginia, being more particularly described as follows:

BEGINNING at a ½ inch by 30 inch Rebar, set for a 1-inch Iron Pipe, now gone, from which a WV Department of Highways right-of-way monument located 85 feet left of Station 39+80 bears S 50-53-05 E at 180.00 feet; thence with said right-of-way for the next three lines; S 33-20-50 W 391.50 feet total distance to a ½ inch by 30 inch Rebar, set for a WV Department of Highways right-of-way monument, now gone, located 224 feet left of Station 36+28; S 75-06-40 W 406.60 feet total distance to a ½ inch by 30 inch Rebar, set for a 1 inch Iron Pipe, now gone, located 225 feet left of Station 29+58; N 84-18-40 W 112.97 feet to a 1 inch Iron Pipe (now gone), found on right-of-way; N 27-30-40 E 25.30 feet to a ½ inch by 30 Rebar (now gone); N 66-47-40 W at 21.14 feet passing a 2 inch Metal Corner Post

-3-

EXHIBIT E

of a chain link fence, in all 146.79 feet to a 2 inch Metal Corner Post of said chain link fence, corner to 84 Lumber, thence with 84 Lumber; N 76-38-30 W at 51.03 feet passing a 2 inch Metal Corner Post of a chain link fence, in all 64.76 feet to a point in the eastern edge of a 20 foot right-of-way, thence with said right of way; N 39-16-40 E 19.97 feet to a Railroad Spike, from which a 1 inch Galvanized Pipe, found on the western edge of said right-of-way and at a corner of 84 Lumber, bears N 58-35-20 W at 20.19 feet, thence; N 23-29-40 E 61.01 feet to a ½ inch by 30 inch Rebar in said right-of-way (now gone), thence leaving said right-of-way; N 23-29-40 E at 45.38 feet passing a ½ inch by 30 inch Rebar, set on said right-of-way at the northern limits thereof, in all 246.64 feet to a 1 inch Galvanized Pipe disturbed, corner to 84 Lumber; thence N 42-45-20 W 694.99 feet to a 1 inch Iron Pipe, found, corner to lands owned by Lin Tech Internationals West Virginia; thence with said Lin Tech Internationals for the next two lines: N 47-16-10 E 400.17 feet to a 1 inch Iron Pipe, found; N 81-19-20 E 897.49 feet to a point in the Little Sandy Creek; thence with the Little Sandy Creek for the next four lines: S 38-54-20 E 255.00 feet to a point; S 28-59-55 E 297.94 feet to a point; S 08-34-40 W 190.88 feet to a point; S 29-09-35 W 327.67 feet total distance to a point, from which a WV Department of Highways right-of-way monument located 85 feet left of Station 39+80 bears S 50-53-05 W at 110 feet; thence N 50-53-05 W 70.00 feet to the place of beginning, containing 28.94 acres, more or less, as calculated by Smith Land Surveying, Inc. in April of 1998.

The above described tracts or parcels being the same which have been re-surveyed and are bounded and described as follows:

All of the following described tract or parcel of land, together with the improvements thereon and the appurtenances belonging, situate, lying and being on the waters of Little Sandy Creek, Elk District, Kanawha County, West Virginia, more particularly bounded and described as follows:

-4-

TRACT NO. 1:   BEGINNING at a West Virginia Division of Highways Concrete Right-of-Way Monument found on the northern right-of-way of West Virginia County Route 45, being 254 feet left of Station 23+77 as shown on plans for Federal Project 1-79-1(26)7 Sheet Number 23, a corner to 84 Lumber (Lease Book 207/772); thence with the right-of-way of said Route 45 for the next two (2) lines S 08-18-04 W 5.00 feet to a point in the line of the original Moles survey; thence N 75-14-56 W 110.47 feet to a 5/8 inch by 36 inch reinforcing rod with a yellow plastic cap stamped "SLS Monument 462-5634", hereinafter referred to as a "rebar", set, near the mouth of a tributary of Little Sandy Creek, a corner to William M. and Linda Crane (DB 1931/570); thence with Crane for the next seven (7) calls, N 49-31-04-E 141.64 feet to a 1 inch iron pipe, found; thence, N 70-35-43 W 209.84 feet to a 1 inch iron pipe, found, at the edge of a gas line right-of-way; thence N 30-43-44 W 184.11 feet to a 1 inch iron pipe, found, inside of a 4 inch PVC pipe; thence N 34-20-55 E. 52.65 feet to a 1 inch iron pipe, found inside of a 4 inch PVC pipe; thence N 38-07-29 E 102.36 feet to a 1 inch iron pipe, found inside of a 4-inch PVC pipe; thence N 04-34-22 E 150.48 feet to a 3/4 inch iron pipe, found inside of a 4-inch PVC pipe; thence N 89-22-46 E 75.34 feet to a 5/8 inch capped rebar, found, a tributary of Little Sandy Creek, corner to Francis K. Moles (WB 600/488); a corner to Interstate Properties, Inc. (DE 219/426); thence, N 06-43-38 E 228.70 feet to a 5/8 inch rebar set; thence through Interstate Properties LLC. Tax Map 18, Parcel 53.1; thence with Plaza Management, LLC. for the next two lines: N 40-55-12 E. 401.13 feet to a 1 inch iron pipe, found; N 74-58-22 E 897.49 feet to a point in Little Sandy Creek; thence with Little Sandy Creek for the next four lines: S 44-59-19 E 255.97 feet to a point; S 35-04-54 E 299.08 feet to a point; S 02-24-21 W 190.88 feet to a point; S 22-59-27 W 327.67 feet total distance to a point, from which a WV Department of Highways right-of-way monument located 85 feet left of Station 39+80 bears S 50-53-05 W at 110 feet; thence leaving Little Sandy Creek N 57-02-11 W 70.00 feet to a 5/8 inch capped rebar, found; thence S 27-07-39 W 391.74 feet to a 5/8 inch capped rebar, found; thence S 68-33-47 W 138.91 feet to a 1/2 inch iron rebar, found; thence S 69-06-42 W 208.88 feet to a 5/8 inch rebar, found;  thence S 68-47-30 W 58.81 feet to a 1/2 inch rebar, found; thence S 89-58-51 W 48.43; thence with Emerald Grand LLC. Tax Map 18, Parcel 53.4 for the next five (5) calls; thence N 12-57-10 E 222.91 feet to a PK Nail in asphalt, found; thence N 68-05-36 W 27.22 feet to a PK Nail in asphalt, found; thence N 49-04-48 W 240.83 feet to a 2 1/4 inch iron pipe, found; thence S 17-25-54 W 307.63 feet to a 5/8 inch rebar, found; thence S 30-51-56 W 20.49 feet to a 1 1/2 inch iron rod, found; thence with Pierce Hardy Limited Partnership, Tax Map 18, Parcel 53.7 for the next five (5) calls, thence N 10-14-40 E 307.97 feet to a 1 inch iron pipe, found; thence N 45-12-28 W 62.70

-5-

feet to a 5/8 inch rebar, found; thence N 87-28-12 W 209.36 feet to a 5/8 inch rebar, found; thence S 60-07-15 W 97.72 feet to a 5/8 inch rebar, found; thence S 07-47-20 W 391.06 feet to beginning.

And being part of the same real estate conveyed to Interstate Properties, LLC, a Florida limited liability company by Interstate Properties, Inc., a Georgia corporation, by deed dated October 18, 2003, and of record in the Office of the Clerk of the County Commission of Kanawha County, West Virginia in Deed Book 2588, at Page 742.

Also being known as Tax Map 18 : Parcels 52.1, 52.2, 53.3, 53.5, 53.6, 55. Containing 32.50 acres more or less as surveyed by G.A. Covey Engineering and shown on the ALTA Survey dated June 18, 2013.

This conveyance is made subject to all existing reservations, restrictions, exceptions, conditions, easements, rights of way or other servitudes, if any, made, retained or created in prior deeds of record in the chain of title to the tract or parcel of land herein conveyed.

The undersigned party of the first part does hereby declare under penalties of fine and imprisonment as provided by law, that this transaction is exempt from the payment of state and county excise tax for the reason this is a transfer between wholly owned entities without consideration.

-6-

EXHIBIT E

IN WITNESS WHEREOF, the undersigned limited liability company has

caused its name to be signed hereto by its Managing Member on the day and year first

above written.

> INTERSTATE PROPERTIES, LLC,
> A FLORIDA LIMITED LIABILITY
> COMPANY
>
> By: _____
>    Its Managing Member

STATE OF ___GEORGIA___

COUNTY OF ___FULTON___, TO-WIT:

The foregoing instrument was acknowledged before me this 11th day

of ___September___, 2013, by ___William A. Abruzzino___ the Managing Member

of INTERSTATE PROPERTIES, LLC, a Florida limited liability company, who has this

day acknowledged the same to be the act and deed of said limited liability company.

My Commission expires: 11/21/14

(Notarial Seal)                   _____
                                    Notary Public

This document prepared without benefit of title examination by:

Gregory A. Morgan, Esquire
Young Morgan & Cann, PLLC
363 Lee Avenue
Clarksburg, WV 26301
g:\abruzino\crossings-tara retail llc\tara deed.docx

This instrument was presented to the Clerk of the County
Commission of Kanawha County, West Virginia, on
and the same is admitted to record:    OCT 0 1 2013
                              -7-
Teste: _____ McCormick Clerk

Kanawha County Commission

EXHIBIT E



EXHIBIT F



SHEET 2 OF 3

EXHIBIT F



SCALE: 1" = 80'

SCHEDULE C - PROPERTY DESCRIPTION

ELKVIEW CROSSINGS
(TRACT NO. 1 - 32.50 Ac.)

| LINE | BEARING | DISTANCE |
|------|---------|----------|
| L1 | S08°18'04"W | 5.00' (M) |
| L2 | N75°14'56"W | 110.47' (M) |
| L3 | N26°31'04"E | 141.86' (M) |
| L4 | N70°25'43"W | 209.84' (M) |
| L5 | N30°43'44"W | 184.11' (M) |
| L6 | N34°30'55"E | 52.65' (M) |
| L7 | N30°29'21"E | 102.38' (M) |
| L8 | N04°14'22"E | 150.48' (M) |
| L9 | N62°09'03"W | 95.34' (M) |
| L10 | N08°43'38"E | 228.70' (M) |
| L11 | N40°53'12"E | 401.13' (M) |
| L12 | S44°38'18"E | 897.49' (M) |
| L13 | S35°04'34"E | 299.08' (M) |
| L14 | S02°24'21"W | 180.88' (M) |
| L15 | S23°39'37"E | 337.67' (M) |
| L16 | N57°02'11"W | 70.00' (M) |
| L17 | S27°49'28"W | 381.74' (M) |
| L18 | S58°33'43"W | 138.91' (M) |
| L19 | S58°07'55"W | 148.99' (M) |
| L20 | S98°04'32"E | 58.61' (M) |
| L21 | S58°38'51"W | 48.43' (M) |
| L22 | N12°57'10"E | 222.91' (M) |
| L23 | N68°05'36"W | 37.22' (M) |
| L24 | N42°04'49"W | 240.83' (M) |
| L25 | S17°25'34"W | 307.63' (M) |
| L26 | S30°51'36"W | 30.43' (M) |
| L27 | N10°14'40"W | 307.8' (M) |
| L28 | N45°35'18"W | 62.11' (M) |
| L29 | N78°35'12"W | 208.36' (M) |
| L30 | S90°37'35"W | 97.74' (M) |
| L31 | S07°47'20"W | 391.05' (M) |

COVEY
ENGINEERING

P.O. BOX 185
SUTTON, WEST VIRGINIA 26601
PHONE: (304) 765-2303
FAX: (304) 790-3354
WWW.COVEYENGINEERING.COM

JOB NUMBER
20134

SHEET 3 OF 3

| DATE OF ORIGINAL: | NOVEMBER 8 , 2010 |
| REVISION: | DATE: 2011 |
| REVISION: SCHEDULE B BOUNDARY | DATE: JUNE 21 , 2013 |
| REVISION: CONFORM TO DESCRIPTION | DATE: SEPTEMBER 19 , 2013 |

EXHIBIT F

# SPOTTS ❖ FAIN

A PROFESSIONAL CORPORATION

ATTORNEYS & COUNSELORS AT LAW

S. SPENCER KATONA

DIRECT DIAL NUMBER
(804) 697-2032
FACSIMILE NUMBER
(804) 697-2132
EMAIL ADDRESS
SKATONA@SPOTTSFAIN.COM

September 20, 2019

MAILING ADDRESS
POST OFFICE BOX 1555
RICHMOND, VIRGINIA 23218

## VIA OVERNIGHT DELIVERY AND ELECTRONIC MAIL

Emerald Grande, LLC
P.O. Box 190
Bonita Springs, Florida 34133-0190
Attention: William Abruzzino

Steven L. Thomas, Esquire
Kay Casto & Chaney, PLLC
P.O. Box 2013
Charleston, West Virginia 25327-2013
Email: sthomas@kaycasto.com

> **Re:** **Title Objections for Purchase and Sale Agreement dated August 9, 2019 (the "Contract") by and between Emerald Grande, LLC ("Seller") and KM Hotels, LLC ("Purchaser") for the sale/purchase of that certain parcel of real property located at 101 Crossings Mall, Elkview, West Virginia 25071, together with the La Quinta hotel and other improvements thereon (collectively, the "Property")**

Ladies and Gentlemen:

Pursuant to the above referenced Contract, Purchaser has reviewed the enclosed ALTA Commitment for Title Insurance, bearing Commitment Number NCS-975064-CAST with an effective date of August 27, 2019 (the "Title Commitment"), issued by First American Title Insurance Company (the "Title Company"). Based on said review of the Title Commitment, Purchaser makes the specific objections and comments as set out below related to the Property.

## Specific Objections

1. Schedule B, Part I Requirements. All exceptions, conditions and requirements set forth in Schedule B, Part I Requirements, must be released, satisfied or disposed of to the Title Company and Purchaser's satisfaction at or prior to closing so that none of such items will be an exception in Schedule B of Purchaser's title policy specifically including, but not limited to, the following:

   a. Items 4 and 13. We request you send us a draft deed and other seller documents for the review and approval of both Purchaser and the Title Company. Purchaser reserves the right to make additional objections based upon its review of same.

EXHIBIT G

Page 2
June 11, 2015

> b. <u>Items 5, 6, 7, 9, 12, 14 and 15</u>. Please provide affidavits, documents, releases and other requested items to the Title Company to satisfy these requirements.

2. <u>Schedule B, Part II Exceptions</u>.

   a. <u>Exceptions 1, 2, 3, 4, 6, 7 and 9</u>. Purchaser hereby objects to these exceptions and will require an affidavit or affidavits from Seller in form sufficient to the Title Company to remove these exceptions.

   b. <u>Exception 5</u>. Purchaser hereby objects to this exception and reserves the right to have such exception updated to reflect Purchaser's current survey.

   c. <u>Exception 8</u>. Purchaser hereby objects to this exception and requests the Seller confirm that all delinquent taxes, if any, will be paid at closing and that 2019 taxes will be prorated at closing and exception will be taken only as to real estate taxes payable after closing. Please also confirm that there are no special tax assessments or roll back taxes affecting the property.

   d. <u>Exception 26</u>. Purchaser hereby objects to this exception on the basis that it has been abandoned per the Plat shown in Exception 40, and reserves the right to require Seller to deliver such affidavits or other documents as the Title Company may require to remove such exception.

   e. <u>Exceptions 40, 41, 42, 43, 48, 49, 50 and 51</u>. Purchaser hereby objects to these exceptions on the basis that they are blanket in nature, and should instead specifically state matters to which the Title Company is taking exception.

   f. <u>Exception 42</u>. Purchaser hereby objects to this exception on the basis that the Title Company has already taken exception to Deed Book 1817, Page 175 in Exception 15.

   g. <u>Exception 43</u>. Purchaser hereby objects to this exception on the basis that the Title Company has already taken exception to Deed Book 1818, Page 573 in Exception 16.

   h. <u>Exception 44</u>. Purchaser hereby objects to this exception on the basis that the Title Company has already taken exception to Deed Book 1817, Page 175 in Exceptions 15 and 42.

   i. <u>Exception 47</u>. Purchaser hereby objects to this exception and will require that Seller deliver an easement, in form and content acceptable to Purchaser and the Title Company, providing a legal right of access to and from the Property.

   j. <u>Exception 49</u>. Purchaser hereby objects to this exception on the basis that the Title Company has already taken exception to Deed Book 2223, Page 405 in Exception 32.

EXHIBIT G

Page 3
June 11, 2015

> k. Exception 50. Purchaser hereby objects to this exception on the basis that the
>    Title Company has already taken exception to Deed Book 2135, Page 284 in
>    Exception 26.
> l. Exception 52. Purchaser hereby objects to this exception pending final review and
>    approval of the Sale Order by both Purchaser and the Title Company.

Purchaser expressly reserves the right to further object upon receipt of the additional
information and/or documentation requested in this letter.

Thank you for your cooperation and assistance in this matter.

> Very truly yours,
> /s/ S. Spencer Katona
> **SPOTTS FAIN PC**

Enclosures

cc:    Mayur Patel (by email only)
       Mike Burke (by email only)
       Angela Molin (by email only)
       David DuVal (by email only)

**EXHIBIT G**



PLAT SHOWING
ALTA/ACSM LAND TITLE SURVEY OF A
1.5638 ACRE PARCEL OF LAND
ON THE WATERS OF LITTLE SANDY CREEK OF ELK RIVER
ELK DISTRICT, KANAWHA COUNTY, WEST VIRGINIA
PREPARED FOR
KM HOTELS, LLC
SCALE: 1" = 30'    OCTOBER 14, 2019

EXHIBIT H

DEED    3053    813
Recorded In Above Book and Page
02/06/2020 04:26:46 PM
Vera J. McCormick
County Clerk
Kanawha County, WV
Deed Tax          0.00
Recording Fee    32.00
TOTAL            32.00

**THIS CONFIRMATORY EASEMENT AND RIGHT OF WAY**, made this **5th day of February, 2020**, by and among **TARA RETAIL GROUP, LLC**, a Georgia limited liability company, hereinafter referred to as "Grantor"; and **EMERALD GRANDE, LLC**, a Georgia limited liability company, hereinafter referred to as "Grantee";

**RECITES:** By that certain deed dated September 10, 1999, made by and between Interstate Properties, Inc., a Georgia corporation, as grantor, and Plaza Management, L.L.C., as grantee, of record in the Office of the Clerk of the County Commission of Kanawha County, West Virginia (the "Clerk's Office"), in Deed Book 2480 at page 541 (the "Hotel Deed"), Plaza Management, L.L.C. acquired a certain parcel of real property containing 1.558 acres, more or less (Elk Tax District Tax Map 18, Tax Parcel 53.4), on which was constructed a hotel (the "Hotel Property").

At the time of the recording of the Hotel Deed, the said Interstate Properties, Inc. owned the adjacent shopping center and access roads, as described on Exhibit A ("Elkview Crossings Mall"), consisting of approximately 32.50 acres, more or less.

The Hotel Deed contains the following provision:

> The GRANTOR [Interstate Properties, Inc.] reserves unto itself and the GRANTOR grants to the GRANTEE [Plaza Management, L.L.C.] a perpetual, mutual and reciprocal cross easement and right of way over, across and through the access roads, ways and lanes and the parking areas of the other for all vehicles and pedestrians as well as for the installation and maintenance of utility facilities to the property of the other party.

Emerald Grande, LLC, the Grantee herein, is the successor in title to Plaza Management, L.L.C. and is the current owner of the Hotel Property, as described on Exhibit B.

1

**KAY CASTO & CHANEY (BOX)**

**EXHIBIT I**

A question has been raised as to whether or not the Hotel Property has access to and from State Route 45 over the property owned by Grantor and as to whether or not the Hotel Property has the right to use certain parking areas owned by Grantor, who is the successor in title to Interstate Properties, Inc. Grantor executes this easement and right of way for the purpose of confirming unto Grantee, its successors and assigns, its right to use the access roads, ways and lanes and parking areas owned by Grantor in or near the Elkview Crossings Mall.

**NOW, THEREFORE,** in consideration of the premises and in pursuance thereof, and pursuant to that certain *Order*, entered by the United States Bankruptcy Court for the Northern District of West Virginia on December 18, 2019 in the proceeding captioned as *In re Tara Retail Group, LLC d/b/a Tara Hotel Group, LLC* [Docket No. 1299], a true and correct copy of which is attached hereto as Exhibit C,  Grantor does hereby **GRANT and CONFIRM** unto Grantee, and Grantee's successors and assigns, a perpetual easement and right of way over, across and through the access roads, ways and lanes and parking areas (the "Driveways and Parking Areas") of Grantor's property located in or near the Elkview Crossings Mall for vehicular and pedestrian access and parking, including, without limiting the generality of the foregoing, access to and from State Route 45 and the Hotel Property as well as for the installation and maintenance of utility facilities. Without limiting the scope or location of the rights hereby granted, the easement and right-of-way hereby granted specifically includes the "Driveways" and "Parking Areas" designated and shown on attached Exhibit D. Grantor and Grantee further agree as follows:

1. Open Access.  Except as provided herein or as otherwise required by applicable law, no walls, fences or barriers of any sort or kind shall be constructed or maintained in the Driveways, Parking Areas, or any portion thereof and between the Elkview Crossings Mall and the Hotel Property, that shall prevent or impair the use of any portion thereof; provided, however, reasonable traffic controls as may be necessary to guide and control the orderly flow of traffic may be installed

2

**EXHIBIT I**

in and on the Driveways and Parking Areas as long as the Driveways and Parking Areas are not closed or blocked and the traffic circulation pattern of the Driveways and Parking Areas are not unreasonably changed or affected. The Driveways and Parking Areas shall be open and passable by vehicular traffic from the Hotel Property and use at all times, and shall not be temporarily or permanently altered, modified, relocated, blocked and/or removed without the express written consent of the benefited party.

2. Maintenance of Driveways and Parking Areas. Grantor shall maintain the Driveways and Parking Areas, which maintenance obligations shall include, without limitation, resurfacing, repaving and restriping the Driveways and Parking Areas; removing all papers, debris and other refuse from and periodically sweeping the Driveways and Parking Areas; maintaining appropriate lighting fixtures, marking, directional signs, lines and signals as needed; and performing any and all such other duties as are necessary to maintain such Driveways and Parking Areas in a clean, safe and orderly condition, reasonably clear of standing water, ice and snow. Grantee shall perform any common law duties to pay for its share of the maintenance expenses for the Driveways and Parking Areas

3. Covenants to Run with Land. The easements and agreements created, granted and confirmed herein shall be appurtenant to and run with the title to the Hotel Property and the Elkview Crossings Mall, and shall be binding upon the parties and their respective successors and assigns. The easements created, granted and confirmed herein include all incidental rights reasonably necessary for the use and enjoyment of the respective easements for their intended purpose.

