## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:

**EMERALD GRANDE, LLC**                              Case No. 1:17-bk-00021

          **Debtor.**                              Chapter 11

---

**EMERALD GRANDE, LLC**                              A.P. No.: 1:20-ap-00028

          **Plaintiff**

v.

**KM HOTELS, LLC,**

**And**

**SAFE HARBOR TITLE COMPANY, LLC,**

          **Defendants**

### EMERALD GRANDE, LLC'S STATEMENT OF UNDISPUTED FACTS
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW Emerald Grande, LLC ("**Plaintiff**"), by and through counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure, and submits this Statement of Undisputed Facts in Support of Its Motion for Summary Judgment ("**SOF**").

### Preliminary Statement

Plaintiff is entitled to judgment against KM Hotels, LLC  ("**KM**") for its breach of that certain *Purchase and Sale Agreement*, dated as of August 9, 2019, by and between Plaintiff and KM (as amended, the "**PSA**") in an amount no less than $3,600,000.00; and judgment against Safe Harbor Title Company, LLC ("**Safe Harbor**"; and, collectively with KM, the "**Defendants**"), the escrow agent under the PSA, for its unlawful release of escrowed funds to KM in breach of that certain *Earnest Money Escrow Agreement*, dated as of August 9, 2019 (the

"**Escrow Agreement**") in the amount of $500,000.00. True and correct copies of the PSA and Escrow Agreement are attached to the Motion and incorporated herein by reference as **Ex. A** and **Ex. B**, respectively.

## Procedural History

1.      On January 11, 2017, Plaintiff filed its Voluntary Petition for Non-Individuals Filing for Bankruptcy, which was assigned Case No. 1:17-bk-00021 (the "**EG Bankr.**"). (EG Bankr. Doc. 1.)

2.      On June 25, 2020, Plaintiff filed this adversary proceeding. (Doc. 1.)

3.      On July 27, 2020, Defendant, Mayur Patel ("**Patel**"), filed a Motion to Dismiss the Complaint as to Counts I and III asserting Patel was not a party to any contract with Plaintiff. (Doc. 12.)

4.      On August 13, 2020, Defendant, Safe Harbor, filed a Motion to Dismiss the Complaint as to it asserting the Court lacked jurisdiction over Safe Harbor because Plaintiff misnamed the defendant, and that the Complaint failed to set forth a claim as to Safe Harbor because the Escrow Agreement was not executed by the purchaser under the PSA, KM, or Safe Harbor. (Doc. 20.)

5.       On August 17, 2020, Plaintiff filed its First Amended Complaint to remove Mayur Patel as a defendant and correct the name of Defendant, Safe Harbor Title Company, LLC. (Doc. 25.)[1]

6.      On August 21, 2020, this Court entered its Order denying as moot the Motion to Dismiss filed by Patel, and denying as moot the Motion to Dismiss party filed by Safe Harbor. (Doc. 26.)

---

[1] Hereinafter, "Compl." refers to Doc. 25.

7.     The defendants KM and Safe Harbor each filed an Answer to the Complaint. (Docs. 29 and 30.)

8.     On October 31, 2020, the Court entered its Pre-Trial Order requiring discovery to be completed by February 26, 2021, and setting March 31, 2021 as the deadline to file dispositive motions. (Doc. 37.)

9.     The parties have served discovery requests and responses, and the matter is ripe for summary judgment.

## Statement of Facts

10.     In or about 1988, Covington Place Associates, LLC ("**Covington Place**") constructed a shopping mall (hereinafter referred to as the "**Crossings Mall**") proximate to Exit 9 on Interstate 79 near Elkview, West Virginia, on a parcel of land adjacent to Little Sandy Creek, Elk District, Kanawha County, West Virginia. (Compl. ¶ 11; Plaintiff's Affidavit attached to the Motion as **Ex. P**, ¶ 3.)

11.     Covington Place later conveyed the Crossings Mall to Interstate Properties, LLC ("**Interstate**") by deed dated December 30, 1993 and recorded with the County Clerk of Kanawha County, West Virginia (the "**Clerk**") in Deed Book 2331, Page 294. (Compl. ¶ 12; Ex. P, ¶ 4.)

12.     Thereafter, Interstate conveyed to Plaza Management, LLC ("**Plaza**") a parcel of real property immediately adjacent to the Crossings Mall (hereinafter referred to as the "**Hotel Parcel**") by deed dated September 10, 1999 and recorded with the Clerk in Deed Book 2480, Page 541 (the "**Plaza Deed**").  Attached to the Motion is a copy of the Plaza Deed as **Ex. C**. (Ex. P, ¶ 5.)

- 3 -

13.     The Plaza Deed granted to Plaza a perpetual, mutual, and reciprocal easement through the Crossings Mall parcel for access to, utility installation on, and maintenance for the Hotel Parcel, providing as follows (the "**Hotel Easement**"):

> to the Grantee a perpetual, mutual and reciprocal cross easement and right of way over, across and through the access roads, ways and lanes and the parking areas of the other, for all vehicles and pedestrians as well as for installation and maintenance of utility facilities to the property of the other party.

(Ex. C; Ex. P, ¶ 6.)

14.     After recordation of the Plaza Deed, Plaza constructed a hotel (the "**Hotel**") on the Hotel Parcel.  (Compl. ¶ 17; Ex. P, ¶ 7.)  The Hotel opened in or around October 2000 as a Holiday Inn Express. (*Id*.)

15.     Plaza subsequently conveyed the Hotel Parcel to Emerald Coast Hospitality, LLC ("**Emerald Coast**") by deed dated January 12, 2008 and recorded with the Clerk in Deed Book 2715, Page 156. (Compl. ¶ 18; Ex. P, ¶ 8.)

16.     Ultimately, Plaintiff acquired title to the Hotel Parcel and the improvements thereon (*viz.*, the Hotel) from Emerald Coast by deed dated October 1, 2008 and recorded with the Clerk in Deed Book 2730, Page 152 (the "**EG Deed**").  Attached to the Motion is a copy of the EG Deed as **Ex. D**. (Ex. P, ¶ 9.)

17.     Through different owners and under different franchises, the Hotel has been operated continuously since at least October 2000, and Plaintiff has operated the Hotel as a La Quinta Inn & Suites from 2013 until present. (Compl. ¶¶ 21-22; Ex. P, ¶ 10.)

18.     In 2013, the owners of Interstate formed Tara Retail Group, LLC ("**Tara**") as a "special purpose entity" to undertake a refinancing of the debt on the Crossings Mall with UBS Real Estate Securities, Inc. ("**UBS**"). (Compl. ¶ 23; Ex. P, ¶ 11.)

19.    Interstate thereafter conveyed the Crossings Mall to Tara by deed dated September 10, 2013 and recorded with the Clerk in Deed Book 2861, Page 401 (the "**Tara Deed**").  Attached to the Motion is a copy of the Tara Deed as **Ex. E**. (Ex. P, ¶ 12.)

20.    Contemporaneously with the execution of the Tara Deed, UBS commissioned a survey of the Crossings Mall, dated September 10, 2013 (the "**Tara Survey**").  Attached to the Motion is a copy of the Tara Survey as **Ex. F**. (Ex. P, ¶ 13.)