*[Signature and acknowledgment page follows]*

3

EXHIBIT I

*[Signature Page to Confirmatory Easement and Right of Way]*

**IN WITNESS WHEREOF**, Tara Retail Group, LLC has caused its name to be hereto signed by its proper manager or officer thereunto duly authorized, as of the year and day first above written:

**TARA RETAIL GROUP, LLC**, a Georgia limited liability company

By: _William A. Abruzzino_

Its: _C.E.D._

STATE OF _West Virginia_,

COUNTY OF _Kanawha_, to-wit:

I do hereby certify that _William A. Abruzzino_, the _C.E.D._ of Tara Retail Group, LLC, a Georgia limited liability company, whose name is signed to the writing above, has this day acknowledged before me the said writing to be the act and deed of the said company.

Given under my hand this _5th_ day of February, 2020.

My commission expires _February 9, 2021_.

_Deadra D. Cummins_
NOTARY PUBLIC

NOTARY PUBLIC OFFICIAL SEAL
DEADRA D. CUMMINS
State of West Virginia
My Comm. Expires Feb 9, 2021
115 Charles Street Hurricane WV 25526

This instrument was prepared by Jonathan Nicol of Kay Casto & Chaney PLLC, Attorneys at Law, Post Office Box 2031, Charleston, West Virginia 25327.

**EXHIBIT I**

## EXHIBIT A

All of the following described parcels of land, together with the improvements thereon and the appurtenances belonging, situate, lying and being on the waters of Little Sandy Creek, Elk District, Kanawha County, West Virginia, more particularly bounded and described as follows:

TRACT NO. 1:    BEGINNING at a West Virginia Division of Highways Concrete Right-of-Way Monument found on the northern right-of-way of West Virginia County Route 45, being 254 feet left of Station 23+77 as shown on plans for Federal Project 1-79-1(26)7 Sheet Number 23, a corner to B4 Lumber (Lease Book 207/772); thence with the right-of-way of said Route 45 for the next two (2) lines S 08-18-04 W 5.00 feet to a point in the line of the original Moles survey; thence N 75-14-56 W 110.47 feet to a 5/8 inch by 36 inch reinforcing rod with a yellow plastic cap stamped "SLS Monument 46Z-5634", hereinafter referred to as a "rebar", set, near the mouth of a tributary of Little Sandy Creek, a corner to William M. and Linda Crane (DB 1931/570); thence with Crane for the next seven (7) calls, N 49-31-04-E 141.64 feet to a 1 inch iron pipe, found; thence, N 70-35-43 W 209.84 feet to a 1 inch iron pipe, found, at the edge of a gas line right-of-way; thence N 30-43-44 W 184.11 feet to a 1 inch iron pipe, found, inside of a 4 inch PVC pipe; thence N 54-20-55 E, 52.65 feet to a 1 inch iron pipe, found inside of a 4 inch PVC pipe; thence N 38-07-29 E 102.36 feet to a 1 inch iron pipe, found inside of a 4-inch PVC pipe; thence N 04-34-22 E 150.48 feet to a 3/4 inch iron pipe, found inside of a 4-inch PVC pipe; thence N 89-32-46 E 75.34 feet to a 5/8 inch capped rebar, found, a tributary of Little Sandy Creek, corner to Francis K. Moles (WB 600/488); a corner to Interstate Properties, Inc. (DB 219/426); thence, N 06-43-38 E 228.70 feet to a 5/8 inch rebar set; thence through Interstate Properties LLC. tax map 18, Parcel 53.1; thence with Plaza Management, LLC. for the next two lines: N 40-55-12 E. 401.13 feet to a 1 inch iron pipe, found; N 74-58-22 E 897.49 feet to a point in Little Sandy Creek; thence with Little Sandy Creek for the next four lines: S 44-59-19 E 255.97 feet to a point; S 35-04-54 E 299.08 feet to a point; S 02-24-21 W 190.88 feet to a point; S 22-59-27 W 327.67 feet total distance to a point, from which a WV Department of Highways right-of-way monument located 85 feet left of Station 39+80 bears S 50-53-05 W at 110 feet; thence leaving Little Sandy Creek N 57-02-11 W 70.00 feet to a 5/8 inch capped rebar, fotiod; thence S 27-07-39 W 391.74 feet to a 5/8 inch capped rebar, found; thence S68-33-47 W 138.91 feet to a 1/2 inch iron rebar, found; thence S 69-06-42 W 208.88 feet to a 5/8 inch rebar, found; thence S 68-47-30 W 58.81 feet to a 1/2 inch rebar, found; thence S 89-58-51 W 48.43; thence with Emerald Grand LLC. Tax Map 18, Parcel 53.4 for the next five (5) calls; thence N 12-57-10 E 222.91 feet to a PK Nail in asphalt, found; thence N 68-05-36 W 27.22 feet to a PK Nail in asphalt, found; thence N 49-04-48 W 240.83 feet to a 2 1/4 inch iron pipe, found; thence S 17-25-54 W 307.53 feet to a 5/8 inch rebar, found; thence S 30-51-56 W 20.49 feet to a 1 1/2 inch iron rod, found; thence with Pierce Hardy Limited Partnership, Tax Map 18, Parcel 53.7 for the next five (5) calls, thence N 10-14-40.E 307.97 feet to a 1 inch iron pipe, found; thence N 45-12-28 W 62.70 feet to a 5/8 inch rebar, found; thence N 87-28-12 W 209.36 feet to a 5/8 inch rebar, found; thence S 60-07-15 W 97.72 feet to a 5/8 inch rebar, found; thence S 07-47-20 W 391.06 feet to beginning.

5

EXHIBIT I

## EXHIBIT B

All of that certain lot or parcel of land, together with the improvements thereon and the appurtenances thereunto belonging, situate on the Waters of Little Sandy Creek, in Elk District, Kanawha County, West Virginia, more particularly described as follows:

BEGINNING at a ½ inch by 36 inch Reinforcing Rod with a yellow plastic cap stamped "SLS Inc., 462-5634" hereinafter referred to as a Rebar, set, corner to Interstate Properties, Inc. from which a ½ inch Rebar, set at a corner of Parcel 2, bears S. 62-42-20 E. at 72.03 feet; thence with said Parcel S. 62-42-20 E. 27.22 feet to a point, corner to Parcel 2; thence with a new line along Parcel 2 S. 18-49-00 W. 221.88 feet to a point; thence N. 84-18-40 W 65.49 feet to a railroad spike, set; thence N. 27-30-40 E. 25.30 feet to a ½ inch rebar, set, corner to 84 Lumber, Inc.; thence with said 84 Lumber, Inc. for the next five (5) lines; N. 66-47-40 W. 146.79 feet to a point; thence N. 76-38-30 W. 64.76 feet to a railroad spike, set; thence N. 39-16-40 E. 19.97 feet to a railroad spike, set; thence N. 23-29-40 E. 106.39 feet to a ½ inch rebar, found at a previous common corner of Moles & Arthur; thence N. 23-29-40 E. 201.26 feet to a rebar, set, corner to said 84 Lumber tract and in a line of Interstate Properties tract; thence S. 42-45-20 E. 240.78 feet to the place of beginning, containing 1.558 acres, more or less, as surveyed by Smith Land Surveying, Inc. in August, 1999, and as shown on the Revised Site Plan and Plat of As-built Survey of The Crossings of Elkview dated October 7, 1998, and last revised September 1, 1999.

EXHIBIT I

## EXHIBIT C

(December 18, 2019, Bankruptcy Court Order)

7

EXHIBIT I

Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:                                          )
                                                )
TARA RETAIL GROUP, LLC                          )
*dba* Tara Hotel Group, LLC,                    )        Case No. 17-bk-57
                                                )
        Debtor.                                 )        Chapter 11
                                                )

## ORDER

Pending before the court is the Debtor's motion to compromise its claim against Emerald Grande, LLC ("EG"). The essence of the proposed settlement is that the Debtor will have an allowed administrative expense claim of $400,000 and a general unsecured claim of $156,332 in the EG bankruptcy case.[1] The court previously approved the same proposal in the EG case. EG's resolution of its motion to surcharge collateral of Carter Bank, its principal secured lender, is the catalyst for the Debtor's receipt of the $400,000. Specifically, Carter Bank agrees to carve out and pay to the Debtor $400,000 of the proceeds to be realized from the sale of EG's hotel adjoining the Debtor's property. Notably, Carter Bank will not realize the full amount of its claim in the EG case. Rather, it is agreeing to pay $400,000 to the Debtor at closing in order to facilitate the sale of EG's two hotel properties, including the Elkview hotel adjoining the Debtor's property. In the same vein of cooperation and in furtherance of EG's proposed sale, the Debtor seeks, as part of its motion here, authorization to resolve certain encroachment issues identified by the purchaser of EG's Elkview hotel. Without resolution of the encroachment issues, EG is unlikely to close the sale of its Elkview hotel, and the Debtor is thus likely unable to readily realize the $400,000 at stake in the EG case, if at all, without incurring significant additional administrative expenses in

_____

[1] The Debtor restored access to its property by employing Applied Construction Solutions, Inc., and SLS Land and Energy Development to build a bridge spanning Little Sandy Creek. To finance the construction, the court approved post-petition financing totaling $1,112,664.50. The Debtor therefor sought from EG $556,332.25 as an administrative expense.

1

EXHIBIT I

litigating to resolution its claim against EG. The Debtor, therefore, seeks recognition of certain easements in place or authorization to grant certain easements to EG in conjunction with the proposed settlement so that EG can, in turn, transfer those easements to the purchaser of its hotel adjoining the Debtor's property.

Comm2013, the Debtor's principal creditor, objects to the Debtor's proposed settlement. In its written objection, it generally contends that the proposed resolution of the encroachment issues constitutes the use of its collateral without the requisite compensation or adequate protection. Additionally, Comm2013 contends that the granting of the easements by the Debtor is not sound business judgment. In that regard, Comm2013 identifies the following seven easements to either be recognized or conveyed by the Debtor's motion: 1) parking easement; 2) access easement; 3) building encroachments easement; 4) signage easement; 5) retaining wall easement; 6) garbage easement; and 7) air-conditioning unit easement. Notably, Comm2013 has no objection to the Debtor receiving $400,000 from EG via Carter Bank.

On November 13, 2019, the court first convened a telephonic hearing regarding the Debtor's proposed compromise and use of estate property vis-à-vis the easements. At the hearing, the parties related to the court that progress had been made toward amicably resolving the matter. For example, the Debtor initially proposed to transfer a fee simple interest in certain of the property at issue but walked back from that notion changing its requested relief to simply include another easement for the property. Comm2013 seemed agreeable with that development but noted that the parking easement remained a significant concern. The parties were hopeful they'd be able to resolve the matter, and the court continued the hearing for one week to allow the parties additional time in that regard.

On November 20, 2019, the court convened its continued hearing and discovered that progress to amicably resolve the Debtor's motion seemingly stalled. At the outset, the court expressed its surprise in that regard because it was under the impression the parking easement was the sole remaining sticking point. Unfortunately, the court learned that although the parking easement was no longer an issue in dispute, the final stage of negotiations broke down because, among other things, the Debtor asked Comm2013 to subordinate its lien to the respective easements upon the subject property. From the Debtor's perspective, such subordination is simply a recognition of the parties' relative legal positions; including Comm2013's interest in the property by virtue of its financing of the Debtor's purchase that arose long after the easements purportedly

2

EXHIBIT I

existed. At the very least, the Debtor contends, Comm2013 took its interest in the property with
knowledge that EG held a right to use and maintain the subject property because its use of the
property precedes by several years Comm2013's security interest.

The Debtor's motion implicates two basic bankruptcy principles: the settlement of claims
under Fed. R. Bankr. P. 9019 and the use of property of the estate under § 363 of the Bankruptcy
Code. Notably, the Debtor does not propose to sell property of the estate such that neither § 363(f)
of the Bankruptcy Code nor other provisions thereof applicable to sales of estate property are
implicated. The Debtor thus also does not propose a sale coupled with a compromise under Rule
9019. Rather, the Debtor proposes only the use of its property—i.e., several easements—as part
of its compromise with EG. The granting of such easements aids in the sale of EG's Elkview
property. Without the easements, substantial uncertainty exists whether EG will ultimately be able
to close the sale of its Elkview hotel due to latent title issues. Without the sale, there is likely no
resolution of the Debtor's administrative expense against EG because the proposed settlement
relies upon Carter Bank's carve out from the sale proceeds.

Under Rule 9019, "[o]n motion by the trustee and after notice and a hearing, the court may
approve a compromise or settlement." A court reviews a Rule 9019 motion to compromise against
"the outcome of four factors: (1) the probability of success in litigation; (2) the likely difficulties
in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and
delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Buffalo Coal
Co.*, No. 06–366, 2006 WL 3359585 at *3, 2006 Bankr. LEXIS 3076 at *12 (Bankr. N.D.W. Va.
Nov. 15, 2006) (citing *Fry's Metals, Inc. v. Gibbons (In re RFE Industries, Inc.)*, 283 F.3d 159,
165 (3d Cir.2002)); *see Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v.
Anderson*, 390 U.S. 414, 424–25 (stating that, in determining whether a compromise is fair and
equitable, a bankruptcy judge should form "an educated estimate of the complexity, expense, and
likely duration of such litigation, the possible difficulties of collecting on any judgment which
might be obtained . . . . Basic to this process in every instance, of course, is the need to compare
the terms of the compromise with the likely rewards of litigation."). Notably, "the court does not
have to be convinced that the settlement is the best possible compromise. Rather, the court must
conclude that the settlement is within the reasonable range of litigation possibilities." *In re World
Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (internal quotations omitted).

3

EXHIBIT I

Section 363(b) of the Bankruptcy Code permits the trustee, or in this context the Debtor, to "use, sell, or lease, other in the ordinary course of business, property of the estate . . ." after notice and a hearing. 11 U.S.C. § 363(b). It is well-settled that the court reviews such a proposal "for compliance with the business judgment rule . . . ." *In re Shipman*, 344 B.R. 493, 495 (Bankr. N.D.W. Va. 2006). "The court must scrutinize the proposed transaction to ensure that the transaction is fair and reasonable, that the maximum value is being recovered, and that 'the decision to [use] is made on an informed basis, in good faith, and in the honest belief that the [use] is in the estate's best interest.'" *In re Love*, 553 B.R. 54, 57 (Bankr. D.S.C. 2016) (quoting *Shipman*, 344 B.R. at 495). Notwithstanding the foregoing, where appropriate, "the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection" of an entity's interest in such property to be used. 11 U.S.C. § 363(e). Congress did not define "adequate protection" in the Bankruptcy Code, but it may be provided, when necessary to protect "an interest of an entity in property . . . by—(1) a cash payment or periodic cash payments to such entity, to the extent that the . . . use . . . under [§] 363 . . . results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361.

Here, the Debtors proposed settlement with EG includes the use of estate property upon which Comm2013 possesses a security interest. In its analysis, the court must therefore consider both whether the approval of the Debtor's compromise under Rule 9019 is justified and whether the exercise of the Debtor's business judgment in using estate property under § 363(b) in furtherance of that compromise is sound. Based upon the court's consideration of stipulated facts and the parties' respective arguments, the court finds it appropriate to authorize the Debtor to use the subject property, i.e. grant easements to the extent they do not currently exist, in aid of its compromise of EG, which the court will also approve.

Specifically, the court finds that the Debtor met its burden under both Rule 9019 and § 363(b). First, looking to the proposed compromise, each of the factors identified above weigh in favor of approval. In that regard, probability of succeeding in litigation is generally always a subjective consideration. That is certain here, where two bankruptcy estates are litigating over the cost of restoring access to the Debtor's property. It is true that EG benefitted from the restoration of access because its property has no independent ingress and egress to the nearest public road, but whether the Debtor could ultimately succeed on one or more legal theories against EG is speculative in the court's view. After all, the Debtor acted in its own self-interest in restoring

4

EXHIBIT I

access to its property so that its tenants could resume operating and it could hopefully reorganize its financial affairs. EG only incidentally benefited from the restoration. Thus whether EG can be held liable is clearly debatable; particularly for nearly one-half the cost of the bridge, based upon the incidental benefit it realized from the Debtor's act.

Regarding likely difficulties in collection, the court's earlier point about EG being a bankrupt debtor is critical. Given the context surrounding the Debtor and EG, the court finds this consideration to be most important. In that regard, EG has not yet proposed a Chapter 11 plan, but the court understands from presiding over the case that it will be one primarily of liquidation. Based upon the record in its case, EG has one unencumbered asset, which is a parcel of real property not contiguous to the Elkview hotel and the Debtor's property. Indeed, EG has proposed to sell that parcel, albeit unsuccessfully, for many months. EG most recently sought court approval to sell the parcel but withdrew its motion in that regard in September 2019 after the prospective purchaser withdrew from the purchase agreement. EG has no unencumbered cash or other assets with which it could fund a judgment to the Debtor if the Debtor were successful in litigation. But for the cooperation of Carter Bank and its prospective carve out, the Debtor would likely have no ability to collect upon any judgment it might obtain against EG.

In the court's view, this is where the Debtor's business judgment leads inexorably to the approval of its use of easements to accomplish the proposed settlement. In that regard, EG's proposed sale of its Elkview hotel is critical, not only to its own Chapter 11 plan but also to its resolution of the Debtor's claim against it. At bottom, there is likely no sale and thus no $400,000 for the Debtor unless the Debtor grants EG these easements to facilitate its sale of the Elkveiw hotel. Despite Comm2013's arguments to the contrary, conveying the easements to achieve the result proposed here is sound business judgment and eminently reasonable under the circumstances. To reiterate in that regard, "[t]he court must scrutinize the proposed transaction to ensure that the transaction is fair and reasonable, that the maximum value is being recovered, and that 'the decision to [use] is made on an informed basis, in good faith, and in the honest belief that the [use] is in the estate's best interest.'" *In re Love*, 553 B.R. at 57 (quoting *Shipman*, 344 B.R. at 495).

Notably, the Debtor does not propose to sell a fee interest in its property that serves as Comm2013's collateral. Rather, it is simply using the property—through the granting of easements—to facilitate the settlement and EG's sale of its property. Under the circumstances,

5

EXHIBIT I

the court finds that the Debtor's proposed use, even without additional compensation that Comm2013 urges should be sought by the Debtor, is fair and reasonable. In that regard, the court finds that the maximum value is being recovered for the easements in this context. It is undisputed that EG is paying no consideration to the Debtor specifically for the easements, but the Debtor ultimately will lose the settlement altogether, including the $400,000, unless EG can close the sale of its hotel. The court thus believes that the Debtor is, in fact, receiving maximum value for the subject easements.[2] Moreover, the Debtor's proposal brings certainty to any percolating issues surrounding the property interests that otherwise might stretch well into the future and cause significant problems for future owners.[3] At bottom, these issues should be addressed sooner or later, so the court perceives the Debtor's proposal to address them now to be prudent. Finally, in a similar vein, the court finds that the decision to use the easements is made on an informed basis, in good faith, and in the honest belief that it is in the estate's best interest.

The court is also satisfied that no adequate protection or compensation is due Comm2013 based upon the Debtor's proposed easements. As the court notes above, adequate protection is only necessary to protect against diminished collateral value from a proposed use of estate property under § 363(b) of the Bankruptcy Code. Even without addressing legal issues of prescriptive easements and the like, the court finds that the Debtor's proposed use of the easements does not diminish Comm2013's collateral interest. In that regard, the court finds as persuasive the fact that EG's purported interest in the Debtor's property preexisted that of Comm2013. For instance, EG

---

[2] Comm2013 suggests that the Debtor should exercise more leverage against EG, who is motivated to accomplish its sale, by seeking to extract specific compensation for the easements. It postulates that if EG and its buyer, and even Carter Bank, are motivated enough to close the sale, then they will find a way to meet the Debtor's demand. However, in the court's view, the Debtor has articulated a sound basis for proceeding as it proposes based upon its judgment as to what can practically be accomplished under the circumstances. Indeed, it is just as likely that the prospective purchaser and thus Carter Bank walk away from the proposed sale and settlement, respectively, with Carter Bank simply foreclosing upon the property and the Debtor receiving nothing, at least not without more significant and costly litigation. The court, therefore, finds the settlement—by which the Debtor will receive over seventy-one percent of its claim against EG—to be exceptionally reasonable under the circumstances.

[3] Interestingly, Comm2013 seeks title to the Debtor's property as part of its proposed Chapter 11 plan. In that regard, it proposes to obtain title and subsequently market and sell the Debtor's property. Just as EG is having difficulty closing its sale of its property, which adjoins the Debtor's, Comm2013 would likely encounter difficulty conveying title to the Debtor's property with the lingering encroachment issues.

6

EXHIBIT I

and its employees and invitees used the subject property for years without interference before Comm2013 financed the Debtor's purchase of its property; and they have continued to use the property since then without Comm2013 asserting any right in the property used by EG. The court finds that open and apparent use important because Comm2013 was, or reasonably should have been, aware of EG's use of the Debtor's property at the time it took its security interest thereupon. The court, therefore, cannot reasonably finds that Comm2013's security interest in the Debtor's property is hampered by the proposed easements based upon the historical use of the property. As such, no adequate protection is necessary to permit the Debtor to use the subject property in furtherance of its settlement with EG.

Turning to the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, the court finds as persuasive the notion that the Debtor will realize by the proposed settlement nearly its full claim against EG while limiting the expense and delay otherwise necessary during litigation. Additionally, as the court noted above regarding its consideration of litigation risk, it is not clear that the Debtor would ultimately succeed in its claim against EG. At bottom, however, the Debtor and EG, through Carter Bank, are trying to be eminently practical in proposing this settlement. To reiterate, EG proposes to pay the Debtor almost the entire amount it seeks by way of its administrative expense, and such payment will be made from Carter Bank's collateral, limiting the expense, inconvenience, and delay attendant litigating the claim and collecting on any judgment.

Finally, the court perceives the paramount interest of the creditors to generally be a neutral factor given the makeup of the Debtor's creditor body. But to the extent it is relevant, the court finds that the Debtor's creditor body will be served by this settlement. The Debtor possesses little, if any, unencumbered cash, and this proposed settlement may inject capital into the Debtor's reorganization effort. Notably, although Comm2013 is the largest creditor in terms of claim value, the overwhelming majority of creditors support the Debtor's reorganization effort. Additionally, the court is aware from other hearings in this case that Comm2013 may claim a security interest in the subject proceeds, but that litigation remains for another day. And in any event, if Comm2013 does possess a security interest in the settlement proceeds, the proposal here inures to its benefit so that paramount interest of creditors is still served by the proposed settlement.