21.    The Tara Survey showed numerous encroachment issues (the "**Encroachments**") between the Hotel Parcel and the Crossings Mall, including the following:

(a)    A portion of the Hotel structure and a portion of the retaining wall separating the Hotel from the adjoining property of 84 Lumber encroach upon the Crossings Mall parcel;

(b)    The air conditioning units and electrical pad and equipment servicing the Hotel, a garbage enclosure utilized by the Hotel, and mulch beds and landscaping for the Hotel each encroach upon the Crossings Mall parcel;

(c)    Certain parking spaces utilized by the Hotel are located within the Crossings Mall parcel; and

(d)    Hotel employees and invitees access the Hotel Parcel by the road within the Crossings Mall parcel.

(Ex. F.)

22.    Notwithstanding the Encroachments shown on the Tara Survey, UBS agreed to close the debt refinancing transactions, as evidenced by that certain *Promissory Note* dated September 17, 2013 (the "**Note**") and that certain *Loan Agreement* dated September 17, 2013 (the "**Loan Agreement**"; and**,** collectively with the Note, the "**Loan Documents**"). (Compl. ¶

- 5 -

29; EG Bankr. Claim 13, pp. 4-5; Ex. P, ¶ 15: Tara Bankr.[2] Claim 2, pp. 4-5, Ex. A, Loan Agreement, and Ex. B, Note.)

23.     Tara's obligations under the Loan Documents were secured by, among other things, that certain *Deed of Trust and Security Agreement*, dated as of September 17, 2013, and recorded with the Clerk on October 1, 2013 in Deed Book 3989, Page 928 (the "**Tara Trust Deed**"). (Compl. ¶ 30; EG Bankr. Claim 13, p. 5; Ex. P, ¶ 16; Tara Bankr. Claim 2, p. 5, Ex. C, Tara Trust Deed.)

24.     The Loan Agreement provides the following with respect to the boundaries of the Crossings Mall parcel: "No easements or other encumbrances affecting the Property encroach upon any of the Improvements so as to affect the value, marketability, use or operation of the Property except those which are insured against by the Title Insurance Policy, each of which, whether or not insured against by the Title Insurance Policy, is shown on the Survey." (Compl. ¶ 31; Tara Bankr. Claim 2, Ex. A, Loan Agreement at § 3.1.21.)

25.     In December of 2013, UBS transferred and assigned the Loan Documents and Tara Trust Deed to U.S. Bank, National Association, as Trustee, for the benefit of the holders of COMM 2013-CCRE12 Mortgage Trust Commercial Mortgage Pass-Through Certificates ("**US Bank**") pursuant to that certain *Assignment of Deed of Trust and Security Agreement*, dated as of December 10, 2013, and recorded with the Clerk on May 1, 2014 in Deed Book 244, Page 109 (the "**Assignment**").   COMM 2013 CCRE-12 Crossings Mall Road, LLC ("**COMM 2013**") is the current holder of the Note pursuant to an allonge executed by US Bank. (Compl. ¶ 33; EG Bankr. Claim 13, p. 5.; Ex. P, ¶ 17.)

---

[2] Case No. 1:17-bk-00057.

26.     The Hotel and the Crossings Mall are immediately adjacent to one another; however, only the Crossings Mall has direct access to Kanawha County Route 45 via the culvert bridge located in the right of way maintained by the West Virginia Division of Highways and/or the West Virginia Division of Natural Resources (the "**Culvert Bridge**").  (Compl. ¶ 36; Ex. P, ¶ 18.)  Because the Hotel Parcel does not have direct access to the Culvert Bridge, ingress and egress requires travel through and across the Crossings Mall property.  (Compl. ¶ 38; Ex. P, ¶ 18.)   The Culvert Bridge is the only viable commercial access point to the Hotel and the Crossings Mall.  (Compl. ¶ 39; Ex. P, ¶ 18.)  On or about June 23, 2016, floodwaters from thunderstorms in southern West Virginia destroyed the Culvert Bridge.  (Compl. ¶ 40; Ex. P, ¶ 19.)  The destruction of the Culvert Bridge and ensuing lack of public access forced the Hotel and the Crossings Mall to close. (Comp. ¶ 41; Ex. P, ¶ 19.)

27.     As a result of the closures of the Hotel and Crossings Mall, Plaintiff filed its EG Bankr., and Tara filed a voluntary chapter 11 petition in this Court on January 24, 2017, initiating Case No. 1:17-bk-00057 (the "**Tara Bankr.**" or "**TB**"). (Compl. ¶ 42; TB Doc. 1; Ex. P, ¶ 19.)

28.     Commercial access to the Hotel and the Crossings Mall remained unavailable until Tara rebuilt the Culvert Bridge at the end of July 2017.  (TB Docs. 98, 200; Ex. P, ¶ 20.)  Due to the restoration of the Culvert Bridge, both the Hotel and the Crossings Mall have been commercially accessible since approximately August 2017. (Compl. ¶ 43; Ex. P, ¶ 20.)

29.     Subsequent to the reconstruction of the Culvert Bridge, Plaintiff determined that a sale of the Hotel was in the best interests of Plaintiff's creditors and stakeholders in the EG Bankruptcy Case.  (Compl. ¶ 44; Ex. P, ¶ 21.)  Plaintiff therefore engaged a real estate brokerage firm to market the Hotel, after which Plaintiff received a number of offers for the purchase of the

- 7 -

Hotel. (*Id*., ¶ 45; ¶ 21.)   KM was one of the offerors.   After reviewing the offers, Plaintiff concluded that KM's offer to purchase the Hotel was the highest and best offer.   Plaintiff elected to move forward with KM's offer, declining all others. (*Id*., ¶ 46; ¶ 21.)

30.   On or about August 9, 2019, Plaintiff and KM entered into the PSA.   (Ex. P, ¶ 22.)   This Court subsequently approved and authorized the PSA by Order entered September 11, 2019 (the "**Sale Order**"). (EG Bankr. Doc. 712.)

31.   Broadly, the PSA provided for KM's purchase of the Hotel in exchange for a payment of $3,600,000.00, subject to certain adjustments at closing (as defined in the PSA, the "**Purchase Price**").   (Ex. A; Ex. P, ¶ 24.)   The PSA further contained, among other things, an earnest money requirement and certain closing conditions. (Compl. ¶ 48; Ex. P, ¶ 24.)

32.   Within three (3) business days after full execution of the PSA, KM was obligated to deposit $500,000.00 of earnest money (the "**Deposit**") with Safe Harbor, the escrow agent under Section 3.2.1 of the PSA and the Escrow Agreement.   (Compl. ¶ 49; Ex. P, ¶ 25.)   KM delivered the Deposit to Safe Harbor after execution of the PSA.   Safe Harbor accepted and held the Deposit. (*Id*. ¶ 50; Ex. P, ¶ 25.)

33.   Section 3.2.1 of the PSA provided for the application of the Deposit to the Purchase Price at closing and specified that the Deposit was nonrefundable to KM, unless, in relevant part: "(i) the Title Commitment contains a defect, lien, or encumbrance other than the Permitted Exceptions [. . .]; [or] (ii) any survey obtained by [KM] reveals material issues affecting the marketability of the [Hotel] . . . ." (Ex. A, PSA at § 3.2.1.)

34.   Even upon the occurrence of one of the foregoing exceptions, however, the PSA permitted the release of the Deposit to KM only if either: (i) Plaintiff provided written notice to Safe Harbor directing the disbursement of the Deposit to KM; or (ii) KM delivered to Safe

- 8 -

Harbor a written request for the return of the Deposit "subject to the terms of the Earnest Money Escrow Agreement." (Ex. A, PSA at § 3.2.4.)

35.    Under the Escrow Agreement, any release of the Deposit required "written instructions **jointly executed** by the parties to th[e] [Escrow] Agreement." (Ex. B, Escrow Agreement at ¶ 1.a.) (emphasis added).