In conclusion, the court finds that the proposed settlement is well within the reasonable range of litigation possibilities and is supported by the sound business judgment of the Debtor.

7

EXHIBIT I

Based upon the foregoing, the court does hereby

**ORDER** that the Debtor's motion to compromise (Doc. No. 1272), filed October 29, 2019, be and hereby is GRANTED.

EXHIBIT I

## EXHIBIT D



8

EXHIBIT I

DEED      3053    796
Recorded In Above Book and Page
02/06/2020 04:25:34 PM
Vera J. McCormick
County Clerk
Kanawha County, WV
Deed Tax                  0.00
Recording Fee            34.00
TOTAL                    34.00

**THIS EASEMENT AND RIGHT OF WAY**, made this 5th day of February, 2020, by and among **TARA RETAIL GROUP, LLC**, a Georgia limited liability company, hereinafter referred to as "Grantor"; and **EMERALD GRANDE, LLC**, a Georgia limited liability company, hereinafter referred to as "Grantee";

**RECITES:** That certain map or plat entitled "PLAT SHOWING ALTA/ACSM LAND TITLE SURVEY OF A 1.5638 ACRE PARCEL OF LAND ON THE WATERS OF LITTLE SANDY CREEK OF ELK RIVER ELK DISTRICT, KANAWHA COUNTY, WEST VIRGINIA PREPARED FOR KM HOTELS, LLC," dated October 14, 2019, prepared by William R. Gunnoe, RPS #801, (the "Map") (a portion of said Map showing the boundary lines for said 1.5638 acre parcel is attached hereto as Exhibit A) has identified certain encroachments (as shown on Exhibit A) onto Grantor's property, which property is described on Exhibit B (Elk District, Tax Map 18, Tax Parcel 52.1) (hereinafter referred to as "Grantor's Property"), (i) located to the north of the said 1.5638 acre parcel (hereinafter referred to as the "Hotel Property") consisting of several air units, a 480v electric pad mount and equipment thereon, landscaping, access sidewalk into the hotel and a trash dumpster enclosure and (ii) located to the west within Grantor's Property abutting Tax Parcel 53.7, now owned by Pierce Hardy Limited Partnership and designated on Exhibit C-1 attached hereto as the "84 Lumber Property," consisting of a retaining wall and landscaping (collectively, subparagraphs (i) and (ii) are referred to as the "Encroachments").

Grantor is willing to grant to Grantee perpetual easements and rights of way on Grantor's Property to use portions of Grantor's Property that include the Encroachments.

KAY CASTO & CHANEY (BOX)

EXHIBIT J

**NOW, THEREFORE,** in consideration of the sum of One Dollar ($1.00), cash in hand paid and other good and valuable considerations, the receipt and sufficiency of all of which is hereby acknowledged, and pursuant to that certain *Order*, entered by the United States Bankruptcy Court for the Northern District of West Virginia on December 18, 2019 in the proceeding captioned as *In re Tara Retail Group, LLC d/b/a Tara Hotel Group, LLC* [Docket No. 1299], a true and correct copy of which is attached hereto as Exhibit C, Grantor does hereby **GRANT and CONVEY** unto Grantee perpetual easements and rights of way over, across and through Grantor's Property for the Encroachments, as well as for their maintenance, repair and replacement, as designated and shown as the "Easement Area" on an enlarged portions of the Map attached hereto and made a part hereof as Exhibit D and Exhibit D-1. The easements and agreements created and granted herein shall be appurtenant to and run with the title to the Hotel Property and the Grantor's Property, and shall be binding upon the parties and their respective successors and assigns. The easements created and granted herein include all incidental rights reasonably necessary for the use and enjoyment of the respective easements for their intended purpose.

*[Signature and acknowledgment pages follow]*

2

**EXHIBIT J**

`

*[Signature Page to Easement and Right of Way]*

**IN WITNESS WHEREOF**, Tara Retail Group, LLC has caused its name to be hereto signed by its proper manager or officer thereunto duly authorized, as of the year and day first above written:

**TARA RETAIL GROUP, LLC**, a Georgia limited liability company

By: _William A. Abruzzino_

Its: _C.E.O._

STATE OF _West Virginia_,

COUNTY OF _Kanawha_, to-wit:

I do hereby certify that _William A. Abruzzino_ the _CEO_ of Tara Retail Group, LLC, a Georgia limited liability company, whose name is signed to the writing above, has this day acknowledged before me the said writing to be the act and deed of the said company.

Given under my hand this _5th_ day of February, 2020.

My commission expires _February 9, 2021_.

NOTARY PUBLIC OFFICIAL SEAL
DEADRA D. CUMMINS
State of West Virginia
My Comm. Expires Feb 9, 2021
115 Charles Street Hurricane WV 25526

_Deadra D. Cummins_
NOTARY PUBLIC

**EXHIBIT J**

[*Signature Page to Easement and Right of Way*]

**IN WITNESS WHEREOF**, Emerald Grande, LLC has caused its name to be hereto signed by its proper manager or officer thereunto duly authorized, as of the year and day first above written:

**EMERALD GRANDE, LLC**, a Georgia limited liability company

By: _William A. Abruzzino_

Its: _C.E.O._

STATE OF _West Virginia_,

COUNTY OF _Kanawha_, to-wit:

I do hereby certify that _William A. Abruzzino_, the _C.E.O._ of Emerald Grande, LLC, a Georgia limited liability company, whose name is signed to the writing above, has this day acknowledged before me the said writing to be the act and deed of the said company.

Given under my hand this _5th_ day of February, 2020.

My commission expires _February 9, 2021_

NOTARY PUBLIC OFFICIAL SEAL
DEADRA D. CUMMINS
State of West Virginia
My Comm. Expires Feb 9, 2021
115 Charles Street Hurricane WV 25526

_Deadra D. Cummins_
NOTARY PUBLIC

(This instrument was prepared by Jonathan Nicol, Attorney at Law, Kay Casto & Chaney PLLC, P.O. Box 2031, Charleston, West Virginia 25327.)

**EXHIBIT J**

EXHIBIT A



5

EXHIBIT J

EXHIBIT B

All of the following described parcels of land, together with the improvements thereon and the appurtenances belonging, situate, lying and being on the waters of Little Sandy Creek, Elk District, Kanawha County, West Virginia, more particularly bounded and described as follows:

TRACT NO. 1:    BEGINNING at a West Virginia Division of Highways Concrete Right-of-Way Monument found on the northern right-of-way of West Virginia County Route 45, being 254 feet left of Station 23+77 as shown on plans for Federal Project I-79-1(26)7 Sheet Number 23, a corner to 84 Lumber (Lease Book 207/772); thence with the right-of-way of said Route 45 for the next two (2) lines S 08-18-04 W 5.00 feet to a point in the line of the original Moles survey; thence N 75-14-56 W 110.47 feet to a 5/8 inch by 36 inch reinforcing rod with a yellow plastic cap stamped "SLS Monument 462-3634", hereinafter referred to as a "rebar", set, near the mouth of a tributary of Little Sandy Creek, a corner to William M. and Linda Crane (DB 1931/570); thence with Crane for the next seven (7) calls, N 49-31-04-E 141.64 feet to a 1 inch iron pipe, found; thence, N 70-35-43 W 209.84 feet to a 1 inch iron pipe, found, at the edge of a gas line right-of-way; thence N 30-43-44 W 184.11 feet to a 1 inch iron pipe, found, inside of a 4 inch PVC pipe; thence N 34-20-55 E, 52.65 feet to a 1 inch iron pipe, found inside of a 4 inch PVC pipe; thence N 38-07-29 E 102.36 feet to a 1 inch iron pipe, found inside of a 4-inch PVC pipe; thence N 04-34-22 E 150.48 feet to a 3/4 inch iron pipe, found inside of a 4-inch PVC pipe; thence N 89-22-46 E 75.34 feet to a 5/8 inch capped rebar, found, a tributary of Little Sandy Creek, corner to Francis K. Moles (WB 600/488); a corner to Interstate Properties, Inc. (DB 219/425); thence, N 06-43-38 E 228.70 feet to a 5/8 inch rebar set; thence through Interstate Properties LLC. tax map 18, Parcel 53.1; thence with Plaza Management, LLC. for the next two lines: N 40-55-12 E. 401.13 feet to a 1 inch iron pipe, found; N 74-58-22 E 897.49 feet to a point in Little Sandy Creek; thence with Little Sandy Creek for the next four lines: S 44-59-19 E 255.97 feet to a point; S 35-04-54 E 299.08 feet to a point; S 02-24-21 W 190.88 feet to a point; S 22-59-27 W 327.67 feet total distance to a point, from which a WV Department of Highways right-of-way monument located 85 feet left of Station 39+80 bears S 50-53-05 W at 110 feet; thence leaving Little Sandy Creek N 57-02-11 W 70.00 feet to a 5/8 inch capped rebar, found; thence S 27-07-39 W 391.74 feet to a 5/8 inch capped rebar, found; thence S68-33-47 W 138.91 feet to a 1/2 inch iron rebar, found; thence S 69-06-42 W 208.88 feet to a 5/8 inch rebar, found; thence S 68-47-30 W 58.81 feet to a 1/2 inch rebar, found; thence S 89-58-51 W 48.43; thence with Emerald Grand LLC. Tax Map 18, Parcel 53.4 for the next five (5) calls; thence N 12-57-10 E 222.91 feet to a PK Nail in asphalt, found; thence N 68-05-36 W 27.22 feet to a PK Nail in asphalt, found; thence N 49-04-48 W 240.83 feet to a 2 1/4 inch iron pipe, found; thence S 17-25-54 W 307.63 feet to a 5/8 inch rebar, found; thence S 30-51-56 W 20.49 feet to a 1 1/2 inch iron rod, found; thence with Pierce Hardy Limited Partnership, Tax Map 18, Parcel 53.7 for the next five (5) calls, thence N 10-14-40 E 307.97 feet to a 1 inch iron pipe, found; thence N 45-12-28 W 62.70 feet to a 5/8 inch rebar, found; thence N 87-28-12 W 209.36 feet to a 5/8 inch rebar, found; thence S 60-07-15 W 97.72 feet to a 5/8 inch rebar, found; thence S 07-47-20 W 391.06 feet to beginning.

6

EXHIBIT J

EXHIBIT C

December 18, 2019, Bankruptcy Court Order

7

EXHIBIT J

Order Entered.

*Patrick M. Flatley*

Patrick M. Flatley
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:                                )
                                       )
TARA RETAIL GROUP, LLC                 )
*dba* Tara Hotel Group, LLC,           )      Case No. 17-bk-57
                                       )
        Debtor.                        )      Chapter 11
_____          )

### ORDER

Pending before the court is the Debtor's motion to compromise its claim against Emerald Grande, LLC ("EG"). The essence of the proposed settlement is that the Debtor will have an allowed administrative expense claim of $400,000 and a general unsecured claim of $156,332 in the EG bankruptcy case.[1] The court previously approved the same proposal in the EG case. EG's resolution of its motion to surcharge collateral of Carter Bank, its principal secured lender, is the catalyst for the Debtor's receipt of the $400,000. Specifically, Carter Bank agrees to carve out and pay to the Debtor $400,000 of the proceeds to be realized from the sale of EG's hotel adjoining the Debtor's property. Notably, Carter Bank will not realize the full amount of its claim in the EG case. Rather, it is agreeing to pay $400,000 to the Debtor at closing in order to facilitate the sale of EG's two hotel properties, including the Elkview hotel adjoining the Debtor's property. In the same vein of cooperation and in furtherance of EG's proposed sale, the Debtor seeks, as part of its motion here, authorization to resolve certain encroachment issues identified by the purchaser of EG's Elkview hotel. Without resolution of the encroachment issues, EG is unlikely to close the sale of its Elkview hotel, and the Debtor is thus likely unable to readily realize the $400,000 at stake in the EG case, if at all, without incurring significant additional administrative expenses in

_____

[1] The Debtor restored access to its property by employing Applied Construction Solutions, Inc., and SLS Land and Energy Development to build a bridge spanning Little Sandy Creek. To finance the construction, the court approved post-petition financing totaling $1,112,664.50. The Debtor therefor sought from EG $556,332.25 as an administrative expense.

1

EXHIBIT J

litigating to resolution its claim against EG. The Debtor, therefore, seeks recognition of certain easements in place or authorization to grant certain easements to EG in conjunction with the proposed settlement so that EG can, in turn, transfer those easements to the purchaser of its hotel adjoining the Debtor's property.

Comm2013, the Debtor's principal creditor, objects to the Debtor's proposed settlement. In its written objection, it generally contends that the proposed resolution of the encroachment issues constitutes the use of its collateral without the requisite compensation or adequate protection. Additionally, Comm2013 contends that the granting of the easements by the Debtor is not sound business judgment. In that regard, Comm2013 identifies the following seven easements to either be recognized or conveyed by the Debtor's motion: 1) parking easement; 2) access easement; 3) building encroachments easement; 4) signage easement; 5) retaining wall easement; 6) garbage easement; and 7) air-conditioning unit easement. Notably, Comm2013 has no objection to the Debtor receiving $400,000 from EG via Carter Bank.

On November 13, 2019, the court first convened a telephonic hearing regarding the Debtor's proposed compromise and use of estate property vis-à-vis the easements. At the hearing, the parties related to the court that progress had been made toward amicably resolving the matter. For example, the Debtor initially proposed to transfer a fee simple interest in certain of the property at issue but walked back from that notion changing its requested relief to simply include another easement for the property. Comm2013 seemed agreeable with that development but noted that the parking easement remained a significant concern. The parties were hopeful they'd be able to resolve the matter, and the court continued the hearing for one week to allow the parties additional time in that regard.

On November 20, 2019, the court convened its continued hearing and discovered that progress to amicably resolve the Debtor's motion seemingly stalled. At the outset, the court expressed its surprise in that regard because it was under the impression the parking easement was the sole remaining sticking point. Unfortunately, the court learned that although the parking easement was no longer an issue in dispute, the final stage of negotiations broke down because, among other things, the Debtor asked Comm2013 to subordinate its lien to the respective easements upon the subject property. From the Debtor's perspective, such subordination is simply a recognition of the parties' relative legal positions; including Comm2013's interest in the property by virtue of its financing of the Debtor's purchase that arose long after the easements purportedly

2

EXHIBIT J

existed. At the very least, the Debtor contends, Comm2013 took its interest in the property with knowledge that EG held a right to use and maintain the subject property because its use of the property precedes by several years Comm2013's security interest.

The Debtor's motion implicates two basic bankruptcy principles: the settlement of claims under Fed. R. Bankr. P. 9019 and the use of property of the estate under § 363 of the Bankruptcy Code. Notably, the Debtor does not propose to sell property of the estate such that neither § 363(f) of the Bankruptcy Code nor other provisions thereof applicable to sales of estate property are implicated. The Debtor thus also does not propose a sale coupled with a compromise under Rule 9019. Rather, the Debtor proposes only the use of its property—i.e., several easements—as part of its compromise with EG. The granting of such easements aids in the sale of EG's Elkview property. Without the easements, substantial uncertainty exists whether EG will ultimately be able to close the sale of its Elkview hotel due to latent title issues. Without the sale, there is likely no resolution of the Debtor's administrative expense against EG because the proposed settlement relies upon Carter Bank's carve out from the sale proceeds.

Under Rule 9019, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." A court reviews a Rule 9019 motion to compromise against "the outcome of four factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Buffalo Coal Co.*, No. 06–366, 2006 WL 3359585 at *3, 2006 Bankr. LEXIS 3076 at *12 (Bankr. N.D.W. Va. Nov. 15, 2006) (citing *Fry's Metals, Inc. v. Gibbons (In re RFE Industries, Inc.)*, 283 F.3d 159, 165 (3d Cir.2002)); *see Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424–25 (stating that, in determining whether a compromise is fair and equitable, a bankruptcy judge should form "an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained . . . . Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation."). Notably, "the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (internal quotations omitted).

EXHIBIT J

Section 363(b) of the Bankruptcy Code permits the trustee, or in this context the Debtor, to "use, sell, or lease, other in the ordinary course of business, property of the estate . . ." after notice and a hearing. 11 U.S.C. § 363(b). It is well-settled that the court reviews such a proposal "for compliance with the business judgment rule . . . ." *In re Shipman*, 344 B.R. 493, 495 (Bankr. N.D.W. Va. 2006). "The court must scrutinize the proposed transaction to ensure that the transaction is fair and reasonable, that the maximum value is being recovered, and that 'the decision to [use] is made on an informed basis, in good faith, and in the honest belief that the [use] is in the estate's best interest.'" *In re Love*, 553 B.R. 54, 57 (Bankr. D.S.C. 2016) (quoting *Shipman*, 344 B.R. at 495). Notwithstanding the foregoing, where appropriate, "the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection" of an entity's interest in such property to be used. 11 U.S.C. § 363(e). Congress did not define "adequate protection" in the Bankruptcy Code, but it may be provided, when necessary to protect "an interest of an entity in property . . . by—(1) a cash payment or periodic cash payments to such entity, to the extent that the . . . use . . . under [§] 363 . . . results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361.

Here, the Debtors proposed settlement with EG includes the use of estate property upon which Comm2013 possesses a security interest. In its analysis, the court must therefore consider both whether the approval of the Debtor's compromise under Rule 9019 is justified and whether the exercise of the Debtor's business judgment in using estate property under § 363(b) in furtherance of that compromise is sound. Based upon the court's consideration of stipulated facts and the parties' respective arguments, the court finds it appropriate to authorize the Debtor to use the subject property, i.e. grant easements to the extent they do not currently exist, in aid of its compromise of EG, which the court will also approve.

Specifically, the court finds that the Debtor met its burden under both Rule 9019 and § 363(b). First, looking to the proposed compromise, each of the factors identified above weigh in favor of approval. In that regard, probability of succeeding in litigation is generally always a subjective consideration. That is certain here, where two bankruptcy estates are litigating over the cost of restoring access to the Debtor's property. It is true that EG benefitted from the restoration of access because its property has no independent ingress and egress to the nearest public road, but whether the Debtor could ultimately succeed on one or more legal theories against EG is speculative in the court's view. After all, the Debtor acted in its own self-interest in restoring

4

EXHIBIT J

access to its property so that its tenants could resume operating and it could hopefully reorganize its financial affairs. EG only incidentally benefited from the restoration. Thus whether EG can be held liable is clearly debatable; particularly for nearly one-half the cost of the bridge, based upon the incidental benefit it realized from the Debtor's act.

Regarding likely difficulties in collection, the court's earlier point about EG being a bankrupt debtor is critical. Given the context surrounding the Debtor and EG, the court finds this consideration to be most important. In that regard, EG has not yet proposed a Chapter 11 plan, but the court understands from presiding over the case that it will be one primarily of liquidation. Based upon the record in its case, EG has one unencumbered asset, which is a parcel of real property not contiguous to the Elkview hotel and the Debtor's property. Indeed, EG has proposed to sell that parcel, albeit unsuccessfully, for many months. EG most recently sought court approval to sell the parcel but withdrew its motion in that regard in September 2019 after the prospective purchaser withdrew from the purchase agreement. EG has no unencumbered cash or other assets with which it could fund a judgment to the Debtor if the Debtor were successful in litigation. But for the cooperation of Carter Bank and its prospective carve out, the Debtor would likely have no ability to collect upon any judgment it might obtain against EG.

In the court's view, this is where the Debtor's business judgment leads inexorably to the approval of its use of easements to accomplish the proposed settlement. In that regard, EG's proposed sale of its Elkview hotel is critical, not only to its own Chapter 11 plan but also to its resolution of the Debtor's claim against it. At bottom, there is likely no sale and thus no $400,000 for the Debtor unless the Debtor grants EG these easements to facilitate its sale of the Elkveiw hotel. Despite Comm2013's arguments to the contrary, conveying the easements to achieve the result proposed here is sound business judgment and eminently reasonable under the circumstances. To reiterate in that regard, "[t]he court must scrutinize the proposed transaction to ensure that the transaction is fair and reasonable, that the maximum value is being recovered, and that 'the decision to [use] is made on an informed basis, in good faith, and in the honest belief that the [use] is in the estate's best interest.'" *In re Love*, 553 B.R. at 57 (quoting *Shipman*, 344 B.R. at 495).

Notably, the Debtor does not propose to sell a fee interest in its property that serves as Comm2013's collateral. Rather, it is simply using the property—through the granting of easements—to facilitate the settlement and EG's sale of its property. Under the circumstances,

5

EXHIBIT J

the court finds that the Debtor's proposed use, even without additional compensation that Comm2013 urges should be sought by the Debtor, is fair and reasonable. In that regard, the court finds that the maximum value is being recovered for the easements in this context. It is undisputed that EG is paying no consideration to the Debtor specifically for the easements, but the Debtor ultimately will lose the settlement altogether, including the $400,000, unless EG can close the sale of its hotel. The court thus believes that the Debtor is, in fact, receiving maximum value for the subject easements.[2] Moreover, the Debtor's proposal brings certainty to any percolating issues surrounding the property interests that otherwise might stretch well into the future and cause significant problems for future owners.[3] At bottom, these issues should be addressed sooner or later, so the court perceives the Debtor's proposal to address them now to be prudent. Finally, in a similar vein, the court finds that the decision to use the easements is made on an informed basis, in good faith, and in the honest belief that it is in the estate's best interest.

The court is also satisfied that no adequate protection or compensation is due Comm2013 based upon the Debtor's proposed easements. As the court notes above, adequate protection is only necessary to protect against diminished collateral value from a proposed use of estate property under § 363(b) of the Bankruptcy Code. Even without addressing legal issues of prescriptive easements and the like, the court finds that the Debtor's proposed use of the easements does not diminish Comm2013's collateral interest. In that regard, the court finds as persuasive the fact that EG's purported interest in the Debtor's property preexisted that of Comm2013. For instance, EG

---

[2] Comm2013 suggests that the Debtor should exercise more leverage against EG, who is motivated to accomplish its sale, by seeking to extract specific compensation for the easements. It postulates that if EG and its buyer, and even Carter Bank, are motivated enough to close the sale, then they will find a way to meet the Debtor's demand. However, in the court's view, the Debtor has articulated a sound basis for proceeding as it proposes based upon its judgment as to what can practically be accomplished under the circumstances. Indeed, it is just as likely that the prospective purchaser and thus Carter Bank walk away from the proposed sale and settlement, respectively, with Carter Bank simply foreclosing upon the property and the Debtor receiving nothing, at least not without more significant and costly litigation. The court, therefore, finds the settlement—by which the Debtor will receive over seventy-one percent of its claim against EG—to be exceptionally reasonable under the circumstances.