36.    Separately from the Deposit, KM also had an obligation to close the sale transaction contemplated in the PSA; however, KM's closing obligations were subject to the satisfaction or waiver of certain conditions specified in the PSA. (Compl. ¶ 54; Ex. A.)

37.    Among other things, these closing conditions included: (i) Plaintiff's procurement of an "access easement providing for deeded ingress/egress between a public right of way and the [Hotel], in a form acceptable to [KM] and sufficient to and sufficient to allow the Title Company to issue an ALTA access endorsement in standard form insuring [KM's] access to the [Hotel]," despite the fact that the Plaza Deed already provided deeded ingress/egress between the public right of way and the Hotel, *viz.* the Hotel Easement (¶ 13, *supra*); and (ii) Plaintiff's conveyance of title "free and clear of all liens and other encumbrances other than Permitted Exceptions." (Ex. A, PSA at §§ 5.2.2, 9.1.1(d).)

38.    With respect to "liens, encumbrances or other exceptions to title," the PSA permitted KM to lodge title objections with Plaintiff during the Diligence Period (as defined therein).  After receipt of such title objections, Plaintiff had the opportunity to cure.  (*See,* Ex. A, PSA at § 5.2.1.)

39.    Following execution of the PSA and entry of the Sale Order, KM began its diligence efforts with respect to the Hotel.  (Compl. ¶ 57; Ex. P, ¶ 26.)  In connection therewith, KM delivered to Plaintiff a letter, dated September 20, 2019 (the "**KM Letter**"), setting forth

"Specific Objections" related to title (each, a "**Title Objection**"; collectively, the "**Title Objections**").  Attached to the Motion is a copy of the KM Letter as **Ex. G**. (Ex. P, ¶ 26.)

40.    In the KM Letter, KM represented that the Title Objections were based upon certain requirements and exceptions enumerated in the *ALTA Commitment for Title Insurance* (Commitment No. NCS-975064-CAST) (the "**Title Commitment**") issued by First American Title Insurance Company ("**First American**"). (Ex. G)

41.    These Title Objections included, among other things, (i) an objection and reservation of rights to conduct a property survey and (ii) an objection to the purported lack of deeded access to the Hotel Parcel (the "**Access Objection**"). (Ex. G, at ¶¶ 2.b., i.)

42.    In connection with the Title Objections, KM commissioned a survey of the Hotel Parcel in or around September of 2019 (as later updated, the "**KM Survey**").  Attached to the Motion is a copy of the KM Survey as **Ex. H**. (Ex. P, ¶ 27.)

43.    The KM Survey identified the same set of Encroachments between the Hotel and the Crossings Mall as are shown in the Tara Survey, (¶¶ 20 and 21, *supra*), including the following:

(a)    A portion of the Hotel structure and a portion of the retaining wall separating the Hotel from the adjoining property of 84 Lumber encroach upon the Crossings Mall parcel;

(b)    The air conditioning units and electrical pad and equipment servicing the Hotel, a garbage enclosure utilized by the Hotel, and mulch beds and landscaping for the Hotel each encroach on the Crossings Mall parcel;

(c)    Certain parking spaces utilized by the Hotel are located within the Crossings Mall parcel; and

- 10 -

(d)    Hotel employees and invitees access the Hotel Parcel by the road within the Crossings Mall parcel.

(Ex. F; Ex. H.)

44.    Even so, KM interposed an additional Title Objection related to the Encroachments (the "**Encroachment Objection**") as a result of the KM Survey. (Compl. ¶ 62; Ex. P, ¶ 28.)

45.    Following receipt of KM's Title Objections, Plaintiff responded with a series of emails in September, October, and November of 2019, transmitting various documents and information, that addressed and cured many of the Title Objections.  (Compl. ¶ 63; Ex. P, ¶ 29.) Plaintiff additionally engaged with KM through a number of conversations, during which Plaintiff further addressed and narrowed the outstanding Title Objections.  (*Id*.)

46.    Ultimately, KM agreed that all but two of its Title Objections were resolved:  the Access Objection and the Encroachment Objection. (Compl. ¶ 64; Ex. P, ¶ 30.)

47.    In response to KM's assertion that its Access Objection and Encroachment Objection were unresolved, Plaintiff stated its position as follows:

(a)    *Encroachments*. Each one of the Encroachments was in existence openly and continuously since October 2000, when the Hotel first began operations.  Further, the Tara Survey identified the Encroachments in 2013.  Consequently, the Encroachments are prescriptive in nature under applicable law because COMM 2013 was at least on inquiry notice of their existence prior to the execution and recording of the Loan Documents.

(b)    *Access*.  Contrary to the parties' assumption at the time the PSA was executed, the Plaza Deed does in fact provide an ingress/egress easement – the Hotel Easement – to and for the benefit of the Hotel Parcel.  Thus, Plaintiff and KM were proceeding under a

- 11 -

mutual mistake when including language in Section 5.2.2 of the PSA that "[t]he Parties acknowledge that the [Hotel] does not have deeded access to a public right of way as of the date of this Agreement." (Ex. A; Ex. P, ¶ 31.) Additionally, Hotel employees and invitees traveled through the Crossings Mall parcel to access the Hotel Parcel since at least 2000, which is also shown on the Tara Survey. (Compl. ¶ 65; Ex. A; Ex. F; Ex. P, ¶ 31.)

48.    Plaintiff therefore posited that, to the extent KM was concerned that Tara or COMM 2013 could extinguish the Plaintiff's rights vis-à-vis the Encroachments, Plaintiff held a superior interest in and to the Encroachments via prescription under applicable law. (Compl. ¶ 66; Ex. P, ¶ 32.) Plaintiff further suggested that, given the parties' mutual mistake at the time of executing the PSA, the Hotel Easement set forth in the Plaza Deed provided the requisite deeded ingress/egress to the Hotel Parcel. (*Id*.)

49.    Notwithstanding the Hotel Easement and prescriptive nature of the Encroachments, however, Plaintiff agreed to request that Tara formally grant easements recognizing the Encroachments and confirming the Hotel Easement as a further accommodation to KM. (Compl. ¶ 67; Ex. P, ¶ 33.)

50.    Accordingly, Plaintiff and Tara together determined to seek this Court's approval of a formal recognition of Plaintiff's existing (i) right of access to and across the Crossings Mall parcel via the Hotel Easement and (ii) use of the Encroachments situated on the Crossings Mall property. (Compl. ¶ 68; Ex. P, ¶ 34.)

51.    On October 29, 2019, Tara filed a motion in the Tara Bankruptcy Case (as orally amended during a prehearing conference, "**Tara's Motion**"), seeking approval of, among other things: (i) Tara's grant of an easement to Plaintiff for continued use, maintenance, and replacement (as applicable) of the Encroachments; (ii) Tara's grant to Plaintiff of a confirmatory

- 12 -

easement formally memorializing Plaintiff's continuing right to use the parking spaces situated on Crossings Mall property, all as shown on the Tara Survey; and (iii) Tara's grant to Plaintiff of a confirmatory access easement, from County Route 45 across the Culvert Bridge and through the access road to the Hotel, consistent with the Hotel Easement in the Plaza Deed. (TB Doc. 1272; Compl. ¶ 69; Ex. P, ¶ 35.)

52.     On November 8, 2019, COMM 2013 filed an objection to Tara's Motion (the "**COMM 2013 Objection"**). (TB Doc. 1285.)  COMM 2013 objected on multiple grounds, including the reason that Tara's Motion requested a grant of the proposed easements free and clear of COMM 2013's security interest in and to the Crossings Mall property.  (*Id*.; Compl. ¶ 70; Ex. P, ¶ 36.)