[3] Interestingly, Comm2013 seeks title to the Debtor's property as part of its proposed Chapter 11 plan. In that regard, it proposes to obtain title and subsequently market and sell the Debtor's property. Just as EG is having difficulty closing its sale of its property, which adjoins the Debtor's, Comm2013 would likely encounter difficulty conveying title to the Debtor's property with the lingering encroachment issues.

6

EXHIBIT J

and its employees and invitees used the subject property for years without interference before Comm2013 financed the Debtor's purchase of its property; and they have continued to use the property since then without Comm2013 asserting any right in the property used by EG. The court finds that open and apparent use important because Comm2013 was, or reasonably should have been, aware of EG's use of the Debtor's property at the time it took its security interest thereupon. The court, therefore, cannot reasonably finds that Comm2013's security interest in the Debtor's property is hampered by the proposed easements based upon the historical use of the property. As such, no adequate protection is necessary to permit the Debtor to use the subject property in furtherance of its settlement with EG.

Turning to the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, the court finds as persuasive the notion that the Debtor will realize by the proposed settlement nearly its full claim against EG while limiting the expense and delay otherwise necessary during litigation. Additionally, as the court noted above regarding its consideration of litigation risk, it is not clear that the Debtor would ultimately succeed in its claim against EG. At bottom, however, the Debtor and EG, through Carter Bank, are trying to be eminently practical in proposing this settlement. To reiterate, EG proposes to pay the Debtor almost the entire amount it seeks by way of its administrative expense, and such payment will be made from Carter Bank's collateral, limiting the expense, inconvenience, and delay attendant litigating the claim and collecting on any judgment.

Finally, the court perceives the paramount interest of the creditors to generally be a neutral factor given the makeup of the Debtor's creditor body. But to the extent it is relevant, the court finds that the Debtor's creditor body will be served by this settlement. The Debtor possesses little, if any, unencumbered cash, and this proposed settlement may inject capital into the Debtor's reorganization effort. Notably, although Comm2013 is the largest creditor in terms of claim value, the overwhelming majority of creditors support the Debtor's reorganization effort. Additionally, the court is aware from other hearings in this case that Comm2013 may claim a security interest in the subject proceeds, but that litigation remains for another day. And in any event, if Comm2013 does possess a security interest in the settlement proceeds, the proposal here inures to its benefit so that paramount interest of creditors is still served by the proposed settlement.

In conclusion, the court finds that the proposed settlement is well within the reasonable range of litigation possibilities and is supported by the sound business judgment of the Debtor.

7

EXHIBIT J

Based upon the foregoing, the court does hereby

**ORDER** that the Debtor's motion to compromise (Doc. No. 1272), filed October 29, 2019, be and hereby is GRANTED.

EXHIBIT J

EXHIBIT D



8

EXHIBIT J

EXHIBIT D-1



9

EXHIBIT J

# SPOTTS❖FAIN

### A PROFESSIONAL CORPORATION

#### ATTORNEYS & COUNSELORS AT LAW

**S. SPENCER KATONA**

DIRECT DIAL   (804) 697-2032
DIRECT FAX   (804) 697-2132

E-MAIL ADDRESS
SKATONA@SPOTTSFAIN.COM

Tax ID:  54-1510051

January 29, 2020

## VIA EMAIL, UPS OVERNIGHT DELIVERY AND CERTIFIED MAIL

Emerald Grande, LLC
P.O. Box 190
Bonita Springs, FL 34133-0190
Attn:  William Abruzzino
Email:  robertplaza@aol.com

Steven L. Thomas, Esquire
Kay Casto & Chaney, PLLC
P.O. Box 2013
Charleston, West Virginia 25327-2013
Email:  sthomas@kaycasto.com

Steven L. Thomas, Esquire
Kay Casto & Chaney, PLLC
1500 Chase Tower, 15th Floor
707 Virginia Street, East
Charleston, West Virginia 25301

Re:   **TERMINATION NOTICE - Purchase and Sale Agreement between KM
      Hotels, LLC ("Purchaser") and Emerald Grande, LLC ("Seller") dated
      August 9, 2019, as amended (the "Purchase Agreement")**

Dear Mr. Abruzzino and Mr. Thomas:

This letter, delivered on behalf of Purchaser pursuant to Section 16.1.4 of the Purchase Agreement, shall serve as notice that Purchaser is exercising its right to timely terminate the Purchase Agreement effective January 29, 2020. This termination shall be conditional with the Purchase Agreement being reinstated in the event Seller agrees to an amendment to the Purchase Agreement (i) extending the Purchaser's right to terminate with full refund of the Deposit until such time as all title issues have been resolved, such resolution to be evidenced by a letter agreement signed by both Purchaser and Seller, (ii) granting Purchaser the right to terminate with full refund of the Deposit if Purchaser cannot obtain a loan commitment due to title issues, and (iii) otherwise in form acceptable to Purchaser. In the event a mutually agreeable amendment is not entered into between the parties by February 7, 2020 then the Purchase Agreement shall be

EXHIBIT K

Emerald Grande, LLC
Steven L. Thomas, Esq.
January 29, 2020
Page 2

deemed terminated effective January 29, 2020 and the Escrow Agent shall be authorized to return the Deposit to Purchaser upon its request.

Sincerely,

S. Spencer Katona, Esq.
Spotts Fain PC

cc:    Mayur Patel (by email)
       Michael Burke (by email)
       David V. DuVal, Esq. (by email)

EXHIBIT K

Chase Tower • 707 Virginia Street, E. • Charleston, WV 25301

Mailing Address: P.O. Box 2031 • Charleston, WV 25327

(304) 345-8900 • Fax: (304) 345-8909

www.kaycasto.com

E-mail: sthomas@kaycasto.com
After Hours Extension: 111

# KAY CASTO & CHANEY PLLC
*Attorneys at Law*

February 6, 2020

*Via E-Mail*

S. Spencer Katona, Esq.
Spotts Fain PC
411 East Franklin Street
Suite 600
Richmond, VA 23219

Re:   **TERMINATION NOTICE – Purchase of Sale Agreement between KM Hotels, LLC ("Purchaser") and Emerald Grande, LLC ("Seller") dated August 9, 2019, as amended (the "Purchase Agreement")**

Dear Mr. Katona:

This responds to your letter dated January 29, 2020, giving conditional notice of termination, and subsequent email of January 31, 2020, stating that the buyer is "pencils down" unless Emerald Grande, LLC ("EG") agrees to an amendment to the Purchase and Sale Agreement ("PSA") to include material changes that are not part of the deal. The basis for this demand is the suggestion that there are "title issues" which apparently were raised by a prospective lender. EG remains puzzled by this suggestion, as Judge Flatley has made clear on the record, his perception that there should be no impediment to EG's ability to convey clear title to the Elkview Hotel.

The Elkview PSA was executed and filed with the Bankruptcy Court on August 12, 2019 and the sale subsequently was approved by Bankruptcy Court on September 11, 2019. On or about September 23, 2019, the prospective purchase identified certain potential issues in connection with a preliminary survey, including some apparent encroachments on the adjacent property. Three weeks later, on October 14, 2019, the purchaser's surveyor provided an updated survey, which you shared with us on October 21, 2019.

In connection with the updated survey, you identified certain issues that the purchaser's title insurer flagged, including the scope of the mutual and reciprocal right of way and access between the Tara Retail Group ("Tara") and EG properties granted in the Elkview Hotel deed, along with several encroachments on the adjacent property. EG and Tara promptly engaged with you and others to try and address these issues, including ongoing discussions on the language contained in the Elkview deed regarding access across the Tara property. Thereafter, we filed a motion in the Tara bankruptcy case seeking authority to grant to EG confirmatory easements addressing any potential access issues and addressing the encroachments. The Bankruptcy Court granted that motion by Order dated December 18, 2019, stating that



S. Spencer Katona, Esq.
February 6, 2020
Page 2

the court finds as persuasive the fact that EG's purported interest in the Debtor's property preexisted that of Comm 2013. For instance, EG and its employees and invitees used the subject property for years without interference before Comm 2013 financed the Debtor's purchase of its property; and they have continued to use the property since then without Comm 2013 asserting any right in the property used by EG. The court finds that open and apparent use important because Comm 2013 was, or reasonably should have been, aware of EG's use of the Debtor's property at the time it took its security interest thereupon. The court, therefore, cannot reasonably find that Comm 2013's security interest in the Debtor's property is hampered by the proposed easements based upon the historical use of the property. As such, no adequate protection is necessary to permit the Debtor to use the subject property in furtherance of its settlement with EG.

Thus, Judge Flatley explicitly recognized that EG's use of this property predated for years Comm 2013's lien.

As EG understand it, the so-called "title issues" referenced in your January 29 letter, pertain to the Comm 2013 lien; however, Judge Flatley's order resolved any purported title issues. To be sure, Judge Flatley recently questioned at a cash collateral hearing in the Elkview case why the sale had not closed, and specifically referenced his order as having resolved any purported title concerns. As noted, Judge Flatley's order specifically found that the EG's interest in the Tara property pre-existed Comm 2013's lien. Moreover, the order specifically found that EG's use of the Tara property (both of access and purported encroachments) was open and apparent such that Comm 2013 was or reasonably should have been on notice of such use – effectively holding that EG holds a prescriptive easement for the "title issues" raised by the purchaser.

Notwithstanding this, we agreed to draft and record confirmatory easements from Tara to EG, consistent with the bankruptcy court order. While we do not view those easements as necessary to resolve any purported title issues, given that they are merely confirmatory in nature, we have nonetheless recorded the easements as a "belts and suspenders" measure. The recorded easements will be provided.

Despite multiple rounds of calls and emails over the past month following the Bankruptcy Court's orders, there is seemingly no forward progress from the buyer. To date, the Debtor has not received any specific, written concerns from the title insurer or been asked by the buyer to communicate directly with the title insurer on the bankruptcy issues allegedly causing the insurer concern. Most recently, the purchaser informed EG that its lender is effectively getting cold feet given the amount of time since the initial underwriting of the loan. Yet we still have no specific written inquiries or a list of potential title commitment exceptions from the title insurer.

MERITAS LAW FIRMS WORLDWIDE

EXHIBIT L



KAY
CASTO
&CHANEY
PLLC
*Attorneys at Law*

S. Spencer Katona, Esq.
February 6, 2020
Page 3

The Debtor does not believe the purchase contract required it to wait until the Tara bankruptcy plan was confirmed over the competing plan of Comm 2013; however, it did so at the request of the purchaser on the understanding that doing so would allay any lingering concerns of the purchaser's lender and title insurer. Since the entry of the bankruptcy court memorandum opinion and order confirming Tara's plan on January 27, 2020, the purchaser has continued to demonstrate its unwillingness to close the sale. Under these circumstances, the PSA does not provide the buyer with a termination right with respect to funding. Nor does the contract provide a termination right if the buyer is unable to obtain a title commitment without any exclusions or exceptions, which is apparently what the purchaser is seeking here – perfect title. All that is required is that EG deliver marketable title. It can do so and has been able to do so for quite some time.

As a result of the foregoing, the Debtor hereby gives notice that it declines the request of the purchaser in its January 29, 2020 purported conditional termination notice to amend the purchase contract to, among other things, add a financing contingency and resolve "all title issues." As previously noted, any purported title issues were resolved some time ago.

Notwithstanding this, EG remains willing and able to consummate the sale which was approved by the Bankruptcy Court 5 months ago. To that end, EG will consider amending the contract solely to provide the buyer with a limited period of time to close the contemplated transaction, but in no case more than 45 days from today. EG is discussing this potential, limited extension of the closing date with its secured lender, Carter Bank. However, given that any conceivable title and survey issues have previously been cured by EG, the purchaser is no longer able to terminate the PSA and seek a return of the escrow deposit, pursuant to Section 3.2.1 of the PSA, and any suggestion in your letter dated January 29, 2020 that the escrow deposit is refundable is rejected.

Please call me to discuss how we can move this deal toward a prompt closing, or if the buyer so desires, terminate the contract and forego the escrow deposit.

Sincerely,

Steven L. Thomas

SLT:ddc
Attachments

EXHIBIT L

# FIRST AMENDMENT TO PURCHASE AGREEMENT

**THIS FIRST AMENDMENT TO PURCHASE AGREEMENT** ("Amendment") is made and entered into effective this 28th day of February, 2020 (the "Effective Date"), by and between **EMERALD GRANDE, LLC**, a Georgia limited liability company ("Seller") and **KM HOTELS, LLC**, a Virginia limited liability company ("Purchaser"). Each of the parties referred to above may be referred to herein as a "Party" and collectively as the "Parties."

**WHEREAS**, Seller and Purchaser are parties to that certain Purchase and Sale Agreement dated August 9, 2019 (as amended, the "Agreement"), whereby Seller agreed to sell to Purchaser, and Purchaser agreed to purchase from Seller, the Transferred Property (as defined in the Agreement) in Kanawha County, West Virginia;

**WHEREAS,** Purchaser obtained a survey for the Transferred Property whichreflects certain potential access and encroachment issues relating to the Transferred Property;

**WHEREAS,** Purchaser delivered a letter to Seller dated January 29, 2020 purporting to terminate the Agreement due to the potential title issues ("Termination Notice"), which purported termination was disputed by letter from Seller to Purchaser dated February 6, 2020;

**WHEREAS,** Seller has taken actions to attempt to correct the alleged access and encroachment issues, including the recording of two easements granted by the adjacent property owner in favor of the Seller;

**WHEREAS,** without prejudice to their respective positions, Purchaser and Seller have agreed to extend the Closing Date in order to allow the Purchaser additional time to seek to obtain the desired title insurance for the Transferred Property and to reinstate the Agreement, to the extent necessary on account of Purchaser's Termination Notice;

**WHEREAS,** the Parties desire to amend the Agreement as more specifically set forth below.

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    Definitions.  Capitalized terms used in this Amendment and not otherwise defined shall have the meanings given to such terms in the Agreement.

2.    Reinstatement.  To the extent the Agreement was previously terminated pursuant to Purchaser's Termination Notice, which Seller disputes, the Parties hereby agree to reinstate the Agreement as of the Effective Date of this Amendment, and agree that all of the terms of the Agreement are incorporated herein by this reference.

01441777.DOCX

**EXHIBIT M**

3.    <u>Amendment</u>.

    (a)    The definition of "Scheduled Closing Date" set forth in Section 10.1 of the Agreement is hereby amended as follows:

        The Scheduled Closing Date shall be 45 days after the Effective Date of this Amendment.

    (b)    Purchaser's right to adjourn the Scheduled Closing Date pursuant to Section 10.1.1 of the Agreement is hereby as amended as follows:

        The Scheduled Closing Date may be extended once by the Purchaser, for a period of no more than fifteen (15) days; provided however, that in order to exercise such extension, Purchaser shall first: (i) provide notice of its intent to exercise the extension of the Scheduled Closing Date no later than five (5) days prior to the Scheduled Closing Date under Section 10.1 of the Agreement (without giving effect to any extension period) and (ii) remit to the Seller a non-refundable extension fee of $10,000.00 by wire in immediately available funds, which fee shall be applied toward the Purchase Price at Closing.

4.    <u>Ratification</u>.  All terms, covenants and conditions of the Agreement not modified by this Amendment are hereby affirmed and ratified by the parties.   In the event of any inconsistency between the terms of the Agreement and the terms of this Amendment, the terms of this Amendment shall control.  Except as set forth in this Amendment, all terms, provisions, agreements and conditions set forth in the Agreement shall remain in full force and effect and enforceable by the Parties in accordance with their terms.  Any reference to the "Agreement" as defined in the Purchase and Sale Agreement dated August 9, 2019 shall mean the Agreement as amended hereby.

5.    <u>Counterparts</u>.  This Amendment may be executed in counterparts, each of which shall be deemed an original and all of which shall be one Amendment.  A facsimile or email ".pdf" signature hereto shall be deemed an original.

*[Signatures Follow On Next Page]*

01441777.DOCX

**EXHIBIT M**

**IN WITNESS WHEREOF**, the parties have executed this Amendment effective as of the Effective Date set forth above.

**SELLER:**

**EMERALD GRANDE, LLC,**
a Georgia limited liability company

By: _William A. Abruzzino_

Name: William A. Abruzzino

Title: _____

**BUYER:**

**KM HOTELS, LLC,**
a Virginia limited liability company

By: _____

Name: Mayur Patel

Title: Managing Member

**EXHIBIT M**

**IN WITNESS WHEREOF**, the parties have executed this Amendment effective as of the Effective Date set forth above.

**<u>SELLER</u>:**

**EMERALD GRANDE, LLC,**
a Georgia limited liability company

By: _____

Name: _____

Title: _____

**<u>BUYER</u>:**

**KM HOTELS, LLC,**
a Virginia limited liability company

By: _____

Name: Mayur Patel _____

Title: _Managing Member_____

EXHIBIT M

DAVID V. DUVAL

DIRECT DIAL NUMBER
(804) 697-2038
FACSIMILE NUMBER
(804) 697-2138
EMAIL ADDRESS
DDUVAL@SPOTTSFAIN.COM



SPOTTS❖FAIN
*Lawyers with your business in mind®*

April 13, 2020

MAILING ADDRESS
POST OFFICE BOX 1555
RICHMOND, VIRGINIA 23218

**HAND DELIVERY**

Safe Harbor Title Company
ATTN: Melissa M. Canavos
4900 Augusta Ave., Ste., 150
Richmond, VA 23230

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Emerald Grande, LLC
P.O. Box 190
Bonita Springs, FL 34133-0190
Attn: William Abruzzino

Steven L. Thomas, Esquire
Kay Casto & Chaney, PLLC
P.O. Box 2013
Charleston, West Virginia 25327-2013

Re:   **REQUEST FOR RETURN OF DEPOSIT - TERMINATION NOTICE
      EFFECTIVE APRIL 13, 2020 - Purchase and Sale Agreement between KM
      Hotels, LLC ("Purchaser") and Emerald Grande, LLC ("Seller") dated
      August 9, 2019, as amended (the "Purchase Agreement")**

Dear Ms. Canavos, Mr. Abruzzino and Mr. Thomas:

         This letter, delivered on behalf of Purchaser pursuant to Section 3.2.1 and 3.2.4 of the
Purchase Agreement, and in compliance with the terms and conditions of the unsigned Earnest
Money Escrow Agreement attached to the Purchase Agreement as Exhibit G, shall serve as
Purchaser's notice of the termination of the Purchase Agreement as well as a request for the
Escrow Agent to refund the Deposit to Purchaser. Purchaser has terminated the Purchase
Agreement effective April 13, 2020, due to Seller's failure to (i) promptly cure Purchaser's title
objections raised in its September 20, 2019 title objection letter, and (ii) comply with the terms
and conditions of Section 5.2.2 of the Purchase Agreement in regard to obtaining the Access
Easement in form acceptable to Purchaser and sufficient to allow Purchaser's title insurer to
issue an ALTA access endorsement insuring Purchaser's access to the subject property.

**EXHIBIT N**

Safe Harbor Title
Emerald Grande, LLC
Steven L. Thomas, Esq.
April 13, 2020
Page 2


     Purchaser is hereby entitled to a full refund of the Deposit and shall provide to Escrow Agent wire transfer instructions by telephone today. Michael Burke, on behalf of Purchaser, shall call Escrow Agent to provide and confirm the wire instructions.

     Should you have any questions please contact me directly.

          Sincerely,

          David V. DuVal, Esq.
          Spotts Fain PC

DVD/akd

cc:   Mayur Patel (by email)
      Michael Burke (by email)
      S. Spencer Katona, Esq. (by email)

EXHIBIT N

# KAY CASTO & CHANEY PLLC
## Attorneys at Law

500 Chase Tower • 707 Virginia Street, E. • Charleston, WV 25301

Mailing Address: P.O. Box 2031 • Charleston, WV 25327

(304) 345-8900 • Fax: (304) 345-8909

www.kaycasto.com

E-mail: sthomas@kaycasto.com
After Hours Extension: 111

April 14, 2020

*VIA E-MAIL AND CERTIFIED MAIL, RETURN RECEIPT REQUESTED*

Safe Harbor Title Company
ATTN: Melissa M. Canavos
4900 Augusta Ave., Suite 150
Richmond, Virginia 23230

KM Hotels, LLC
Attn: Mayur Patel
6627 W. Broad Street, Suite 300
Richmond, Virginia 23230

Spotts Fain PC
Attn: David V. DuVal
411 E. Franklin Street, Suite 600
Richmond, Virginia 23219

Re:    **REQUEST FOR RETURN OF DEPOSIT - TERMINATION NOTICE –
Purchase and Sale Agreement between KM Hotels, LLC ("Purchaser") and
Emerald Grande, LLC ("Seller") dated August 9, 2019 as amended
(the "Purchase Agreement")**

Dear Ms. Canavos, Mr. Patel and Mr. DuVal:

This letter responds to the Purported Termination Notice remitted by Purchaser. Seller hereby disputes the Purchaser's right to terminate the Purchase Agreement and receive a refund of the Deposit. Specifically, Seller disputes that it has failed to (i) promptly cure Purchaser's title objections raised in its September 20, 2019 title objection letter, and (ii) comply with the terms and conditions of Section 5.2.2 of the Purchase Agreement in regard to obtaining the Access Easement in form acceptable to Purchaser and sufficient to allow Purchaser's title insurer to issue an ALTA access endorsement insuring Purchaser's access to the subject property. Consequently, Purchaser is not entitled to a refund of the Deposit. Further, the Purchase Agreement does not provide Purchaser a right to unilaterally demand that the Escrow Agent release the Deposit to Purchaser. Rather, Section 3.2.4 of the Purchase Agreement provides that any refund of the Deposit shall be made pursuant to written instructions provided by the Seller. No such instructions have been given and Escrow Agent is hereby instructed to disregard Purchaser's demand and continue to hold the Deposit.

Sincerely,

Steven L. Thomas

SLT/afb

**EXHIBIT O**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**EMERALD GRANDE, LLC,**

                                          **Case Number: 1: 17-0021**

            **Debtor.**

**EMERALD GRANDE, LLC,**

            **Plaintiff,**

**v.**                                       **Adv. Pro. 1: 20-00028**

**KM HOTELS, LLC, and**
**SAFE HARBOR TITLE, LLC,**

            **Defendants.**

### <u>PLAINTIFF'S AFFIDAVIT</u>

STATE OF FLORIDA,

COUNTY OF LEE, to-wit:

    William Abruzzino, being first duly sworn, deposes and says the following:

    1.    I am Managing Member of Gold Coast Partners, LLC, acting as the sole member of

Emerald Grande, LLC ("EG"), and as such am the Manager of EG, the Plaintiff in this action.