53.     This Court held a hearing on Tara's Motion and the COMM 2013 Objection on November 20, 2019.  (Compl. ¶ 71.)  During the hearing, Tara introduced into evidence, among other things, the Tara Survey.  (*Id*.)  As set forth above, the Tara Survey was commissioned in conjunction with the Loan Documents executed by COMM 2013's predecessor in interest, UBS, in 2013.  (TB Doc. 1295, Hearing Exhibit 1; Compl. ¶ 72.)

54.     After receiving evidence introduced by Tara, proffers of the parties, and arguments by counsel, this Court stated that it was "mystified as to why we are here."  (TB Doc. 1296, Recording of Hearing at 17:40.)  Beginning at the 19-minute mark of the recording, this Court observed that the Hotel's various uses of the Crossings Mall property were in existence and known at the time of the Tara Trust Deed and Assignment.  (*Id*. at 19:00.)  At 32:50 of the recording, this Court stated that it appears "there is an issue of a prescriptive easement." (*Id*. at 32:50.)

55.     On December 18, 2019, this Court entered an order granting Tara's Motion and

overruling the COMM 2013 Objection (the "**Easement Order**").  (TB Doc. 1299; Ex. P, ¶ 37.)

56.     In the Easement Order, this Court made the following observations:

> The court is also satisfied that no adequate protection or
> compensation is due [COMM] 2013 based upon [Tara's] proposed
> easements. As the court notes above, adequate protection is only
> necessary to protect against diminished collateral value from a
> proposed use of estate property under § 363(b) of the Bankruptcy
> Code. **Even without addressing legal issues of prescriptive
> easements and the like,** the court finds that [Tara's] proposed use
> of the easements does not diminish [COMM] 2013's collateral
> interest. In that regard, **the court finds as persuasive the fact that
> [Plaintiff's] purported interest in [Tara's] property preexisted
> that of [COMM] 2013. For instance, [Plaintiff] and its
> employees and invitees used the subject property for years
> without interference before [COMM] 2013 financed [Tara's]
> purchase of its property; and they have continued to use the
> property since then without [COMM] 2013 asserting any right
> in the property used by [Plaintiff]. The court finds that open
> and apparent use important because [COMM] 2013 was, or
> reasonably should have been, aware of [Plaintiff's] use of
> [Tara's] property at the time it took its security interest
> thereupon.** The court, therefore, cannot reasonably finds that
> [COMM] 2013's security interest in [Tara's] property is hampered
> by the proposed easements based upon the historical use of the
> property. As such, no adequate protection is necessary to permit
> [Tara] to use the subject property in furtherance of its settlement
> with [Plaintiff].

(TB Doc. 1299, at 6-7) (emphasis added).

57.     COMM 2013 did not seek an appeal from or move to alter, amend, modify or

vacate the Easement Order. (*See*, TB Bankr.; Compl. ¶ 76.)

58.     Consistent with the Easement Order, Tara granted to Plaintiff that certain

*Confirmatory Easement and Right of Way* (the "**Confirmatory Easement**") and that certain

*Easement and Right of Way* (the "**Encroachment Easement**" and collectively with the

Confirmatory Easement, the "**2020 Easements**") on February 3, 2020.  Attached to the Motion

- 14 -

are copies of the Confirmatory Easement and Encroachment Easement as **Ex. I** and **Ex. J**, respectively.  (Ex. P, ¶ 38.)  The forms of the 2020 Easements were shared with and approved by KM.  (Compl. ¶ 78; Ex. P, ¶ 38.)  The Confirmatory Easement was recorded with the Clerk in Deed Book 3053, Page 813 on February 6, 2020, and the Encroachment Easement was recorded with the Clerk in Deed Book 3053, Page 796 on February 6, 2020.  (Compl. ¶ 79; Ex. P, ¶ 38.)

59.    After entry of the Easement Order, KM served Plaintiff with a conditional notice of termination of the PSA by letter dated January 29, 2020 (the "**Conditional Notice**").  Attached to the Motion is a copy of the Conditional Notice as **Ex. K**.  (Ex. P, ¶ 39.)  In the Conditional Notice, KM threatened to proceed with a termination of the PSA due to "title issues" unless Plaintiff:

> agree[d] to an amendment to the [PSA] (i) extending [KM's] right to terminate with full refund of the Deposit until such time as all title issues have been resolved . . . (ii) granting [KM] the right to terminate with full refund of the Deposit if [KM] cannot obtain a loan commitment due to title issues, and (iii) otherwise in form acceptable to [KM].

(Ex. K, at 1; Ex. P, ¶ 39.)  The Conditional Notice did not detail the allegedly unresolved "title issues."  (Compl. ¶ 83; Ex. P, ¶ 39.)

60.    Plaintiff responded to the Conditional Notice by letter dated February 6, 2020 (the "**First Termination Response**").  Attached to the Motion is a copy of the First Termination Response as **Ex. L**. (Ex. P, ¶ 40.)  As set forth in the First Termination Response, Plaintiff observed that any purported "title issues" had been resolved through the grant and recordation of the 2020 Easements, consistent with the Easement Order.  (Ex. L; Ex. P, ¶ 40.)  Plaintiff further responded that the Easement Order itself made clear that the 2020 Easements were not necessary for Plaintiff to deliver marketable title and otherwise satisfy the conditions to close the

transactions in the PSA.  (*Id*.)  Nevertheless, Plaintiff restated its willingness and commitment to
consummating the PSA.  (*Id*.)  To that end, Plaintiff stated that it would consider an amendment
to the PSA to provide KM a limited extension of time to close the sale transaction, beyond the
then-current scheduled closing date of February 28, 2020.  (*Id*.)

61.     On or about the time of the First Termination Response, however, KM indicated
its proposed lender was unable or unwilling to provide a funding commitment for KM to
consummate the sale transactions under the PSA.  (Compl. ¶ 87; Ex. P, ¶ 41.)  Upon information
and belief, KM used the Conditional Notice to manufacture a controversy over purported "title
issues" to conceal KM's deteriorating financing prospects.  (Compl. ¶ 88; Ex. P, ¶ 41.)  KM
nevertheless assured Plaintiff that KM remained committed to purchasing the Hotel. (Compl. ¶
89; Ex. P, ¶ 41.)

62.     In reliance on the assurances from KM, and in an effort to facilitate a closing,
Plaintiff agreed to extend to April 13, 2020 the scheduled closing date under the PSA by entering
into that *First Amendment to Purchase Agreement*, dated as of February 28, 2020 (the
"**Amendment**").   Attached to the Motion is a copy of the First Amendment to Purchase
Agreement as **Ex. M**. (Ex. P, ¶ 42.)  Subsequent to the Amendment, Plaintiff engaged with KM
to address the purportedly remaining "title issues" referenced in the Conditional Notice.  KM
represented that these "title issues" related to the 2020 Easements.  (Compl. ¶ 92; Ex. P, ¶ 42.)

63.     According to KM, First American (its title insurer) allegedly would only provide
insurance for KM's interest in the 2020 Easements by excluding the Tara Trust Deed, given its
recordation prior to the 2020 Easements.  (Compl. ¶ 93; Ex. P, ¶ 43.)  KM relayed that First
American allegedly was concerned that the 2020 Easements could be extinguished if COMM
2013 foreclosed on the Tara Trust Deed.  (*Id*.)  As a result, KM requested that Plaintiff obtain an

- 16 -

agreement from COMM 2013, whereby COMM 2013 would subordinate to the 2020 Easements its security interest in and to the Crossings Mall parcel evidenced by the Tara Trust Deed. (Compl. ¶ 94; Ex. P, ¶ 43.)  However, COMM 2013 refused to voluntarily subordinate the Tara Trust Deed to the 2020 Easements.  (Compl. ¶ 95; Ex. P, ¶ 43.)