    2.    In my capacity as such, I am personally familiar with the management and operation of

EG, including all issues and events asserted in the above-styled bankruptcy and adversary proceeding.

    3.    In or about 1988, Covington Place Associates, LLC ("**Covington Place**") constructed a

shopping mall (hereinafter referred to as the "**Crossings Mall**") proximate to Exit 9 on Interstate 79

near Elkview, West Virginia, on a parcel of land adjacent to Little Sandy Creek, Elk District, Kanawha

County, West Virginia.

    4.    Covington Place later conveyed the Crossings Mall to Interstate Properties, LLC

("**Interstate**") by deed dated December 30, 1993 and recorded with the County Clerk of Kanawha

County, West Virginia (the "**Clerk**") in Deed Book 2331, Page 294.

     5.       Thereafter, Interstate conveyed to Plaza Management, LLC ("**Plaza**") a parcel of real property immediately adjacent to the Crossings Mall (hereinafter referred to as the "**Hotel Parcel**") by deed dated September 10, 1999 and recorded with the Clerk in Deed Book 2480, Page 541 (the "**Plaza Deed**").

     6.       The Plaza Deed granted to Plaza a perpetual, mutual, and reciprocal easement through the Crossings Mall parcel for access to, utility installation on, and maintenance for the Hotel Parcel.

     7.       After recordation of the Plaza Deed, Plaza constructed a hotel (the "**Hotel**") on the Hotel Parcel, which opened in or around October 2000 as a Holiday Inn Express.

     8.       Plaza subsequently conveyed the Hotel Parcel to Emerald Coast Hospitality, LLC ("**Emerald Coast**") by deed dated January 12, 2008 and recorded with the Clerk in Deed Book 2715, Page 156.

     9.       Ultimately, EG acquired title to the Hotel Parcel and the improvements thereon (*viz.*, the Hotel) from Emerald Coast by deed dated October 1, 2008 and recorded with the Clerk in Deed Book 2730, Page 152 (the "**EG Deed**").

     10.     Through different owners and under different franchises, the Hotel has been operated continuously since at least October 2000, and EG has operated the Hotel as a La Quinta Inn & Suites from 2013 until present.

     11.     In 2013, the owners of Interstate formed Tara Retail Group, LLC ("**Tara**") as a "special purpose entity" to undertake a refinancing of the debt on the Crossings Mall with UBS Real Estate Securities, Inc. ("**UBS**").

     12.     Interstate thereafter conveyed the Crossings Mall to Tara by deed dated September 10, 2013 and recorded with the Clerk in Deed Book 2861, Page 401 (the "**Tara Deed**").

13.     Contemporaneously with the execution of the Tara Deed, UBS commissioned a survey of the Crossings Mall, dated September 10, 2013 (the "**Tara Survey**").

14.     The Tara Survey showed numerous encroachment issues (the "**Encroachments**") between the Hotel Parcel and the Crossings Mall.

15.     Notwithstanding the Encroachments shown on the Tara Survey, UBS agreed to close the debt refinancing transactions, as evidenced by that certain *Promissory Note* dated September 17, 2013 (the "**Note**") and that certain *Loan Agreement* dated September 17, 2013 (the "**Loan Agreement**"; and, collectively with the Note, the "**Loan Documents**").

16.     Tara's obligations under the Loan Documents were secured by, among other things, that certain *Deed of Trust and Security Agreement*, dated as of September 17, 2013, and recorded with the Clerk on October 1, 2013 in Deed Book 3989, Page 928 (the "**Tara Trust Deed**").

17.     In December of 2013, UBS transferred and assigned the Loan Documents and Tara Trust Deed to U.S. Bank, National Association, as Trustee, for the benefit of the holders of COMM 2013-CCRE12 Mortgage Trust Commercial Mortgage Pass-Through Certificates ("**US Bank**") pursuant to that certain *Assignment of Deed of Trust and Security Agreement*, dated as of December 10, 2013, and recorded with the Clerk on May 1, 2014 in Deed Book 244, Page 109 (the "**Assignment**"). COMM 2013 CCRE-12 Crossings Mall Road, LLC ("**COMM 2013**") is the current holder of the Note pursuant to an allonge executed by US Bank.

18.     The Hotel and the Crossings Mall are immediately adjacent to one another; however, only the Crossings Mall has direct access to Kanawha County Route 45 via the culvert bridge located in the right of way maintained by the West Virginia Division of Highways and/or the West Virginia Division of Natural Resources (the "**Culvert Bridge**"). Because the Hotel Parcel does not have direct access to the Culvert Bridge, ingress and egress requires travel through and across the Crossings Mall

property. The Culvert Bridge is the only viable commercial access point to the Hotel and the Crossings Mall.

19.    On or about June 23, 2016, floodwaters from thunderstorms in southern West Virginia destroyed the Culvert Bridge. The destruction of the Culvert Bridge and ensuing lack of public access forced the Hotel and the Crossings Mall to close. As a result of the closures of the Hotel and Crossings Mall, EG filed its EG Bankr., and Tara filed a voluntary chapter 11 petition in this Court on January 24, 2017, initiating Case No. 1:17-bk-00057 (the "**Tara Bankr.**" or "**TB**").

20.    Commercial access to the Hotel and the Crossings Mall remained unavailable until Tara rebuilt the Culvert Bridge at the end of July 2017. Due to the restoration of the Culvert Bridge, both the Hotel and the Crossings Mall have been commercially accessible since approximately August 2017.

21.    Subsequent to the reconstruction of the Culvert Bridge, EG determined that a sale of the Hotel was in the best interests of EG's creditors and stakeholders in the EG Bankruptcy Case. EG therefore engaged a real estate brokerage firm to market the Hotel, after which EG received a number of offers for the purchase of the Hotel. KM was one of the offerors. After reviewing the offers, EG concluded that KM's offer to purchase the Hotel was the highest and best offer. EG elected to move forward with KM's offer, declining all others.

22.    On or about August 9, 2019, EG and KM entered into the Purchase and Sale Agreement ("PSA").

23.    I executed the Escrow Agreement on behalf of EG, which was included as an Exhibit to the PSA.

24.    Broadly, the PSA provided for KM's purchase of the Hotel in exchange for a payment of $3,600,000.00, subject to certain adjustments at closing (as defined in the PSA, the "**Purchase Price**"). The PSA further contained, among other things, an earnest money requirement and certain

4

closing conditions.

25.     Within three (3) business days after full execution of the PSA, KM was obligated to deposit $500,000.00 of earnest money (the "**Deposit**") with Safe Harbor, the escrow agent under Section 3.2.1 of the PSA and the Escrow Agreement. KM delivered the Deposit to Safe Harbor after execution of the PSA, and Safe Harbor accepted and held the Deposit.

26.     Following execution of the PSA, KM began its diligence efforts with respect to the Hotel. In connection therewith, KM delivered to EG a letter, dated September 20, 2019 (the "**KM Letter**"), setting forth "Specific Objections" related to title (each, a "**Title Objection**"; collectively, the "**Title Objections**").

27.     In connection with the Title Objections, KM commissioned a survey of the Hotel Parcel in or around September of 2019 (as later updated, the "**KM Survey**").

28.     Though the KM Survey identified the same set of Encroachments between the Hotel and the Crossings Mall as are shown in the Tara Survey, KM interposed an additional Title Objection related to the Encroachments (the "**Encroachment Objection**") as a result of the KM Survey.

29.     Following receipt of KM's Title Objections, EG responded with a series of emails in September, October, and November of 2019, transmitting various documents and information, that addressed and cured many of the Title Objections. EG additionally engaged with KM through a number of conversations, during which EG further addressed and narrowed the outstanding Title Objections.

30.     Ultimately, KM agreed that all but two of its Title Objections were resolved:  the Access Objection and the Encroachment Objection.

31.     In response to KM's assertion that its Access Objection and Encroachment Objection were unresolved, EG stated its position as follows:

(a)     *Encroachments*. Each one of the Encroachments was in existence openly and continuously since October 2000, when the Hotel first began operations. Further, the Tara Survey identified the Encroachments in 2013. Consequently, the Encroachments are prescriptive in nature under applicable law because COMM 2013 was at least on inquiry notice of their existence prior to the execution and recording of the Loan Documents;

(b)     *Access*. Contrary to the parties' assumption at the time the PSA was executed, the Plaza Deed does in fact provide an ingress/egress easement – the Hotel Easement – to and for the benefit of the Hotel Parcel. Thus, EG and KM were proceeding under a mutual mistake when including language in Section 5.2.2 of the PSA that the Hotel did not have deeded access to a public right of way as of the date of the Agreement. Additionally, Hotel employees and invitees traveled through the Crossings Mall parcel to access the Hotel Parcel since at least 2000, which is also shown on the Tara Survey.

32.     EG therefore posited that, to the extent KM was concerned that Tara or COMM 2013 could extinguish the EG's rights vis-à-vis the Encroachments, EG held a superior interest in and to the Encroachments via prescription under applicable law. EG further suggested that, given the parties' mutual mistake at the time of executing the PSA, the Hotel Easement set forth in the Plaza Deed provided the requisite deeded ingress/egress to the Hotel Parcel.

33.     Notwithstanding the Hotel Easement and prescriptive nature of the Encroachments, however, EG agreed to request that Tara formally grant easements recognizing the Encroachments and confirming the Hotel Easement as a further accommodation to KM.

34.     Accordingly, EG and Tara together determined to seek the Bankruptcy Court's approval of a formal recognition of EG's existing (i) right of access to and across the Crossings Mall parcel via the Hotel Easement and (ii) use of the Encroachments situated on the Crossings Mall

6

property.

35.      On October 29, 2019, Tara filed a motion in the Tara Bankruptcy Case (as orally amended during a prehearing conference, "**Tara's Motion**"), seeking approval of, among other things: (i) Tara's grant of an easement to EG for continued use, maintenance, and replacement (as applicable) of the Encroachments; (ii) Tara's grant to EG of a confirmatory easement formally memorializing EG's continuing right to use the parking spaces situated on Crossings Mall property, all as shown on the Tara Survey; and (iii) Tara's grant to EG of a confirmatory access easement, from County Route 45 across the Culvert Bridge and through the access road to the Hotel, consistent with the Hotel Easement in the Plaza Deed.

36.      On November 8, 2019, COMM 2013 filed an objection to Tara's Motion (the "**COMM 2013 Objection**"). COMM 2013 objected on multiple grounds, including the reason that Tara's Motion requested a grant of the proposed easements free and clear of COMM 2013's security interest in and to the Crossings Mall property.

37.      On December 18, 2019, the Bankruptcy Court entered an order granting Tara's Motion and overruling the COMM 2013 Objection (the "**Easement Order**").

38.      Consistent with the Easement Order, Tara granted to EG that certain *Confirmatory Easement and Right of Way* (the "**Confirmatory Easement**") and that certain *Easement and Right of Way* (the "**Encroachment Easement**" and collectively with the Confirmatory Easement, the "**2020 Easements**") on February 3, 2020. The forms of the 2020 Easements were shared with and approved by KM. The Confirmatory Easement was recorded with the Clerk in Deed Book 3053, Page 813 on February 6, 2020, and the Encroachment Easement was recorded with the Clerk in Deed Book 3053, Page 796 on February 6, 2020.

39.     After entry of the Easement Order, KM served EG with a conditional notice of termination of the PSA by letter dated January 29, 2020 (the "**Conditional Notice**"). In the Conditional Notice, KM threatened to proceed with a termination of the PSA due to title issues. The Conditional Notice did not detail the allegedly unresolved title issues.

40.     EG responded to the Conditional Notice by letter dated February 6, 2020 (the "**First Termination Response**"). As set forth in the First Termination Response, EG observed that any purported "title issues" had been resolved through the grant and recordation of the 2020 Easements, consistent with the Easement Order. EG further responded that the Easement Order itself made clear that the 2020 Easements were not necessary for EG to deliver marketable title and otherwise satisfy the conditions to close the transactions in the PSA. Nevertheless, EG restated its willingness and commitment to consummating the PSA. To that end, EG stated that it would consider an amendment to the PSA to provide KM a limited extension of time to close the sale transaction, beyond the then-current scheduled closing date of February 28, 2020.

41.     On or about the time of the First Termination Response, however, KM indicated its proposed lender was unable or unwilling to provide a funding commitment for KM to consummate the sale transactions under the PSA. Upon information and belief, KM used the Conditional Notice to manufacture a controversy over purported "title issues" to conceal KM's deteriorating financing prospects. KM nevertheless assured EG that KM remained committed to purchasing the Hotel.

42.     In reliance on the assurances from KM, and in an effort to facilitate a closing, EG agreed to extend to April 13, 2020 the scheduled closing date under the PSA (the "**Amendment**"). Subsequent to the Amendment, EG engaged with KM to address the purportedly remaining "title issues" referenced in the Conditional Notice. KM represented that these "title issues" related to the 2020 Easements.

8

43.     According to KM, First American (its title insurer) allegedly would only provide insurance for KM's interest in the 2020 Easements by excluding the Tara Trust Deed, given its recordation prior to the 2020 Easements. KM relayed that First American allegedly was concerned that the 2020 Easements could be extinguished if COMM 2013 foreclosed on the Tara Trust Deed. As a result, KM requested that EG obtain an agreement from COMM 2013, whereby COMM 2013 would subordinate to the 2020 Easements its security interest in and to the Crossings Mall parcel evidenced by the Tara Trust Deed. However, COMM 2013 refused to voluntarily subordinate the Tara Trust Deed to the 2020 Easements.

44.     On April 13, 2020, KM sent a letter of even date to EG and Safe Harbor, purporting to terminate the PSA for cause (the "**Termination Letter**"). In the Termination Letter, KM asserted that it was terminating the PSA because EG failed to promptly cure KM's Title Objections, and to comply with the terms and conditions of the PSA in regard to obtaining the Access Easement in form acceptable to KM and sufficient to allow KM's title insurer to issue an ALTA access endorsement. KM did not state in the Termination Letter that it was unable to obtain an ALTA access endorsement from the Title Company – *i.e.*, Safe Harbor. Upon information and belief, KM did not even seek an ALTA access endorsement from Safe Harbor but, instead, manufactured the alleged "title issues" due to its deteriorating financial ability to close the purchase of the Hotel.

45.     The Termination Letter did not specify the Title Objections that EG allegedly failed to cure. Upon information and belief, however, the reference in the Termination Letter to uncured Title Objections related solely to First American's alleged, and unfounded, concern that the 2020 Easements could be extinguished if COMM 2013 foreclosed on the Tara Trust Deed.

46.     EG cured or caused to be cured all Title Objections prior to the date of the Termination Letter. EG further provided the requisite deeded ingress/egress access to the Hotel Parcel prior to the

9

date of the Termination Letter.

47.    In addition to purportedly terminating the PSA, the Termination Letter instructed Safe Harbor to refund the Deposit to KM.

48.    Less than 24 hours after receipt of the Termination Letter, EG responded with a letter dated April 14, 2020 to KM and Safe Harbor (the "**Dispute Notice**"). In the Dispute Notice, EG advised KM and Safe Harbor that EG contested KM's right to terminate the PSA and/or receive a refund of the Deposit.

49.    Despite (i) the unilateral instruction in the Termination Notice and (ii) the Dispute Notice contesting the release of the Deposit, Safe Harbor released the Deposit to KM. Safe Harbor failed to contact EG prior to releasing the Deposit. Thereafter, KM failed and refused to close the sale transactions in the PSA. KM further failed and refused to turn over the Deposit to EG.

50.    As a result of the conduct of KM and Safe Harbor, and the breaches of the parties' respective agreements, EG has suffered and will continue to suffer harm and damages and has incurred fees and costs in this action.

EMERALD GRANDE, LLC

By: *William Abruzzino*
William Abruzzino, Manager

SUBSCRIBED AND SWORN TO before me this 31st day of March, 2021.

*Cory Akins*
Notary Public

My Commission expires: 07/31/21

Notary Public State of Florida
Cory Akins
My Commission GG 129712
Expires 07/31/2021

10

 (https://safeharbortc.com/)

| (https://www.linkedin.com/company/safe-harbor-title-company-rva/) | (https://www.facebook.com/SafeHarborTitle-Company-1450644088696662/) | (https://www.instagram.com/safeharbortitlecompany/) |
|---|---|---|



## First American Title Insurance Company

First American Title helps homebuyers and sellers, real estate agents and brokers, mortgage lenders, commercial property professionals, homebuilders and developers, title agencies and legal professionals close transactions. Find out more about our products and services, and how First American can help you streamline your transaction and protect your investment.



## Old Republic National Title Insurance Company

At the Old Republic Title Insurance Group (ORTIG), we provide title insurance policies and related real estate transaction and mortgage lending products and services to individual consumers, mortgage lenders, businesses and government agencies. Our products and services protect our customers from financial loss and hardship related

to unknown judgments and liens, forged transfers, inconsistencies within a property's title or misapplication of fiduciary funds. The distribution channel for our products and services spans across the nation and includes independent title insurance agents, our wholly owned insurance company branch offices, owned/affiliated agencies and ancillary services subsidiaries.



## Chicago Title Insurance Company

Chicago Title and Trust Co. dates back more than 150 years through the succession of several firms and corporations that were engage in the abstract and title business in Cook County, Illinois.



## Fidelity National Title Insurance Company

Fidelity National Title Group is a member of the Fidelity National Financial (NYSE: FNF) family of companies and the nation's largest group of title companies and title insurance underwriters – Chicago Title Insurance Company, Commonwealth Land Title Insurance Company, Fidelity National Title Insurance Company, Alamo Title Insurance, Lawyers Title, and Ticor Title – that collectively issue more title insurance policies than any other title company in the United States.

## Safe Harbor Title Company

Get to know the Safe Harbor Title Company Difference. We only do closings and title insurance, so there are no other tasks that can steal our focus from you. Find out the difference the right title company – and the support of nearly two decades of title experience – can make at your next closing.

## Recent Posts

○

**We are open!**

(https://safeharbortc.com/2020/03/27/we-are-open/)

By Melissa Canvos (https://safeharbortc.com//author/safeharbor)

(https://
safehar
bortc.c
m/2020
/03/27/        ○
(https://
safehar
open/)
bortc.co

**COVID-19 Closing Continuity**

(https://safeharbortc.com/2020/03/19/covid-19-closing-continuity/)

By Melissa Canvos (https://safeharbortc.com//author/safeharbor)

m/202
/03/19/        ○
covid-
19-
(https://
safehar
closing-
bortc.co
continui
m/2019
ty/)
/01/09/
govern
ment-
shutdo
wn-
delayin
g-

**Government Shutdown Delaying, Cancelling Deals Involving IRS Liens**

(https://safeharbortc.com/2019/01/09/government-shutdown-delaying-cancelling-deals-involving-irs-liens/)

By Melissa Canvos (https://safeharbortc.com//author/safeharbor)

# Safe Harbor Locations

(selling-deals-involving-irs-liens/)

Richmond

4900 Augusta Ave., Suite 150

Richmond, VA 23230

Yorktown

3526 George Washington Highway, Suite D1

Yorktown, VA 23693

**From:** Angela Molin [angelam@safeharbortc.com]
**Sent:** 3/18/2020 1:43:46 PM
**To:** Spencer Katona [skatona@spottsfain.com]
**Subject:** [External Sender] Re: [External Sender] Re: [External Sender] Re: [External Sender] Re: [External Sender] Re: [External Sender] Re: FW: EXTERNAL: RE: **EXTERNAL**RE: insurance

I tried to call you several times and the calls will not go through. Are you having a phone issue?

# *Angela D. Molin*

Vice President



3526 George Washington Memorial Highway
Suite D-1
Yorktown, VA 23693
(757) 223-1588 Office
(757) 358-0459 Mobile
angelam@safeharbortc.com
www.safeharbortc.com

*Please be advised that Safe Harbor Title WILL NOT SEND OR RECEIVE WIRE INSTRUCTIONS VIA EMAIL!*

*Additionally, all wire instructions will be verified using our 3-step method. Should you receive wire instructions via email or receive a request to send your wire instructions via email, notify this office immediately, as this may be an indicator of wire fraud.*

This message and any attached documents contain information which may be confidential, subject to privilege or exempt from disclosure under applicable law. These materials are intended only for the use of the intended recipient. If you are not the intended recipient of this transmission you are hereby notified that any distribution, disclosure, printing, copying, storage, modification or the taking of any action in reliance upon this transmission is strictly prohibited. Delivery of this message to any person other than the intended recipient shall not compromise or waive such confidentiality, privilege or exemption from disclosure as to this communication. If you have received this communication in error, please immediately notify the sender and delete the message from your system. Thank you.

NOTICE: Safe Harbor Title Company does not accept cash, personal checks or credit cards. Settlement funds due at closing under $10,000 may be in the form of a certified check or wire. Funds in excess of $10,000 MUST be wired prior to closing.

On Wed, Mar 18, 2020 at 1:41 PM Spencer Katona <skatona@spottsfain.com> wrote:

Will do, thanks for setting it up.

S. Spencer Katona
Spotts Fain PC
(804) 697-2032
(804) 697-2132 FAX
skatona@spottsfain.com

**From:** Angela Molin <angelam@safeharbortc.com>
**Sent:** Wednesday, March 18, 2020 1:37 PM
**To:** Spencer Katona <skatona@spottsfain.com>

**Subject:** [External Sender] Re: [External Sender] Re: [External Sender] Re: [External Sender] Re: [External Sender] Re: FW: EXTERNAL: RE: **EXTERNAL**RE: insurance

David and Spencer,

Our office is scheduled to be sprayed with an anti viral agent at 4 today, so I will not be able to join the call. Please let me know the details.

*Angela D. Molin*

Vice President



3526 George Washington Memorial Highway

Suite D-1

Yorktown, VA 23693

(757) 223-1588 Office

(757) 358-0459 Mobile

angelam@safeharbortc.com

www.safeharbortc.com

*Please be advised that Safe Harbor Title WILL NOT SEND OR RECEIVE WIRE INSTRUCTIONS VIA EMAIL!*

*Additionally, all wire instructions will be verified using our 3-step method. Should you receive wire instructions via email or receive a request to send your wire instructions via email, notify this office immediately, as this may be an indicator of wire fraud.*

This message and any attached documents contain information which may be confidential, subject to privilege or exempt from disclosure under applicable law. These materials are intended only for the use of the intended recipient. If you are not the intended recipient of this transmission you are hereby notified that any distribution, disclosure, printing, copying, storage, modification or the taking of any action in reliance upon this transmission is strictly prohibited. Delivery of this message to any person other than the intended recipient shall not compromise or waive such confidentiality, privilege or exemption from disclosure as to this communication. If you have received this communication in error, please immediately notify the sender and delete the message from your system. Thank you.