      64.    On April 13, 2020, KM sent a letter of even date to Plaintiff and Safe Harbor, purporting to terminate the PSA for cause (the "**Termination Letter**").  Attached to the Motion is a copy of the Termination Letter as **<u>Ex. N</u>**.  (Ex. P, ¶ 44.)  In the Termination Letter, KM asserted that it was terminating the PSA for two reasons: "[Plaintiff's] failure to (i) promptly cure [KM's] [Title Objections] . . . and (ii) comply with the terms and conditions of Section 5.2.2 of the [PSA] in regard to obtaining the Access Easement in form acceptable to [KM] and sufficient to allow [KM's] title insurer to issue an ALTA access endorsement . . . ."  (Ex. N, at 1.)  KM did not state in the Termination Letter that it was unable to obtain an ALTA access endorsement from "the Title Company" – *i.e.*, Safe Harbor.  (*See*, Ex. N.)  Upon information and belief, KM did not even seek an ALTA access endorsement from Safe Harbor but, instead, manufactured the alleged "title issues" due to its deteriorating financial ability to close the purchase of the Hotel. (Compl. ¶ 102; Ex. P, ¶ 44.)

      65.    The Termination Letter did not specify the Title Objections that Plaintiff allegedly failed to cure.  (Compl. ¶ 105; Ex. P, ¶ 45.)  Upon information and belief, however, the reference in the Termination Letter to uncured Title Objections related solely to First American's alleged, and unfounded, concern that the 2020 Easements could be extinguished if COMM 2013 foreclosed on the Tara Trust Deed.  (*Id*.)

66.     In sum, Plaintiff cured or caused to be cured all Title Objections prior to the date of the Termination Letter.  (Compl. ¶ 108; Ex. P, ¶ 46.)  Plaintiff further provided the requisite deeded ingress/egress access to the Hotel Parcel prior to the date of the Termination Letter.  (*Id*.)

67.     In addition to purportedly terminating the PSA, the Termination Letter instructed Safe Harbor to refund the Deposit to KM.  (Ex. N; Ex. P, ¶ 47.)

68.     Less than 24 hours after receipt of the Termination Letter, Plaintiff responded with a letter dated April 14, 2020 to KM and Safe Harbor (the "**Dispute Notice**").  Attached to the Motion is a copy of the Dispute Notice as **Ex. O**.  (Ex. P, ¶ 48.)  In the Dispute Notice, Plaintiff advised KM and Safe Harbor that Plaintiff contested KM's right to terminate the PSA and/or receive a refund of the Deposit.  (Ex. O; Ex. P, ¶ 48.)

69.     Despite (i) the unilateral instruction in the Termination Notice and (ii) the Dispute Notice contesting the release of the Deposit, Safe Harbor released the Deposit to KM.  (Ex. P, ¶ 49.)  Safe Harbor failed to contact Plaintiff prior to releasing the Deposit.  (Compl. ¶ 111; Ex. P, ¶ 49.)  Thereafter, KM failed and refused to close the sale transactions in the PSA.  (Compl. ¶ 114; Ex. P, ¶ 49.)  KM further failed and refused to turn over the Deposit to Plaintiff.  (Compl. ¶ 115; Ex. P, ¶ 49.).  Indeed, the correspondence between Safe Harbor and KM shows that Safe Harbor knew – at least three days in advance of the official Termination Notice – that KM planned to demand a release of the Deposit.  (Ex. R.)

70.     As a result of the conduct of KM and Safe Harbor, and the breaches of the parties' respective agreements, Plaintiff has suffered and will continue to suffer harm and damages and has incurred fees and costs in this action to which it is entitled to recover.  (Compl. ¶ 116; Ex. P, ¶ 50.)

- 18 -

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:

**EMERALD GRANDE, LLC**                                **Case No. 1:17-bk-00021**

      **Debtor.**                                       **Chapter 11**

_____

**EMERALD GRANDE, LLC**                                **A.P. No.: 1:20-ap-00028**

      **Plaintiff**

**v.**

**KM HOTELS, LLC,**

**And**

**SAFE HARBOR TITLE COMPANY, LLC,**

      **Defendants**

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF EMERALD GRANDE, LLC'S
### <u>MOTION FOR SUMMARY JUDGMENT</u>

Emerald Grande, LLC ("**EG**"), by and through counsel, pursuant to Fed. R. Civ. Proc. 56(b), made applicable by Fed. R. Bankr. Proc. 9014(c) and 7056, hereby submits this Memorandum of Law in Support of Plaintiff Emerald Grande, LLC's Motion for Summary Judgment, filed concurrently herewith (the "**Motion**"). There are no genuine issues of material fact, and Plaintiff is entitled to judgment as a matter of law against KM Hotels, LLC ("**KM**") and Safe Harbor Title Company, LLC ("**Safe Harbor**" and collectively with KM, the "**Defendants**") on all counts of the First Amended Complaint, filed by Plaintiff on August 17, 2020 (the "**Complaint**").

- 19 -

# I.    SUMMARY OF ARGUMENT

On August 9, 2019, Plaintiff entered into that certain *Purchase and Sale Agreement* with KM (as amended, the "**PSA**") for the purchase and sale of EG's La Quinta hotel located in Elkview, West Virginia.  In connection with the contemplated sale, EG, KM and Safe Harbor entered into that certain *Earnest Money Escrow Agreement*, dated as of August 9, 2019 (the "**Escrow Agreement**") with respect to the $500,000 earnest funds deposited by KM pursuant to the PSA.  Subsequently, KM conducted due diligence on the hotel and obtained a survey identifying certain minimal encroachments on an adjacent parcel.  EG resolved the encroachments and confirmed KM's right of public access through two easements granted by the adjacent property owner, an affiliate of EG.  While KM approved the form of easements, the proposed title insurer refused to insure coverage for the easements without a subordination agreement from COMM 2013 – the grantor's secured lender.  The ensuing disagreement over the subordination issue led to the pending litigation.

The material facts of the case are: (1) EG and KM were mutually mistaken when entering into the PSA that the subject real property lacked deeded access to a public right of way;  (2) the deed conveying the subject real property to EG's predecessor expressly provides the grantee with a mutual, reciprocal right of access to a public right of way; (3) under the mistaken belief that the subject property lacked a right of way for public access, the PSA required EG to deliver an access easement in a form acceptable to KM and sufficient to allow the "Title Company" to issue an access endorsement ensuring KM's access to the real property; (4) the PSA defines "Title Company" as "Safe Harbor Title Company"; (5) Safe Harbor is the agent for multiple title companies, including First American Title, Old Republic National Title, Chicago Title Insurance, and Fidelity National Title; (6) at KM's request, EG obtained the requisite access

- 20 -

easement and encroachment easement from the adjacent property owner; (7) the easements were previewed with and approved by KM; (8) the Bankruptcy Court granted the two confirmatory easements and overruled COMM 2013's objection thereto - finding that COMM 2013 had constructive, if not actual, knowledge of KM's right of public access and the encroachments burdening it's collateral; (9) KM or Safe Harbor initially sought a title commitment from First American Title Insurance Company, who refused to ensure KM's right of access without a subordination agreement from COMM 2013; (10) COMM 2013 declined to subordinate it's security interest to the confirmatory easements; (11) KM failed to seek a title commitment from one of Safe Harbor's alternative title insurers.