NOTICE: Safe Harbor Title Company does not accept cash, personal checks or credit cards. Settlement funds due at closing under $10,000 may be in the form of a certified check or wire. Funds in excess of $10,000 MUST be wired prior to closing.

On Wed, Mar 18, 2020 at 1:16 PM Spencer Katona <skatona@spottsfain.com> wrote:

Angela, I have copied Jen West on this email. Please include her in the invite.

Jen, Are you available for a call at 4pm? I will send you a separate email shortly.

S. Spencer Katona
Spotts Fain PC
(804) 697-2032
(804) 697-2132 FAX
skatona@spottsfain.com

**From:** David DuVal <dduval@spottsfain.com>
**Sent:** Wednesday, March 18, 2020 1:09 PM
**To:** Spencer Katona <skatona@spottsfain.com>; 'Angela Molin' <angelam@safeharbortc.com>
**Subject:** RE: [External Sender] Re: [External Sender] Re: [External Sender] Re: [External Sender] Re: FW: EXTERNAL: RE: **EXTERNAL**RE: insurance

Sorry just saw this, include jen if available.

**From:** Spencer Katona
**Sent:** Wednesday, March 18, 2020 1:05 PM

I am available. Angela, please circulate conference call instructions, or I can if you prefer.

David, should I see if Jen can get on the line as well? And are we going to have this initial call without the attorneys from seller's side, or should I try to loop them in as well?

S. Spencer Katona
Spotts Fain PC
(804) 697-2032
(804) 697-2132 FAX
skatona@spottsfain.com

**From:** David DuVal <dduval@spottsfain.com>
**Sent:** Wednesday, March 18, 2020 1:03 PM
**To:** 'Angela Molin' <angelam@safeharbortc.com>
**Cc:** Spencer Katona <skatona@spottsfain.com>
**Subject:** RE: [External Sender] Re: [External Sender] Re: [External Sender] Re: [External Sender] Re: FW:
EXTERNAL: RE: **EXTERNAL**RE: insurance

I am but need to have Spencer as he knows more of the details.

Spencer?

**From:** Angela Molin [mailto:angelam@safeharbortc.com]
**Sent:** Wednesday, March 18, 2020 1:00 PM
**To:** David DuVal
**Cc:** Spencer Katona
**Subject:** [External Sender] Re: [External Sender] Re: [External Sender] Re: [External Sender] Re: FW: EXTERNAL: RE:
**EXTERNAL**RE: insurance

Are you all available for a call at 3pm CST?

*Angela D. Molin*

Vice President



3526 George Washington Memorial Highway

Suite D-1

Yorktown, VA 23693

(757) 223-1588 Office

(757) 358-0459 Mobile

angelam@safeharbortc.com

www.safeharbortc.com

*Please be advised that Safe Harbor Title WILL NOT SEND OR RECEIVE WIRE INSTRUCTIONS VIA EMAIL!*

*Additionally, all wire instructions will be verified using our 3-step method. Should you receive wire instructions via email or receive a request to send your wire instructions via email, notify this office immediately, as this may be an indicator of wire fraud.*

This message and any attached documents contain information which may be confidential, subject to privilege or exempt from disclosure under applicable law. These materials are intended only for the use of the intended recipient. If you are not the intended

recipient of this transmission you are hereby notified that any distribution, disclosure, printing, copying, storage, modification or the taking of any action in reliance upon this transmission is strictly prohibited. Delivery of this message to any person other than the intended recipient shall not compromise or waive such confidentiality, privilege or exemption from disclosure as to this communication. If you have received this communication in error, please immediately notify the sender and delete the message from your system. Thank you.

NOTICE: Safe Harbor Title Company does not accept cash, personal checks or credit cards. Settlement funds due at closing under $10,000 may be in the form of a certified check or wire. Funds in excess of $10,000 MUST be wired prior to closing.

On Wed, Mar 18, 2020 at 12:58 PM David DuVal <dduval@spottsfain.com> wrote:

Thanks

**From:** Angela Molin [mailto:angelam@safeharbortc.com]
**Sent:** Wednesday, March 18, 2020 12:36 PM
**To:** David DuVal
**Cc:** Spencer Katona
**Subject:** [External Sender] Re: [External Sender] Re: [External Sender] Re: FW: EXTERNAL: RE: **EXTERNAL**RE: insurance

See below from the local underwriter. I will be in touch.

*I have again reached out to our bankruptcy counsel, explaining that the matter is urgent. I can tell by our system that she is tied up in a meeting or on a conference call right now.*

*I will get back to you as soon as I hear back from her.*

**Angela D. Molin**

Vice President

3526 George Washington Memorial Highway

Suite D-1

Yorktown, VA 23693

(757) 223-1588 Office

(757) 358-0459 Mobile

angelam@safeharbortc.com

www.safeharbortc.com

*Please be advised that Safe Harbor Title WILL NOT SEND OR RECEIVE WIRE INSTRUCTIONS VIA EMAIL!*

*Additionally, all wire instructions will be verified using our 3-step method. Should you receive wire instructions via email or receive a request to send your wire instructions via email, notify this office immediately, as this may be an indicator of wire fraud.*

This message and any attached documents contain information which may be confidential, subject to privilege or exempt from disclosure under applicable law. These materials are intended only for the use of the intended recipient. If you are not the intended recipient of this transmission you are hereby notified that any distribution, disclosure, printing, copying, storage, modification or the taking of any action in reliance upon this transmission is strictly prohibited. Delivery of this message to any person other than the intended recipient shall not compromise or waive such confidentiality, privilege or exemption from disclosure as to this communication. If you have received this communication in error, please immediately notify the sender and delete the message from your system. Thank you.

NOTICE: Safe Harbor Title Company does not accept cash, personal checks or credit cards. Settlement funds due at closing under $10,000 may be in the form of a certified check or wire. Funds in excess of $10,000 MUST be wired prior to closing.

On Wed, Mar 18, 2020 at 11:53 AM David DuVal <dduval@spottsfain.com> wrote:

We need to have direct contact with the counsel. We are running out of time on this and seller and their lender are again posturing regarding marketable title. We need direct discussions/answers from the underwriter and their counsel so we know what ground we have to stand on and what is needed to send back to the seller/seller lender.

Please put us in direct contact.

Regards, David

David V. DuVal
**Shareholder**

**SPOTTS FAIN PC**
411 E. FRANKLIN STREET, SUITE 600
RICHMOND, VA 23219
(804) 697-2038

(804) 697-2138 Fax

dduval@spottsfain.com

SPOTTS·FAIN

Bio | LinkedIn | VCARD

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.

**From:** Spencer Katona
**Sent:** Wednesday, March 18, 2020 10:38 AM
**To:** 'Angela Molin'
**Cc:** David DuVal
**Subject:** RE: [External Sender] Re: [External Sender] Re: FW: EXTERNAL: RE: **EXTERNAL**RE: insurance

Thanks. If there are still issues, seller's counsel and counsel for seller's secured lender have also requested a call. We don't necessarily have to grant them their request, though they would be in better position to answer questions from bankruptcy counsel about the ongoing proceedings.

S. Spencer Katona
Spotts Fain PC
(804) 697-2032
(804) 697-2132 FAX
skatona@spottsfain.com

**From:** Angela Molin <angelam@safeharbortc.com>
**Sent:** Wednesday, March 18, 2020 10:28 AM
**To:** Spencer Katona <skatona@spottsfain.com>
**Cc:** David DuVal <dduval@spottsfain.com>
**Subject:** [External Sender] Re: [External Sender] Re: FW: EXTERNAL: RE: **EXTERNAL**RE: insurance

See below from the local underwriter.

*I reached out to our bankruptcy counsel yesterday and am waiting for her response.*

*I will get back to you as soon as I have more information.*

Vice President

3526 George Washington Memorial Highway

Suite D-1

Yorktown, VA 23693

(757) 223-1588 Office

(757) 358-0459 Mobile

angelam@safeharbortc.com

www.safeharbortc.com

***Please be advised that Safe Harbor Title WILL NOT SEND OR RECEIVE WIRE INSTRUCTIONS VIA EMAIL!***

***Additionally, all wire instructions will be verified using our 3-step method. Should you receive wire instructions via email or receive a request to send your wire instructions via email, notify this office immediately, as this may be an indicator of wire fraud.***

This message and any attached documents contain information which may be confidential, subject to privilege or exempt from disclosure under applicable law. These materials are intended only for the use of the intended recipient. If you are not the intended recipient of this transmission you are hereby notified that any distribution, disclosure, printing, copying, storage, modification or the taking of any action in reliance upon this transmission is strictly prohibited. Delivery of this message to any person other than the intended recipient shall not compromise or waive such confidentiality, privilege or exemption from disclosure as to this communication. If you have received this communication in error, please immediately notify the sender and delete the message from your system. Thank you.

NOTICE: Safe Harbor Title Company does not accept cash, personal checks or credit cards. Settlement funds due at closing under $10,000 may be in the form of a certified check or wire. Funds in excess of $10,000 MUST be wired prior to closing.

On Wed, Mar 18, 2020 at 5:52 AM Spencer Katona <skatona@spottsfain.com> wrote:

Sorry to be pushy, but if you can please confirm that you received this email and have sent it along I would appreciate it. Our client has a substantial amount of money already tied up in this deal and we need to get issues resolved asap.

Thanks, and I hope you are your family are staying safe.

Spencer

S. Spencer Katona

Spotts Fain PC

(804) 697-2032

(804) 697-2132 FAX

skatona@spottsfain.com

**From:** Spencer Katona

**Sent:** Tuesday, March 17, 2020 11:29 AM

**To:** 'Angela Molin' <angelam@safeharbortc.com>

**Cc:** David DuVal <dduval@spottsfain.com>

**Subject:** RE: [External Sender] Re: FW: EXTERNAL: RE: **EXTERNAL**RE: insurance

Angela,

I have spoken with our internal bankruptcy lawyers about this matter. Below is a brief summary of the history of this deal and our current status. If your counsel disagrees on any of these points, we would like

to set up a call to discuss directly between your counsel and our bankruptcy attorney, or if you could send us his/her contact information we can email directly. The point here is to hopefully speed up a resolution of issues and eliminate the telephone game, not to cut you out entirely.

Also, please send me the updated commitment. I realize that it will still take exception to the Comm2013 deed of trust for now.

1. Emerald Grande (as seller) and KM Hotels (as purchaser) entered into a Purchase and Sale Agreement dated 8/9/19 (the "PSA")

2. Emerald Grande petitioned the Bankruptcy Court to permit the sale to KM Hotels by Order Approving the Sale Procedures entered on 8/13/19 (attached) (the "Sale Motion")

a. The Sale Motion requests approval for sale of the Transferred Property, and defines "Transferred Property" by reference to the definition in the PSA

b. The PSA defines the Transferred Property to include, among other things, the land "*together with all appurtenant easements* and any other rights and interests"

3. The Court entered the Order Authorizing the Sale on 9/11/19 (attached) (the "Sale Order")

a. The Sale Order approved the sale of the Transferred Property, and defines Transferred Property by reference to the Sale Motion and the PSA

4. In connection with purchaser's due diligence review, we noted a lack of access and numerous encroachment issues that would need to be resolved prior to closing.

5. Both the lack of access and encroachment issues can be resolved by easements from the adjacent property owner, Tara Retail Group, LLC. Tara Retail Group is also in bankruptcy and would need a court order or the consent of its secured lender Comm2013 to grant easements.

6. On 12/18/19 the Court entered an Order approving the necessary easements (attached) (the "Order Approving Easements")

a. Purchaser and the title company requested that Comm2013 sign a subordination agreement whereby it subordinated its interest in the Tara Retail Group property to the easements granted by the Order Approving Easements. Comm2013 has not agreed to sign a subordination agreement.

7. On 1/27/20 the Court entered a Memorandum Opinion approving Tara Retail Group's plan of reorganization (the "Memorandum Opinion") (attached as Exhibit A to the Release of Deed of Trust).

8. On 2/6/20 Tara Retail Group recorded (a) a Release of Deed of Trust by Bankruptcy Court Order in the real estate records of Kanawha County, WV in DB 1329, pg 174 (the "Release of DOT"), and immediately thereafter, (b) an Easement and Right of Way in DB 3053, pg 796 (to address the encroachment issues), and (c) a Confirmatory Easement and Right of Way in DB 3053, pg 813 (to address the access issues).

9. The Release of DOT contains the following exhibits: Exhibit A – the Memorandum Opinion; Exhibit B – the Order entered 1/27/20 confirming Tara Retail Group's proposed Chapter 11 plan of reorganization (the "Confirmation Order"); and Exhibit C – Tara Retail Group's confirmed plan of reorganization (the "Confirmed Chapter 11 Plan").

a. The Release of DOT purports to release the Comm2013 deed of trust. If we can get comfortable that the Comm2013 deed of trust has in fact been released, then there will be no further need for a subordination from Comm2013 and the title company should be able to insure the easements without exception.

b. Section 4.1 of the Confirmed Chapter 11 Plan sets forth the payments required to fully and completely satisfy the Comm2013 claim, and also states that on the Confirmation Date the parties will enter into a new note and a new loan agreement, and the existing note and loan agreement will be cancelled.

i. The Confirmation Date is 1/27/20

existing loan agreement will be cancelled and discharged without further action, and the new loan agreement will be issued.

d. Section 10.4 of the Confirmed Chapter 11 Plan states that the distributions, rights and treatments under the Confirmed Chapter 11 Plan shall be in complete satisfaction and release, effective as of the Effective Date, of all claims against Tara Retail Group, as well as liens on, obligations of and rights against Tara Retail Group and its property. Section 10.4 also states that the Confirmation Order shall be a judicial determination of the discharge of all claims subject to the Effective Date occurring.

i. The Recitals in the Release of DOT state that all conditions precedent to the Effective Date have occurred.

10. Tara Retail Group and Comm2013 have agreed to mediate their remaining issues, including the form of the new loan documents. Mediation is likely to take place on April 3.

a. The form loan agreement attached as Exhibit 2 to the Confirmed Chapter 11 Plan contains language confirming that the original loan documents (specifically including the original deed of trust) will be cancelled and discharged without further action, and the new loan documents will be issued.

11. At this point, we believe that the seller has obtained sufficient Court orders to (a) grant valid easements, and (b) effect the release of the deed of trust. However, we are not completely comfortable with the unilateral release of the deed of trust, and would still like for Comm2013 to either sign a subordination agreement or some other agreement confirming that the original deed of trust has been released. Since Comm2013 still refuses to agree to a subordination, we are left with option (b). Pursuant to Tara Retail Group's plan of reorganization as outlined above, the existing loan documents will be cancelled and discharged and new loan documents issued. We believe that the language in the new loan agreement (assuming it is substantially the same as the loan agreement form attached to the Confirmed Chapter 11 Plan) is sufficient to evidence the agreement/acknowledgment of Comm2013 that its prior lien has been released and discharged and replaced by a new loan. Once the new loan agreement is signed we do not think the title company should have any further objections to the easements and lien subordination, and should be able to issue both an owner's and lender's policy without exception for the Comm2013 deed of trust.

Thanks,

Spencer

S. Spencer Katona
Spotts Fain PC
(804) 697-2032
(804) 697-2132 FAX
skatona@spottsfain.com

**From:** Angela Molin <angelam@safeharbortc.com>
**Sent:** Wednesday, March 11, 2020 10:14 AM
**To:** Spencer Katona <skatona@spottsfain.com>
**Subject:** [External Sender] Re: FW: EXTERNAL: RE: **EXTERNAL**RE: insurance

See below from counsel.

Based on a review of the documents you provided, Tara's bankruptcy counsel's comments, and the recent filings by Comm2013 in the Tara bankruptcy case, First American is prepared to insure the only the access easement subject to Comm2013's deed of trust lien.

To delete the exception for the Comm2013 lien, First American requires a subordination of that lien to the easements being granted by Tara under its bankruptcy order.

To add the additional easements for parking and encroachments, First American requires an amended motion to sell in the Emerald Grande bankruptcy case to include the additional

easements not originally contemplated in the motion to sell. If a non-appealable order is entered
easements not originally contemplated in the motion to sell. If a non-appealable order is entered
in the Emerald Grande case for this amended motion, then First American would insure the
additional easements subject to Comm2013's deed of trust lien. As in the access easement, this
exception would be omitted upon receipt of a subordination agreement from Comm2013.

*Angela D. Molin*

Vice President



3526 George Washington Memorial Highway

Suite D-1

Yorktown, VA 23693

(757) 223-1588 Office

(757) 358-0459 Mobile

angelam@safeharbortc.com

www.safeharbortc.com

*Please be advised that Safe Harbor Title WILL NOT SEND OR RECEIVE WIRE INSTRUCTIONS VIA EMAIL!*

*Additionally, all wire instructions will be verified using our 3-step method. Should you receive wire instructions via email or receive a request to send your wire instructions via email, notify this office immediately, as this may be an indicator of wire fraud.*

This message and any attached documents contain information which may be confidential, subject to privilege or exempt from disclosure under applicable law. These materials are intended only for the use of the intended recipient. If you are not the intended recipient of this transmission you are hereby notified that any distribution, disclosure, printing, copying, storage, modification or the taking of any action in reliance upon this transmission is strictly prohibited. Delivery of this message to any person other than the intended recipient shall not compromise or waive such confidentiality, privilege or exemption from disclosure as to this communication. If you have received this communication in error, please immediately notify the sender and delete the message from your system. Thank you.

NOTICE: Safe Harbor Title Company does not accept cash, personal checks or credit cards. Settlement funds due at closing under $10,000 may be in the form of a certified check or wire. Funds in excess of $10,000 MUST be wired prior to closing.

On Tue, Mar 10, 2020 at 2:28 PM Spencer Katona <skatona@spottsfain.com> wrote:

Angela, I realize the email chain may not be clear. This is the Elkview Hotel deal.

S. Spencer Katona
Spotts Fain PC
(804) 697-2032
(804) 697-2132 FAX
skatona@spottsfain.com

**From:** Spencer Katona
**Sent:** Tuesday, March 10, 2020 2:21 PM
**To:** 'Kimberly H. Bryant' <KBryant@dickinson-wright.com>
**Cc:** 'Angela Molin' <angelam@safeharbortc.com>
**Subject:** RE: EXTERNAL: RE: **EXTERNAL**RE: insurance

Thanks, I will review with my client. Angela Molin with Safe Harbor Title Company is the contact. Her information is below, and she is copied on this email.

Angela, Kim Bryant is counsel for Community Trust Bank.

Angela D. Mello
Vice President

3526 George Washington Memorial Highway

Suite D-1

Yorktown, VA 23693

(757) 223-1588 Office

(757) 358-0459 Mobile

angelam@safeharbortc.com

www.safeharbortc.com

S. Spencer Katona
Spotts Fain PC
(804) 697-2032
(804) 697-2132 FAX
skatona@spottsfain.com

**From:** Kimberly H. Bryant <KBryant@dickinson-wright.com>
**Sent:** Tuesday, March 10, 2020 2:16 PM
**To:** Spencer Katona <skatona@spottsfain.com>
**Subject:** [External Sender] RE: EXTERNAL: RE: **EXTERNAL**RE: insurance

Our current version of the checklist is attached. Who is acting as escrow/closing agent?

**Kimberly H. Bryant** Member

| | |
|---|---|
| 300 West Vine Street | Phone  859-899-8708 |
| Suite 1700 | |
| Lexington KY 40507 | Mobile  859-396-4482 |
| Profile   V-Card | |
| | Fax      844-670-6009 |
| | Email   KBryant@dickinsonwright.com |

DICKINSON WRIGHT PLLC
ARIZONA  CALIFORNIA  FLORIDA  KENTUCKY  MICHIGAN  NEVADA  OHIO
TENNESSEE  TEXAS  WASHINGTON DC  TORONTO

**From:** Kimberly H. Bryant
**Sent:** Tuesday, March 10, 2020 10:52 AM
**To:** 'Spencer Katona' <skatona@spottsfain.com>
**Subject:** RE: EXTERNAL: RE: **EXTERNAL**RE: insurance

Perfect, thank you. I can get you a checklist.

**From:** Spencer Katona <skatona@spottsfain.com>
**Sent:** Tuesday, March 10, 2020 10:51 AM

**To:** Kimberly H. Bryant <KBryant@dickinson-wright.com>
**Subject:** RE: EXTERNAL: RE: **EXTERNAL**RE: insurance

The borrower's organizational documents are attached. Please let me know if you need anything else. Are you going to produce a checklist for this deal?

S. Spencer Katona
Spotts Fain PC
(804) 697-2032
(804) 697-2132 FAX
skatona@spottsfain.com

---

**From:** Kimberly H. Bryant <KBryant@dickinson-wright.com>
**Sent:** Tuesday, March 10, 2020 10:45 AM
**To:** Spencer Katona <skatona@spottsfain.com>
**Subject:** [External Sender] RE: EXTERNAL: RE: **EXTERNAL**RE: insurance

Thank you. Does the borrower have an operating agreement?

**Kimberly H. Bryant** Member

300 West Vine Street
Suite 1700
Lexington KY 40507
[Profile] [V-Card]

Phone  859-899-8708

Mobile  859-396-4482

Fax      844-670-6009

Email  KBryant@dickinsonwright.com

DICKINSON WRIGHT PLLC

ARIZONA  CALIFORNIA  FLORIDA  KENTUCKY  MICHIGAN  NEVADA  OHIO
TENNESSEE  TEXAS  WASHINGTON DC  TORONTO

---

**From:** Spencer Katona <skatona@spottsfain.com>
**Sent:** Monday, March 9, 2020 11:32 AM
**To:** 'Steve Belcher' <belchest@ctbi.com>
**Cc:** Kimberly H. Bryant <KBryant@dickinson-wright.com>; michael.burke@kmhotels.com
**Subject:** EXTERNAL: RE: **EXTERNAL**RE: insurance

Steve and Kim,

I have attached a draft Deed from Emerald Grande to the borrower and a draft assignment of the purchase agreement from KM Hotels to the borrower. Kim, I am not sure how muc you know about this deal yet so here is a brief outline of how things will unfold: (1) KM Hotels is currently under contract to purchase the property from Emerald Grande, (2) KM Hotels will assign its rights and obligations under the purchase agreement to its affiliate Elkview Hotel (a SPE formed solely to hold this property), and (3) the property will be deeded directly from Emerald Grande to Elkview Hotel. There will not be a deed from KM Hotels to the borrower.

When seller delivers the resolution authorizing Emerald Grande to sell the property I will forward it to you. I will prepare a resolution authorizing Elkview Hotel to purchase the property and enter into the loan, and will forward that to you for review and approval.