Defendants have no evidence to dispute these material facts. Instead, KM unilaterally terminated the PSA under the narrow reading that only First American Title Insurance Company could issue a title commitment for the proposed transaction. KM's theory behind the termination is fatally flawed for one simple reason: Safe Harbor acts as the agent for multiple title insurers, any of whom may have insured KM's right of access notwithstanding COMM 2013's lack of subordination agreement. However, KM refused to seek a commitment from any of the alternative insurers under the Safe Harbor umbrella. Its refusal evidences the true intent behind the termination – a desire to back out of the deal in the face of changing market conditions.

KM's document production bears out this truth. First, its own legal counsel disagreed with the subordination position taken by First American – stating that the easements obtained by EG were effectively prescriptive in nature and, therefore, a subordination agreement was unnecessary. Second, KM expressly recognized that it could seek an alternative title commitment from a different insurer but dismissed any suggestion of doing so due to alleged additional costs. Third, in discussions with its lender in the months leading up to the PSA

termination, members of KM expressly stated the view that they wanted to back out of the deal.

Indeed, one member of KM stated, "the longer this drags on the harder it will be to kill the deal

in my opinion." In a subsequent email, the same member of KM states he hopes the lender just

"let[s] this one go."  Less than a month before KM's purported termination, the lender suggested

that KM attempt to push back the closing until COVID-19 had passed.  Similarly, KM's lawyers

suggested they were trying to postpone the deal as long as possible.

Simply put, EG fully performed its obligations under the PSA.  Although it disagreed any

easements were necessary to provide KM with access to a public right of way or address the

encroachments, EG nonetheless sought and obtained confirmatory easements from the

Bankruptcy Court.  KM's efforts, on the other hand, were not focused on faithfully performing

under the PSA.  Rather, the evidence clearly demonstrates it wanted to kill the deal.  With that

motivation, KM refused to look beyond First American for a title commitment consistent with

the PSA.  As a result, its purported termination was a breach of the PSA and, likewise, Safe

Harbor's return of the escrow funds was a breach of the Escrow Agreement.  For these reasons,

and as more fully set forth below, EG's Motion should be granted judgment entered against the

Defendants.

## II.   ARGUMENT AND CITATION TO AUTHORITIES

### SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure, as made applicable to this proceeding by

Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that summary judgment is

appropriate if the movant demonstrates "that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A party

seeking summary judgment must make a *prima facie* case by showing the following: *first,* the

- 22 -

apparent absence of any genuine dispute of material fact; and, *second*, the movant's entitlement

to judgment as a matter of law on the basis of the undisputed facts. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).

The movant "always bears the initial responsibility of informing the [] court of the basis

for its motion, and identifying those portions of the 'pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S.

317, 323 (1986).  To avoid summary judgment, the nonmoving party "must do more than show

that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  The mere existence of any factual dispute will

not automatically necessitate denial of a motion for summary judgment; rather, only factual

disputes that are material preclude entry of summary judgment. *See Shaw v. Stroud,* 13 F.3d

791, 798 (4th Cir.1994).  Material facts are those necessary to establish the elements of the cause

of action. *Anderson*, 477 U.S. at 248.

If no genuine issue of material fact exists, the court has a duty to prevent claims and

defenses not supported in fact from proceeding to trial. *Celotex Corp.*, 477 U.S. at 317, 323–24.

## ARGUMENT

## I.     EG FULLY PERFORMED UNDER THE PSA

### A.     The Easements Were Not Necessary to Convey Marketable Title

EG acquired the 2020 Easements in order to assuage KM's concerns regarding whether

COMM 2013 could extinguish its rights in the Crossings Mall property.[3]  But the 2020

Easements were not necessary because COMM 2013 had at least constructive, if not actual,

---

[3] SOF ¶ 50.

- 23 -

knowledge of EG's rights of public access and the encroachments burdening its collateral.

The prescriptive nature of these easements and encroachments is not a disputable fact, for at least two reasons.  *First,* the easements and encroachments were of record prior to COMM 2013's recording of its trust deed secured by the Crossings Mall property.  The Hotel Easement, which provided ingress/egress to the Hotel parcel, is contained within the Plaza Deed, which was recorded in September 1999.[4]  COMM 2013 did not obtain its security interest in the Crossings Mall property until December 2013.[5]

*Second,* Judge Flatley found that COMM 2013 had, at least, constructive notice of the easements and encroachments.  At the hearing on the Tara Motion, Judge Flatley observed that the Hotel's various uses of the Crossings Mall property were in existence and known at the time of the Tara Trust Deed and Assignment and that these were prescriptive easements.[6]  Subsequently, in the Easement Order, Judge Flatley found that EG's rights in the Crossings Mall property preexisted that of COMM 2013's, and, due to EG's open and continuous use of the Crossings Mall property, COMM 2013 had constructive notice of the easements and encroachments because it "was, or reasonably should have been, aware of [Plaintiff's] use of [Tara's] property at the time it took its security interest thereupon."[7]

Prescriptive easements cannot be extinguished by a party with constructive notice.[8]  Because COMM 2013 had, at a minimum, constructive notice of the easements and encroachments, it could not extinguish those rights.  Consequently, EG was ready, willing, and

---

[4] *Id.* ¶¶ 12-14.
[5] *Id.* ¶ 25.  *Cf. In re Williams,* 213 W.Va. 780, 784 (2003) (constructive notice  is "notice implied or imputed by law, usually on the basis that the information is part of a public record or file, as in the case of notice of documents which have been recorded in the appropriate registry of deeds or probate.") (quotation omitted).
[6] SOF ¶ 54.
[7] *Id*. ¶ 56.
[8] *See Wolfe v. Alpizar,* 219 W. Va. 525, 528 n.5 (2006) (a prescriptive easement cannot be extinguished by a bona fide purchaser with notice - either actual or constructive).

able to provide KM with marketable title to the subject property consistent with its obligations under the PSA.

**B.**    **Even If The 2020 Easements Were Required, EG Obtained Them in Form and Substance as Required Under the PSA**

Even if the 2020 Easements were necessary to convey marketable title, EG obtained them.  The 2020 Easements, which were recorded on February 6, 2020, ***confirmed*** that EG possessed rights in the Crossings Mall property superior to those of COMM 2013.  KM approved the form of the 2020 Easements.[9]  Thus, the (alleged) "title issues" raised by KM were fully resolved and EG fully performed under the PSA.  Moreover, in obtaining the 2020 Easements, EG provided an access easement in a form acceptable to KM, as required by Section 5.2.2 of the PSA.

KM now contends that an acceptable form could only be achieved by way of a subordination agreement.  KM's indications to EG and its conduct throughout the case indicated otherwise.  EG agreed to request that Tara formally grant the easements recognizing the encroachments and confirming the Hotel Easement as an accommodation to KM's Access Objection.[10]  Tara obliged to this request.  Throughout this process, EG provided KM with updates on the drafting of Tara's Motion, the associated easements that Tara requested be granted to EG and related issues.  Critically, KM reviewed and approved the associated documents, including the 2020 Easements.  Indeed, KM's counsel attended the hearing on Tara's Motion and voiced no objection to EG's and Tara's requests for the subject 2020 Easements.[11]

---

[9] SOF ¶ 58.
[10] *Id*. ¶ 49.
[11] (TB, DI 1296, Hearing Exhibit 1).