Steve, I know that you and Mike have spoken about commitment letter but he wanted me to add one additional comment: the outside closing date is listed as March 30, 2020. Per the contract, we have until 4/13 to close, with the possibility of a 15 day extension to 4/28. Please revise the loan commitment so that the outside closing date is 4/28 or later.

Thanks,

Spencer

S. Spencer Katona

SPOTTS FAIN PC
411 E. FRANKLIN STREET, SUITE 600
RICHMOND, VA 23219
(804) 697-2032
(804) 697-2132 FAX
skatona@spottsfain.com

**SPOTTS✦FAIN**

Bio | LinkedIn | VCARD

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others

**From:** Steve Belcher <belchest@ctbi.com>
**Sent:** Thursday, March 5, 2020 9:39 AM
**To:** Spencer Katona <skatona@spottsfain.com>
**Cc:** Kimberly H. Bryant <KBryant@dickinson-wright.com>
**Subject:** [External Sender] Re: **EXTERNAL**RE: insurance

I was just reminded we will need a resolution from Emerald Grade, LLC authorizing them to sign deed

then one for KM Hotels to sign deed

then a resolution authorizing Mayur (Manager) to sign the deed

I will copy our attorney

sb

Steve Belcher

Senior Vice President

Commercial Lending

Phone: 606-437-3287

Fax:606-2188312

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or proprietary information. Any unauthorized review, use, disclosure or distribution is prohibited. The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Spencer Katona <skatona@spottsfain.com>
**Sent:** Thursday, March 5, 2020 8:39 AM
**To:** Steve Belcher <belchest@ctbi.com>
**Cc:** Sandra Young <youngsa@ctbi.com>
**Subject:** RE: **EXTERNAL**RE: insurance

unsigned commitment 03/31/2. If you have a signed copy I would appreciate you sending that to me so that I can provide it to the title company.

Seller is in bankruptcy. All funds will flow through the settlement agent at closing. As I understand it, the seller is underwater on its existing mortgage so I expect that all funds not going to closing costs will be delivered directly to the existing lender as a payoff. Given the back and forth that we have had with the seller, I would prefer not to ask for them to deliver a deed into escrow quite yet – please let me know if that is going to be an issue for the bank. We will certainly require them to deliver the deed and all other seller docs into escrow once a closing date has been set.

Thanks for moving things along, please let me know if I can provide anything to help out.

S. Spencer Katona
Spotts Fain PC
(804) 697-2032
(804) 697-2132 FAX
skatona@spottsfain.com

**From:** Steve Belcher <belchest@ctbi.com>
**Sent:** Thursday, March 5, 2020 8:28 AM
**To:** Spencer Katona <skatona@spottsfain.com>
**Cc:** Sandra Young <youngsa@ctbi.com>
**Subject:** [External Sender] Re: **EXTERNAL**RE: insurance

do you have or do you need a copy of the commitment letter that spells out the terms. I was thinking maybe the title company would need a copy.

Mike has a copy but I can send one if you need.

We are working on the application and reviewing the file today just to keep everything moving.

How will the seller want paid and will they go ahead and sign deed in escrow

sb

Steve Belcher

Senior Vice President

Commercial Lending

Phone: 606-437-3287

Fax:606-2188312

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or proprietary information. Any unauthorized review, use, disclosure or distribution is prohibited. The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Spencer Katona <skatona@spottsfain.com>
**Sent:** Wednesday, March 4, 2020 10:18 PM
**To:** Steve Belcher <belchest@ctbi.com>
**Cc:** michael.burke@kmhotels.com <michael.burke@kmhotels.com>
**Subject:** RE: **EXTERNAL**RE: insurance

Steve,

The Certificate of Existence (WV's equivalent of the cert of good standing) is attached. Please let me know if you need anything else.

Thanks,
Spencer

S. Spencer Katona
Spotts Fain PC
(804) 697-2032
(804) 697-2132 FAX
skatona@spottsfain.com

**From:** Steve Belcher <belchest@ctbi.com>
**Sent:** Wednesday, March 4, 2020 1:09 PM
**To:** Spencer Katona <skatona@spottsfain.com>
**Subject:** [External Sender] Re: **EXTERNAL**RE: insurance

I have found a local attorney that is licensed in Wva and he has agreed to prepare deed of trust and assignment.

I have articles and operating agreement you could send me good standing

sb

Steve Belcher
Senior Vice President
Commercial Lending
Phone: 606-437-3287
Fax:606-2188312

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or proprietary information. Any unauthorized review, use, disclosure or distribution is prohibited. The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Spencer Katona <skatona@spottsfain.com>
**Sent:** Wednesday, March 4, 2020 12:47 PM
**To:** Steve Belcher <belchest@ctbi.com>
**Subject:** **EXTERNAL**RE: insurance

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Thanks Steve. I know that Mike is working on the insurance. Do you have the articles of organization and good standing yet, or should I send those? Sounds like you are working on a WV attorney – please let me know if you need recommendations from me. I have reached out to a few folks for the names of trusted WV attorneys, but am waiting to hear back.

Thanks,
Spencer

S. Spencer Katona
Spotts Fain PC
(804) 697-2032
(804) 697-2132 FAX
skatona@spottsfain.com

KM_0011683

**From:** Steve Belcher <belchst1@ctbi.com>
**Sent:** Tuesday, March 3, 2020 4:48 PM
**To:** Spencer Katona <skatona@spottsfain.com>
**Subject:** [External Sender] Fw: insurance

see below just some basic information we need

I am trying to lock down an attorney to prepare our deed of trust and assignments.

sb

Steve Belcher

Senior Vice President

Commercial Lending

Phone: 606-437-3287

Fax:606-2188312

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of
the intended recipient(s) and may contain confidential or proprietary information. Any unauthorized
review, use, disclosure or distribution is prohibited. The contents of this e-mail message and any
attachments are confidential and are intended solely for addressee. The information may also be legally
privileged. If you are not the intended recipient, immediately contact the sender by reply e-mail and
destroy all copies of the original message.

---

**From:** Steve Belcher
**Sent:** Tuesday, March 3, 2020 11:52 AM
**To:** Michael Burke <michael.burke@kmhotels.com>
**Cc:** Sandra Young <youngsa@ctbi.com>
**Subject:** insurance

I will try and work on a check list for us

but right now

Check with attorney to see if they would prepare Deed of Trust and Assignment of Rents

Work on locating Articles and good standing

Work on Insurance Policy make sure policy list

Community Trust Bank Inc.

Box 2947

Pikeville, Ky. 40502

as Mortgagee and Loss Payee

Need copy of deed transferring property (does not have to be signed)

copy of title policy asap so we can address any issues

then we will need to open a escrow account so that you can deposit the down payment and renovation
funds into. This account should not last long but we would request that you open a regular account up
with us for the hotel.

sb

Steve Belcher

Senior Vice President

Commercial Lending

Phone: 606-437-3287

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or proprietary information. Any unauthorized review, use, disclosure or distribution is prohibited. The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message.

CONFIDENTIALITY NOTICE: This message contains confidential information and is intended solely for the use of the individual or entity to which it is addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this message by mistake and delete it from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message which arise as a result of e-mail transmission. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

CONFIDENTIALITY NOTICE: This message contains confidential information and is intended solely for the use of the individual or entity to which it is addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this message by mistake and delete it from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message which arise as a result of e-mail transmission. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

CONFIDENTIALITY NOTICE: This message contains confidential information and is intended solely for the use of the individual or entity to which it is addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this message by mistake and delete it from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message which arise as a result of e-mail transmission. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

CONFIDENTIALITY NOTICE: This message contains confidential information and is intended solely for the use of the individual or entity to which it is addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this message by mistake and delete it from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message which arise as a result of e-mail transmission. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

The information contained in this e-mail, including any attachments, is confidential, intended only for the named recipient(s), and may be legally privileged. If you are not the intended recipient, please delete the e-mail and any attachments, destroy any printouts that you may have made and notify us immediately by return e-mail.

Neither this transmission nor any attachment shall be deemed for any purpose to be a "signature" or "signed" under any electronic transmission acts, unless otherwise specifically stated herein. Thank you.

The information contained in this e-mail, including any attachments, is confidential, intended only for the named recipient(s), and may be legally privileged. If you are not the intended recipient, please delete the e-mail and any attachments, destroy any printouts that you may have made and notify us immediately by return e-mail.

Neither this transmission nor any attachment shall be deemed for any purpose to be a "signature" or "signed" under any electronic transmission acts, unless otherwise specifically stated herein. Thank you.

| From: | Angela Molin [angelam@safeharbortc.com] |
|---|---|
| Sent: | 3/11/2020 10:21:36 AM |
| To: | Spencer Katona [skatona@spottsfain.com] |
| CC: | David DuVal [dduval@spottsfain.com] |
| Subject: | [External Sender] Re: [External Sender] Re: FW: EXTERNAL: RE: **EXTERNAL**RE: insurance |

Sounds good, thank you.

## *Angela D. Molin*

Vice President



3526 George Washington Memorial Highway
Suite D-1
Yorktown, VA 23693
(757) 223-1588 Office
(757) 358-0459 Mobile
angelam@safeharbortc.com
www.safeharbortc.com

*Please be advised that Safe Harbor Title WILL NOT SEND OR RECEIVE WIRE INSTRUCTIONS VIA EMAIL!*

*Additionally, all wire instructions will be verified using our 3-step method. Should you receive wire instructions via email or receive a request to send your wire instructions via email, notify this office immediately, as this may be an indicator of wire fraud.*

This message and any attached documents contain information which may be confidential, subject to privilege or exempt from disclosure under applicable law. These materials are intended only for the use of the intended recipient. If you are not the intended recipient of this transmission you are hereby notified that any distribution, disclosure, printing, copying, storage, modification or the taking of any action in reliance upon this transmission is strictly prohibited. Delivery of this message to any person other than the intended recipient shall not compromise or waive such confidentiality, privilege or exemption from disclosure as to this communication. If you have received this communication in error, please immediately notify the sender and delete the message from your system. Thank you.

NOTICE: Safe Harbor Title Company does not accept cash, personal checks or credit cards. Settlement funds due at closing under $10,000 may be in the form of a certified check or wire. Funds in excess of $10,000 MUST be wired prior to closing.

On Wed, Mar 11, 2020 at 10:20 AM Spencer Katona <skatona@spottsfain.com> wrote:

I am going to have to push back on this. I have talked to our firm's bankruptcy experts and think that the easements should be insured without exception for the Comm2013 lien. Let me gather some additional information and I will be in touch.

S. Spencer Katona
Spotts Fain PC
(804) 697-2032
(804) 697-2132 FAX
skatona@spottsfain.com

**From:** Angela Molin <angelam@safeharbortc.com>
ive in red:

**From:** Angela Molin <angelam@safeharbortc.com>
**Sent:** Wednesday, March 11, 2020 10:14 AM
**To:** Spencer Katona <skatona@spottsfain.com>
**Subject:** [External Sender] Re: FW: EXTERNAL: RE: **EXTERNAL**RE: insurance

See below from counsel.

Based on a review of the documents you provided, Tara's bankruptcy counsel's comments, and the recent filings by Comm2013 in the Tara bankruptcy case, First American is prepared to insure the only the access easement subject to Comm2013's deed of trust lien.

To delete the exception for the Comm2013 lien, First American requires a subordination of that lien to the easements being granted by Tara under its bankruptcy order.

To add the additional easements for parking and encroachments, First American requires an amended motion to sell in the Emerald Grande bankruptcy case to include the additional easements not originally contemplated in the motion to sell. If a non-appealable order is entered in the Emerald Grande case for this amended motion, then First American would insure the additional easements subject to Comm2013's deed of trust lien. As in the access easement, this exception would be omitted upon receipt of a subordination agreement from Comm2013.

*Angela D. Molin*

Vice President



3526 George Washington Memorial Highway

Suite D-1

Yorktown, VA 23693

(757) 223-1588 Office

(757) 358-0459 Mobile

angelam@safeharbortc.com

www.safeharbortc.com

*Please be advised that Safe Harbor Title WILL NOT SEND OR RECEIVE WIRE INSTRUCTIONS VIA EMAIL!*

*Additionally, all wire instructions will be verified using our 3-step method. Should you receive wire instructions via email or receive a request to send your wire instructions via email, notify this office immediately, as this may be an indicator of wire fraud.*

This message and any attached documents contain information which may be confidential, subject to privilege or exempt from disclosure under applicable law. These materials are intended only for the use of the intended recipient. If you are not the intended recipient of this transmission you are hereby notified that any distribution, disclosure, printing, copying, storage, modification or the taking of any action in reliance upon this transmission is strictly prohibited. Delivery of this message to any person other than the intended recipient shall not compromise or waive such confidentiality, privilege or exemption from disclosure as to this communication. If you have received this communication in error, please immediately notify the sender and delete the message from your system. Thank you.

NOTICE: Safe Harbor Title Company does not accept cash, personal checks or credit cards. Settlement funds due at closing under $10,000 may be in the form of a certified check or wire. Funds in excess of $10,000 MUST be wired prior to closing.

On Tue, Mar 10, 2020 at 2:28 PM Spencer Katona <skatona@spottsfain.com> wrote:

Angela, I realize the email chain may not be clear. This is the Elkview Hotel deal.

S. Spencer Katona
Spotts Fain PC
(804) 697-2032
(804) 697-2132 FAX
skatona@spottsfain.com

**From:** Spencer Katona <skatona@spottsfain.com>
**Sent:** Thursday, February 27, 2020 11:00 PM
**To:** 'Michael Burke' <michael.burke@kmhotels.com>; Steve Belcher <belchest@ctbi.com>
**Cc:** Mayur Patel <mayur.patel@kmhotels.com>
**Subject:** **EXTERNAL**RE: [External Sender] RE: hotel

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Steve,

I look forward to working with you, my contact information is below. I have attached the deed vesting title in seller (first three pages of the attached PDF).

Mike forwarded to me a fee estimate for title insurance from Investors Title. We have already spent substantial time and money on title through Safe Harbor Title Company, writing for First American Title Insurance Company. I understand that your bank may have an affiliation with Investors Title, but it would save us a substantial amount of money to stick with Safe Harbor/First American. Please confirm that you are ok with us using Safe Harbor/First American.

Thank you,
Spencer

S. Spencer Katona

SPOTTS FAIN PC
411 E. FRANKLIN STREET, SUITE 600
RICHMOND, VA 23219
(804) 697-2032
(804) 697-2132 FAX
SKATONA@SPOTTSFAIN.COM

SPOTTS✦FAIN

BIO | LINKEDIN | VCARD

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.

**From:** Michael Burke <michael.burke@kmhotels.com>
**Sent:** Thursday, February 27, 2020 12:00 PM
**To:** Steve Belcher <belchest@ctbi.com>
**Cc:** Mayur Patel <mayur.patel@kmhotels.com>; Spencer Katona <skatona@spottsfain.com>
**Subject:** [External Sender] RE: hotel

Steve, great news on the loan approval. I appreciate the help. Please move quickly on the appraisal as we need to expedite this closing. I am attaching the purchase agreement and a recent survey. I am working on getting a copy of the current owner's deed and should have for you shortly. The legal description is in the PSA if you need it though.

I am also copying Spencer Katona at Spotts Fain. He is our attorney that will handle the closing and also has been working on the title work. Safe Harbor is our local title company and they are working through a WV agent on the policy already. Hopefully we can continue down the path we have already started as there has been a lot of effort put into the title REVIEW ALREADY.

Look forward to reviewing your commitment later today.

Mike



**Michael D. Burke**

KM_0007462

Vice President, Finance and Acquisition
KM Hotels
6627 West Broad Street
Suite 300
Richmond, VA 23230
(O) 804-318-3401
(M) 804-519-9000
Michael.Burke@KMHotels.com

**From:** Steve Belcher <belchest@ctbi.com>
**Sent:** Thursday, February 27, 2020 10:16 AM
**To:** Michael Burke <michael.burke@kmhotels.com>
**Cc:** Mayur Patel <mayur.patel@kmhotels.com>
**Subject:** hotel
Would one of you please call me, I have tried to call both of you and your mail boxes are full.
sb
Steve Belcher
Senior Vice President
Commercial Lending
Phone: 606-437-3287
Fax:606-2188312

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or proprietary information. Any unauthorized review, use, disclosure or distribution is prohibited. The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. If you are not the intended recipient, immediately contact the sender by reply e-mail and destroy all copies of the original message.

CONFIDENTIALITY NOTICE: This message contains confidential information and is intended solely for the use of the individual or entity to which it is addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this message by mistake and delete it from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message which arise as a result of e-mail transmission. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

CONFIDENTIALITY NOTICE: This message contains confidential information and is intended solely for the use of the individual or entity to which it is addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this message by mistake and delete it from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message which arise as a result of e-mail transmission. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

CONFIDENTIALITY NOTICE: This message contains confidential information and is intended solely for the use of the individual or entity to which it is addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received

| | |
|---|---|
| **From:** | Michael Burke <michael.burke@kmhotels.com> |
| **Sent:** | Thursday, January 23, 2020 5:07 PM |
| **To:** | anil.patel@kmhotels.com |
| **Subject:** | RE: [External Sender] FW: LQ Elkview |

I agree.  I think if we get a no back from the bank tomorrow we should just kill it and not look for another lender.  We can push Mayur on it after we hear abck



**Michael D. Burke**
**Vice President, Finance and Acquisition**
KM Hotels
6627 West Broad Street
Suite 300
Richmond, VA 23230
(O) 804-318-3401
(M) 804-519-9000
Michael.Burke@KMHotels.com

**From:** anil.patel@kmhotels.com <anil.patel@kmhotels.com>
**Sent:** Thursday, January 23, 2020 5:05 PM
**To:** 'Michael Burke' <michael.burke@kmhotels.com>
**Subject:** FW: [External Sender] FW: LQ Elkview

The longer this drags on the harder it will be to kill the deal in my opinion.

**Thanks, Anil Patel**



Anil Patel
Vice President Development & Construction
6627 West Broad Street
Suite 300
Richmond, VA 23230
804-318-3426
336-269-2645 (cell)
804-723-1700 (fax)
Anil.Patel@kmhotels.com

The information transmitted is intended only for the purpose or entity to which it is addressed and may contain confidential and/or privileged material not intended for public use.  Any review, retransmission, dessimination or other use of, or taking any action in

1

KM_0000515

reliance upon this information by persons or entities other than the intended recipient is strictly prohibited. If you receive this communication in error, please notify the sender and delete the material from any and all computers or devices.

**From:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>
**Sent:** Thursday, January 23, 2020 4:40 PM
**To:** Michael Burke <michael.burke@kmhotels.com>
**Cc:** Mayur Patel <mayur.patel@kmhotels.com>; Anil Patel <anil.patel@kmhotels.com>; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** RE: [External Sender] FW: LQ Elkview

Excellent! Thank you!

Eric E. Belfrage, CRE, ISHC, MAI | Senior Vice President
CBRE Hotels | Investment Properties
200 Civic Center Dr. 14th. Floor | Columbus, OH 43215
T 614.430.5048 | C 614.226.9349 | F 614.224.1767
eric.belfrage@cbre.com | www.cbre.com/eric.belfrage

**CBRE Deal Flow:** Register now to receive CBRE exclusive inventory

Please consider the environment before printing this email.

This email may contain information that is confidential or attorney-client privileged and may constitute inside information. The contents of this email are intended only for the recipient(s) listed above. If you are not the intended recipient, you are directed not to read, disclose, distribute or otherwise use this transmission. If you have received this email in error, please notify the sender immediately and delete the transmission. Delivery of this message is not intended to waive any applicable privileges.

**From:** Michael Burke <michael.burke@kmhotels.com>
**Sent:** Thursday, January 23, 2020 4:38 PM
**To:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>
**Cc:** Mayur Patel <mayur.patel@kmhotels.com>; Anil Patel <anil.patel@kmhotels.com>; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** RE: [External Sender] FW: LQ Elkview

External

We spoke to him today and gave him some additional info he is taking to his credit committee. I expect to hear back from him late today or tomorrow morning. We are trying to keep everything moving as well!



**Michael D. Burke**
**Vice President, Finance and Acquisition**
KM Hotels
6627 West Broad Street

2

KM_0000516

Suite 300
Richmond, VA 23230
(O) 804-318-3401
(M) 804-519-9000
Michael.Burke@KMHotels.com

**From:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>
**Sent:** Thursday, January 23, 2020 4:29 PM
**To:** Michael Burke <michael.burke@kmhotels.com>
**Cc:** Mayur Patel <mayur.patel@kmhotels.com>; anil.patel@kmhotels.com; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** RE: [External Sender] FW: LQ Elkview

Michael,
Have you heard anything from your lender today? I am trying to push the attorneys to move this along!

Eric E. Belfrage, CRE, ISHC, MAI | Senior Vice President
CBRE Hotels | Investment Properties
200 Civic Center Dr. 14th. Floor | Columbus, OH 43215
T 614.430.5048 | C 614.226.9349 | F 614.224.1767
eric.belfrage@cbre.com | www.cbre.com/eric.belfrage

**CBRE Deal Flow:** Register now to receive CBRE exclusive inventory

Please consider the environment before printing this email.

This email may contain information that is confidential or attorney-client privileged and may constitute inside information. The contents of this email are intended only for the recipient(s) listed above. If you are not the intended recipient, you are directed not to read, disclose, distribute or otherwise use this transmission. If you have received this email in error, please notify the sender immediately and delete the transmission. Delivery of this message is not intended to waive any applicable privileges.

**From:** Michael Burke <michael.burke@kmhotels.com>
**Sent:** Wednesday, January 22, 2020 12:12 PM
**To:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>
**Cc:** Mayur Patel <mayur.patel@kmhotels.com>; anil.patel@kmhotels.com; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** FW: [External Sender] FW: LQ Elkview

External

Eric-we are waiting on our lender to respond to the call we had last week.  We have a VM and email into him.  I expect we will hear something in the next day or so.  We are also waiting on the title company for a response on the easements and our attorney is following up with them.  At this point I can't pinpoint a closing date, but I do not see us closing by February 12.  We do have the appraisal and other due diligence, so we should be able to move quickly once these items are addressed.

Thanks
Mike

KM_0000517



**Michael D. Burke**
**Vice President, Finance and Acquisition**
KM Hotels
6627 West Broad Street
Suite 300
Richmond, VA 23230
(O) 804-318-3401
(M) 804-519-9000
Michael.Burke@KMHotels.com


**From:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>
**Sent:** Tuesday, January 21, 2020 10:00 AM
**To:** mayur.patel@kmhotels.com; anil.patel@kmhotels.com
**Cc:** Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** LQ Elkview

Mayur and Anil,
Steven Thomas reached out yesterday to Spencer K. regarding closing the LQ. He wanted to see if your lender is in agreement with the courts decision on easements. I suggested scheduling a closing date of February 12th. Is that a good target?