Upon the Court's approval of Tara's Motion, EG provided KM with copies of the 2020 Easements.[12]  KM approved the 2020 Easements as to form and substance.[13]  At no time during this process did KM indicate to EG that it objected to EG's course of action or the associated documents.

Moreover, KM's contention that it viewed a subordination agreement as the only acceptable form does not comport with its email correspondence with First American.  When First American informed KM that it would not provide the title commitment without a subordination agreement, KM's counsel "pushed back on this" position because its "bankruptcy experts [think] that the easements should be insured without exception for the COMM2013 lien."[14]  This clearly indicates that KM had considered the 2020 Easements as an acceptable form.  Accordingly, the undisputed evidence shows that EG fulfilled its obligations under Section 5.2.2. of the PSA by obtaining the 2020 Easements requested by KM in a form and in substance KM indicated was acceptable.

## II.    KM BREACHED THE PSA

### A.    The PSA Does Not Provide that First American Is the Exclusive Provider of Title Insurance

KM's purported termination of the PSA is premised on the mistaken theory that *only* First American could issue a title commitment for the subject hotel property.  However, Section 5.2.2 of the PSA required KM to seek an ALTA access endorsement from "the Title Company," which was defined to mean "Safe Harbor Title Company, LLC."  Safe Harbor, acting as the insurance agent, does not issue commitments itself.  Rather, Safe Harbor acts as an agent for

---

[12] SOF ¶ 58.
[13] *Id*.
[14] Ex. S at KM_0011757.

- 26 -

multiple title insurers, not solely First American, including Old Republic National Title, Chicago Title Insurance, and Fidelity National Title.[15]

The Defendants initially sought the ALTA access endorsement from First American. When First American refused to issue the request endorsement without a subordination from COMM 2013, KM's own counsel pushed back – arguing that a subordination agreement was unnecessary based on the analysis of its bankruptcy lawyers.  Had KM actually wanted to continue with the deal, it would have naturally directed Safe Harbor, as the insurance agent, to seek an alternative opinion from one of its other title insurers.  Indeed, it was required to do so under Section 5.2.2 of the PSA because First American is not listed as the exclusive provider of title coverage.  KM, however, took no such action.  To the contrary, KM, through its counsel, declined the request of its lender that a new title insurer be considered because "it would save us a substantial amount of money to stick with Safe Harbor/First American."[16]

If KM had desired First American to be the exclusive provider of title insurance, it could have negotiated for such terms to be included in the PSA.  It did not.  Instead, the PSA plainly provides that the ALTA access endorsement is to be issued from Safe Harbor.  Accordingly, First American's refusal to provide a standard ALTA access endorsement required KM to seek a title commitment from any one of Safe Harbor's additional title insurers.[17]  Yet, KM refused to even consider its additional insurer options.  The inability to obtain the ALTA endorsement from First American unquestionably did not provide KM with a termination right under the PSA.  As such, KM's unilateral termination and refusal to proceed to a closing of the transaction was an express breach of the PSA.

---

[15] *See* Exhibit Q.
[16] Ex. T at KM_0007462.
[17] *See* Ex. A, PSA at § 5.2.2.

**B.** **KM Terminated Solely Because of Changing Market Conditions.**

KM's unfounded termination of the PSA was not legitimately based on EG's purported failure to perform or its inability to acquire a title commitment from First American (which, as discussed above, did not constitute grounds for termination). Rather, it was based upon KM's desire to back out of the deal in the face of changing market conditions. KM's document production makes this clear.

As an initial matter, KM's own legal counsel disagreed with First American's position regarding the requested subordination from COMM 2013. Specifically, KM's counsel "pushed back on this" position because its "bankruptcy experts [think] that the easements should be insured without exception for the COMM2013 lien."[18] Had KM actually desired to move forward with the deal, it could have, and indeed should have under the terms of the PSA, sought to obtain an ALTA access endorsement from one of Safe Harbor's alternative title insurers. KM recognized that it could look elsewhere but declined to do so because it wanted to save money.[19] Section 5.2.2 of the PSA, however, does not speak to the financial limitations in connection with obtaining the requisite ALTA endorsement – only that an endorsement be obtained.

In reality, KM simply wanted out of the deal and was looking for any justification, legitimate or not. This is clearly evidenced by KM's document production. Throughout the negotiation process, KM struggled to acquire a lender and, at one point, threatened to terminate the PSA unless EG agreed to an amendment providing KM the right, in part, to terminate "with a full refund of the Deposit" if KM could not obtain a loan commitment."[20] During conversations between members of KM, KM's counsel, and its lender, the desire to delay – or kill – the deal

---

[18] Ex. S at KM_0011757.
[19] Ex. T at KM_0007462.
[20] SOF ¶ 59.

- 28 -

were overtly expressed.

In January of 2020, one member of KM, in response to issues involving KM's lender, stated that "[t]he longer this drags on the harder it will be kill the deal[.]"[21]  In response to this, one of KM's executives agreed and proposed pressuring another member of KM to kill the deal if their current lender fell through.[22]  Shortly thereafter, that same member stated that he "hope[d] [KM] let this one go."[23]

KM's desire to terminate the deal was driven by unfavorable market conditions – not EG's alleged inability to perform under the PSA.  Less than one month prior to KM's wrongful termination, members of KM discussed whether KM wanted to continue with the deal due to "current market issues" or whether it should discuss with its counsel "***any opportunity*** to get [its] [D]eposit back."[24]  Noticeably absent from such discussions is ***any*** mention of purported title issues or First American's refusal to issue a standard access endorsement.  In another instance, KM told its lender that it wanted to "wait as long as possible" but if the (alleged) title issues were resolved "we will have to close."[25]

Simply put, EG fulfilled its obligations under the PSA.  KM, to the contrary, did not.  Rather, KM continually delayed and, when faced with a looming closing, searched for any reason to kill the deal.  Its manufactured termination right ignores the express terms of the PSA and common industry practice when seeking title coverage.  As a result, KM had no right to terminate the PSA and its refusal to close the transaction resulted in a breach thereof.

---

[21] Ex. U at KM_0000515.
[22] *Id*.
[23] Ex. V at KM_0000519.
[24] Ex. W at KM_0000589-0000590 (emphasis added).
[25] Ex. X at KM_0004596.

## III.    SAFE HARBOR BREACHED THE ESCROW AGREEMENT BY RETURNING THE DEPOSIT WITHOUT AUTHORIZATION FOLLOWING KM'S BREACH OF THE PSA

### A.    The Unsigned Escrow Agreement Is Valid and Binding on the Defendants

Elementary principles of contract law provide that a valid contract is formed by offer, acceptance, and consideration.[26]  Acceptance of a putative contract can, but need not be, demonstrated by signatures of the parties thereto.[27]  Indeed, it is "well established" that "an acceptance may be effected [*sic*] by silence accompanied by an act . . . which constitutes . . . performance."[28]  Thus, a putative contract can be accepted by performance alone – particularly when it does not specify the manner of acceptance (*viz.*, it is silent as to whether acceptance may be made by promise or performance).[29]

This is exactly how Safe Harbor accepted, and agreed to be bound by, the Escrow Agreement.  Although Safe Harbor did not execute the Escrow Agreement, Safe Harbor performed under its terms (until breach) by receiving and holding the Deposit from KM.[30]  More compellingly, the Escrow Agreement – which is Safe Harbor's own form – does not condition acceptance or validity upon full execution.[31]  Put differently, "nowhere in the [Escrow Agreement] does it say that the parties intended not to be bound unless the document is fully

---

[26] *McCormick v. Hamilton Bus. Sys., Inc.*, 175 W. Va. 222, 224 (1985) ("The elements of a contract are an offer and an acceptance supported by consideration.").  *See also* Hardwood Grp. v. Larocco, 219 W. Va. 56, 64 (2006) ("'The fundamentals of a legal 'contract' are competent parties, legal subject-matter, valuable consideration, and mutual assent.") (internal citations omitted).