Eric E. Belfrage, CRE, ISHC, MAI | Senior Vice President
CBRE Hotels | Investment Properties
200 Civic Center Dr. 14th. Floor | Columbus, OH 43215
T 614.430.5048 | C 614.226.9349 | F 614.224.1767
eric.belfrage@cbre.com | www.cbre.com/eric.belfrage


**CBRE Deal Flow:** Register now to receive CBRE exclusive inventory

Please consider the environment before printing this email.

This email may contain information that is confidential or attorney-client privileged and may constitute inside information. The contents of this email are intended only for the recipient(s) listed above. If you are not the intended recipient, you are directed not to read, disclose, distribute or otherwise use this transmission. If you have received this email in error, please notify the sender immediately and delete the transmission. Delivery of this message is not intended to waive any applicable privileges.

4

**From:** Anil Patel [anil.patel@kmhotels.com]
**Sent:** 1/24/2020 10:41:55 AM
**To:** 'Michael Burke' [michael.burke@kmhotels.com]
**Subject:** FW: Closing of Elkview
**Attachments:** image001.jpg

I hope we let this one go.

**Thanks, Anil Patel**



**Anil Patel**
**Vice President Development & Construction**
6627 West Broad Street
Suite 300
Richmond, VA 23230
804-318-3426
336-269-2645 (cell)
804-723-1700 (fax)
Anil.Patel@kmhotels.com

The information transmitted is intended only for the purpose or entity to which it is addressed and may contain confidential and/or privileged material not intended for public use. Any review, retransmission, dessimination or other use of, or taking any action in reliance upon, this information by persons or entities other than the intended recipient is strictly prohibited. If you receive this communication in error, please notify the sender and delete the material from any and all computers or devices.

---

**From:** Spencer Katona <skatona@spottsfain.com>
**Sent:** Thursday, January 23, 2020 8:45 PM
**To:** Mayur Patel <mayur.patel@kmhotels.com>; Anil Patel <anil.patel@kmhotels.com>; michael.burke@kmhotels.com
**Cc:** David DuVal <dduval@spottsfain.com>
**Subject:** FW: Closing of Elkview

S. Spencer Katona
SPOTTS FAIN PC
(804) 697-2032
(804) 697-2132 FAX
SKATONA@SPOTTSFAIN.COM

---

**From:** Brooks, Matthew Ray <Matthew.Brooks@troutman.com>
**Sent:** Thursday, January 23, 2020 5:10 PM

**To:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>; Spencer Katona <skatona@spottsfain.com>
**Cc:** Steven L. Thomas <sthomas@kaycasto.com>; Jonathan Nicol <jnicol@kaycasto.com>; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** [External Sender] RE: Closing of Elkview

Please relay to the lender that Carter Bank has grown very impatient with this underwriting process dragging out.  Taxes continue to accrue and to have this kind of underwriting delay and additional diligence this far into the process is very frustrating.  We all spoke with the lender over a week ago and addressed all of their questions about the shopping center, admin claims, bridge, etc.  We need a thumbs up or done this week so that Carter Bank can decide which direction to move.  Cash collateral use expires on 1/31 and I have not been given any authority to further extend consensual use until we have a response from the lender.

## Matthew Ray Brooks
troutman **sanders**
Direct: 404.885.2618
matthew.brooks@troutman.com

---

**From:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>
**Sent:** Thursday, January 23, 2020 4:45 PM
**To:** Spencer Katona <skatona@spottsfain.com>; Brooks, Matthew Ray <Matthew.Brooks@troutman.com>
**Cc:** Steven L. Thomas <sthomas@kaycasto.com>; Jonathan Nicol <jnicol@kaycasto.com>; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** RE: Closing of Elkview

**EXTERNAL SENDER**

Cool!

Eric E. Belfrage, CRE, ISHC, MAI | Senior Vice President
CBRE Hotels | Investment Properties
200 Civic Center Dr. 14th. Floor | Columbus, OH 43215
T 614.430.5046 | C 614.226.9349 | F 614.224.1767
eric.belfrage@cbre.com | www.cbre.com/eric.belfrage

**CBRE Deal Flow:** Register now to receive CBRE exclusive inventory

Please consider the environment before printing this email.

This email may contain information that is confidential or attorney-client privileged and may constitute inside information. The contents of this email are intended only for the recipient(s) listed above. If you are not the intended recipient, you are directed not to read, disclose, distribute or otherwise use this transmission. If you have received this email in error, please notify the sender immediately and delete the transmission. Delivery of this message is not intended to waive any applicable privileges.

---

**From:** Spencer Katona <skatona@spottsfain.com>
**Sent:** Thursday, January 23, 2020 4:42 PM
**To:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>; Brooks, Matthew Ray <Matthew.Brooks@troutman.com>
**Cc:** Steven L. Thomas <sthomas@kaycasto.com>; Jonathan Nicol <jnicol@kaycasto.com>; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** RE: Closing of Elkview

 External

I just spoke to them again. The lender has said we should have a response tomorrow. I'm not holding my breath but will let everyone on this chain know when we do hear from them.

S. Spencer Katona
SPOTTS FAIN PC
(804) 697-2032
(804) 697-2132 FAX
SKATONA@SPOTTSFAIN.COM

---

**From:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>
**Sent:** Thursday, January 23, 2020 4:35 PM
**To:** Spencer Katona <skatona@spottsfain.com>; Brooks, Matthew Ray <Matthew.Brooks@troutman.com>
**Cc:** Steven L. Thomas <sthomas@kaycasto.com>; Jonathan Nicol <jnicol@kaycasto.com>; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** [External Sender] RE: Closing of Elkview

Thanks Spencer!

Eric E. Belfrage, CRE, ISHC, MAI | Senior Vice President
CBRE Hotels | Investment Properties
200 Civic Center Dr. 14th Floor | Columbus, OH 43215
T 614.430.5048 | C 614.226.9349 | F 614.224.1767
eric.belfrage@cbre.com | www.cbre.com/eric.belfrage

**CBRE Deal Flow: Register now to receive CBRE exclusive inventory**

Please consider the environment before printing this email.

This email may contain information that is confidential or attorney-client privileged and may constitute inside information. The contents of this email are intended only for the recipient(s) listed above. If you are not the intended recipient, you are directed not to read, disclose, distribute or otherwise use this transmission. If you have received this email in error, please notify the sender immediately and delete the transmission. Delivery of this message is not intended to waive any applicable privileges.

---

**From:** Spencer Katona <skatona@spottsfain.com>
**Sent:** Thursday, January 23, 2020 4:31 PM
**To:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>; Brooks, Matthew Ray <Matthew.Brooks@troutman.com>
**Cc:** Steven L. Thomas <sthomas@kaycasto.com>; Jonathan Nicol <jnicol@kaycasto.com>; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** RE: Closing of Elkview

External

I have been told that the lender still has not given the green light, though I do not know specifically what issue(s) remains. The lender contact has been out of the office this week so that is also part of the holdup.

S. Spencer Katona
SPOTTS FAIN PC
(804) 697-2032
(804) 697-2132 FAX
SKATONA@SPOTTSFAIN.COM

**From:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>
**Sent:** Thursday, January 23, 2020 4:28 PM
**To:** Brooks, Matthew Ray <Matthew.Brooks@troutman.com>; Spencer Katona <skatona@spottsfain.com>
**Cc:** Steven L. Thomas <sthomas@kaycasto.com>; Jonathan Nicol <jnicol@kaycasto.com>; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** [External Sender] RE: Closing of Elkview

I've heard nothing from Mayur, I will follow up.

Eric E. Belfrage, CRE, ISHC, MAI | Senior Vice President
CBRE Hotels | Investment Properties
200 Civic Center Dr. 14th Floor | Columbus, OH 43215
T 614.430.5048 | C 614.226.9349 | F 614.224.1767
eric.belfrage@cbre.com | www.cbre.com/eric.belfrage

**CBRE Deal Flow:** Register now to receive CBRE exclusive inventory

Please consider the environment before printing this email.

This email may contain information that is confidential or attorney-client privileged and may constitute inside information. The contents of this email are intended only for the recipient(s) listed above. If you are not the intended recipient, you are directed not to read, disclose, distribute or otherwise use this transmission. If you have received this email in error, please notify the sender immediately and delete the transmission. Delivery of this message is not intended to waive any applicable privileges.

**From:** Brooks, Matthew Ray <Matthew.Brooks@troutman.com>
**Sent:** Thursday, January 23, 2020 4:27 PM
**To:** Spencer Katona <skatona@spottsfain.com>
**Cc:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>; Steven L. Thomas <sthomas@kaycasto.com>; Jonathan Nicol <jnicol@kaycasto.com>; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** Re: Closing of Elkview

External

Any update from the lender?

Sent from my iPhone

**Matthew Ray Brooks**
troutman sanders
Direct: 404.885.2618
matthew.brooks@troutman.com

On Jan 22, 2020, at 9:55 AM, Spencer Katona <skatona@spottsfain.com> wrote:

**EXTERNAL SENDER**

We have not heard anything from the lender. I have spoken to my client and understand that they reached out this morning for an update, with a request for response by the end of the day. When we hear back I will let you know.

S. Spencer Katona
SPOTTS FAIN PC
(804) 697-2032
(804) 697-2132 FAX
SKATONA@SPOTTSFAIN.COM

---

**From:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>
**Sent:** Tuesday, January 21, 2020 4:37 PM
**To:** Brooks, Matthew Ray <Matthew.Brooks@troutman.com>; Steven L. Thomas <sthomas@kaycasto.com>; Spencer Katona <skatona@spottsfain.com>
**Cc:** Jonathan Nicol <jnicol@kaycasto.com>; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** [External Sender] RE: Closing of Elkview

Will do!

Eric E. Belfrage, CRE, ISHC, MAI | Senior Vice President
CBRE Hotels | Investment Properties
200 Civic Center Dr. 14th Floor | Columbus, OH 43215
T 614.430.5048 | C 614.226.9349 | F 614.224.1767
eric.belfrage@cbre.com | www.cbre.com/eric.belfrage

**CBRE Deal Flow: Register now to receive CBRE exclusive inventory**

Please consider the environment before printing this email.

This email may contain information that is confidential or attorney-client privileged and may constitute inside information. The contents of this email are intended only for the recipient(s) listed above. If you are not the intended recipient, you are directed not to read, disclose, distribute or otherwise use this transmission. If you have received this email in error, please notify the sender immediately and delete the transmission. Delivery of this message is not intended to waive any applicable privileges.

---

**From:** Brooks, Matthew Ray <Matthew.Brooks@troutman.com>
**Sent:** Tuesday, January 21, 2020 4:32 PM
**To:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>; Steven L. Thomas <sthomas@kaycasto.com>; Spencer Katona <skatona@spottsfain.com>
**Cc:** Jonathan Nicol <jnicol@kaycasto.com>; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** RE: Closing of Elkview

External

Ok, thanks. Spencer, please let us know if you have separately heard anything from the lender.

**Matthew Ray Brooks**
troutman **sanders**
Direct: 404.885.2618
matthew.brooks@troutman.com

**From:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>
**Sent:** Tuesday, January 21, 2020 3:12 PM
**To:** Brooks, Matthew Ray <Matthew.Brooks@troutman.com>; Steven L. Thomas <sthomas@kaycasto.com>; Spencer Katona <skatona@spottsfain.com>
**Cc:** Jonathan Nicol <jnicol@kaycasto.com>; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** RE: Closing of Elkview

EXTERNAL SENDER

I spoke with Mayur today who is just back from vacation and he indicated he was checking with his lender.

Eric E. Belfrage, CRE, ISHC, MAI | Senior Vice President
CBRE Hotels | Investment Properties
200 Civic Center Dr. 14th. Floor | Columbus, OH 43215
T 614.430.5048 | C 614.226.9349 | F 614.224.1767
eric.belfrage@cbre.com | www.cbre.com/eric.belfrage

**CBRE Deal Flow:** Register now to receive CBRE exclusive inventory

Please consider the environment before printing this email.

This email may contain information that is confidential or attorney-client privileged and may constitute inside information. The contents of this email are intended only for the recipient(s) listed above. If you are not the intended recipient, you are directed not to read, disclose, distribute or otherwise use the transmission. If you have received this email in error, please notify the sender immediately and delete the transmission. Delivery of this message is not intended to waive any applicable privileges.

**From:** Brooks, Matthew Ray <Matthew.Brooks@troutman.com>
**Sent:** Tuesday, January 21, 2020 3:09 PM
**To:** Steven L. Thomas <sthomas@kaycasto.com>; Spencer Katona <skatona@spottsfain.com>
**Cc:** Jonathan Nicol <jnicol@kaycasto.com>; Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>; Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** RE: Closing of Elkview

External

Following up on Steve's email below.  Spencer, have you heard from the lender on whether underwriting has signed off based on the supplemental information from our last group call?  Thanks

**Matthew Ray Brooks**
troutman sanders
Direct: 404.885.2618
matthew.brooks@troutman.com

**From:** Steven L. Thomas <sthomas@kaycasto.com>
**Sent:** Monday, January 20, 2020 8:04 AM
**To:** Spencer Katona <skatona@spottsfain.com>
**Cc:** Brooks, Matthew Ray <Matthew.Brooks@troutman.com>; Jonathan Nicol <jnicol@kaycasto.com>; Eric E. Belfrage (eric.belfrage@cbre.com) <eric.belfrage@cbre.com>; 'michael.shirey@cbre.com' <michael.shirey@cbre.com>
**Subject:** FW: Closing of Elkview

EXTERNAL SENDER

Eric Belfrage sent this email, stating that the buyer is asking about setting a closing date. Have the lender's concerns been fully addressed? If so, is there any reason to not set an earlier closing date?

**Steven L. Thomas**

***Kay Casto & Chaney PLLC***

*A Meritas Firm*

Phone: 304.391.8811 or
          304.345.8900, ext. 111
Fax:    304.345.8909
e-mail: sthomas@kaycasto.com
Cell:   304-549-9870

**Confidentiality Notice:** This e-mail and any attachments are confidential and may be protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender, delete this copy from your system and destroy all printed copies. Thank you for your cooperation.

---

**From:** Belfrage, Eric @ Columbus, OH <Eric.Belfrage@cbre.com>
**Sent:** Saturday, January 18, 2020 5:02 PM
**To:** Steven L. Thomas <sthomas@kaycasto.com>; Brooks, Matthew Ray <matthew.brooks@troutman.com>
**Cc:** Shirey, Michael @ Columbus <Michael.Shirey@cbre.com>
**Subject:** Closing of Elkview

Steven,
Can we schedule a closing for February 12? The buyer would like to get a date on the books!

Get Outlook for iOS

---

This e-mail message (and any attachments) from Troutman Sanders LLP may contain legally privileged and confidential information solely for the use of the intended recipient. If you received this message in error, please delete the message and notify the sender. Any unauthorized reading, distribution, copying, or other use of this message (and attachments) is strictly prohibited.

---

This e-mail message (and any attachments) from Troutman Sanders LLP may contain legally privileged and confidential information solely for the use of the intended recipient. If you received this message in error, please delete the message and notify the sender. Any unauthorized reading, distribution, copying, or other use of this message (and attachments) is strictly prohibited.

---

This e-mail message (and any attachments) from Troutman Sanders LLP may contain legally privileged and confidential information solely for the use of the intended recipient. If you received this message in error, please delete the message and notify the sender. Any unauthorized reading, distribution, copying, or other use of this message (and attachments) is strictly prohibited.

This e-mail message (and any attachments) from ... contains legally privileged and confidential information solely for the use of the intended recipient. If you received this message in error, please delete the message and notify the sender. Any unauthorized reading, distribution, copying, or other use of this message (and attachments) is strictly prohibited.

KM_0000526

| | |
|---|---|
| **From:** | Michael Burke <michael.burke@kmhotels.com> |
| **Sent:** | Tuesday, March 17, 2020 11:49 PM |
| **To:** | Teresa Cooper |
| **Subject:** | FW: Items to Address |

Just thought I should keep you in the loop. Hoping to get Mayur on the phone tomorrow to discuss a lot of issues we have pending. Let me know if you want me to add anything else from your list. Thanks!



**Michael D. Burke**
**Vice President, Finance and Acquisition**
KM Hotels
6627 West Broad Street
Suite 300
Richmond, VA 23230
(O) 804-318-3401
(M) 804-519-9000
Michael.Burke@KMHotels.com

**From:** Michael Burke <michael.burke@kmhotels.com>
**Sent:** Tuesday, March 17, 2020 11:48 PM
**To:** 'Mayur Patel' <mayur.patel@kmhotels.com>; Anil Patel <anil.patel@kmhotels.com>
**Subject:** Items to Address

Sorry for the late email, but I wanted to put a list together of things I think the three of us need to get together and discuss, especially in light of the corona virus issues that are growing. Can we find time tomorrow to all get on the phone and go through these items and anything else that you guys feel is urgent and needs attention? I am pretty open

- Blacksburg-I have all the signatures now I believe and we should be in position to close tomorrow. We need to discuss status of outstanding capital call so we have funds to cover current bills and closing costs
- Bama-we have a payment that was due today to Thomas Builders I believe. Need to make sure we talk to Thomas about our plans to male payment and ensure no lien issues come up
- Glenside RI-need to work on getting in the capital call money we requested 10+/- days ago so we can catch up bills. M&T is continuing to fund draws but expect us to have our money in this month
- Carytown-we have an extension deposit due this Friday.
- Canal-it looks like Richard Souter believes we agreed to continue making bi-monthly additional deposits during the one year extension period. We need to finalize the extension terms and execute as currently we are technically out of the approval period and required to close next month if an extension is not finalized
- Elkview-discuss where we are with closing and if we want to move forward given the current market issues, or talk to Spotts Fain about any opportunity to get back our deposit to keep cash in hand for any other issues we have to address
- Richmond La Quinta-Armi and First Bank are working on term sheets; however we need to think about contingency plans and how we want Rick to move forward with renovation and getting money in from partners to cover bills in short term

1

KM_0000589

- Radford, Ashland, Glenside-all three are scheduled to open in the next 2-3 months.  We need to think about our plans to open them-do we go full speed and hire staff or get them built and ready but hold off on staffing up and opening until we see where things are headed

Sorry for the long list, but I think these are all things that need to be addressed relatively soon.  I am also fielding calls from partners in Alaking/Steeplechase so we need to think about what we are doing on that one.  I believe new were getting some pressure from IHG on Waynesboro HIX as well, although I think they probably will let up given the current environment.

Let's find a time to all get on a call tomorrow and make some game plans.  Thanks guys



**Michael D. Burke**
**Vice President, Finance and Acquisition**
KM Hotels
6627 West Broad Street
Suite 300
Richmond, VA 23230
(O) 804-318-3401
(M) 804-519-9000
Michael.Burke@KMHotels.com

KM_0000590

| | |
|---|---|
| **From:** | Michael Burke <michael.burke@kmhotels.com> |
| **Sent:** | Monday, March 23, 2020 4:38 PM |
| **To:** | Steve Belcher |
| **Cc:** | Mayur Patel |
| **Subject:** | Re: **EXTERNAL**#919 - Elkview Hotel, 101 Crossings Mill Road, Elkview, WV |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Thanks Steve-we are working with our attorneys to figure out how long we can take to close. There are still some title issues that need to be resolved prior to closing by the seller. Until that happens we can hold off closing, however once that's cleaned up we will have to close. Obviously we prefer to wait as long as possible. Once we get some guidance from our attorney I'll let you know



**Michael D. Burke**
**Vice President, Finance and Acquisition**
KM Hotels
6627 West Broad Street
Suite 300
Richmond, VA 23230
(O) 804-318-3401
(M) 804-519-9000
Michael.Burke@KMHotels.com


On Mar 23, 2020, at 3:21 PM, Steve Belcher <belchest@ctbi.com> wrote:


Mike I thought I would go ahead and send you a copy of the appraisal.  Just received today.

Would like to see if you can push back the closing until we are through the COVID-19.

I just spoke to Mayur

we can discuss there is still time to see how this virus is going to impact all of us.

sb


Steve Belcher

Senior Vice President

Commercial Lending

1

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of
the intended recipient(s) and may contain confidential or proprietary information. Any
unauthorized review, use, disclosure or distribution is prohibited. The contents of this e-mail
message and any attachments are confidential and are intended solely for addressee. The
information may also be legally privileged. If you are not the intended recipient, immediately
contact the sender by reply e-mail and destroy all copies of the original message.

---

**From:** Nancy Smith <smithna@ctbi.com>
**Sent:** Monday, March 23, 2020 2:22 PM
**To:** Steve Belcher <belchest@ctbi.com>
**Subject:** Fw: **EXTERNAL**#919 - Elkview Hotel, 101 Crossings Mill Road, Elkview, WV

**\*This appraisal has not been reviewed or approved.**

The Appraisal you ordered has been received and is attached.  The report is subject to
review and approval by the Appraisal Department.  If it is necessary to relay any value in
this report to your customer, it needs to be accompanied by a condition that the value(s)
noted and report are subject to the final review and approval of the Appraisal
Department.  If you identify any report issues please contact the appraisal department; e.g.
the property appraised is incorrect, building and/or lot size is incorrect, income/expense
data is incorrect, etc.

Please provide the date you need the completed review:  Date _____

Thanks,
*Nancy*

---

**From:** Email Moderator <Email.Moderator@ctbi.com>
**Sent:** Monday, March 23, 2020 1:54 PM
**To:** Appraisal Review Team <Appraisal.Review.Team@ctbi.com>
**Subject:** FW: **EXTERNAL**#919 - Elkview Hotel, 101 Crossings Mill Road, Elkview, WV

---

**From:** Greg Barrow
**Sent:** Monday, March 23, 2020 1:53:22 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** Appraisal Review Team
**Cc:** David Pope; Meredith Smith
**Subject:** **EXTERNAL**#919 - Elkview Hotel, 101 Crossings Mill Road, Elkview, WV

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless
you recognize the sender and know the content is safe.

Please find attached the appraisal report and invoice for the La Quinta Inn & Suites hotel in Elkview, WV.
We appreciate the opportunity to be of service.

2

Respectfully,

Hotel and Club Associates, Inc.
3717 West Market Street
Suite D
Greensboro, NC 27410
336-379-1400

---

CONFIDENTIALITY NOTICE: This message contains confidential information and is intended solely for the use of the individual or entity to which it is addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this message by mistake and delete it from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message which arise as a result of e-mail transmission. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

<Appraisal - La Quinta Inn and Suites, Elkview, WV.pdf>
<Invoice - La Quinta, Elkview WV.pdf>

KM_0004598