[27] *See, e.g., New v. GameStop, Inc.*, 232 W. Va. 564, 572-73 (2013) (". . . acceptance may be by word, act or conduct that evince the intention of the parties to contract.").

[28] *First Nat'l Bank v. Marietta Mfg. Co.*, 151 W. Va. 636, 641-42 (1967).

[29] *E.g., Smith v. 21st Century Nat. Fuels, Ltd. Liab. Co.*, No. 3:14-12507, 2016 U.S. Dist. LEXIS 50410, at *26 (S.D. W. Va. Apr. 14, 2016) ("Although the purchase agreement called for signatures from Mr. Smith and 21st Century, this on its own is insufficient evidence for the Court to rule as a matter of law that the half-executed purchasing agreement, as an offer from Mr. Smith, invited acceptance by promise and not performance, especially where, as here, the parties acted on the agreement by rendering part performances.").

[30] SOF ¶ 32.

[31] *See generally* Escrow Agreement.

executed."[32]   This, together with Safe Harbor's acceptance by performance (until breach), establishes conclusively that the Escrow Agreement is a valid contract despite Safe Harbor's failure to execute the document.

### B.      The Statute of Frauds Is Inapplicable.

The statute of frauds provides, in relevant part, that "[n]o action shall be brought in" certain cases "[u]nless the offer, promise, contract . . . . be in writing and signed by the party to be charged thereby."[33]   These "cases" include: (i) the extension of credit; (ii) contracts signed by infants; (iii) promises to pay debts on behalf of an estate or for another; (iv) agreements made in consideration of marriage; (v) agreements that cannot be performed within one year; and (vi) offers or agreements from certain financial institutions to make loans over a threshold amount for nonagricultural, business, or commercial purposes.[34]   The purpose of this statute "is to make the establishment of perjured and fraudulent claims difficult by foreclosing enforcement" of the contracts referenced therein.[35]   Thus, "[u]nless a contract is one of those specifically mentioned . . . it is not within the statute and is enforceable in court."[36]

Here, the Escrow Agreement plainly does not fall within the statute of frauds.  Entirely absent from the statute of frauds, in fact, is any mention of escrow agreements or similar contracts.[37]   Nor could an escrow agreement feasibly be construed as a type or subset of any of the agreements delineated in the statute.[38]   It is, therefore, abundantly clear that the Escrow

---

[32] *Smith*, 2016 U.S. Dist. LEXIS 50410, at *2.  *Cf.* Escrow Agreement.
[33] W. Va. Code § 55-1-1
[34] *Id*.  *See also id*. § 36-1-3 ("No contract for the sale of land, or the lease thereof for more than one year, shall be enforceable unless the contract . . . be in writing and signed by the party thereby . . .").
[35] *Yanero v. Thompson*, 176 W. Va. 257, 259 (1986).
[36] *Id*.
[37] *See* W. Va. Code § 55-1-1.
[38] *Cf. id*.

Agreement does not fall "within the statute [of frauds] and is enforceable in court."[39]

But even if the Escrow Agreement fell within the statute of frauds – and it does not – there are at least two reasons that compel enforcement of the Escrow Agreement nonetheless. *First*, Safe Harbor's performance under the Escrow Agreement (until breach) prevents its reliance on the statute of frauds to defeat enforceability of the Escrow Agreement.[40]  *Second*, West Virginia courts have recognized repeatedly that the statute of frauds should not be enforced when the result would be to "shield[], protect[], or aid[] the party who relies upon it in perpetration of a fraud or in the consummation of a fraudulent scheme."[41]  The purpose of the statute, in other words, along with longstanding principles of equity and fairness, proscribes use of the statute of frauds to procure an inherently inequitable result.[42]  Yet that is precisely what would happen here, were Safe Harbor to successfully assert the statute of frauds (the possibility of which EG denies).  Safe Harbor would be permitted to escape the terms of its ***own contract*** – under which it received and held the Deposit – by arguing that its failure to sign renders the Escrow Agreement unenforceable.  This result is as absurd as it is inequitable.  Accordingly, and to the extent the statute of frauds is even remotely relevant, it should not be applied to the Escrow Agreement.

### C.    Safe Harbor's Release of the Deposit Breached the Escrow Agreement.

Pursuant to the PSA and Escrow Agreement, there effectively were two conditions precedent to a release of the Deposit to KM.  As a threshold matter, KM was only entitled to a

---

[39] *Yanero*, 176 W. Va. at 259.
[40] *See, e.g.*, *Chitwood v. Collins*, 122 W. Va. 267, 270 (1940) ("[P]erformance . . . sustain[s] a contract otherwise subject to the statute of frauds.").  *Cf. Frasher v. Frasher*, 162 W. Va. 338, 343 (1978) ("We have followed the general rule that where one party fully performs on an agreement that would otherwise be barred by the Statute of Frauds, he is entitled to sue the other party for performance.").
[41] *Ross v. Midelburg*, 129 W.Va. 851, 861, (1947) (internal citations and quotations omitted).
[42] *Cf. generally Brock & Davis Co. v. Charleston Nat'l Bank*, 443 F. Supp. 1175, 1180 (S.D. W. Va. 1977).

return of the Deposit if it had a valid right to terminate the PSA.[43]   But even then, the Escrow Agreement permitted Safe Harbor to release the Deposit solely "in accordance with the written instructions *jointly executed* by the parties to [the Escrow] Agreement."[44]

Neither of these conditions were fulfilled.   KM did not have a valid reason to terminate the PSA, as set forth above.[45]   Nonetheless, Safe Harbor released the Deposit to KM – and did so following KM's *unilateral* instructions via the Termination Letter, despite the clear and unequivocal language in the Escrow Agreement requiring any instructions be "jointly executed."[46]   Worse, the Defendants' correspondence demonstrates that Safe Harbor knew – up to three days in advance of the Termination Letter – that KM intended to request a return of the Deposit unilaterally, yet Safe Harbor released the Deposit all the same.[47]   This unauthorized release of the Deposit violated the express terms of the Escrow Agreement, resulting in a breach thereunder.   For these reasons, EG is entitled to summary judgment as a matter of law on Count II of the Complaint.

## CONCLUSION

For the reasons set forth above, EG respectfully requests that the Court grant the Motion and enter judgment against the Defendants on Counts I and II of the Complaint and award EG its attorneys' fees and costs incurred in connection with this litigation pursuant to the PSA.

**EMERALD GRANDE, LLC,**

**By Counsel:**

---

[43] *See* SOF ¶ 33.
[44] SOF ¶ 35.   *See also* Escrow Agreement at § 1.a. ("The Escrow Funds [Deposit] shall be paid and delivered in accordance with the written instructions jointly executed by the parties to this Agreement.")
[45] *See supra*, § II.
[46] *See* SOF ¶ 69.
[47] *Id.*

/s/ Steven L. Thomas
Steven L. Thomas (WVSB # 3738)
Victoria L. Wilson (WVSB # 10607)
Kay Casto & Chaney PLLC
P.O. Box 2031
Charleston, West Virginia 25327
Tel:  (304) 345-8900
Fax:  (304) 345-8909
sthomas@kaycasto.com;
vwilson@kaycasto.com
   *Counsel to Tara Retail Group, LLC*